No. 12-1334

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

ELEANOR MCCULLEN, *et al.*,

*Plaintiffs-Appellants*,

*v.*

MARTHA COAKLEY, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Massachusetts, No. 08-cv-10066
Before the Honorable Joseph L. Tauro

## BRIEF FOR PLAINTIFFS-APPELLANTS

EDWARD C. DUMONT
TODD C. ZUBLER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

PHILIP D. MORAN
265 Essex Street, Suite 202
Salem, MA 01970
(978) 745-6085

MARK L. RIENZI
THE CATHOLIC UNIVERSITY OF AMERICA
COLUMBUS SCHOOL OF LAW
3600 John McCormack Road, NE
Washington, DC 20064
(202) 319-5140

MICHAEL J. DEPRIMO
778 Choate Avenue
Hamden, CT 06518
(203) 281-1496

May 21, 2012

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................iv

JURISDICTIONAL STATEMENT .........................................................1

ISSUES PRESENTED............................................................................1

STATEMENT OF THE CASE.................................................................2

STATEMENT OF FACTS ......................................................................3

    A.    Plaintiffs And Their Speech ....................................................3

    B.    The Act ....................................................................................4

    C.    The Attorney General's Interpretation ...................................6

    D.    Procedural History ..................................................................6

        1.    Prior Facial Decisions ..................................................8

            a)    First district court ruling ....................................8

            b)    *McCullen I* ........................................................9

        2.    *In Limine* Rulings On Remand ................................11

        3.    Evidence Relating To As-Applied Time, Place, And Manner Claims.................................................12

            a)    Boston ..............................................................15

            b)    Worcester .........................................................20

            c)    Springfield .......................................................23

            d)    Alternative Means...........................................26

        4.    District Court's Ruling................................................28

SUMMARY OF ARGUMENT ............................................................30

ARGUMENT ...................................................................................32

I.   THE COURT CAN AND SHOULD HOLD THE ACT FACIALLY
     UNCONSTITUTIONAL, DESPITE *MCCULLEN I* ...................................32

     A.   *McCullen I* Cannot Be Squared With Supreme Court
          Precedent ...........................................................33

          1.   Discrimination Among Speakers Is "Prohibited"—
               Not Acceptable If "Reasonably Related" To A
               "Legitimate" Government Interest.............................34

          2.   Far From Saving The Act By Making It Content-
               Neutral, The Attorney General's Purported
               "Interpretation" Is An Admission Of The Act's
               Unconstitutionality Under *United States v. Stevens* ................42

     B.   The Act Fails Strict Scrutiny.................................45

     C.   The Court Should Not Perpetuate A Conflict Between
          This Case And The Ninth Circuit's Decision in *Hoye v.
          City of Oakland* ...................................................46

II.  THE ACT IS UNCONSTITUTIONAL AS APPLIED BECAUSE IT DOES
     NOT PROVIDE AMPLE ALTERNATIVE CHANNELS OF
     COMMUNICATION AT THE CHALLENGED LOCATIONS ....................................49

     A.   Standard Of Review ..........................................49

     B.   Alternative Avenues Of Communication Are Inadequate
          When Speakers Are Unable To Reach Particular Intended
          Audiences .............................................................50

     C.   Alternative Channels Are Inadequate In This Case ............................55

III. THE DISTRICT COURT IMPROPERLY NARROWED THE REQUIRED
     CONSTITUTIONAL ANALYSIS .........................................................58

A.  The District Court Erred By Relieving The State Of Its Burden To Show Neutrality, Narrow Tailoring, And A Significant Government Interest As-Applied At The Challenged Locations ........................................................... 58

B.  The District Court Erred In Entering Judgment On The Pleadings And Denying Leave To Amend ......................................... 60

CONCLUSION ........................................................................................ 63

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page

*281 Care Committee v. Arneson*, 638 F.3d 621 (8th Cir. 2011)...............................34

*AIDS Action Committee v. MBTA*, 42 F.3d 1 (1st Cir. 1994)...................................49

*Arizona v. California*, 460 U.S. 605 (1983)..................................................................33

*Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990).........................35

*Bay Area Peace Navy v. United States*, 914 F.2d 1224 (9th Cir. 1990)......51, 53, 54

*Bl(a)ck Tea Society v. City of Boston*, 378 F.3d 8 (1st Cir. 2004)..........................53

*Board of Trustees v. Fox*, 492 U.S. 469 (1989).......................................................59

*Brown v. Entertainment Merchants Ass'n*, 131 S. Ct. 2729 (2011) .................34, 45

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993)..................................................................................................46

*Citizens United v. FEC*, 130 S. Ct. 876 (2010)................................................. *passim*

*City of Boerne v. Flores*, 521 U.S. 507 (1997).........................................................45

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) .........................................51, 52, 55, 57

*Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984).............41, 59

*Feliciano v. Rhode Island*, 160 F.3d 780 (1st Cir. 1998) ........................................58

*Frisby v. Schultz*, 487 U.S. 474 (1988)..............................................................45, 46

*Globe Newspaper Co. v. Beacon Hill Architectural Commission*, 100 F.3d 175 (1st Cir. 1996)..................................................................................53

*Gresham v. Peterson*, 225 F.3d 899 (7th Cir. 2000)................................................51

*Heffron v. International Society for Krishna Consciousness, Inc.*,
    452 U.S. 640 (1981)......................................................................51

*Hill v. Colorado*, 530 U.S. 703 (2000) ........................................... *passim*

*Hoye v. City of Oakland*, 642 F. Supp. 2d 1029 (N.D. Cal. 2009) .........................47

*Hoye v. City of Oakland*, 653 F.3d 835 (9th Cir. 2011) .................................. *passim*

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
    515 U.S. 557 (1995).....................................................................50

*Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994) ..............................32

*McCullen v. Coakley*, 571 F.3d 167 (1st Cir. 2009), *cert. denied*, 130
    S. Ct. 1881 (2010).................................................................... *passim*

*McCullen v. Coakley*, 573 F. Supp. 2d 382 (D. Mass. 2008) ....................8, 9, 36, 47

*McGuire v. Reilly*, 260 F.3d 36 (1st Cir. 2001) .....................................4, 8, 9, 36, 47

*McGuire v. Reilly*, 386 F.3d 45 (1st Cir. 2004) ....................................................4, 62

*Members of City Council of Los Angeles v. Taxpayers for Vincent*,
    466 U.S. 789 (1984)..................................................................51, 55

*NAACP v. Button*, 317 U.S. 415 (1963)..................................................................61

*Naser Jewelers, Inc. v. City of Concord*, 513 F.3d 27 (1st Cir. 2008) .............34, 58

*New York v. Ferber*, 458 U.S. 747 (1982) .............................................................61

*Phelps-Roper v. Nixon*, 545 F.3d 685 (8th Cir. 2008)............................................55

*Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S.
    833 (1992) ...............................................................................14

*Police Department of Chicago v. Mosley*, 408 U.S. 92 (1972) ........................39, 62

*RAV v. City of St. Paul*, 505 U.S. 377 (1992) ........................................................40

*Reno v. ACLU*, 521 U.S. 844 (1997).....................................................................44

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
    487 U.S. 781 (1988)....................................................................51

*Rosenberger v. Rectors & Visitors of University of Virginia*, 515 U.S.
    819 (1995)...............................................................................39

*Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011) ..................52, 54

*Snyder v. Phelps*, 131 S. Ct. 1207 (2011) ...............................34, 37, 41, 55

*Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653 (2011) ........34, 37, 38, 39, 41

*Stanley v. Georgia*, 394 U.S. 557 (1969).................................................14

*Startzell v. City of Philadelphia*, 533 F.3d 183 (3d Cir. 2008)................53

*Sullivan v. City of Augusta*, 511 F.3d 16 (1st Cir. 2007)...................49, 50

*Thomas v. Collins*, 323 U.S. 516 (1945)..................................................46

*Turchick v. United States*, 561 F.2d 719 (8th Cir. 1977)........................61

*Turner Broadcasting System Inc. v. FCC*, 512 U.S. 622 (1994) ............32

*United States v. Bell*, 988 F.2d 247 (1st Cir. 1993) .................................33

*United States v. O'Brien*, 391 U.S. 367 (1968) .......................................38

*United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803
    (2000)..........................................................................39, 45, 59

*United States v. Stevens*, 130 S. Ct. 1577 (2010) ...........34, 42, 43, 44, 45

*Washington State Grange v. Washington State Republican Party*,
    552 U.S. 442 (2008).....................................................................61

*Weinberg v. City of Chicago*, 310 F.3d 1029 (7th Cir. 2002)...............51, 53, 54, 55

**STATUTES**

8 U.S.C. § 248(a) ......................................................................................5

28 U.S.C.
  § 1291 ...................................................................................................1
  § 1331 ...................................................................................................1
  § 1343 ...................................................................................................1

42 U.S.C. § 1983 ........................................................................................1

Mass. Gen. Laws
  ch. 272, § 53.........................................................................................5
  ch. 266, § 120E.....................................................................................46
  ch. 266, § 120E1/2........................................................................1, 5, 6, 43

## OTHER AUTHORITIES

Fallon, Richard H., *Making Sense of Overbreadth,* 100 Yale L.J. 853
       (1991)...........................................................................................61

Finer, Lawrence, et al., *Reasons U.S. Women Have Abortions:*
       *Quantitative and Qualitative Perspectives*, 37 Perspectives on
       Sexual and Reproductive Health 113 (2005), *available at* http://
       www.guttmacher.org/pubs/journals/3711005.pdf .........................14

## JURISDICTIONAL STATEMENT

This is an action under 42 U.S.C. § 1983 alleging violation of First and Fourteenth Amendment rights.  The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)-(a)(4).  That court entered its final judgment on February 22, 2012.  Addendum 121a.  Notice of appeal was timely filed on March 19, 2012.  Joint Appendix ("App.") 28.  This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

Massachusetts has made it a criminal offense to "enter or remain on a public way or sidewalk" within a "radius of thirty-five feet" of any entrance to an abortion clinic—with exceptions for, among others, clinic employees or agents, those entering or leaving, and passers-by.  Addendum 1a, Mass. Gen. Laws ch. 266, § 120E1/2 (the "Act").  The effect is to prohibit personal, face-to-face speech by one carefully targeted class of speakers:  those who seek to counsel against or offer alternatives to abortion.  The issues presented are:

1.    Whether, in light of recent Supreme Court cases applying the First Amendment, the Act's content- and viewpoint-based prohibition on peaceful speech in public areas by one class of speakers is unconstitutional on its face, despite this Court's previous conclusion, in a prior appeal in this case, that the

- 1 -

Act's provisions were permissible because they are "reasonably related" to "legitimate" government interests.

2.    Whether the Act is constitutional as applied at three specific locations, where the record demonstrates that Plaintiffs lack adequate alternative channels of communication and that the Act has precluded thousands of peaceful conversations.

3.    Whether the district court erred in (a) skipping over two of the three required legal inquiries in rejecting the single as-applied claim it considered, and (b) treating Plaintiffs' other as-applied claims as foreclosed by this Court's prior rejection of Plaintiffs' facial challenge.

## STATEMENT OF THE CASE

In 2007, Massachusetts adopted the current version of its exclusion-zone Act.  Addendum 1a.  The Attorney General then issued an "interpretation" purporting to narrow the Act's statutory exemptions—evidently in an effort to make its prohibitions content-neutral.  *Id.* 3a.  In January 2008, Plaintiffs filed this action challenging the constitutionality of the Act.  App. 31.

In August 2008, the district court ruled that the Act was facially constitutional and denied Plaintiffs' request for injunctive relief on that ground.  Addendum 6a-49a.  This Court affirmed that denial and remanded for

consideration of Plaintiffs' as-applied claims (*id.* 50a-67a), and the Supreme Court declined to review the case at that interlocutory stage, 130 S. Ct 1881 (2010).

On remand, in December 2010, the district court allowed joinder of new as-applied Plaintiffs, but denied leave to amend Plaintiffs' complaint to challenge the constitutionality of the Attorney General's purported enforcement policy. Addendum 86a-87a. The district court also (1) refused to reconsider the Act's facial validity in light of intervening Supreme Court precedent; (2) rejected all but one of Plaintiffs' as-applied claims on the pleadings; and (3) ruled that resolution of Plaintiffs' remaining as-applied challenge would be based solely on whether the Act left Plaintiffs with adequate alternative means of speaking at each of three challenged locations (without requiring the State to prove that the Act is content-neutral and narrowly tailored to serve a significant government interest). Addendum 68a-90a. On February 22, 2012, the district court held the Act constitutional as applied at each location. *Id.* 91a-119a. This appeal follows.

## STATEMENT OF FACTS

### A.    Plaintiffs And Their Speech

Plaintiffs are seven individual Massachusetts residents who engage in peaceful speech outside abortion clinics in the State. App. 210-11, 236-37, 244-45, 261-62, 266, 308-10, 319. They believe many women choose abortion because they are pressured by boyfriends or parents, or because they believe they are alone,

- 3 -

unloved, and without other choices.  App. 210-11, 266, 308-10.  Accordingly, Plaintiffs seek to offer women love, support, and information about alternatives to abortion, as well as assistance in carrying their babies to term.  *Id.* 212, 238, 246, 266-67, 309, 321.

Plaintiffs do not wish to shout, to scream their message through a loudspeaker, or to chase after women to offer this support.  App. 217, 238, 249, 267, 311, 324.  Nor are they accused of blocking access, harassing anyone, or engaging in violence or disruption of any kind.  *Id.* 217, 242, 250, 265, 308, 324.  They wish to engage in peaceful, consensual, civil speech on public sidewalks.

## B.    The Act

In 2000, Massachusetts enacted a statute (narrower than the current Act) that prohibited only close, physical approaches within six feet of unwilling listeners outside abortion clinics.  Modeled in part on a law sustained in *Hill v. Colorado*, 530 U.S. 703 (2000), the 2000 statute was defended by the State and sustained by this Court as a prophylactic measure restricting only conduct (the non-consensual approaches) and designed to address "violence and aggressive behavior" outside clinics.  *McGuire v. Reilly*, 260 F.3d 36, 39 (1st Cir. 2001) ("*McGuire I*"); *see also, e.g.*, *id*. at 49; *McGuire v. Reilly*, 386 F.3d 45, 65-66 (1st Cir. 2004) ("*McGuire II*").

- 4 -

Between 2000 and 2007, there were no proven violations of the 2000 no-approach law.  And the legislature heard no evidence of even a single prosecution in Massachusetts under any of the many other federal, state, or local laws that prohibit obstructive, intimidating, or violent conduct, at abortion clinics or elsewhere.[1]  Nevertheless, in 2007, the State enacted the much more sweeping law at issue in this case.

The 2007 Act, reprinted at Addendum 1a, provides in pertinent part:

> (b)     No person shall knowingly enter or remain on a public way or sidewalk adjacent to a reproductive health care facility within a radius of thirty-five feet of any portion of an entrance to, exit from, or driveway of a reproductive health care facility, or within the area within a rectangle created by extending the outside boundaries of any entrance to, exit from, or driveway of, a reproductive health care facility in straight lines to the point where such lines intersect the sideline of the street in front of such entrance, exit or driveway. This subsection shall not apply to the following:
>
> (1)  persons entering or leaving such facility;
>
> (2)  employees or agents of such facility acting within the scope of their employment;
>
> (3)  law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment;

---

[1]     *See, e.g.*, 8 U.S.C. § 248(a) (prohibiting injuring, intimidating, or interfering with anyone seeking reproductive health services); Mass. Gen. Laws ch. 266, § 120E1/2(e) (forbidding obstructing, detaining, hindering, impeding or blocking another person's entry to or exit from an abortion clinic); Mass. Gen. Laws ch. 272, § 53 (breach of the peace and disorderly conduct).

(4) persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility.

Mass. Gen. Laws ch. 266, § 120E1/2(b). A "reproductive health care facility" is defined as "a place, other than within or upon the grounds of a hospital, where abortions are offered or performed." *Id.* § 120E1/2(a). Violation of the Act carries fines of up to $5,000 and prison sentences of up to two and one-half years. *Id.*

By prohibiting entry, the Act makes it illegal for speakers to engage in peaceful speech, distribute leaflets, display signs, or engage (or even offer to engage) in consensual conversations within the forbidden zone. On the other hand, the Act's exemptions allow various potential speakers free use of the zone for any purpose, including speech. This includes both mere passers-by and those whose speech might be expected to support the use of a clinic's services (*i.e.*, anyone entering or leaving the clinic, and clinic employees or agents acting within the scope of their employment). In practical effect, the only persons meaningfully excluded from entry are those who wish to speak in the zones to offer information about alternatives to abortion.

## C.    The Attorney General's Interpretation

Two months after adoption of the Act, the Attorney General issued a purported "interpretation" of the statutory exemptions. Addendum 3a. Although the exemptions are absolute on their face, the Attorney General asserted that the

- 6 -

exemption for clinic agents or employees "allows clinic personnel to assist in protecting patients and ensuring their safe access to clinics*, but does not allow them to express their views about abortion or to engage in any other partisan speech* within the buffer zone." *Id*. 4a (emphasis supplied).  Similarly, the Attorney General asserted that the exemption "for persons using the sidewalk or street adjacent to the clinic to reach a destination other than the clinic" did not apply to passers-by who "do anything else within the buffer zone (such as *expressing their views about abortion* or engaging in other partisan speech)."  *Id*. 5a (emphasis supplied).  Thus, as construed by the Attorney General—citing no textual or other authority—the statutory exemptions may not apply as written, depending on the content of an exempted party's in-zone speech.

### D.    Procedural History

In 2008, Plaintiffs filed this suit challenging the Act on various First and Fourteenth Amendment grounds, both on its face and as applied to Plaintiffs' activities outside particular abortion clinics in Massachusetts.  Both the trial court's first ruling (Addendum 6a-49a) and this Court's first decision (*id.* 50a-67a) addressed only the facial aspect of Plaintiffs' challenges.  On remand, the district court addressed the claims as applied.  *Id.* 68a-121a.  This sequence of rulings is described below.

### 1. Prior Facial Decisions

#### a) First district-court ruling

In August 2008, the district court held the Act facially valid as a permissible restriction on the time, place, and manner of speech. Addendum 6a, 39a; *McCullen v. Coakley*, 573 F. Supp. 2d 382, 415 (D. Mass. 2008). The court emphasized that it was applying only the standard for facial challenges, which was more rigorous than the standard that would apply to an as-applied challenge. *See, e.g.*, 573 F. Supp. 2d at 401 n.118 ("[A] party who mounts a facial challenge to a statute must carry a significantly heavier burden than one who seeks merely to sidetrack a particular application of the law." (quoting *McGuire I*, 260 F.3d at 46-47)); *id*. at 386-87, 401, 407, 408, 413.

With that qualification, the district court sustained the Act's restriction of speech only outside abortion clinics on the theory that "the legislature was making every effort to restrict as little speech as possible while combating the deleterious secondary effects of anti-abortion protests." 573 F. Supp. 2d at 404-05. It also sustained the exemption for clinic speakers, reasoning that the legislature "likely concluded" that "clinic employees are less likely to engage in directing unwanted speech toward captive listeners." *Id*. at 407 (quoting *McGuire I*, 260 F.3d at 46). In the court's view, such a speaker distinction was facially valid so long as there was "at least one legitimate reason for including" it in the Act, and one such reason

would be "in order to make crystal clear ... that those who work to secure peaceful access to RHCFs need not fear prosecution." *Id.* (citing *McGuire I*, 260 F.3d at 47).

The district court also relied upon and endorsed the Attorney General's "enforcement position," concluding that her interpretation of the Act "expressly and unequivocally prohibits any advocacy by employees and agents of the RHCF's in the buffer zone." 573 F. Supp. 2d at 407; *see also id.* at 422-23 (relying on interpretation in holding Act not vague). It noted that, under the Attorney General's interpretation, even simply walking through the zone to get to the other side—an activity expressly permitted on the face of the statute—is "specifically prohibited" for walkers wearing "shirts with abortion-related or partisan messages." *Id.* at 423.

### b)    *McCullen I*

In July 2009, this Court affirmed. Addendum 50a, 67a; *McCullen v. Coakley*, 571 F.3d 167, 184 (1st Cir. 2009) ("*McCullen I*"). The panel began by dismissing arguments based on the Act's exclusive focus on abortion clinics. 571 F.3d at 177. Recognizing that the legislature "was plainly moved to enact the statute by the secondary effects of anti-abortion protests," *id*. at 181, the Court nonetheless concluded that any disparate impact on abortion speech did not result from "a content-based preference." *Id*. at 177. The panel was likewise untroubled

- 9 -

by the Act's exemption permitting clinic employees or agents free use of the sidewalks, reasoning that "[t]he decisive question in a facial challenge is not whether a regulation is necessary to achieve the legislature's stated goal, but, rather, whether a court can glean legitimate reasons for its existence." *Id*. In the panel's view, the Act's distinctions among speakers were facially permissible because they were "reasonably related" to a "legitimate" government public safety objective. *Id*. at 178.

*McCullen I* also concluded that, for purposes of a facial challenge, the Act was narrowly tailored and left open ample alternative channels of communication. 571 F.3d at 178-82. The panel rejected Plaintiffs' arguments that the 2007 Act unjustifiably outlaws peaceful leafletting on public sidewalks and goes far beyond the "conversational distance" no-approach restrictions sustained in *Hill v. Colorado*, 530 U.S. at 726-28. *See* 571 F.3d at 180. It reasoned that "the Constitution neither recognizes nor gives special protection to any particular conversational distance" and that "handbilling is not specially protected." *Id*. As to alternative channels of communication, the panel asserted that as long as it could "envision circumstances in which a 35-foot buffer zone allows adequate alternative means of expression, the [facial] challenge must fail." *Id*. And as to overbreadth, the panel found the Act's change from prohibiting close physical approaches toward unwilling listeners to selectively banning certain speakers from coming

- 10 -

near a clinic entrance at all to be "not a matter of constitutional significance." *Id.*

at 181.

*McCullen I* concluded by emphasizing that it addressed only the facial

aspects of Plaintiffs' claims:

> We add a caveat. This decision flows naturally from the very heavy
> burden that plaintiffs must carry in mounting a facial challenge to a
> state statute. Nothing that we have said forecloses the possibility that,
> on a better-developed record, this legislative solution may prove
> problematic in particular applications.

571 F.3d at 184.

### 2.    *In Limine* Rulings On Remand

On remand, the district court promptly held that virtually all of Plaintiffs' as-

applied claims were precluded by the facial rulings in *McCullen I.* Addendum

68a-88a. In particular, Plaintiffs could not argue that the law was substantially

overbroad as applied at particular locations, "because this court and the First

Circuit have already held the Act facially constitutional." *Id*. 82a. Likewise,

Plaintiffs were barred from claiming that the Act, as enforced at any particular

location, was an impermissible prior restraint, constrained their liberty without due

process, or violated the Free Exercise Clause. *Id*. 82a-86a.

The court also held that because Plaintiffs "have conceded that the Act

applies to them," they could not argue it was vague as applied to others.

Addendum 85a. It did not address Plaintiffs' claim that the Act is vague as applied

to their own activities.  *See id.*; *see also* App. 19-20, 24-25.  In addition, the court

held that Plaintiffs had not pled sufficient facts to state a viewpoint discrimination

or Equal Protection claim, because they had not alleged police complicity in the

speech of statutorily-favored speakers from the clinic.  Addendum 83a.  Finally,

the court denied Plaintiffs leave to amend their complaint to allege that the

Attorney General's interpretation of the Act rendered it unconstitutional as applied.

*Id*. 87a.

The court did allow Plaintiffs to argue that the Act was not a valid time,

place, and manner regulation as applied at the clinics in Boston, Worcester, and

Springfield, and permitted additional plaintiffs to be added for those locations.  *Id*.

Without explanation, however, the court "clarified" Plaintiffs' claim, declaring that

"all that remains to be tried is whether the statute as applied at the clinics specified

in the complaint leaves open adequate alternative channels of communication."  *Id*.

86a.  It did not explain why Defendants would not first be required to show that the

exclusion zones at those locations were, as applied by Defendants, "justified

without reference to the content of speech" and "narrowly tailored to serve a

significant governmental interest."  *McCullen I*, 571 F.3d at 175.

### 3.    Evidence Relating To As-Applied Time, Place, and Manner Claims

The district court received written testimony and factual submissions in a

form agreed by the parties and then heard argument on the lone remaining aspect

of Plaintiffs' case: whether Defendants could show that the Act, as applied at three locations, left open ample alternative channels of communication.

Plaintiffs testified that they seek to engage in close, kind, personal communication, with a calm voice, caring demeanor, and eye contact. App. 213, 238, 246, 267, 309, 324; *see also id.* at 224-35, 251-60, 298-01, 351-64. They testified that this kind of communication is essential to their ability to effectively convey their message of love and support. *Id*. 217, 241, 246, 267, 309-11, 324. And they testified, without rebuttal, that application of the Act to their activities at each location virtually destroys their ability to effectively communicate their message to the very particular audience they need to reach—pregnant women on the verge of a potentially unnecessary abortion. *Id*. 212-17, 239-43, 245-50, 263, 267-74, 310-15, 319-24, 480-508, 511-43.

Undisputed evidence—including testimony from a State witness—showed that women often have abortions because of financial or other pressures, including pressure from husbands or partners. *See, e.g.*, App. 487a (some women seeking abortion suffer from economic hardship, and some are pressured by boyfriends or husbands). Indeed, most women that Plaintiff McCullen succeeds in speaking with tell her they do not want an abortion but feel they have no viable alternative. App. 213. Academic studies, including studies by the Alan Guttmacher Institute, confirm that women often seek abortions because they feel they cannot afford a

baby, are having relationship problems, or are being pressured to have an abortion.
*See, e.g.*, Finer et al., *Reasons U.S. Women Have Abortions: Quantitative and Qualitative Perspectives*, 37 Perspectives on Sexual and Reproductive Health 113 (2005) (reasons given for abortion: "Can't afford a baby now" [73%]; "Not sure about relationship" [19%]; "Husband or partner wants me to have an abortion" [14%]).[2]

In these circumstances, a woman seeking an abortion may well welcome speech that includes, for example, an offer of not just moral support but concrete financial or other assistance, such as the offers that Plaintiff McCullen makes in Boston. App. 212.[3] A personal, face-to-face conversation with an "outsider" will often be the only effective means of getting through the message that such

---

[2]     Available at http://www.guttmacher.org/pubs/journals/3711005.pdf. Women approaching abortion clinics, of course, have a First Amendment right to receive information. *See Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas."). The Supreme Court has noted that providing information about alternatives "ensures an informed choice" and helps "reduce[] the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed." *See, e.g.*, *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 882-83 (1992).

[3]     McCullen is 74-year-old grandmother who generally offers help outside of Boston Planned Parenthood on Tuesdays and Wednesdays. App. 211-12. Over the 5 years before her testimony, McCullen and her husband spent over $50,000 of their own money to pay for baby showers, living quarters, furniture, household items, heating oil, electricity, water, telephone, gasoline, clothing, food, baby formula, diapers, strollers, or whatever else was needed by a woman who chose to give birth. *Id.* 212.

alternative help is available.  McCullen testified that it is, as a practical matter, impossible to make women aware of the financial help she can provide without close personal contact and an opportunity for confidential discussion.  *Id.*  As one of the State's witnesses testified at her deposition, in all of her investigations at Planned Parenthood, she observed only one person respond to attempts at communication—a young woman with whom the pro-life counselors spoke at close range and were able to make eye contact.  *Id*. 522.  When the only available communication was a pro-life sign, people just "walked on by."  *Id*.

By keeping Plaintiffs at least 35 feet from any door or vehicle entry point to an abortion clinic, the Act prevents Plaintiffs from engaging in effective communication by identifying and offering to speak with women heading there.  It also forces any conversation to stop at the boundary line of the buffer zone.  In sharp contrast, of course, clinic employees and agents are free to enter, remain, approach, and counsel as they choose.

### a)    Boston

The exclusion zone in Boston surrounds an abortion clinic located at 1055 Commonwealth Avenue, at the corner of Commonwealth and Alcorn Street.  App. 544.  The clinic is pictured below:

- 15 -



App. 218; *see also id.* 219-23.

An arc painted on the ground marks the contours of the exclusion zone on Commonwealth Avenue, surrounding the clinic's front door.[4]  The following photograph from the record provides an overhead view of the front-door zone:

---

[4]     The parties entered into detailed stipulations concerning the physical layout, number of marked zones, and other aspects of each location.  *See* App. 544-53.



Case 1:08-cv-10066-JLT   Document 138-11   Filed 08/09/11   Page 1 of 1

App. 540.

At the top, the arc encompasses all but one foot of the public sidewalk, and to the right, the arc extends 4 feet into the street, making it impossible for plaintiffs to stand at that edge of the arc (as shown in the picture below). *Id*. 545. Instead, they must stand even farther away, across the street—even while clinic employees, shown below within the zone wearing blue vests, can remain in the zone and approach and speak with anyone entering it.



App. 223.

Plaintiff McCullen testified that the Act inhibits her ability to communicate in several ways. First and most obviously, she is forced to refrain from speaking in the zone for fear of imprisonment. App. 213. If left free to speak where she wants on the public sidewalks, she would choose to stand in the zone, where it would be much easier to identify and ask to speak with incoming clinic patrons. *Id.* 213-15.

Second, although McCullen attempts to speak with women outside the zone, the Act frequently makes such discussions impossible. App. 214-17. When standing outside the zone, it is difficult to determine if someone walking into the

zone is heading for the clinic or just passing by. Further, there are times when McCullen sees a woman approaching the clinic from the side of the zone opposite where McCullen is standing. *Id*. 214. Often she cannot get around the zone in time to try to begin a conversation with an approaching person, or to place literature near the person's hands before the person enters the zone. *Id*.

When McCullen is actually able to able to reach her intended audience, her outreach is remarkably effective. She estimates, for example, that the information and offers of assistance she has managed to provide even under the 2007 Act's restrictions have led some 80 women to pursue an alternative to abortion. App. 384. The Act's new exclusion zones have, however, drastically reduced her ability to communicate her life-saving message. She testified that application of the Act in Boston has prevented her from speaking at all with at least 5-6 people per day of outreach activity, or 480-586 per year. *Id*. 216. At that rate, since the Act took effect McCullen has been prevented from speaking with between 2,160-2,637 people. Even when she is able to make an initial contact, McCullen testified that the Act's restrictions change the nature of her conversations, making them shorter and less effective because she is forced to speak hurriedly, sometimes speak louder, and stop walking at the painted exclusion line. *Id*. 214, 216.

For similar reasons, Plaintiff Zarrella—an 85-year-old grandmother who counsels Saturdays and some Wednesdays—likewise testified that the Act has so

dramatically reduced her ability to effectively convey her message that she has not had a single successful interaction with an incoming woman since the Act took effect—after more than 100 successful interactions prior to the Act.  App. 244-250.[5]

Plaintiffs also testified that employees and agents of the abortion clinic regularly use their statutory exemption to interfere with Plaintiffs' attempts to communicate.  For example, clinic speakers surround, cluster, walk with, yell, make noise, chatter and/or talk loudly as they usher people into the clinic doors, saying things like, "you don't have to listen to her," or "don't pay any attention to her," or "don't listen to her," or "she is crazy."  *Id*. 241-42, 247-48, 263-64.  Clinic speakers also raise and lower their arms to prevent Plaintiffs from placing literature near the hand of recipients.  *Id*. 241.  These actions make it more difficult for Plaintiffs to communicate their messages.  *Id*. 241-42, 248, 264.

### b)    Worcester

Two exclusion zones surround an abortion clinic located at 470 Pleasant Street, in Worcester.  App. 546.  The Worcester clinic is located in a stand-alone building, with the entrance set back from the public sidewalk behind two fences,

---

[5]    Plaintiffs Cadin and Smith likewise seek to engage in First Amendment activity at the Boston Planned Parenthood.  Plaintiff Cadin seeks to engage patrons and particularly their young male companions in conversation, which the Act makes much more difficult.  App. 238-42.  Plaintiff Smith simply prays the rosary so that clinic patrons and employees can hear his prayer.  *Id*. 262-64.  The Act forces him to stand further back from his usual, pre-Act position.  *Id*. 263.

and under a building overhang.  *Id*.  The driveway entrance is located around the corner on Dewey Street.  *Id*. 267-68, 546.  The door to the clinic is located more than 300 feet from the driveway entrance.  *Id*. 272.

The zones in both locations extend far into the street and beyond.  *Id*. 278-87, 316, 546.  One of the zones outlaws speech around the concrete walkway on Pleasant Street, even though Defendants' witness acknowledged it is neither intended for vehicle access nor used for patient access.  *Id*. 486-87, 502.

The following photograph from the record shows one zone at the Worcester clinic:



App. 316; *see also id.* 275-97, 302-07, 317.

Plaintiffs Clark and Bashour testified that, when applied in the context of the Worcester clinic, the Act forces them to stand behind a fence at least 75-100 feet

away from the clinic doorway entrance. App. 270-72, 311-12. Not surprisingly, when they are forced to try to shout offers of help over such distances, virtually no one ever responds. *Id*. 270, 312.

Likewise, the Act makes it impossible for Plaintiffs Clark and Bashour to offer literature to the approximately 95% of clinic patrons who arrive by car. *Id*. 273, 312-13. But for the Act, Plaintiffs Clark and Bashour would be able to offer this literature to patrons arriving by car as they enter the driveway across the public sidewalk. *Id*. 273-74, 314. Because of the Act, they are forced to stand further away, where they are unable to effectively proffer literature to incoming cars. *Id*. 273-74, 312-13.

At no stage of the litigation have Defendants offered any evidence to carry their burden of demonstrating a significant governmental interest in enforcing exclusion zones in the particular context of the Worcester clinic—in particular the zone on Pleasant Street because the entrance to the clinic is already set back from the public way by more than fifty feet. *Id*. 486-87, 502, 546. Nor has the State offered any evidence of a single incident of violence, harassment, intimidation, or any other unlawful interference with access to any abortion clinic in Worcester. Nor have Defendants offered any evidence that they ever had occasion to enforce any of the pre-existing laws protecting clinics or their patrons from inappropriate conduct. *See supra* n.1.

- 22 -

**c)** **Springfield**

Five (5) separate exclusion zones surround an abortion clinic that is part of a medical complex at 3550 Main Street, Springfield, Massachusetts.  App. 547-48. Because the clinic is set back on private property, these speech-free portions of public sidewalk are all hundreds of feet from the clinic doors.  *Id*. 547.  Further, all extend into the road, several of them over double yellow lines on busy streets.  *Id*. 547-48.

The following photographs show the five zones at the Springfield clinic:







App. 533, 534, 345; *see also id.* 326-50.

Plaintiff Dr. Cyril Shea, a retired orthopedic surgeon and Navy veteran of World War II and Korea, testified that the zones make it virtually impossible for him to successfully offer literature to the 90% of clinic patrons who arrive by car. App. 318, 323. Prior to the Act, Dr. Shea would stand a few feet from the driveway and offer his literature. *Id*. 323. Since the Act took effect, he has not been able to distribute *even a single piece of literature* to any patron arriving by car. *Id*. Prior to enactment of the Act, Dr. Shea often observed pro-life individuals hand out literature to occupants of vehicles entering the driveway. *Id*. Since enactment, he has not observed *even a single instance* where literature was distributed to occupants inside vehicles. *Id*.

At no stage of the litigation have Defendants offered any evidence to carry their burden of demonstrating a significant governmental interest in enforcing exclusion zones in the particular context of the Springfield clinic, which is already set back from the public way by more than 200 feet. *Id*. 547. Nor have the Defendants offered any evidence of a single incident of violence, harassment, intimidation, or any other unlawful interference with access to any abortion clinic in Springfield, or any evidence that they ever had occasion to enforce any of the pre-existing laws protecting clinic patrons from any inappropriate conduct.

### d)    Alternative Means

The Plaintiffs who seek to engage incoming patrons in conversation testified that in order to be effective, their messages must be conveyed in a friendly, gentle voice, with eye contact, and from a conversational distance.  App. 213-14, 238, 240, 246, 248, 247, 270-71, 309-10, 313, 324.  It is their experience "that eye contact and a smile are very important to put people at ease."  *Id*. 213, 267; *see also id.* 246, 309.  Likewise, most passers-by will not make the effort to accept proffered literature unless it is placed near their hands.  *Id*. 214, 239-40, 246, 272-73, 313.  Plaintiffs either do not shout at all or do so only when absolutely necessary, because each believes that shouting is counter-productive.  *Id*. 213, 238, 249, 267, 311, 324.

Testimony from the State's only two witnesses confirms that (a) close, personal communication is the only effective way to communicate with women entering abortion clinics, (b) signs and shouting are ineffective, and (c) a listener can read a person's kindness and sincerity from a close personal approach in a way that is not possible with a sign or a shout.  Thus, Attorney General's Office Investigator Kristin Metzger testified that she spent nearly nine hours observing speech activities around the three clinics at issue with the Act's exclusion zones in effect.  App. 519.  Metzger saw speakers try to express a pro-life message through signs, prayers, shouting, and distributing literature, but she never saw a *single*

*person* actually respond under those circumstances. *Id*. 522. The one and only successful communication Ms. Metzger observed occurred instead when a speaker was able to engage in personal communication from a conversational distance of a few feet away. *Id*. 512, 522. This is not surprising, as Ms. Metzger also confirmed that when people simply hold signs, she could not tell whether they were nice, gentle, loving, or hateful. *Id*. 519. She herself would be more likely to be persuaded by, or accept literature from, a smiling person a few feet away than someone yelling from a distance of 35 feet. *Id*. 520.

Defendants' other witness, Planned Parenthood's security chief Michael Baniukiewicz, similarly agreed that face-to-face conversation is always the best way to communicate with willing listeners. *Id*. 489. He conducts his own important discussions at close range (*id*. 491-92), and he "absolutely" can judge sincerity by looking at a person's face, eyes, and mannerisms (*id*. 492). Mr. Baniukiewicz has seen literature successfully handed out at close range, but has never seen someone walk across an exclusion zone to get literature offered from a distance. *Id*. 500-01.[6]

Neither Mr. Baniukewicz nor Ms. Metzger offered any evidence that even a single actual person had *ever* responded to shouts, signs, or offers of literature at a

---

[6]     Mr. Baniukewicz also acknowledged that agents of abortion clinics are instructed to force incoming women to discard any such literature before entering the clinic. App. 489.

distance at the abortion clinics in Boston, Worcester, or Springfield.  Mr.

Baniukewicz further conceded that, because of the distance between the public

sidewalk and the entrance to the Springfield clinic, the only opportunity for pro-life

communication is at the driveway on Wason Avenue.  *Id*. 500.

### 4.     District Court's Ruling

On February 22, 2012, the district court held that the Act, as applied,

provides ample alternative channels for communication at each of the three clinic

locations.

The court began by noting that Plaintiffs remained free to engage in speech

outside the zones.  Addendum 98a.  It reasoned that it did not need to consider,

even for the as-applied analysis, the impact of physical details of the particular

locations at issue.  Rather, such "other barriers to communication not attributable

to the state," are "irrelevant to the First Amendment analysis."  *Id*. 96a; *see also id.*

113a (concluding that physical layout issues, such as the presence of fences and the

location of parking lots, is not part of the constitutional analysis of whether

remaining alternatives are adequate).

The court acknowledged that "it is beyond doubt that" the Act imposes "'a

degree of curtailment'" on Plaintiffs' speech activities.  *Id*. 106a.  For each

location, however, the court found that Plaintiffs "can be seen and heard" by

people approaching the clinic (*id*. 107a, 112a-113a, 117a), and that Plaintiffs "may

engage in any form of communicative activity they desire anywhere else on the public sidewalk" (*id.* 119a).

The court attributed Plaintiffs' failure to engage more women in conversation to the fact that it believed women were unreceptive to Plaintiffs' message. Relying on *Hill*, the court cited "the unwilling listener's interest in avoiding unwanted communication" and explained that the fact that "more people don't accept Plaintiffs' offers is not an indication that adequate alternative means of communication do not exist, but rather shows that many members of Plaintiffs' audience are simply unreceptive to Plaintiffs' message." Addendum 107a. Thus, "[w]hile most women may choose to ignore" Plaintiffs' speech, that is because they "do not want to engage with Plaintiffs" and "is not because the Commonwealth has failed to leave open adequate alternative means of communication." *Id.* 113a.

On these grounds, the district court concluded that Plaintiffs still had ample opportunities to convey their messages.

## SUMMARY OF ARGUMENT

Plaintiffs are seven Massachusetts citizens who believe women often have abortions because they lack resources, experience pressure from boyfriends or parents, or feel they have no other choice.  Accordingly, Plaintiffs seek to offer information about and assistance in pursuing abortion alternatives.  Plaintiffs make these offers on public streets and sidewalks near abortion clinics and seek to do so like civilized adults:  in a calm, friendly tone, without shouting, and from a normal conversational distance.

Massachusetts, however, has created exclusion zones on its public streets and sidewalks near abortion clinics.  Within the zones, it is illegal to engage in these peaceful conversations, even with a willing listener.  The zones are otherwise open to the public—anyone may walk right through.  But they are closed to Plaintiffs' peaceful speech.

The Act is tied directly and solely to the issue of abortion.  It applies only when and where abortions are offered, and the Attorney General's announced enforcement policy even purports to create special rules for talking about abortion.  Yet the Act does not apply to all speakers about abortion.  Rather, virtually everyone else who might be talking near an abortion clinic—passers-by, patrons, and clinic employees—is statutorily exempt from the Act.  As a result, the law

- 30 -

carefully targets one and only one group of speakers at abortion clinics: those who

offer information about and assistance pursuing alternatives to abortion.

The First Amendment does not permit this type of content-based, viewpoint-

based, and speaker-based regulation of speech. Recent Supreme Court precedent is

crystal clear: restrictions "distinguishing among different speakers, allowing

speech by some but not others" are "prohibited." *Citizens United v. FEC*, 130 S.

Ct. 876, 898-99 (2010). The Act is thus facially unconstitutional, and this Court

should revisit its prior panel decision in *McCullen I*.

Even if *McCullen I* had not been superseded by Supreme Court precedent,

the Act is unconstitutional as applied at each of the three challenged locations:

Boston, Worcester, and Springfield. The undisputed evidence on remand shows

that the Act dramatically limits Plaintiffs' ability to reach their intended audience,

thwarting literally thousands of conversations. And the undisputed evidence shows

that the alternatives—shouting from a distance, holding a sign far away, or running

around the zone to start a conversation before the listener gets into the zone—are

ineffective. Accordingly, the Act does not allow ample alternative avenues of

speech, and therefore is invalid.

The trial court also erred by improperly restricting the analysis of Plaintiffs'

time, place, and manner claim, and in granting judgment on the pleadings on the

remainder of Plaintiffs' as-applied claims. The Court should invalidate the Act

now; but if it does not, it should remand to allow Plaintiffs to pursue their full

range of as-applied claims.

## ARGUMENT

## I.    THE COURT CAN AND SHOULD HOLD THE ACT FACIALLY UNCONSTITUTIONAL, DESPITE *MCCULLEN I*

The Act is invalid on its face because it is a content-based, viewpoint-based,

and speaker-based restriction of peaceful speech with willing listeners on public

streets and sidewalks.

The Act is undisputedly targeted at "anti-abortion protests."  *McCullen v.*

*Coakley*, 571 F.3d 167, 181 (1st Cir. 2009) ("*McCullen I*").  Further, unlike the

buffer zones upheld in prior Supreme Court cases, the Act is not limited to close

approaches to unwilling listeners, *compare Hill v. Colorado*, 530 U.S. 703, 726-28

(2000); is not an injunction limited to prior bad actors, *compare Madsen v.*

*Women's Health Center*, *Inc.*, 512 U.S. 753 (1994); and is targeted at speech

outside facilities that offer one controversial service:  abortion, *compare Hill*, 530

U.S. at 731 (applying reduced scrutiny "precisely because" law applied at *all*

healthcare facilities).  Indeed, according to Defendants, even if Plaintiffs walk

through the zone as passers-by, they are criminally prohibited from "expressing

their views about abortion."  Addendum 5a.  This makes the law a classic content-

based speech restriction.  *See Turner Broad. Sys. Inc. v. FCC*, 512 U.S. 622, 643

(1994) ("As a general rule, laws that by their terms distinguish favored speech

from disfavored speech on the basis of the ideas or views expressed are content based.").

Worse, the law is gerrymandered so that virtually all speech *except* pro-life speech is permitted. The law expressly exempts clinic "employees and agents," allowing them to enter and remain in the zone and have conversations that pro-life speakers would be jailed for having. Indeed, the zones remain open for ordinary travel—passers-by can walk right through. And clinic patrons are free to enter and say whatever they choose. As a practical matter, the law restricts one and only one group of speakers on public sidewalks near abortion clinics: those who wish to offer alternatives to abortion.

The Supreme Court, however, has now made unmistakably clear that "restrictions distinguishing among different speakers, allowing speech by some but not others" are categorically "prohibited." *Citizens United v. FEC*, 130 S. Ct. 876, 898-99 (2010).

## A.    *McCullen I* Cannot Be Squared With Supreme Court Precedent

A prior panel decision in the same matter is generally followed as law of the case. That rule yields, however, in the face of an intervening change or clarification of the law by the Supreme Court or where the prior error works a serious injustice. *See United States v. Bell*, 988 F.2d 247, 251 (1st Cir. 1993); *see also Arizona v. California*, 460 U.S. 605, 618 (1983) (law-of-the-case doctrine

- 33 -

"directs a court's discretion, it does not limit the tribunal's power."). *McCullen I* cannot be squared with subsequent Supreme Court precedent that is binding on this Court, and thereby creates a serious injustice for Plaintiffs and the women to whom they wish to offer help.[7]

In particular, since 2009, the Supreme Court has decided five major First Amendment cases, each underscoring the centrality and scope of the First Amendment's protection of free speech. *See Citizens United*, 130 S. Ct. 876; *United States v. Stevens*, 130 S. Ct. 1577 (2010); *Snyder v. Phelps*, 131 S. Ct. 1207 (2011); *Sorrell v. IMS Health, Inc.,* 131 S. Ct. 2653 (2011)*; Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729 (2011). As the Eighth Circuit recently observed, in light of this imposing array of recent decisions, "the breadth of protection afforded to political speech under the First Amendment is difficult to overstate." *281 Care Comm. v. Arneson*, 638 F.3d 621, 636 (8th Cir. 2011).

### 1. Discrimination Among Speakers Is "Prohibited"—Not Acceptable If "Reasonably Related" To A "Legitimate" Government Interest

*McCullen I* reasoned that a law may discriminate among speakers in the public forum if the differential treatment is "reasonably related" to a "legitimate" public safety interest. 571 F.3d at 178. That conclusion, seemingly voiced in the language of "rational basis" scrutiny under the Equal Protection Clause, is

---

[7]    The district court's decision to adhere to *McCullen I* was a decision of law and is therefore reviewed *de novo. Naser Jewelers, Inc. v. City of Concord*, 513 F.3d 27, 31 (1st Cir. 2008).

incompatible with the sort of stringent and non-deferential analysis of government action that the Supreme Court has demanded under the First Amendment.

In *Citizens United*, for example, the Supreme Court considered a challenge to a federal campaign statute that banned corporations and unions from making any "broadcast, cable, or satellite communication" referring to candidates for office within specified periods before an election, while imposing no such restrictions on individual speakers.  130 S. Ct. at 887.  The Court was asked to reconsider its prior holding in *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990), which had permitted limitations on political speech "based on the speaker's corporate [or union] identity."  *Citizens United*, 130 S. Ct. at 886.

The Supreme Court firmly rejected any such distinction based on the identity of a speaker:

> Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints.  *Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others.*  As instruments to censor, these categories are interrelated:  *Speech restrictions based on the identity of the speaker are all too often simply a means to control content.*
>
> Quite apart from the purpose or effect of regulating content, moreover, the Government may commit a constitutional wrong when by law it identifies certain preferred speakers.  By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice.  The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration. …  *We find no basis for the proposition that, in the context of political speech, the Government may impose*

- 35 -

*restrictions on certain disfavored speakers.*

*Citizens United*, 130 S. Ct. at 898-99 (emphasis supplied) (internal citations omitted).  Based on this rejection of speaker-based distinctions, the Supreme Court concluded that "*Austin* was not well-reasoned" and expressly overruled it. 130 U.S. at 912-13.

The Supreme Court's discussion is directly pertinent here.  *Citizens United* explains that speaker distinctions are "all too often simply a means to control content."  130 S. Ct. at 899.  Both this Court and the district court have previously indicated that the distinction drawn by Massachusetts between speakers such as Plaintiffs (who may not enter or speak in an abortion clinic exclusion zone) and clinic "employees and agents" (who may) is permissible in order to make "crystal clear … that those who work to secure peaceful access to RHCFs need not fear prosecution," and because the state legislature "likely concluded" that "clinic employees are less likely to engage in directing unwanted speech toward captive listeners."  *McCullen*, 573 F. Supp. 2d at 407 (quoting *McGuire I*, 260 F.3d at 46). As *Citizens United* teaches, however, such speaker distinctions are "prohibited," precisely because the government is *not permitted* to favor speakers who, for example, offer access to abortion clinics over those who, like Plaintiffs, offer access to alternatives.  Any such decision by the government impermissibly strips the disfavored speaker of her "right to use speech to strive to establish worth,

standing, and respect for the speaker's voice," and the intended audience of its

"right and privilege to determine for itself what speech and speakers are worthy of

consideration." 130 S. Ct. at 899.[8]

The Supreme Court's later decisions in *Snyder* and *Sorrell* likewise confirm

that the First Amendment tolerates no discrimination among speakers. In *Snyder*,

the Court held that speakers from the Westboro Baptist Church who held up signs

near a military funeral stating "Thank God for Dead Soldiers," "God Hates the

USA," "God Hates Fags," and "God Hates You"—speech far more aggressive and

distressing than any proffered by Plaintiffs here—were protected even from civil

tort liability, let alone from criminal sanctions. *See* 131 S. Ct. at 1219-20. In

particular, the Court rejected the speaker-based distinction that was implicit in

allowing tort recovery against Westboro: the Court found it significant that a

"group of parishioners standing at the very spot where Westboro stood, holding

signs that said 'God Bless America' and 'God Loves You,' would not have been

subject to liability." *Id.* at 1218-19. *Snyder* also relied on the special protection

---

[8]     *Citizens United*'s prohibition on speaker distinctions is consistent with the
Supreme Court's analysis of a no-unconsented-approach law in *Hill v. Colorado*.
The law sustained in *Hill*, unlike the 2007 Massachusetts Act, (1) applied only to
unwanted speech (as determined by the listener, not the government), 530 U.S. at
716, 718, and (2) applied equally to all speakers, including those who supported
abortion, *id.* at 719, 725. The Court emphasized the law's equal application to all
speakers, "whether they oppose or support the woman who has made an abortion
decision. *That is the level of neutrality that the Constitution demands*." *Id.* at 725
(emphasis supplied).

accorded to speech that occurs on public streets and sidewalks:

> Westboro conducted its picketing peacefully on matters of public concern at a public place adjacent to a public street.  Such space occupies a "special position in terms of First Amendment protection."  "[W]e have repeatedly referred to public streets as the archetype of a traditional public forum," noting that "'[t]ime out of mind' public streets and sidewalks have been used for public assembly and debate."

*Id*. at 1218 (citations omitted).  That analysis once again applies directly to the speech on public sidewalks at issue in this case.

In *Sorrell*, the Court struck down a Vermont regulation on the sale, disclosure, and use of certain pharmacy records because it concluded that the regulation imposed "content- and speaker-based restrictions."  131 S. Ct. at 2663.  Vermont had attempted to prohibit the distribution of records to parties known as "detailers," who would use the information for marketing speech, while allowing distribution to those who proposed to engage in "educational communications."  *Id.* at 2663-2664.  The Court concluded that the law "on its face burden[ed] disfavored speech by disfavored speakers."  *Id.*  That conclusion was bolstered by the fact that the law had "the effect of preventing detailers—and only detailers" from engaging in the relevant speech.  *Id.*

The *Sorrell* Court also explained that the "*inevitable effect of a statute on its face* may render it unconstitutional."  131 S. Ct. at 2663 (emphasis added) (quoting *United States v. O'Brien*, 391 U.S. 367, 384 (1968)).  And it emphasized that Vermont's discriminatory law could not be saved because it merely burdened

plaintiff's speech, rather than banning it.  The "distinction between laws burdening and laws banning speech is but a matter of degree," and the "Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans."  *Id.* at 2664 (citing *United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 812 (2000)).

Here, as in *Sorrell*, Defendants have created a law that has the "inevitable effect" of targeting speech by disfavored speakers.  131 S. Ct. at 2663.  The Act creates a speech gerrymander that subjects pro-life speakers to criminal sanctions for entering a substantial portion of the public sidewalk outside abortion clinics, while permitting free passage to clinic speakers and mere passers-by.  It is difficult to think of a more precise way of targeting pro-life, and only pro-life, speech.

As the Supreme Court's decisions make clear, this is simply impermissible. It should be axiomatic that the First Amendment "means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).  Thus, the "government may *not* grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views."  *Id.* at 96 (emphasis supplied).  Further, the viewpoint discrimination at issue here is "an egregious form of content discrimination" and a "blatant" First Amendment violation.  *Rosenberger v. Rectors & Visitors of Univ.*

*of Va.*, 515 U.S. 819, 829 (1995).  The government "has no … authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules."  *RAV v. City of St. Paul*, 505 U.S. 377, 392 (1992).  Yet, that is exactly what Massachusetts has done here—as vividly demonstrated by this picture of the Boston clinic:



App. 223.

Abortion clinic agents—here with blue vests—may stand safely within the State's exclusion zone, free to approach and counsel people entering the clinic. Those who seek to offer and counsel alternative courses of action are forced to stay

outside the zone—often unable, as a practical matter, to identify persons who are headed toward the clinic in time to engage them in conversation, and criminally prohibited from beginning or carrying on any such conversation within the marked zone. It could not be clearer that "[t]he State has burdened [one] form of protected expression" while, "[a]t the same time, [it] has left unburdened those speakers whose messages are in accord with its own views. This the State cannot do." *Sorrell*, 131 S. Ct. at 2672.

The district court sought to distinguish *Citizens United* from this case on the ground that it addressed "an absolute ban on speech rather than a time, place or manner restriction." Addendum 73a. That distinction is untenable, however, because the threshold requirement for any valid "time, place, and manner" restriction is that it be content-neutral. *See, e.g.*, *Snyder*, 131 S. Ct. at 1211-12; *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984). The Act at issue here discriminates on its face in favor of those whose function is to offer access to abortion-clinic services, and against anyone who seeks to provide information or counseling about alternatives to abortion. As the Supreme Court explained in *Sorrell*, the "Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." 131 S. Ct. at 2664.

Indeed, the dissent in *Citizens United* argued in part that restricting certain types of communications by corporations and unions before elections was merely a

time, place, and manner regulation.  *See* 130 S. Ct. at 944-45 (Stevens, J.,

dissenting).  The Court rejected that characterization precisely because the law

distinguished among speakers.  *See id.* at 898 ("If § 441b applied to individuals, no

one would believe that it is merely a time, place, or manner restriction on speech.

Its purpose and effect are to silence entities whose voices the Government deems

to be suspect.").

In short, the Supreme Court's decisions since *McCullen I* unequivocally

confirm that the First Amendment prohibits the government from discriminating

among speakers and make clear that the Act at issue here is unconstitutional on its

face.  With respect, this Court should recognize that *McCullen I* is now untenable

and invalidate the Act.

> **2.     Far From Saving The Act By Making It Content-Neutral, The Attorney General's Purported "Interpretation" Is An Admission Of The Act's Unconstitutionality Under *United States v. Stevens***

That conclusion is reinforced as well by the Supreme Court's 2010 decision

in *United States v. Stevens*.  Among other things, *Stevens* makes clear that the

government may not save a criminal statute by purporting to construe it in a way

that has no basis in the text.

In *Stevens*, a federal statute prohibited the creation, sale, or possession of

portrayals of animal cruelty.  130 S. Ct. at 1583.  In response to a First Amendment

challenge, the Solicitor General argued that federal prosecutors would construe and

- 42 -

apply the statute narrowly "to reach only 'extreme' cruelty." *Id.* at 1591. The Supreme Court found this argument, which had no basis in the statutory text, "pertinent only as an implicit acknowledgment of the potential constitutional problems with a more natural reading." *Id.*

The Supreme Court also held that an otherwise unconstitutional law many not be upheld based on government promises about how it will be enforced. The "First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige.* We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *Id.*

The same reasoning applies squarely here. The Act on its face exempts certain categories of persons from its criminal prohibitions, including "employees or agents of [an abortion clinic] acting within the scope of their employment." Addendum 1a, § 120E1/2(b)(2). Clearly recognizing the facial unconstitutionality of that distinction among potential speakers, the Attorney General promptly issued a purported "interpretation," in the form of a "guidance" letter sent to state enforcement officials. Addendum 3a. With no support in the text of the Act and citing no other authority, the letter simply asserts that the Act "does not allow [employees or agents of a clinic] to express their views about abortion or to engage in any other partisan speech" while within the Act's exclusion zone. *Id*. 4a. The letter likewise purports to extend the Act's criminal prohibitions to mere passers-

- 43 -

by, who supposedly could be imprisoned for "expressing their views about abortion or engaging in other partisan speech" on a public sidewalk while walking past the entrance to an abortion clinic.  *Id.* 5a.

The Attorney General's "interpretation" should be treated as what it is—a deliberate but baseless attempt to "rewrite a … law to conform it to constitutional requirements."  *Stevens*, 130 S. Ct. at 1592 (quoting *Reno v. ACLU*, 521 U.S. 844, 884-85 (1997)).  That is exactly what the Supreme Court refused to allow the federal government to do in *Stevens*.  *Id*.  The Attorney General cannot fix the 2007 Act by instructing the police or prosecutors—let alone state courts—to apply a "construction" of the Act that is flatly contradicted by its text.

Indeed, unlike the *narrowing* interpretations offered in *Stevens*, which one could at least imagine prosecutors abiding by on their own through the exercise of charging discretion, the Attorney General's interpretations here purport to *broaden* the scope of a criminal statute.  That a prosecutor plainly cannot do.  If the State sought to prosecute an abortion clinic employee or agent for speaking on behalf of the clinic while within an exclusion zone, the charge would have to be dismissed as a matter of law by reason of the unambiguous statutory exemption.  No executive enforcement policy can cure the constitutional flaw in a facially discriminatory prohibition on speech by purporting to *extend* criminal liability to speech or conduct that the legislature has clearly defined as not a crime.  Rather, any effort to

- 44 -

adopt and rely on any such policy can only serve, as in *Stevens*, to demonstrate how obvious it is that the prohibition *as enacted* is unconstitutional on its face.

### B.     The Act Fails Strict Scrutiny

Where, as here, a statute is content- and viewpoint-based, it is subject to strict scrutiny and presumptively unconstitutional.  The government's burden to "demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).  As the Supreme Court explained last term in *Brown v. Entertainment Merchants Ass'n*, the government can survive strict scrutiny only if it can "identify an 'actual problem' in need of solving" and prove that the restriction on free speech is "actually necessary to the solution."  131 S. Ct. at 2738.  Because the government "bears the risk of uncertainty, … ambiguous proof will not suffice." *Id.* at 2738-39.  Moreover, the government must show that the Act "targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)).  "If a less restrictive alternative would serve the Government's purpose, the legislature *must use* that alternative." *Playboy Entm't Grp., Inc.*, 529 U.S. at 813 (emphasis supplied).

Here, the State cannot plausibly claim that prohibiting all speech by non-clinic speakers in the exclusion zones it has defined is the least restrictive means of

serving a compelling government interest.  The compelling interest test can be satisfied only when the law at issue serves interests "of the highest order."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 546 (1993).  "Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation" of the fundamental right to free speech.  *Thomas v. Collins,* 323 U.S. 516, 530 (1945).  Here, there is no evidence that, at any time in the past *decade*, Defendants have had occasion to enforce any of the numerous laws against conduct that actually interferes with access at abortion clinics.  If anyone is blocking a clinic or engaging in violence, the appropriate government response is to prosecute that person under one of those laws.  By definition, outlawing peaceful consensual speech and leafleting is not "target[ing] and eliminat[ing] no more than the exact source" of any such evil.  *Frisby,* 487 U.S. at 485.[9]

## C.    The Court Should Not Perpetuate A Conflict Between This Case And The Ninth Circuit's Decision in *Hoye v. City of Oakland*

Another relevant development since this Court's decision in *McCullen I* is the Ninth Circuit's conflicting decision in *Hoye v. City of Oakland,* 653 F.3d 835 (9th Cir. 2011).  There, an Oakland city ordinance prohibited approaching another

---

[9]    Indeed, when regulating speech activity outside of a broader class of medical facilities—i.e., every medical facility *except* the abortion clinics at issue here—Massachusetts has been quite careful to target *only* behavior that actually "obstructs entry or departure" but expressly preserved "other rights to engage in peaceful picketing which does not obstruct entry or departure."  Mass. Gen. Laws ch. 266, § 120E.

person, without consent, within zones around entrances to abortion clinics.  *Id.* at

841. Although the ordinance on its face did not exempt clinic employees or agents,

the city had adopted a policy of not enforcing the ordinance against such clinic

speakers.  *Id.* at 849-51.  In other words, Oakland's enforcement policy matched

the text of the Act at issue here.  Moreover, just as in this case, "[t]he City

explained its position as being that speech that 'facilitates access' to the clinic does

not trigger the Ordinance's consent requirement, while speech that does not

facilitate access does trigger it."  *Id.* at 851; *compare McCullen*, 573 F. Supp. 2d at

407 ("[S]ince it is within the scope of their employment for clinic personnel to

escort patients in this fashion, and since a primary purpose of the law is to facilitate

safe access, the employee exemption serves the basic objectives of the Act."

(quoting *McGuire I*, 260 F.3d at 46)).

       The district court in *Hoye* sustained this enforcement policy, expressly

relying on this Court's decisions in *McCullen I* and the precursor *McGuire* cases.

*Hoye v. City of Oakland*, 642 F. Supp. 2d 1029, 1038 (N.D. Cal. 2009).  The Ninth

Circuit reversed, holding that "[t]he City's policy of distinguishing between speech

that facilitates access to clinics and speech that discourages access *is not content-

neutral*."  *Hoye*, 653 F.3d at 851 (emphasis supplied).[10]  Indeed, the court observed

that the differential enforcement policy was "the epitome of a content-based speech

---

[10]     The unanimous decision in *Hoye* was authored by Judge Marsha Berzon and
joined by Judges Stephen Reinhardt and Louis Pollak (sitting by designation).

restriction." *Id.* Analyzing the Supreme Court's decision in *Hill*, the court

recognized that the statute at issue there was held to be content-neutral

> because it applie[d] "to all protest, to all counseling, and to all
> demonstrators whether or not the demonstration concerns abortion,
> and *whether they oppose or support the woman who has made an
> abortion decision.*"  530 U.S. at 725 (quotation omitted) (emphasis
> added). "That is the level of neutrality that the Constitution demands."
> *Id.*

*Hoye*, 653 F.3d at 851-52.  In contrast, Oakland's policy "d[id] not meet this level

of neutrality" because "[t]o distinguish between speech facilitating access and

speech that discourages access is necessarily to distinguish on the basis of

substantive content." *Id.* at 852 ("Asking a woman 'May I help you into the

clinic?' facilitates access; 'May I talk to you about alternatives to abortion?'

discourages it.").  Thus, the differential enforcement policy was "*indubitably*

content-based." *Id.* (emphasis supplied).

The Ninth Circuit's reasoning and holding in *Hoye* are directly contrary to

this Court's reasoning and holding in *McCullen I*.  Where this Court sustained the

Massachusetts Act's differential treatment of clinic-sponsored and other speech

around the entrances to abortion clinics as facially content-neutral, *Hoye* correctly

recognizes precisely the same distinction as the "epitome" of a content-based

restriction.  Accordingly, *Hoye* confirms the prohibition on such content-,

viewpoint- and speaker-based regulations described above and provides this Court

with additional reason to revisit *McCullen I*, namely to avoid perpetuating an unjustifiable conflict with another circuit.

## II. THE ACT IS UNCONSTITUTIONAL AS APPLIED BECAUSE IT DOES NOT PROVIDE AMPLE ALTERNATIVE CHANNELS OF COMMUNICATION AT THE CHALLENGED LOCATIONS

Apart from the continuing vitality of *McCullen I*, the district court erred in concluding on remand that the State had carried its burden of proving that, as applied to Plaintiffs, the Act is a reasonable regulation of the time, place, and manner of speech because it leaves open ample alternative channels for Plaintiffs' speech. *See* Addendum 119a. To the contrary, undisputed evidence shows that the Act severely limits Plaintiffs' ability to engage willing listeners in normal conversation, and that alternatives are largely ineffective to convey their message to the listeners they need to reach. Accordingly, the Act is unconstitutional as applied in the three locations addressed in the proceedings below.

### A. Standard Of Review

Where, as here, "the trial court is called upon to resolve a number of mixed law/fact matters" on a stipulated factual record "which implicate core First Amendment concerns," appellate review "is plenary so that the court may reduce the likelihood of a 'forbidden intrusion on the field of free expression.'" *Sullivan v. City of Augusta*, 511 F.3d 16, 21-22, 24-25 (1st Cir. 2007) (quoting *AIDS Action Comm. v. MBTA*, 42 F.3d 1, 7 (1st Cir. 1994)). "Plenary review is called for

'simply because the reaches of the First Amendment are ultimately defined by the facts it is held to embrace, and [the Court] must thus decide for [itself] whether a given course of conduct falls on the near or far side of the line of constitutional protection.'" *Id*. at 25 (quoting *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 567 (1995)).

### B. Alternative Avenues Of Communication are Inadequate When Speakers are Unable To Reach Particular Intended Audiences

In addressing Plaintiffs' as-applied challenges, the district court considered only whether the Act left open ample alternative avenues of communication. *See* Addendum 94a. It concluded that Plaintiffs did have ample alternatives because, at each location, signs displayed outside the Act's exclusion zones could be seen by passers-by; voices shouting from outside the zones could be heard; literature could be distributed outside the zones; nothing prevented persons in a zone from stepping outside it to talk with Plaintiffs; and burdens on speech not imposed directly by the government, such as the location of a clinic entrance well inside a surrounding parking lot on private land, were of no constitutional import. Addendum 105a-107a, 113a-114a, 117a-119a. Plaintiffs' testimony, however, unequivocally demonstrates that the zones prevent them from effectively communicating with their intended audience. App. 212-16, 240-42, 246-250, 264, 269-74, 311-15, 320-24, 483-86, 510-11. The district court's ruling should be reversed.

"While the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places, a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate." *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984). The First Amendment presumes that speakers, not the government, "know best both what they want to say and how to say it." *Riley v. National Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 790-91 (1988). Consequently, "[w]hether an alternative is ample should be considered from the speaker's point of view," not the government's. *Weinberg v. City of Chicago*, 310 F.3d 1029, 1041 (7th Cir. 2002).

Every citizen has the right to "'reach the minds of willing listeners and to do so there must be opportunity to win their attention.'" *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 655 (1981). "The simple fact that [a speaker] is permitted to communicate his message elsewhere does not end [the] analysis if the intended message is rendered useless or is seriously burdened." *Weinberg*, 310 F.3d at 1041 (citing *City of Ladue v. Gilleo*, 512 U.S. 43, 56-57 (1994), and *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990)). An alternative is not adequate if it "foreclose[s] a speaker's ability to reach one audience even if it allows the speaker to reach other groups." *Gresham v. Peterson*, 225 F.3d 899, 907 (7th

Cir. 2000).  Therefore, evidence demonstrating that speakers are able to

disseminate their message to the public *at large* is insufficient to prove

alternative avenues of communication are adequate to disseminate messages to

*specific audiences*.

The Supreme Court's decision in *City of Ladue v. Gilleo* is instructive.

There, the Court invalidated a restriction on certain residential lawn signs.  512

U.S. at 57.  The government argued that it remained possible to convey a message

by many other means, such as "*hand-held* signs, letters, handbills, flyers, telephone

calls, newspaper advertisements, bumper stickers, speeches, and neighborhood or

community meetings."  *Id.* at 56 (citing government's brief).  The Court, however,

held that these other means were not adequate for purposes of a First Amendment

time, place, and manner inquiry because

> a sign from one's own residence often carries a message quite distinct
> from placing the same sign someplace else, or conveying the same
> text or picture by other means.  Precisely because of their location,
> such signs provide information about the identity of the 'speaker.'  …
> *Furthermore, a person who puts up a sign at her residence often*
> *intends to reach neighbors, an audience that could not be reached*
> *nearly as well by other means.*

*Id.* at 56-57 (emphasis added).

Multiple circuits that have considered the issue have expressly held,

consistent with *Ladue*, that "[a]n alternative is *not* ample if the speaker is not

permitted to reach the intended audience."  *Saieg v. City of Dearborn*, 641 F.3d

727, 740 (6th Cir. 2011) (emphasis added); *Startzell v. City of Phila.*, 533 F.3d

183, 202 (3d Cir. 2008); *Weinberg*, 310 F.3d at 1042; *Bay Area Peace Navy*, 914

F.2d at 1229.[11]

    *Bay Area Peace Navy*, for example, considered a 75-yard "security zone"

imposed by the Coast Guard during Fleet Week.  The Peace Navy was an anti-war

group that sought to protest to Navy officials.  914 F.2d at 1225-26.  The Ninth

Circuit held that the 75-yard barrier "insulated" the intended audience from the

Peace Navy's message, rendering the communication "ineffective."  *Id.* at 1229-

30.  It concluded that the government had "simply not met its burden of showing

---

[11]    This Court appears to have addressed only once the issue of alternative channels of communication when a speaker seeks to convey a message to a particular audience.  In *Bl(a)ck Tea Society v. City of Boston*, 378 F.3d 8 (1st Cir. 2004), the Court sustained the denial of a preliminary injunction and thus allowed the establishment of "a highly secure hard zone in the area immediately surrounding" the 2004 Democratic National Convention, into which "[o]nly candidates, delegates, staff, press, and other specially authorized classes of persons were permitted."  *Id.* at 10.  The zone was established because of "heightened sensitivity to security concerns following the terrorist attacks of September 11, 2001."  *Id.*  No analogous concerns are present in this case.  Further, the restriction in *Bl(a)ck Tea Society* did not, like the Act here, discriminate against any particular protesters or message.  Moreover, the Court in *Bl(a)ck Tea Society* ultimately deferred to the district court's assessment of a "close and difficult case" litigated on a "hastily assembled record."  *Id.* at 14.  The Court "express[ed] no view" about whether "the same result would be supportable in less tumultuous times or on a better-developed record."  *Id.* at 15 & n.5.

    Other First Circuit cases such as *Sullivan*, 511 F.3d at 20, 44, and *Globe Newspaper Co. v. Beacon Hill Architectural Commission*, 100 F.3d 175, 192-93 (1st Cir. 1996), that have addressed alternative channels of communication have involved only speakers who sought to convey a message to the public at large, not speakers trying to reach a particular, targeted audience.

that there are sufficient alternative means of communicating the Peace Navy's message." *Id.* at 1230.

In *Saieg*, the Sixth Circuit addressed a regulation banning leafletting on a public sidewalk outside a Muslim Festival. The intended audience was Muslims whom the speaker sought to convert to Christianity. *Saieg*, 641 F.3d at 729-30. Agreeing with the Ninth Circuit, the court held that "'[a]n alternative is not ample if the speaker is not permitted to reach the intended audience.'" *Id.* at 740 (quoting *Bay Area Peace Navy*, 914 F.2d at 1229). The leafletting ban was thus "not a reasonable time, place, and manner restriction" as applied to the speaker and speech at issue. *Saieg*, 641 F.3d at 740-41.

Likewise, *Weinberg* considered an ordinance prohibiting the sale of merchandise within 1,000 feet of the United Center in Chicago. 310 F.3d at 1033-34. Weinberg sought to sell a book critical of Bill Wirtz, owner of the Chicago Blackhawks, who played their home games at the Center. *Id.* at 1033. The Seventh Circuit recognized that Weinberg's intended audience was Blackhawks fans, and "[t]he most opportune time and place to reach this audience is outside the United Center, before and after Blackhawks home games." *Id.* at 1042. Refusing to "check common sense at the door," the court agreed that the Center was "a unique location for the sale of Weinberg's book." *Id.* Because application of the ordinance had "substantially detrimental effects on Mr. Weinberg's free speech

rights," the law "d[id] not provide ample alternatives" and was unconstitutional as applied to him.  *Id.* at 1042, 1045.

Finally, in *Phelps-Roper v. Nixon*, 545 F.3d 685 (8th Cir. 2008) (which involved the same group at issue in *Snyder v. Phelps*), the Eighth Circuit reviewed application of a Missouri statute that criminalized picketing within 300 feet of a funeral location or procession.  *Id.* at 688.  The court explained that people who "protest or picket at or near a military funeral wish to reach an audience that can only be addressed at such [an] occasion."  *Id.* at 694.  It thus concluded that the law "fail[ed] to afford open, ample and adequate alternative channels for the dissemination of [the speaker's] particular message."  *Id*.

As these cases hold, "government must not substantially foreclose, as a practical matter, speakers' ability to communicate their message," *Hoye*, 653 F.3d at 849, and "alternatives are not ample where a speaker's 'ability to communicate effectively is threatened,'" *Weinberg*, 310 F.3d at 1042 (quoting *Taxpayers for Vincent*, 466 U.S. at 812).

## C.    Alternative Channels Are Inadequate In This Case

Just as alternatives to lawn signs were not adequate to reach neighbors in *City of Ladue*, alternatives to close, personal, peaceful communication are not adequate to reach potential abortion clinic patrons in this case.

Plaintiffs testified without contradiction about their experience that close, personal, peaceful communication is effective and that shouting from a distance or holding a sign is not.  App. 13, 216-17, 237-40, 246-50, 267-74, 311-15, 324. Defendants offered nothing to rebut the evidence that, for example, Ms. McCullen has been precluded from having more than 2,000 conversations with women since the 2007 Act took effect, or that Ms. Zarrella has been unable to make a single successful offer of her help while the law has been in effect, in sharp contrast to the over 100 successful offers she made before the Act.  *Id*. 216, 250.[12]  They offered nothing to rebut Plaintiffs' evidence showing that, even when they can begin conversations, those conversations are shorter and louder and have different content than when they are permitted to speak without the restrictions imposed by the Act's exclusion zones.  *Id*. 216.  They offered nothing to rebut testimony from Plaintiffs Bashour and Clark about how far away they are forced to stand in Worcester, or how they are unable to distribute literature to incoming cars.  *Id*. 270-74, 311-15.[13]  And they offered nothing to rebut testimony from Plaintiff Shea

---

[12]    The trial court's speculation that this dramatic decline in effectiveness is due to women disliking the *content* of Plaintiffs' message finds no support in the record, and contradicts common sense—the message did not change in 2007; the speech rules did.

[13]    The trial court erred in suggesting that an as-applied challenge does not include consideration of the facts on the ground at a particular location.  *See, e.g.*, *Hill*, 530 U.S. at 730 ("Special problems that may arise where clinics have particularly wide entrances or are situated within multipurpose office buildings may be worked out as the statute is applied.");  *Hoye*, 653 F.3d at 859 (noting that

about his inability to distribute literature or begin conversations while avoiding the five zones around the Springfield clinic. *Id.* 321-24. To the contrary, even Defendants' witnesses' testimony confirmed that the only effective communication on the streets and sidewalks around abortion clinics was the close personal conversation the Act severely restricts. *Id.* 489-92, 500-01, 511-13, 519-22.

Thus, the undisputed evidence from all sides confirms that, while there are ways in which Plaintiffs may communicate despite the Act's exclusion zones— standing outside the lines and shouting; carrying signs; waving leaflets at women from a distance; even occasionally engaging an approaching woman in a hurried conversation before she reaches the zone—these alternative modes of speech are demonstrably inadequate to reach Plaintiffs' particular audience at the locations at issue. Rather, close personal communication, like the forbidden lawn signs in *City of Ladue*, "often carries a message quite distinct from," and provides "information about the identity of the speaker" quite unlike, what can be conveyed by a sign, shout, or hurried half-conversation carried on while keeping one eye out to be sure to stop outside a government exclusion line. 512 U.S. at 56. Here, as in *Ladue*, the particular audience in question cannot "be reached nearly as well by other means." *Id.* at 57. The Act therefore fails to leave Plaintiffs with adequate alternative means to speak.

---

actions of exempted clinic speakers stifling plaintiff's speech can be considered in as-applied challenge).

### III.   THE DISTRICT COURT IMPROPERLY NARROWED THE REQUIRED CONSTITUTIONAL ANALYSIS

As Parts I and II demonstrate, this Court has ample grounds on which to hold the 2007 abortion clinic exclusion zone Act unconstitutional on its face and as applied.  Plaintiffs have been seeking relief from this unconstitutional burden on their peaceful, life-saving speech for more than four years.  This Court should provide it now.

Nevertheless, if the Court concludes that the Act survives both facial challenge and the single as-applied argument Plaintiffs were permitted to pursue on remand, it should again remand the case with instructions to allow Plaintiffs to present the remainder of their as-applied case.  The district court erred when it began the previous remand proceedings by dismissing, limiting, and denying leave to amend Plaintiff's as-applied claims.  *See* Addendum 68a-90a; *supra* pp. 11-13. Those legal rulings are subject to *de novo* review.  *See Feliciano v. Rhode Island*, 160 F.3d 780, 788 (1st Cir. 1998); *Naser Jewelers*, 513 F.3d at 31.

### A.   The District Court Erred By Relieving The State Of Its Burden To Show Neutrality, Narrow Tailoring, And A Significant Government Interest As-Applied At The Challenged Locations

At the outset of the remand proceedings, the district court limited consideration of Plaintiffs' as-applied time, place and manner challenge to a single aspect of the applicable test:  whether the Act left open adequate alternative means

of communication.  Addendum 56a.  The court provided no explanation for that ruling.  *Id*.

Whatever the court's reasoning, it was error to relieve the State of its full burden of proving the Act constitutional as applied to Plaintiffs in each challenged location.  *See Playboy Entm't Grp.*, 529 U.S. at 816 ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *Board of Trustees v. Fox*, 492 U.S. 469, 480 (1989) ("[S]ince the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require." (citation omitted)).

To justify a restriction on speech as a permissible time, place, or manner restriction, the government must prove *three* things:  that the restriction is content-neutral, that it is narrowly tailored to serve a significant government interest, and that it leaves the speaker with ample alternative channels for communication.  *E.g.*, *Clark*, 468 U.S. at 293.  For Plaintiffs' as-applied challenges, the State was required to make each of these three showings as to the application of the Act in each challenged location.

For example, the government should have been required to carry its burden of showing that having *five* different zones in Springfield, hundreds of feet from clinic doors, is narrowly tailored to a serve significant government interest in that location.  Further, the district court never considered the effect of the Attorney

General's interpretation—which expressly creates *different* rules for speech about abortion than speech about other topics—regarding whether the Act is neutral as applied.

The district court had no ground for relieving the State of its burden of showing that its restrictions were content-neutral and narrowly tailored to significant government interests as applied.

### B.  The District Court Erred In Entering Judgment On The Pleadings And Denying Leave To Amend

Finally, this Court in *McCullen I* carefully emphasized that its decision was limited to the facial challenge then before the Court, and did *not* foreclose Plaintiffs' as-applied claims:

> We add a caveat.  This decision flows naturally from the very heavy burden that plaintiffs must carry in mounting a *facial challenge* to a state statute.  *Nothing we have said* forecloses the possibility that, on a *better-developed record*, this legislative solution may prove problematic in *particular applications*.

571 F.3d at 184 (emphasis supplied).  Despite this clear admonition—indeed, without even acknowledging it—the district court purported to rely on *McCullen I* to eliminate virtually all of Plaintiffs' as-applied claims.

For example, *McCullen I* concluded only that the Act was not overbroad in *all* applications.  571 F.3d at 180.  Plaintiffs continue to believe that conclusion is

incorrect.[14] But even if *McCullen I* stands, it does not suggest that the Act might

not be overbroad in *some* applications. Addendum 80a-82a. This Court never

addressed whether it would be overbroad to apply the Act in Springfield, where

one clinic is "protected" by *five* buffer zones, each hundreds of feet from any

actual clinic entrance, and where the State has produced no evidence of even a

single arrest, conviction, or allegation of interference with clinic access.[15] Nor

does *McCullen I* answer the question whether the Act is substantially overbroad in

---

[14]     A law is unconstitutionally overbroad if "a 'substantial number' of its
applications are unconstitutional, 'judged in relation to the statute's plainly
legitimate sweep.'" *Washington State Grange v. Washington State Republican
Party*, 552 U.S. 442, 450 n.6 (2008) (quoting *New York v. Ferber*, 458 U.S. 747,
769-71 (1982)). The Act prohibits not just conduct that might fall within some
"legitimate sweep," such as blocking an entrance or engaging in violence or
aggression (which are already illegal), but *all* First Amendment activity by
Plaintiffs within the exclusion zones.

[15]     The district court mistakenly believed that the only type of overbreadth
challenge available is an assertion of a third party's rights. *See* Addendum 81a.
To the contrary, it is quite possible to challenge a law as overbroad as applied to a
particular plaintiff. *See, e.g.*, *Turchick v. United States*, 561 F.2d 719, 721 n.3 (8th
Cir. 1977) ("'Facial' overbreadth analysis should be distinguished from
overbreadth 'as applied' to a particular claimant. The latter involves a judgment as
to the constitutionality of a challenged statute based on the harm caused to the
litigating party. The 'as applied' method vindicates a claimant whose conduct is
within the First Amendment but invalidates the challenged statute only to the
extent of the impermissible application."); Fallon, *Making Sense of Overbreadth*,
100 Yale L.J. 853, 896-97 (1991) (Supreme Court in *NAACP v. Button* "held a
Virginia barratry law impermissibly overbroad, but only as applied to the
politically oriented litigating efforts of the NAACP" (citing *NAACP v. Button*, 317
U.S. 415 (1963))). Indeed, one of the Supreme Court's most recent overbreadth
cases involved a plaintiff that was asserting its own rights, not those of a third
party. *See Washington State Grange*, 552 U.S. at 452 (dispute was over whether
the law "severely burdens *respondents'* associational rights" (emphasis supplied)).

its particular applications in Boston or Worcester.  Those questions should have been open for litigation in the district court.

Likewise, the district court should not have granted judgment on the pleadings or denied leave to amend as to Plaintiffs' claims that the Act is applied in content- and viewpoint-based ways and violates Equal Protection.  Both the First and Fourteenth Amendments prohibit the government from choosing which speakers may speak in a public forum and which issues may be addressed.  *See Mosley*, 408 U.S. at 96.  The Act plainly targets the content and viewpoint of speech, as explained above.  Moreover, although the panel in *McCullen I* refused to consider the Attorney General's interpretation as a facial matter, such an interpretation is clearly relevant to how the law is actually applied.  *See McCullen I*, 571 F.3d at 178 (noting that interpretation cannot render the law *facially* unconstitutional); *McGuire II*, 386 F.3d at 58-59, 64 (deeming interpretation irrelevant at facial stage but "important" in as applied challenge).

Here, Plaintiffs specifically alleged that "[t]he Attorney General's purported interpretation of the Act permits clinic speakers to tell incoming clients 'we'll help you inside the clinic' but prohibits Plaintiffs from saying 'we'll help you down the street' or otherwise making competing offers of assistance inside the zone."  App. 81 (Prop. Am. Compl. ¶ 179).  This allegation was sufficient to state claims for viewpoint discrimination and violation of equal protection.  *Compare Hoye*, 653

F.3d at 850-51.  The district court's entry of judgment on Plaintiffs' other counts was also error.  In each case, all the *McCullen I* court held was that, on a pre-discovery record, applying a high facial-challenge burden, Plaintiffs had not proven that the law was *always* unconstitutional.  Even if correct, that ruling should not have precluded Plaintiffs from arguing those claims in the specific concrete contexts described in the complaint.

## CONCLUSION

The Court should hold that the 2007 Act is unconstitutional, both on its face and as applied to Plaintiffs in Boston, Worcester, and Springfield, and remand to the district court with directions to enter appropriate injunctive relief.  Alternatively, the case should be remanded for full development of Plaintiffs' remaining as-applied claims.

Respectfully submitted,

/s/ Mark L. Rienzi

EDWARD C. DUMONT
TODD C. ZUBLER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

PHILIP D. MORAN
265 Essex Street, Suite 202
Salem, MA 01970
(978) 745-6085

May 21, 2012

MARK L. RIENZI
THE CATHOLIC UNIVERSITY OF AMERICA
COLUMBUS SCHOOL OF LAW
3600 John McCormack Road, NE
Washington, DC 20064
(202) 319-5140

MICHAEL J. DEPRIMO
778 Choate Avenue
Hamden, CT 06518
(203) 281-1496

# ADDENDUM

# TABLE OF CONTENTS

Page

Mass. Gen. Laws ch. 266 § 120E1/2 (Buffer Statute) ..............................................1a

Attorney General's Guidance Letter ......................................................................3a

District Court Memorandum, Aug. 22, 2008 (Facial Challenge) ............................6a

First Circuit Opinion, July 8, 2009 (Facial Challenge) .........................................50a

District Court Memorandum, Dec. 29, 2010 (Pre-Trial Motions)........................68a

District Court Order, Dec. 29, 2010 (Pre-Trial Motions) .....................................89a

District Court Memorandum, Feb. 22, 2012 (As Applied Challenge) ..................91a

District Court Order, Feb. 22, 2012 (As Applied Challenge)..............................121a

M.G.L.A. 266 § 120E 1/2

Massachusetts General Laws Annotated Currentness

Part IV. Crimes, Punishments and Proceedings in Criminal Cases (Ch. 263-280)
Title I. Crimes and Punishments (Ch. 263-274)

  📖 Chapter 266. Crimes Against Property (Refs & Annos)

➡️ **§ 120E 1/2. Reproductive health care facilities**

(a) For the purposes of this section, "reproductive health care facility" means a place, other than within or upon the grounds of a hospital, where abortions are offered or performed.


(b) No person shall knowingly enter or remain on a public way or sidewalk adjacent to a reproductive health care facility within a radius of 35 feet of any portion of an entrance, exit or driveway of a reproductive health care facility or within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of a reproductive health care facility in straight lines to the point where such lines intersect the sideline of the street in front of such entrance, exit or driveway. This subsection shall not apply to the following:--

(1) persons entering or leaving such facility;

(2) employees or agents of such facility acting within the scope of their employment;

(3) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and

(4) persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility.

(c) The provisions of subsection (b) shall only take effect during a facility's business hours and if the area contained within the radius and rectangle described in said subsection (b) is clearly marked and posted.

(d) Whoever knowingly violates this section shall be punished, for the first offense, by a fine of not more than $500 or not more than three months in a jail or house of correction, or by both such fine and imprisonment, and for each subsequent offense, by a fine of not less than $500 and not more than $5,000 or not more than two and one-half years in a jail or house of correction, or both such fine and imprisonment. A person who knowingly violates this section may be arrested without a warrant by a sheriff, deputy sheriff or police officer if that sheriff, deputy sheriff, or police officer observes that person violating this section.

(e) Any person who knowingly obstructs, detains, hinders, impedes or blocks another person's entry to or exit from a reproductive health care facility shall be punished, for the first offense, by a fine of not more than $500 or not more than three months in a jail or house of correction, or by

**Add. 1a**

both such fine and imprisonment, and for each subsequent offense, by a fine of not less than $500 nor more than $5,000 or not more than two and one-half years in a jail or house of correction, or by both such fine and imprisonment. A person who knowingly violates this provision may be arrested without a warrant by a sheriff, deputy sheriff or police officer.

(f) A reproductive health care facility or a person whose rights to provide or obtain reproductive health care services have been violated or interfered with by a violation of this section or any person whose rights to express their views, assemble or pray near a reproductive health care facility have been violated or interfered with may commence a civil action for equitable relief. The civil action shall be commenced either in the superior court for the county in which the conduct complained of occurred, or in the superior court for the county in which any person or entity complained of resides or has a principal place of business.

M.G.L.A. 266 § 120E 1/2



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL

ONE ASHBURTON PLACE
BOSTON, MASSACHUSETTS 02108

MARTHA COAKLEY
ATTORNEY GENERAL

(617) 727-2200
www.ago.state.ma.us

January 25, 2008

Chief Daniel C. O'Leary
Brookline Police Department
350 Washington Street
Brookline, MA 02445

Re:   Amendment to the Massachusetts Reproductive Health Care Facilities Act (a.k.a. the "Massachusetts Buffer Zone Law")

Dear Chief O'Leary:

I am writing to you because there is at least one reproductive health care facility within your jurisdiction to which the state "buffer zone" law applies, or may apply in the future. The law is formally called the Massachusetts Reproductive Health Care Facilities Act, Mass. Gen. Laws ch. 266, § 120E ½ (the "Act"). The law in its original form took effect on November 10, 2000.[3] The Governor recently signed an emergency amendment to the Act that took effect on November 13, 2007. A copy of the Act as amended is enclosed with this letter. I am writing to provide guidance regarding the primary provisions of the amended Act.

In general, the amended Act creates fixed "no enter" zones (or "buffer zones") in defined areas near the entrances to reproductive health care facilities if such areas are "clearly marked and posted." The "buffer zones" consist of (1) the area within a 35-foot radius around clinic driveways and clinic building entrances and exits, to the extent such areas fall within a public way, and (2) a rectangular corridor (to the extent it falls on a public way) that extends in parallel lines from the outside boundaries of clinic building entrances or exits, and clinic driveways, to the edge of the street.

Specifically, the amended Act makes it unlawful for any person to "knowingly enter or remain on a public way or sidewalk adjacent to a reproductive health care facility within a radius of 35 feet of any portion of an entrance, exit or driveway of a reproductive health care facility." *Id.,* § 120E ½ (b). In addition, the amended Act makes it unlawful for any person to "knowingly

---

[3] In its original form, the Act created a "floating bubble zone" that prohibited persons from approaching within six feet of another person for the purpose of protest, education, or counseling without their consent. This provision applied only within an 18-foot radius of clinic building entrances and exits and clinic driveways and within the 6-foot rectangular corridor from clinic building entrances and exits and clinic driveways to the street. The United States Court of Appeals for the First Circuit upheld the original version of the Act against constitutional challenges in *McGuire v. Reilly*, 386 F.3d 45 (1st Cir. 2004) ("*McGuire II*"), and *McGuire v. Reilly*, 260 F.3d 36 (1st Cir. 2001) ("*McGuire I*").

**Add. 3a**

*Id.,* § 120E ½ (b). In addition, the amended Act makes it unlawful for any person to "knowingly enter or remain on a public way or sidewalk adjacent to a reproductive health care facility . . . within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of a reproductive health care facility in straight lines to the point where such lines intersect the sideline of the street in front of such entrance, exit or driveway." *Id.*[4] These provisions are in effect only during the clinic's business hours and if the areas described above are "clearly marked and posted." *Id.,* § 120E ½ (c). The marking and posting of the areas could be accomplished by marking the areas with painted lines on a street and sidewalk, and by posting a sign advising the public of the applicability of the law.

The amended Act exempts four categories of persons from the above provisions: 1) persons entering or leaving the clinic; 2) employees or agents of the clinic acting within the scope of their employment; 3) law enforcement, ambulance, firefighting, construction, utilities, public works, and other municipal agents acting within the scope of their employment; and 4) persons using the public sidewalk or street right-of-way adjacent to the clinic solely to reach a destination other than the clinic. *Id.,* § 120E ½ (b). Identical exemptions in the original Act were upheld by the First Circuit in *McGuire II,* 386 F.3d at 57-59, and *McGuire I,* 260 F.3d at 46-47. With respect to exemption (2), the Court found that it reasonably allows clinic personnel to assist in protecting patients and ensuring their safe access to clinics. *Id.*

The Attorney General provides the following guidance to assist you in applying the four exemptions in the prior paragraph, in locations where the buffer zone is clearly marked and posted, and during a clinic's business hours.

The first exemption — for persons entering or leaving the clinic — only allows people to cross through the buffer zone on their way to or from the clinic. It does not permit companions of clinic patients, or other people not within the scope of the second or third exemptions, to stand or remain in the buffer zone, whether to smoke, talk with others, or for any other purpose.

The second exemption — for employees or agents of the clinic acting within the scope of their employment —allows clinic personnel to assist in protecting patients and ensuring their safe access to clinics, but does not allow them to express their views about abortion or to engage in any other partisan speech within the buffer zone.

Similarly, the third exemption — for municipal employees or agents acting within the scope of their employment — does not allow municipal agents to express their views about abortion or to engage in any other partisan speech within the buffer zone.

---

[4] The Act applies only to the public way (*i.e.,* public streets and sidewalks). *Id.* There may be sites at which a clinic entrance is set back more than 35 feet from the public street or sidewalk. In that case, the Act would not apply to the area outside of the clinic entrance, as the 35-foot radial area around the entrance falls on private property, not on the public way. At such sites, other laws, such as trespass law, could still apply to the area outside of those clinic entrances. However, the Act would still apply to clinic driveway entrances and exits abutting a public way.

Finally, the fourth exemption — for persons using the sidewalk or street adjacent to the clinic to reach a destination other than the clinic — applies to individuals who are crossing through the buffer zone, without stopping, to go somewhere other than a location within the zone and other than the clinic, and who are not using the buffer zone for some other purpose while passing through.  For example, an individual may cross through the buffer zone to reach and speak with someone outside the zone, to reach and stand in a location outside the zone (perhaps to engage in lawful protest, other speech, or prayer), or to travel on to another place altogether, provided that the individual does not do anything else within the buffer zone (such as expressing their views about abortion or engaging in other partisan speech).

If you have any questions, or need additional information, please feel free to contact me at (617) 727-2200, ext. 2068.

Very truly yours,

Maura T. Healey
Assistant Attorney General
Chief, Civil Rights Division
Public Protection and Advocacy Bureau

cc:     Dennis C. Mahoney, First Assistant District Attorney, Norfolk County
        Cathy Cappelli, Assistant District Attorney, Norfolk County
        Jennifer Dopazo, Counsel, Town of Brookline
        Lieutenant William McDermott, Brookline Police Department

**Add. 5a**

warranty claims fail as a matter of law.[14]

### ORDER

For the foregoing reasons, Empire's Motion for Summary Judgment is *ALLOWED.* The Clerk will enter judgment for Empire and close the case.

SO ORDERED.



Eleanor McCULLEN, Jean Blackburn Zarrella, Gregory A. Smith, Carmel Farrell, and Eric Cadin, Plaintiffs,

v.

Martha COAKLEY, in her capacity as Attorney General for the Commonwealth of Massachusetts, Defendant.

Civil Action No. 08–10066–JLT.

United States District Court,
D. Massachusetts.

Aug. 22, 2008.

**Background:** Pro-life demonstrators brought action challenging the facial constitutionality of Massachusetts statute which established a 35-foot fixed buffer zone around driveways and entrances of reproductive health care facilities (RHCF).

**Holdings:** The District Court, Tauro, J., held that:

(1) statute was content-neutral and validly regulated the time, place and manner of expressive activity;

(2) employee exemption of statute did not constitute unlawful viewpoint discrimination;

(3) statute was narrowly tailored to serve the Commonwealth's legitimate interest in protecting public safety at RHCF entrances and driveways;

(4) statute did not constitute an impermissible prior restraint on speech;

(5) statute did not violate the Free Exercise clause;

(6) statute did not violate the First Amendment's right to associate or assemble peaceably; and

(7) statute did not violate alleged liberty interest in the "right to loiter."

So ordered.

### 1. Constitutional Law ⟐1518

A content-based law will be upheld only if it is absolutely necessary to serve a compelling state interest and is narrowly tailored to the achievement of that end. U.S.C.A. Const.Amend. 1.

---

*Smith v. Robertshaw Controls Co.,* 410 F.3d 29, 37 (1st Cir.2005) (upholding summary judgment on the basis of late notice resulting in prejudice because of the loss of evidence.); *Gath v. M/A–Com, Inc.,* 440 Mass. 482, 488, 802 N.E.2d 521 (2003) ("In a case involving spoliation, exclusion of evidence both sanctions the party responsible for destroying certain evidence and remedies the unfairness that such spoliation created."); *Nally v. Volkswagen of Am., Inc.,* 405 Mass. 191, 197, 539 N.E.2d 1017 (1989) (an expert's testimony should be excluded if the expert changes, destroys, or loses an item of physical evidence "in such circumstances that the expert knows or reasonably should know that that item in its original form may be material to litiga-

tion."). "The rule excluding evidence as a remedy for spoliation is based on both the unfair prejudice that would otherwise result and the fact of a negligent or intentional destruction of physical evidence. Spoliation, therefore, does not include a fault-free destruction or loss of physical evidence." *See Kippenhan v. Chaulk Serv., Inc.,* 428 Mass. 124, 127, 697 N.E.2d 527 (1998). The dismissal of PSMI's Amended Complaint as a matter of law makes unnecessary an inquiry by the court into the degrees of fault and prejudice that the spoliation might have entailed.

**14.** As the contract claim is derivative of the warranty claims, it also will be dismissed.

McCULLEN v. COAKLEY    **383**
Cite as 573 F.Supp.2d 382 (D.Mass. 2008)

**2. Constitutional Law** ⟸**1514, 1515**

Content-neutral restrictions are evaluated under the intermediate level of scrutiny, and will be upheld if (1) they are justified without reference to the content of the regulated speech; (2) are narrowly tailored to serve a significant governmental interest; and (3) leave open ample alternative channels for communication of the information. U.S.C.A. Const.Amend. 1.

**3. Abortion and Birth Control** ⟸**129**
    **Constitutional Law** ⟸**1795**

Massachusetts statute, which established a 35-foot fixed buffer zone around driveways and entrances of reproductive health care facilities (RHCF), was content-neutral and validly regulated the time, place and manner of expressive activity; the statute did not directly regulate speech, the legislature adopted the statute to address continued and serious public safety problems in the areas adjacent to RHCF entrances and driveways, including significant concerns regarding safe patient access to medical services, and, the statute advanced interests unconnected to expressive content. U.S.C.A. Const.Amend. 1; M.G.L.A. c. 266, § 120E 1/2.

**4. Constitutional Law** ⟸**1512**

A law designed to serve purposes unrelated to the content of protected speech is deemed content-neutral even if, incidentally, it has an adverse effect on certain messages while leaving others untouched. U.S.C.A. Const.Amend. 1.

**5. Abortion and Birth Control** ⟸**129**
    **Constitutional Law** ⟸**1795**

Employee exemption of Massachusetts statute, which established a 35-foot fixed buffer zone around driveways and entrances of reproductive health care facilities (RHCF), did not constitute unlawful viewpoint discrimination; it was within the scope of their employment for clinic personnel to escort patients in this fashion, and since a primary purpose of the law

was to facilitate safe access, the employee exemption served the basic objectives of the statute. U.S.C.A. Const.Amend. 1; M.G.L.A. c. 266, § 120E 1/2.

**6. Constitutional Law** ⟸**1509**

Time, place and manner regulations will be upheld if (1) they are justified without reference to the content of the regulated speech; (2) are narrowly tailored to serve a significant governmental interest; and (3) leave open ample alternative channels for communication of the information. U.S.C.A. Const.Amend. 1.

**7. Abortion and Birth Control** ⟸**129**
    **Constitutional Law** ⟸**1795**

Massachusetts statute, which established 35-foot fixed buffer zone around driveways and entrances of reproductive health care facilities (RHCF), was narrowly tailored, consonant with free speech rights, to serve Commonwealth's legitimate interest in protecting public safety at RHCF entrances and driveways, and buffer zone targeted only problematic areas during problematic time, specifically during business hours. U.S.C.A. Const.Amend. 1; M.G.L.A. c. 266, § 120E 1/2.

**8. Abortion and Birth Control** ⟸**129**
    **Constitutional Law** ⟸**1795**

Massachusetts statute, which established 35-foot fixed buffer zone around driveways and entrances of reproductive health care facilities (RHCF), was not overbroad in violation of right of freedom of speech; all persons entering and exiting the health care facilities shared legitimate health and safety interests served by statute. U.S.C.A. Const.Amend. 1; M.G.L.A. c. 266, § 120E 1/2.

**9. Abortion and Birth Control** ⟸**129**
    **Constitutional Law** ⟸**1795, 4329**

Massachusetts statute, which established a 35-foot fixed buffer zone around driveways and entrances of reproductive

**Add. 7a**

health care facilities (RHCF), did not constitute an impermissible prior restraint on speech in violation of the First and Fourteenth Amendments, given that the statute had not sought to prevent speech, but, rather, to regulate the place and manner of its expression. U.S.C.A. Const.Amends. 1, 14; M.G.L.A. c. 266, § 120E 1/2.

**10. Abortion and Birth Control ⇐129**
   **Constitutional Law ⇐1398(1)**

Massachusetts statute, which established a 35-foot fixed buffer zone around driveways and entrances of reproductive health care facilities (RHCF), did not violate the Free Exercise clause; the statute did not regulate speech, expression, prayer, singing, worship, or display of religious articles, and, it merely regulated where such expression may take place, specifically, outside of a clearly marked buffer zone during the normal business hours of an RHCF. U.S.C.A. Const.Amends. 1, 14; M.G.L.A. c. 266, § 120E 1/2.

**11. Constitutional Law ⇐1440**

Regulations imposing severe burdens on plaintiffs' associational rights must be narrowly tailored and advance a compelling state interest; lesser burdens, however, trigger less exacting review, and a state's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions. U.S.C.A. Const.Amend. 1.

**12. Abortion and Birth Control ⇐129**
   **Constitutional Law ⇐1430, 1441**

Massachusetts statute, which established a 35-foot fixed buffer zone around driveways and entrances of reproductive health care facilities (RHCF), did not violate the First Amendment's right to associate or assemble peaceably, given that the statute permitted ample alternative channels of communication. U.S.C.A. Const. Amend. 1; M.G.L.A. c. 266, § 120E 1/2.

**13. Constitutional Law ⇐3067**

Where a state shows a satisfactory rationale for a content-neutral time, place, and manner regulation, that regulation necessarily passes the rational basis test employed under the Equal Protection Clause. U.S.C.A. Const.Amend. 5.

**14. Abortion and Birth Control ⇐129**
   **Constitutional Law ⇐4329**

Exemption of Massachusetts statute, which established a 35-foot fixed buffer zone around driveways and entrances of reproductive health care facilities (RHCF), for persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility was not void for vagueness under the Due Process Clause; the exemption clearly applied if an individual walked through the zone with the sole purpose of walking home or to work or to the store, and, additionally, if a counselor or protester decided to walk through the zone with the sole purpose of getting to the other side, the exemption would apply. U.S.C.A. Const.Amend. 14.

**15. Criminal Law ⇐13.1(1)**

The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. U.S.C.A. Const. Amend. 5.

**16. Abortion and Birth Control ⇐129**
   **Constitutional Law ⇐4329**

Massachusetts statute, which established a 35-foot fixed buffer zone around driveways and entrances of reproductive health care facilities (RHCF), did not violate anti-abortion protesters' alleged liberty interest in the "right to loiter"; even assuming protesters were seeking a right

to enter the areas immediately adjacent to RHCF entrances and driveways simply to wander and loiter innocently, such a right could not be characterized as fundamental. U.S.C.A. Const.Amend. 1; M.G.L.A. c. 266, § 120E 1/2.

————————

Benjamin W. Bull, Alliance Defense Fund, Scottsdale, AZ, Kevin H. Theriot, Alliance Defense Fund, Leawood, KS, Michael J. DePrimo, Hamden, CT, Philip D. Moran, Salem, MA, Timothy D. Chandler, Alliance Defense Fund, Folsom, CA, for Plaintiffs.

Kenneth W. Salinger, Massachusetts Attorney General's Office, Anna–Marie L. Tabor, Office of the Attorney General, Boston, MA, for Defendant.

*MEMORANDUM*

TAURO, District Judge.

## Introduction

Plaintiffs challenge the facial constitutionality of a recently revised Massachusetts statute, Mass. Gen. Laws ch. 266, § 120E 1/2 ("Act"), which establishes a 35–foot fixed buffer zone around driveways and entrances of reproductive health care facilities ("RHCFs").[1] Following a Bench Trial held on May 28, 2008, this court finds that the Act survives First Amendment, Equal Protection and Due Process challenges.

## Background

### A. The Parties

Plaintiffs Eleanor McCullen, Jean Blackburn Zarrella, Gregory A. Smith, Carmel Farrell and Eric Cadin are Massachusetts residents who regularly engage in pro-life counseling outside RHCFs.[2] Defendant Attorney General Martha Coakley is the chief lawyer and law enforcement officer of the Commonwealth of Massachusetts. As such, Attorney General Coakley bears responsibility for enforcing the Act. She is sued in her official capacity only.[3]

### B. Procedural History

On January 16, 2008, Plaintiffs filed the Complaint, advancing eight counts under 42 U.S.C. § 1983: (1) Free Speech—Time, Place and Manner; (2) Free Speech—Substantial Overbreadth; (3) Free Speech—Prior Restraint; (4) "Free Speech—Free Association—Free Exercise Hybrid;" (5) Free Speech—Viewpoint Discrimination; (6) Due Process—Vagueness; (7) Due Process—Liberty Interest; and (8) Equal Protection.[4]

Plaintiffs seek that this court: (1) declare that the Act is unconstitutional on its face; (2) declare that the Act is unconstitutional as applied at the Allston–Brighton Planned Parenthood and Women's Health Service; (3) preliminarily [5] and permanently enjoin Defendant from enforcing the Act; (4) award costs and attorneys fees; and (5) grant any other relief that this court deems necessary and proper.[6]

————————

1.  An Act Relative to Public Safety at Reproductive Health Care Facilities, Chapter 155 of the Acts of 2007 (codified as amended at Mass. Gen. Laws ch. 266, § 120E 1/2 (2007)) (Trial Ex. 1)[# 36].  The Act revised parts of Mass. Gen. Laws ch. 266, § 120E 1/2 (2000) (Trial Ex. 3)[# 38].

2.  *See* Decl. of Eleanor McCullen (Trial Ex. 4)[# 39]; Decl. of Jean Blackburn Zarrella (Trial Ex. 5)[# 40]; Decl. of Carmel Farrell

(Trial Ex. 6)[# 41]; Decl. of Eric Cadin (Trial Ex. 7)[# 42]; Decl. of Gregory A. Smith (Trial Ex. 8)[# 43].

3.  *See* Compl. at 3[# 1].

4.  *See id.* at 13–22[# 1].

5.  Pls.' *Mot. for Prelim.  Inj.* [# 2].

6.  *See* Compl. at 22–23.

Following Defendant's Answer, and briefing on Plaintiffs' preliminary injunction motion, this court held a Case Management Conference on April 23, 2008. Without objection from the Parties, this court ordered that the matter proceed on the merits in two stages:[7] (1) a Bench Trial on Plaintiffs' facial challenge; and (2) a Bench Trial on Plaintiffs' as-applied challenge.[8]

In early May 2008, the Parties stipulated to the content of the Trial Record for the facial challenge,[9] and filed a Joint Trial Record with this court.[10] On May 14, 2008, the Parties filed Proposed Findings of Fact and Conclusions of Law.[11] Also on May 14, 2008, four individuals filed an Amicus Brief in support of Plaintiffs' facial and as-applied challenges.[12]

On May 28, 2008, this court held a Bench Trial on Plaintiffs' facial challenge. The Parties presented extensive oral argument, and this court took the matter under advisement.[13]

## Factual Findings

### A. Notes on Factual Findings

#### 1. Source

The following findings of fact derive from the Joint Trial Record submitted by the Parties. Additionally, this court takes notice of the findings of the First Circuit with respect to the legislative justification for the original statute enacted in 2000 ("2000 Act").[14]

#### 2. Focus on Facial Challenge

Plaintiffs urge this court to adopt various findings of fact relating to, among other things, the following: Plaintiffs' activities at certain RHCFs; specific incidents at certain RHCFs; and the operation of the buffer zone at certain RHCFs.[15]

---

7. This court denied Plaintiffs' *Motion for Preliminary Injunction* without prejudice to re-raising similar issues in a Bench Trial on the merits. *See* Order [# 34].

8. *See id.*

9. *See* Joint Stipulation as to the Content of the Trial R. for the Bench Trial of Pls.' Facial Challenge [# 35].

10. *See* Trial Exs. 1–29 [Docket Nos. 36–66].

11. *See* Pls.' Proposed Findings of Fact and Conclusions of Law [# 69] ("PFF"); Def.'s Proposed Findings of Fact and Conclusions of Law [# 70] ("DFF").

12. Mem. of Amicae Curiae [# 71].

13. On June 3, 2008, Plaintiffs filed a *Motion for Leave to File Post–Argument Brief on the Trial of Facial Challenge* [# 72], which Defendant opposed. *See* Opp'n to Pls.' Mot. for Leave to File a Post–Trial Brief [# 73]. This court denied Plaintiffs' motion. *See* Electronic Order dated June 5, 2008. On June 16, 2008, this court received a preliminary copy of the Bench Trial Transcript ("Prelim. Bench Trial Transcript").

14. *See McGuire v. Reilly,* 260 F.3d 36, 39–41 (1st Cir.2001) ("*McGuire I*"); *McGuire v. Reilly,* 386 F.3d 45, 48–49 (1st Cir.2004) ("*McGuire II*"). *See also, e.g., Daggett v. Comm'n on Governmental Ethics and Election Practices,* 205 F.3d 445, 456 n. 9 (1st Cir. 2000) ("The Rules of Evidence state that the court may take judicial notice of legislative facts whether requested or not. *See* Fed. R.Evid. 201(c). A 'legislative fact' is defined as 'one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' Fed.R.Evid. 201(b)."); *Daggett v. Comm'n on Governmental Ethics and Election Practices,* 172 F.3d 104, 112 (1st Cir.1999) ("[S]o-called 'legislative facts,' which go to the justification for a statute, usually are not proved through trial evidence but rather by material set forth in the briefs, the ordinary limits on judicial notice having no application to legislative facts.") (*citing* Fed.R.Evid. 201 advisory committee's note; *Knight v. Dugger,* 863 F.2d 705, 742 (11th Cir.1988)).

15. *See* PFF at 2–10.

Additionally, Defendant asks this court to adopt certain findings of fact relating to the effects of the Act, to date, at certain RHCFs.[16] While this information may be important to Plaintiffs' as-applied challenge, it is largely irrelevant to the facial challenge. Moreover, because the as-applied challenge will be tried separately, this court does not have a complete record from which to make such findings.

### B. History of the 2000 Act

As noted by the First Circuit, "[b]y the late 1990s, Massachusetts had experienced repeated incidents of violence and aggressive behavior outside RHCFs."[17] These included a shooting that occurred on December 30, 1994, in which two people were killed and several others injured.[18] Massachusetts courts also issued numerous injunctions prohibiting certain individuals from engaging in violent, harassing or intimidating activity at RHCFs.[19]

Responding to these concerns, "the Massachusetts legislature, confronted with an apparently serious public safety problem, investigated the matter thoroughly."[20] "That investigation yielded solid evidence that abortion protesters are particularly aggressive and patients particularly vulnerable as they enter or leave RHCFs."[21]

Part of the investigation included a state senate hearing on the matter in April of 1999.[22] At the hearing, the "received testimony chronicled the harassment and intimidation that typically occurred outside RHCFs."[23] In addition, "numerous witnesses addressed the emotional and physical vulnerability of women seeking to avail themselves of abortion services, and gave accounts of the deleterious effects of overly aggressive demonstrations on patients and providers alike."[24]

The senate, "[b]ased in part on this testimony, . . . concluded that existing laws did not adequately protect public safety in areas surrounding RHCFs," and the Legislature began considering new laws to address the problem.[25] Initially, in Senate Bill 148, the senate considered a 25–foot fixed buffer zone around RHCF entrances and driveways. The First Circuit explained:

> To remedy this situation, the senate favored the creation of fixed buffer zones. The sponsors of the bill left no doubt that they intended the proposed law to "increase public safety in and around [RHCFs]" while "maintaining the flow of traffic and preventing congestion" there. S.B. 148 . . . § 1. In the bargain, the sponsors expected the law to provide "reasonable time, place and manner re-

---

**16.** *See* DFF at 16–18.

**17.** *McGuire I,* 260 F.3d at 38.

**18.** *See id.* at App. B.

**19.** *See, e.g., Planned Parenthood League of Mass., Inc. v. Bell,* 424 Mass. 573, 677 N.E.2d 204 (1997); *Commonwealth v. Filos,* 420 Mass. 348, 649 N.E.2d 1085 (1995); *Planned Parenthood League of Mass., Inc. v. Blake,* 417 Mass. 467, 631 N.E.2d 985 (1994); *Commonwealth v. Cotter,* 415 Mass. 183, 612 N.E.2d 1145 (1993); *Commonwealth v. Brogan,* 415 Mass. 169, 612 N.E.2d 656 (1993); *Planned Parenthood League of Mass., Inc. v. Operation Rescue,* 406 Mass. 701, 550 N.E.2d 1361

(1990); *Commonwealth v. Manning,* 41 Mass. App.Ct. 696, 673 N.E.2d 73 (1996).

**20.** *McGuire I,* 260 F.3d at 44.

**21.** *Id.*

**22.** *Id.* at 39.

**23.** *Id.* For copies of the written testimony received by the senate, see Exhibits A–F to the Affidavit of Richard A. Powell (Trial Ex. 29) [# 66–2–7]. The testimony includes numerous specific observations and incidents.

**24.** *Id.*

**25.** *Id.*

strictions to reconcile and protect both the First Amendment rights of persons to express their views near reproductive health care facilities and the rights of persons seeking access to those facilities to be free from hindrance, harassment, intimidation and harm." It thereby would "create an environment in and around reproductive health care facilities which is conducive towards the provision of safe and effective medical services . . . to its patients." *Id.*

Skeptics worried that the proposed law might offend the Constitution. To stave off these gloom-and-doom predictions, the senate, on November 3, 1999, asked the Massachusetts Supreme Judicial Court (SJC) for an advisory opinion on the bill's constitutionality.

On January 24, 2000, the SJC concluded that the Constitution presented no obstacle to enactment. *Opinion of the Justices to the Senate*, 430 Mass. 1205, 1211–12, 723 N.E.2d 1 (2000). The SJC advised that the bill, as framed, was unrelated to the content of protected expression. *Id.* at 1209, 723 N.E.2d 1Moreover, the restrictions imposed had a rational basis in view of the heightened governmental interest that arises when "advocates of both sides of one of the nation's most divisive issues frequently meet within close proximity of each other in the areas immediately surrounding the State's clinics, in what can and often do become congested areas charged with anger." *Id.* at 1210, 723 N.E.2d 1.[26]

Following the SJC's opinion, the state senate adopted the bill on February 29, 2000.[27] On June 28, 2000, however, the Supreme Court decided *Hill v. Colorado*,[28] There, the Court considered the constitutionality of a Colorado statute that regulated speech-related conduct around RHCFs.[29] The statute created a "floating" buffer zone within a 100–foot "fixed" buffer zone.[30] Plaintiffs challenged the "floating" zone, which "ma[de] it unlawful within the regulated areas for any person to 'knowingly approach' within eight feet of another person, without that person's consent, 'for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person . . . .'"[31]

The Court upheld the Colorado statute as a valid time, place and manner regulation, finding that the law was "narrowly tailored" and "serve[d] governmental interests that are significant and legitimate and that the restrictions are content neutral."[32] This court will address *Hill* in more detail below.

## C. The 2000 Act[33]

Subsequently, the Massachusetts Legislature decided to follow the Court-approved Colorado model of a "floating" buffer zone within a "fixed" buffer zone. The state house redrafted Senate Bill 148 accordingly, and on July 28, 2000, adopted an Act Relative to Reproductive Health Care Facilities, Chapter 217 of the Acts of 2000 ("2000 Act").[34] The senate approved on

26. *Id.* at 39–40 (spacing modified).

27. *Id.* at 40.

28. 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).

29. *See id.* at 707, 120 S.Ct. 2480.

30. *See id.*

31. *Id.*

32. *Id.* at 725–26, 120 S.Ct. 2480.

33. Judge Harrington, at the trial level, and the First Circuit on appeal, have adjudicated the constitutionality of the 2000 Act, and much of the information in this section draws from their discussions in the *McGuire* line of cases.

34. *See McGuire I*, 260 F.3d at 40; Mass. Gen. Laws ch. 266, § 120E 1/2 (2000) (Trial Ex. 3).

July 29, 2000, and Governor Celluci signed the bill on August 10, 2000.[35]

The 2000 Act created an 18–foot fixed buffer zone around RHCFs, within which a 6–foot floating buffer zone existed around any person or occupied motor vehicle:

(b) No person shall knowingly approach another person or occupied motor vehicle within six feet of such person or vehicle, unless such other person or occupant of the vehicle consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education or counseling with such other person in the public way or sidewalk area within a radius of 18 feet from any entrance door or driveway to a reproductive health care facility or within the area within a rectangle not greater than six feet in width created by extending the outside boundaries of any entrance door or driveway to a reproductive health care facility at a right angle and in straight lines to the point where such lines intersect the sideline of the street in front of such entrance door or driveway.[36]

The 2000 Act, however, exempted certain groups from its coverage:

(1) persons entering or leaving such facility;

(2) employees or agents of such facility acting within the scope of their employment;

(3) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and

(4) persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility.[37]

Additionally, the provisions of the 2000 Act were only in "effect during a facility's business hours and [only] if the area contained within the radius and rectangle described in said subsection (b) is clearly marked and posted."[38]

### D.  Attorney General's Guidance on the 2000 Act

On November 10, 2000, the Massachusetts Attorney General's office sent a letter to the Brookline and Boston police departments regarding the 2000 Act.[39] The letter explained the Attorney General's interpretation of the exemption for "employees or agents of such facility acting within the scope of their employment,"[40] and "noted that if escorts were to approach within six feet of a woman within the fixed buffer zone in order to 'hurl[ ] epithets at demonstrators,' then their actions would not be within the scope of their employment and they would not be protected by the exemption."[41]

On May 23, 2001, members of the Attorney General's office met with staff from the Planned Parenthood League of Massachusetts, "to communicate the Attorney General's interpretation that the Act's exemption for clinic employees and agents acting within the scope of their employment would not protect such persons if they were to use the exemption to engage in counter-protests, counter-education, or counter-counseling against anti-abortion

---

**35.**  *See McGuire I,* 260 F.3d at 40;  Mass. Gen. Laws ch. 266, § 120E 1/2 (2000) (Trial Ex. 3).

**36.**  Mass. Gen. Laws ch. 266, § 120E 1/2(b) (2000) (Trial Ex. 3).

**37.**  *Id.*

**38.**  *Id.* § 120E 1/2(c).

**39.**  *See McGuire II,* 386 F.3d at 52.

**40.**  Mass. Gen. Laws ch. 266, § 120E 1/2(b) (2000) (Trial Ex. 3).

**41.**  *McGuire II,* 386 F.3d at 52.

views, rather than simply assisting the patients into the clinic and protecting clinic access." [42]

On February 14, 2003, an assistant attorney general issued a letter to the police departments with RHCFs affected by the 2000 Act.[43] The letter reiterated that " 'all persons in the restricted area, including clinic employees and agents, are subject to the restrictions in Section 120E 1/2(b) of the Act, including the restriction on oral protest, education, or counseling[,]' and that clinic employees and agents may not use the exemption to 'express their views about abortion[.]' " [44]  As noted by the First Circuit, this letter "did not signify a new interpretation; it was merely a restatement of an old position.  In this most recent clarification of the interpretation, the Attorney General has clearly construed the exemption to exclude pro-abortion or partisan speech from the term 'scope of their employment.' " [45]

### E.  *McGuire I* and *McGuire II*

Three pro-life "sidewalk counselors" [46] challenged the facial and as-applied constitutionality of the 2000 Act in a federal lawsuit in this District.  Judge Harrington found that the statute—on its face—violated the First Amendment, and preliminarily enjoined its enforcement pending a hearing on the merits.[47]

In *McGuire v. Reilly* ("*McGuire I*"), the First Circuit reversed, holding that the statute lawfully regulated the time, place and manner of speech without discriminating based on content or viewpoint, and remanded the case to the district court for further proceedings.[48]

On remand, the plaintiffs pressed facial and as-applied challenges on the merits. Based on the First Circuit's decision in *McGuire I*, Judge Harrington granted Defendants summary judgment on Plaintiffs' facial challenge,[49] but denied summary judgment on the as-applied challenge pending additional discovery and the filing of a renewed motion for summary judgment.[50]

After additional discovery, Judge Harrington granted Defendants summary judgment on the as-applied challenge.[51] On the issue of enforcement following *McGuire I*, Judge Harrington found that "the Act has since been interpreted by the Attorney General so as to require even-handed enforcement of its prohibitions, even against clinic employees and agents, and the Attorney General's interpretation has been adopted by the law enforcement authorities." [52]

In *McGuire v. Reilly* ("*McGuire II*"), the First Circuit affirmed summary judgment on both the facial and as-applied

---

**42.**  *Id.* Also during July of 2001, the Attorney General's office provided training consistent with its November 10, 2001 guidance letter to the Boston and Brookline police departments. *Id.*

**43.**  *McGuire v. Reilly,* 271 F.Supp.2d 335, 339 (D.Mass.2003) (Harrington, J.), *aff'd, McGuire II,* 386 F.3d 45 (1st Cir.2004).  Hereinafter, this court will refer to the letter as the ''2003 Guidance Letter.''

**44.**  *Id.* at 339–40.

**45.**  *McGuire II,* 386 F.3d at 52 n. 1.

**46.**  *Id.* at 48.

**47.**  *See McGuire v. Reilly,* 122 F.Supp.2d 97 (D.Mass.2000) (Harrington, J.), *rev'd, McGuire I,* 260 F.3d 36 (1st Cir.2001).

**48.**  *See McGuire I,* 260 F.3d 36.

**49.**  *See McGuire v. Reilly,* 230 F.Supp.2d 189, 193 n. 10 (D.Mass.2002) (Harrington, J.).

**50.**  *Id.* at 194.

**51.**  *See McGuire v. Reilly,* 271 F.Supp.2d 335 (D.Mass.2003) (Harrington, J.), *aff'd, McGuire II,* 386 F.3d 45 (1st Cir.2004).

**52.**  *Id.* at 341.

challenges.[53] *McGuire I* controlled the facial challenge, and the plaintiffs "offered no reason why the conclusion reached in *McGuire I* . . . is flawed."[54] Additionally, the court concurred with Judge Harrington's assessment of the Commonwealth's enforcement position, holding that "[t]he Attorney General's interpretation . . . is important for our purposes . . . because it is clearly a proper, content-neutral way of interpreting the exemption."[55] With respect to the as-applied challenge, the court concluded that "there is no evidence that the police have enforced this statute in anything other than an evenhanded way. . . ."[56]

## F. The Legislature Determines that the Statute Needs to be Revised

### 1. Proposed Senate Bill 1353

Following the passage and operation of the 2000 Act, members of the Legislature became aware of continued and serious public safety problems in the areas adjacent to RHCF entrances and driveways, including significant concerns regarding safe patient access to medical services.[57]

In 2007, responding to these concerns, several members of the Legislature introduced Senate Bill 1353, "An Act Relative

to Public Safety." The proposed preamble read:

> Whereas preservation of public safety is a fundamental obligation of state government;
> Whereas pedestrians have a right to travel peacefully on Massachusetts streets and sidewalks; and
> Whereas clearly defined boundaries improve the ability of safety officials to protect the public;[58]

The bill modified the size and nature of the buffer zone:

> (b) No person shall knowingly enter or remain on a public way or sidewalk adjacent to a reproductive health care facility within a radius of thirty-five feet of any portion of an entrance, exit or driveway of a reproductive health care facility or within the area within a rectangle created by extending the outside boundaries of any entrance to, exit from or driveway of, a reproductive health care facility in straight lines to the point where such lines intersect the sideline of the street in front of such entrance, exit or driveway.[59]

The Legislature's Joint Committee[60] on Public Safety and Homeland Security ("Committee") held a public Hearing on the bill on May 16, 2007, and received written and oral testimony from law enforcement officials;[61] RHCF staff, volun-

---

53. *See McGuire II*, 386 F.3d 45.

54. *Id.* at 59.

55. *Id.* at 64.

56. *Id.* at 65.

57. *See, e.g.*, Hearing Transcript at 7–13 (legislators—including some of the bill's sponsors—discussing public safety concerns at RHCFs, problems with the 2000 Act, and the origins of Senate Bill 1353).

58. An Act Relative to Public Safety, S.B. 1353, 185th Gen. Court (Mass.2007) (enacted), Ex. A to Aff. of Adam T. Martignetti ("Martignetti Aff.") (Trial Ex. 24) [# 61–2]. Plaintiffs argue that the preamble constitutes "three very different facts underlying [the

bill's] purpose." Pl. Mem. in Supp. of Mot. for Prelim. Inj. at 52[# 16]. This court disagrees. All three sections of the preamble clearly relate to public safety.

59. *Id.*

60. Members of the state house and senate serve on the Committee.

61. Captain Williams Evans ("Evans") of the Boston Police Department testified. Evans is the police commander for the South End, Back Bay, Lower Roxbury and Fenway sections of Boston. *See* Transcription of Videotape of Hearing of the Joint Committee on Public Safety and Homeland Security at 25 ("Hearing Transcript"), Ex. C to Aff. of Vineeth Narayanan ("Narayanan Aff.") (Trial

teers and representatives; and representatives of various advocacy organizations.[62] At the Hearing, the Committee also viewed video footage and photographs of protest activity at certain RHCFs.[63] Additionally, the Committee received written correspondence supporting and opposing the bill.[64]

### 2.  Public Safety and Access to Medical Services

The Committee received testimony that, despite the 2000 Act's floating and fixed buffer zones, significant public safety concerns continued to exist at RHCFs in the Commonwealth, including major concerns regarding safe patient access to medical services.  Attorney General Martha Coakley ("Coakley") explained that the fixed buffer zone was necessary to address the situation:

> This is an important public safety issue. Over the years, reproductive healthcare facilities have been the scene of mass demonstrations, congestion, blockages, disturbances, and even murders.  SB 1353 will help ensure greater safety along our public ways and sidewalks and prevent violence, harassment and intimidation of women who are attempting to exercise their fundamental right to access health care.
>
> . . .
>
> I support the bill's recognition that "clearly defined boundaries improve the ability of safety officials to protect the public."
>
> . . .
>
> Facility employees, volunteers, patients and prospective patients are routinely harassed as they try to enter and exit

facilities for medical counseling and treatment.  For example, at the Boston location, which has a recessed door, protesters are able to stand close to the entrance, with some protesters standing right at the entrance.  Demonstrators regularly crowd facility entrances and surround women, facility employees and volunteers with graphic and discomfiting pictures of aborted fetuses, and shout at and taunt them calling them "baby killers" and "murderers."

> . . .
>
> [P]atients and employees are forced to step around or through the protestors as they make their way into the building. We have heard of cases where women arrive at the facilities and then leave because they are too upset to pass through the gauntlet of protestors.
>
> Protestors also stand and block cars as patients and employees attempt to enter the driveway or garage entrance to these facilities.  Other times, protestors circle cars and put their faces against, or in close proximity to, the car windows to scream at and sometimes videotape people in their cars.  In some cases, protestors throw anti-abortion literature and leaflets into people's cars as they enter or exit the facilities.  Even more egregious are the protestors who dress as Boston Police Department officers and approach women and their companions at close distance, pretending that they are escorting them to the clinic's entrance, only to taunt them or force leaflets into their hands as they make their way to and from the healthcare facilities. All of these actions can and do easily spark reaction and response and create

---

Ex. 26) [# 63–4].  Attorney General Coakley, Mary Beth Heffernan, Undersecretary for Criminal Justice, and William Keating, Norfolk County District Attorney, also testified.

**62.**  *See* Martignetti Aff. at 1 (Trial Ex. 24)[# 61].

**63.**  *See, e.g.,* Hearing Transcript at 16 (Trial Ex. 26) [# 63–4].

**64.**  *See* Compilation of Letters at 2–25 (Trial Ex. 17)[# 52].

McCULLEN v. COAKLEY          393

Cite as 573 F.Supp.2d 382 (D.Mass. 2008)

an unsafe, dangerous risk along our public ways. The actions directly impede the normal flow of traffic along the Commonwealth's public ways and sidewalks and hinder women's ability to access reproductive healthcare.[65]

The Legislature also heard testimony from RHCF staff, volunteers and law enforcement personnel regarding specific incidents of patient harassment and intimidation in the areas immediately outside RHCF entrances and driveways. Additionally, the Legislature learned about protesters blocking access RHCFs by physically positioning themselves very close to RHCF entrances and driveways.[66] Examples included the following:

- One clinic volunteer at a Boston RHCF reported:

  The protestors are moving closer and closer to the main door. They scream and block the way for the patients to get into the clinic. We fill out police reports almost every week regarding the way they encroach upon the door, but nothing has changed.[67]

  They get very close to the patients and escorts inside the buffer zone . . . . [68]

  [T]hey're getting so close that patients are terrified to even walk into the clinic. I've had people ask me, isn't there a back way . . . . [69]

When it is raining, it is exceptionally bad. Many of the protestors are inside the buffer zone with very large umbrellas and have no regard for who they hit with them. I have often been swiped with the points on their umbrellas and have nearly fallen to avoid being hit.[70]

- The president of Planned Parenthood League of Massachusetts personally observed the following at the organization's Boston facility:

  - Protestors screaming at patients and employees inside the current 'buffer zone', usually right at the doorway . . . .

  - Protesters photographing and filming into patients and employees' cars and taking photos of license plate numbers to post on websites

  - Protesters standing in front of cars and the keypad to the garage to block access, so that they can throw pamphlets and other propaganda into cars entering the garage

  - And, most deceptively, I've seen protesters dress up wearing Boston Police T-shirts and hats, trying to collect patient contact information, videotaping, and in other ways trying to intimidate those who are simply exercising their legal right to seek confidential medical services [71]

---

**65.** Martha Coakley Written Testimony, Ex. D to Martignetti Aff. (Trial Ex. 24) [# 61–5] (spacing modified).

**66.** Indeed, Captain Evans testified:

A lot of people are under the misconception that [the law] prevents protestors from going into that buffer zone, which is incorrect. Protestors can stand up right in front of the door. A lot of them hold signs right there. As long as they stay stationary, you know, they can stand in front of that door. William Evans Oral Testimony, Hearing Transcript at 25 (Trial Ex. 26) [# 63–4].

**67.** Gail Kaplan Written Testimony, Ex. C to Martignetti Aff. (paragraph number omitted) (Trial Ex. 24) [# 61–4].

**68.** *Id.* (paragraph number omitted).

**69.** Gail Kaplan Oral Testimony, Hearing Transcript at 40 (Trial Ex. 26) [# 63–4].

**70.** Gail Kaplan Written Testimony, Ex. C to Martignetti Aff. (paragraph number omitted) (Trial Ex. 24) [# 61–4].

**71.** Diane Luby Written Testimony at 2, Ex. G to Martignetti Aff. (Trial Ex. 24) [# 61–8].

**Add. 17a**

- A Planned Parenthood volunteer reported that protesters stood in front of the building's entrance, "every Saturday morning, every week."[72]   She explained:

  There are several long-time protesters who appear in front of Planned Parenthood . . . .

  When women approach the building, protesters fan out and approach them.

  . . .

  The clear intent of the vast majority of protesters is to deter people from entering the building at all.  The current buffer zone . . . does not permit protesters to 'approach' anyone without consent in the zone, but it does not speak to standing still in front of the building's entrance and thereby forcing patients to approach them.

  . . .

  Physical blocking is practiced regularly by protesters.  They either stand in front of the door, in the middle of the sidewalk, or in front of car doors as cars pull up to the sidewalk.  Some people pull up in cars and roll down their window to ask about the clinic's secure parking garage.  If the protesters get to the car first, they have been repeatedly heard to tell people that the garage is closed, when it is not.  They also shove pamphlets through the open window, regardless of the occupant's requests.

  In the rear of the building, near the clinic's garage entrance . . . . protesters often wait by the door and video tape the patients' cars' license plates.[73]

- At an Attleboro RHCF, a patient advocate reported:

[P]rotesters impede access to clinic doors, but also create safety issues for the general public trying to use sidewalks, streets or driveways.

. . .

[P]rotesters walk back and forth across the entrance of the driveway . . . .  Though prohibited from standing in the entrance of the driveway, they frequently stop there until threatened with police action.  There have been instances of picketers either slowing or speeding up to narrowly avoid being hit by cars driven by staff.  Patients have reported feeling too intimidated by the pacing protesters to enter the property, and turning back.[74]

- At one RHCF, on a weekly basis, women try to drive to the facility but turn away "because they're afraid to enter the parking lot entranceway, [protesters] will block so as not to allow the car to come in, and then we have the other protestors dressed in paraphernalia who will come over to the window with a clipboard and ask them to please sign in before they come through the driveway."[75]

- Likewise, at one RHCF, "You can also see people circling in the same car around and around, and every time they pull up, you can see that they want to go out and they'll ask where is the garage and then they never stop."[76]

- A protester followed a woman into a Boston RHCF entranceway.  At the same location, another protester ap-

**72.**  Liz McMahon Written Testimony at 1, Ex. F to Martignetti Aff. (Trial Ex. 24) [# 61–7].

**73.**  *Id.* at 1–2.

**74.**  Melissa Conroy Written Testimony, Ex. B to Martignetti Aff. (Trial Ex. 24) [# 61–3].

**75.**  Michael Baniukiewicz Oral Testimony, Hearing Transcript at 50–51 (Trial Ex. 26) [# 63–4].

**76.**  Liz McMahon Oral Testimony, Hearing Transcript at 51 (Trial Ex. 26) [# 63–4].

proached and placed her head inside a car outside the clinic.[77]

- A protester wearing a "Boston Police" shirt, standing immediately next to a car trying to enter an RHCF garage.[78]
- Protestors "wearing police hats and police uniforms" as a way to get patients and others to consent to an approach.[79]

### 3.  Law Enforcement's Position

The Legislature also received testimony about the difficulties of enforcing the 2000 Act.[80] The record demonstrates that these difficulties reduced the efficacy of the statute's intended protections, and were part of the reason that significant public safety concerns continued to exist at RHCFs. Attorney General Coakley explained:

The current law provides no clearly defined boundary because it is a "floating" buffer zone within a defined radius of eighteen feet, so the buffer zone effectively moves and shifts as people pass along the public way to facility entrances or driveways. Either ignoring the law, or inadequately measuring the six-foot distance around a moving person, protestors routinely invade the existing buffer zone *in violation of the law.* This fact alone has made it very difficult if

not impossible for police to be able to immediately or ever determine whether a violation has occurred.

Another problem with the existing law is the inability to discern whether a patient, her companions, or facility employees have consented to a given protester's approach. Some protesters have said that they believed that a patient "consented" because of the way she made eye contact or because a patient uttered a statement in response to a protestor's comment (even if that statement was not one of consent).... Given the lack of a clearly defined buffer zone boundary, it has been very difficult, if not impossible, for police officers to monitor the distance these protestors maintain between themselves and the persons approaching the facilities and determine if there has been a violation; in other words, to enforce the law.[81]

Echoing Coakley's remarks, Massachusetts law enforcement personnel reported significant difficulties in enforcing the 2000 Act, and urged legislators to modify the law. Captain Evans reported, "This law, the way it stands, the current buffer zone with the 18–foot buffer zone, makes it very difficult for us to enforce the law." [82]

---

**77.**  *See* Martha Coakley Oral Testimony, Hearing Transcript at 18–19 (Trial Ex. 26) [# 63–4].

**78.**  William Evans Oral Testimony, Hearing Transcript at 36 (Trial Ex. 26) [# 63–4].

**79.**  *Id.* at 35–37.

**80.**  Plaintiffs argue that because a proposed amendment to Senate Bill 1353 did not make it into the final bill, "it appears the General Court rejected allegations that the [2000] Act was enforceable." Pl. Mem. in Supp. of Mot. for Prelim. Inj. at 51. The proposed amendment was a line that stated, "The general court hereby finds that law enforcement officials have testified about practical problems related to the enforcement of [the 2000 Act]."

*Id.* (*citing* Mass. Senate Journal, Oct. 23, 2007). This argument is unpersuasive. The Legislature may not have adopted this amendment for a number of reasons, upon which this court will not speculate. Regardless, however, of why this line was not included, the Legislature heard and considered testimony regarding enforcement difficulties with the 2000 Act. The record also demonstrates that enforcement difficulties were related to the public safety problems.

**81.**  Martha Coakley Written Testimony at 4–6, Ex. D to Martignetti Aff. (emphasis in original) (spacing modified) (Trial Ex. 24) [# 61–5].

**82.**  William Evans Oral Testimony, Hearing Transcript at 25 (Trial Ex. 26) [# 63–4].

Mainly, the police had trouble determining whether a protester had "approached" a person within the six feet floating buffer, without that person's consent. Evans explained:

> What [the protesters] have to do is make an approach. Now what an approach is is very hard to determine; whether they stick out their hand, that's an approach; where they take a step forward, that's an approach. Basically, it turns us into basically something like—I like to make the reference of a basketball referee down there, where we're watching feet, we're watching hands.[83]

This "constant watching" proved difficult and created a public safety problem. At one of the RHCFs, for example, there have been "over 100 protestors every Saturday and a lot of them go right up in the faces of patients entering the premises."[84] Additionally, such surveillance was a significant "tying up of resources" that the police "had to deal with [for] seven years."[85]

Contrary to Plaintiffs' assertions at oral argument,[86] the police and district attorneys *tried* to prosecute violations of the 2000 Act. Evans indicated his frustration with trying to prosecute violations at one of the RHCF locations:

> We've trying [sic] everything, honestly. We've tried violation of the buffer zone, and we've brought a few cases up to Brighton Court and the court has basically not supported us . . . .
>
> Chairman, we know all the players down there. We know the regular protesters.

We back up the stay-away orders and nothing seems to work down there.[87]

Evans noted that at one of the RHCFs, police had made "no more than five or so arrests."[88] The low number of arrests, however, was due to the difficulty of enforcing the law, not a lack of problematic conduct. Evans explained:

> Again, [it is] a very difficult law to enforce, what an approach is, what isn't. I mean, like I said, people can stand inside the buffer zone, and given the current set up of Planned Parenthood there, their door is in 10 feet of——actually, their buffer zone is really only 8 feet outside because of the setup.
>
> So it's such close quarters as it is there that everybody is in everybody's face, no matter what. So the buffer zone basically is no good, it really isn't, because just the proximity. It's almost like a goalie's crease out there . . . .
>
> So given that fact, it makes it very difficult for us to say someone is violating it because they're allowed to stand outside the door, with the sign in their hand.[89]

In response to these problems, Captain Evans urged the Legislature to implement the 35–foot fixed buffer zone:

> Week in and week out, we are constantly receiving calls down there [at one of the facilities], both from protestors and from Planned Parenthood on violations. I think clearly having a fixed buffer zone, where everyone knows the rules and nobody can go in that and protest, will make our job so much easier. I think you've seen the video; you see what we

---

**83.** *Id.* at 25–56.

**84.** *Id.* at 26–27.

**85.** *Id.* at 26.

**86.** *See, e.g.,* Prelim. Bench Trial Transcript at 73.

**87.** William Evans Oral Testimony, Hearing Transcript at 34–35 (Trial Ex. 26) [# 63–4].

**88.** *Id.* at 33.

**89.** *Id.* at 33–34.

have to deal with. You know, it's a very difficult rule to enforce.

You know, there's the misconception that it's a fixed area where no protestors can go. That would be great. That would make our job so much easier.

. . .

So I encourage the Committee and the legislators to support this bill. Not only will it safeguard the patients going in there, but it will also make the public safety official's job a lot easier. So I welcome the 35–foot buffer zone.[90]

With respect to the problem of protesters wearing police hats and uniforms, Evans noted:

[W]e've tried everything, and I think the only thing honestly that will keep these people out and the patients safe is to establish a fixed zone. That way there's no watching feet, watching hands and allowing protesters right up in their face.[91]

### 4. First Amendment Concerns Articulated by Advocacy Groups

The Public Safety Committee also received testimony and correspondence from several organizations that voiced First Amendment concerns about the bill. For example, the American Civil Liberties Union of Massachusetts opposed the bill, mainly on overbreadth grounds.[92] Wendy Kaminer of the Defending Dissent Foundation expressed her "dismay about the effect of this bill on free speech."[93] Marie Sturgis of Massachusetts Citizens for Life, Inc. testified, "To increase the size of the existing area without substantial reason

would be an action that demonstrates unquestionable bias and clashes with First Amendment rights."[94] C.J. Doyle of the Catholic Action League of Massachusetts stated, "The proposed expansion of existing buffer zone legislation represents yet another effort to impose a content based restriction on freedom of speech, and to impair other constitutionally protected First Amendment activity such as freedom of religion and freedom of assembly."[95]

### 5. Balancing First Amendment Concerns

The Legislature specifically acknowledged these First Amendment concerns, and took them into account. Indeed, at the May 16, 2007 Hearing, several legislators discussed the importance of balancing public safety considerations with the First Amendment rights of the protesters. Representative Marty Walz explained:

What we're seeking here is to amend the existing buffer zone law around healthcare clinics to establish a fixed buffer zone of only 35 feet, so much smaller than the 150 feet that we're accustomed to around polling places, and so for that 35 feet, we think that is an appropriate balance and one that strikes the right balance between First Amendment rights of protesters and the rights of women and other patients and family members and staff members to enter unimpeded into the healthcare clinics, so to recognize that there are competing rights and interests here, just as there are at polling places, and we think a 35–foot fixed buffer zone strikes the right

---

90. *Id.* at 26–27.

91. *Id.* at 35.

92. *See* Statement of the ACLU of Massachusetts (Trial Ex. 17)[# 52].

93. Wendy Kaminer Written Testimony at 1 (Trial Ex. 17)[# 52].

94. Marie Sturgis Written Testimony (Trial Ex. 17)[# 52].

95. Letter from C.J. Doyle, Catholic Action League to Committee, May 16, 2007 (Trial Ex. 17)[# 52].

balance to protect women entering and exiting the clinics.[96]

Similarly, Representative Michael Festa stated that the 2000 Act balanced the "First Amendment issues" with the concern "that without unfettered and reasonable access to these health services, that many women were being intimidated from having those services provided in an appropriate manner." [97]    Addressing the 2007 Act, Representative Festa commented:

> I think this bill, quite frankly, strikes the balance in a way in 2007 that we can acknowledge, does give due respect for those who feel that they have need to express their objections to this whole situation, and at the same time, acknowledge that 35 feet is quite reasonable. . . . [T]his bill, I think, fundamentally does what needs to be done today, which is to give that protection and also afford the right to those who are concerned to express their views.[98]

The Legislature also specifically solicited and heard testimony on balancing these concerns. Senator Jarrett Barrios, the Committee's Chairman, stated:

> [S]ince I've got three of the finest lawyers in Massachusetts in front of me, and one of the leading arguments that is made in opposition to this is infringe-

ment on First Amendment rights which the federal government, and obviously there's a state equivalent to that.

> . . .

> And I'm interested in your thoughts, if you have any, specifically as to why that's not the case.[99]

Attorney General Coakley responded that the law was a constitutional time, place and manner restriction that appropriately balanced patient rights, protester rights and public safety considerations.[100] Additionally, after recognizing the importance of First Amendment rights,[101] Coakley emphasized the balancing process: "There's always a balance involved" in First Amendment situations, "and I think it's an appropriate question and I think the Legislature has to weigh this." [102]    Similarly, Keating noted, "I also view this in a Constitutional sense as a contest of competing freedoms. . . ." [103] Heffernan agreed with Coakley and Keating, and briefly echoed their comments.[104]

### G.  The 2007 Act

After receiving and considering this testimony, the Legislature enacted Senate Bill 1353 on November 8, 2007,[105] titled "An Act Relative to Reproductive Health Care Facilities ("Act or 2007 Act")," Chapter 155 of the Acts of 2007.[106]  The Act contained an emergency preamble:

---

**96.**  Marty Walz Oral Testimony, Hearing Transcript at 7 (Trial Ex. 26) [# 63–4].

**97.**  Michael Festa Oral Testimony, Hearing Transcript at 11–12 (Trial Ex. 26) [# 63–4].

**98.**  *Id.* at 12–13.

**99.**  Jarrett Barrios Oral Testimony, Hearing Transcript at 29–30 (Trial Ex. 26) [# 63–4].

**100.**  Martha Coakley Oral Testimony, Hearing Transcript at 30–32 (Trial Ex. 26) [# 63–4]. *See also* Martha Coakley Written Testimony at 6–7, Ex. D to Martignetti Aff. (discussing how the proposed bill protected First Amendment rights) (Trial Ex. 24) [# 61–5].

**101.**  *Id.* at 30 ("I think all four of us take that right of the First Amendment extremely seriously. . . .").

**102.**  *Id.* at 30.

**103.**  William Keating Oral Testimony, Hearing Transcript at 32 (Trial Ex. 26) [# 63–4].

**104.**  *See* Mary Beth Heffernan Oral Testimony, Hearing Transcript at 32–33 (Trial Ex. 26) [# 63–4].

**105.**  *See* Martignetti Aff. at 3 (Trial Exhibit 24)[# 61] ("Senate No. 1353 in its final form was passed by the Senate and the House on November 8, 2007.").

**106.**  An Act Relative to Public Safety at Reproductive Health Care Facilities, Chapter 155 of

*Whereas,* The deferred operation of this act would tend to defeat its purpose, which is to increase forthwith public safety at reproductive health care facilities, therefore it is hereby declared to be an emergency law, necessary for the immediate preservation of the public safety.[107]

The Act itself read:

Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same as follows:

SECTION 1.   Section 120E 1/2 of chapter 266 of the General Laws, as appearing in the 2006 Official Edition, is hereby amended by inserting after the word "within", in line 2, the following words:–or upon the grounds of.

SECTION 2.  Subsection (b) of said section 120E1/2 of said chapter 266, as so appearing, is hereby amended by striking out the first sentence and inserting in place thereof the following sentence:No person shall knowingly enter or remain on a public way or sidewalk adjacent to a reproductive health care facility within a radius of 35 feet of any portion of an entrance, exit or driveway of a reproductive health care facility or within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of a reproductive health care facility in straight lines to the point where such lines intersect the sideline of the street

in front of such entrance, exit or driveway.[108]

The Act did not affect the 2000 Act's exemptions:

(1) persons entering or leaving such facility;

(2) employees or agents of such facility acting within the scope of their employment;

(3) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and

(4) persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility.[109]

The Act also maintained the business hours and clearly marked restriction of the 2000 Act: "The provisions of subsection (b) shall only take effect during a facility's business hours and if the area contained within the radius and rectangle described in said subsection (b) is clearly marked and posted." [110]

Governor Patrick signed the bill on November 13, 2007.[111]

### H.   Attorney General's Guidance on the 2007 Act

On January 25, 2008, the Attorney General's Office sent a letter to law enforcement personnel and RHCFs subject to the Act's coverage.[112] The letter summarized

---

the Acts of 2007 (codified as amended at Mass. Gen. Laws ch. 266, § 120E 1/2 (2007)) (emphasis in original) (Trial Ex. 1)[# 36].

**107.**  *Id.* (emphasis in original).

**108.**  *Id.*

**109.**  Mass. Gen. Laws ch. 266, § 120E 1/2(b) (2000), *amended by* Mass. Gen. Laws ch. 266 § 120E 1/2(b) (2007) (spacing modified) (Trial Ex. 3)[# 38].

**110.**  *Id.* § 120E 1/2(c) (2000), *amended by* Mass. Gen. Laws ch.  266 § 120E 1/2(c) (2007) (Trial Ex. 3).

**111.**  *See* An Act Relative to Public Safety at Reproductive Health Care Facilities, Chapter 155 of the Acts of 2007 (codified as amended at Mass. Gen. Laws ch. § 120E 1/2 (2007)) (Trial Ex. 1); Martignetti Aff. at 3 (Trial Ex. 24)[# 61].

**112.**  *See* Narayanan Aff. at 1 (Trial Ex. 26)[# 63]; Letters from Maura T. Healey,

the Act, and emphasized that the Act's provisions were in effect only during an RHCF's business hours and only if the boundaries were "clearly marked and posted." [113]  The letter also provided "guidance to assist you in applying the four exemptions" in the Act, which consisted of the following four paragraphs:

> The first exemption—for persons entering or leaving the clinic—only allows people to cross through the buffer zone on their way to or from the clinic.  It does not permit companions of clinic patients, or other people not within the scope of the second or third exemptions, to stand or remain in the buffer zone, whether to smoke, talk with others, or for any other purpose.

> The second exemption—for employees or agents of the clinic acting within the scope of their employment—allows clinic personnel to assist in protecting patients and ensuring their safe access to clinics, but does not allow them to express their views about abortion or to engage in any other partisan speech within the buffer zone.

> Similarly, the third exemption—for municipal employees or agents acting within the scope of their employment—does not allow municipal agents to express their views about abortion or to engage in any other partisan speech within the buffer zone.

> Finally, the fourth exemption—for persons using the sidewalk or street adjacent to the clinic to reach a destination other than the clinic—applies to individuals who are crossing through the buffer zone, without stopping, to go somewhere other than a location within the zone and other than the clinic, and who are not using the buffer zone for some other purpose while passing through.  For example, an individual may cross through the buffer zone to reach and speak with someone outside the zone, to reach and stand in a location outside the zone (perhaps to engage in lawful protest, other speech, or prayer), or to travel on to another place altogether, provided that the individual does not do anything else within the buffer zone (such as expressing their views about abortion or engaging in other partisan speech).[114]

The Attorney General's approach with respect to the second exemption directly tracks its approach to this exemption in the 2000 Act,[115] an approach approved by the First Circuit in *McGuire II*.[116]

---

Chief, Civil Rights Division, to the Boston and Brookline Police Departments, Ex. A to Narayanan Aff. (Trial Ex. 26) [# 63–2]; Letters from Maura T. Healey, Chief, Civil Rights Division, to Planned Parenthood League of Massachusetts and Women's Health Services, Ex. B to Narayanan Aff. (Trial Ex. 26) [# 63–3].  Aside from slight differences in the introductory paragraph, the letters are identical. Accordingly, this court will refer to the letter as the "2008 Guidance Letter."

**113.**  2008 Guidance Letter at 1–2 (Trial Ex. 26).

**114.**  *Id.* at 2–3 (Trial Ex. 26).

**115.**  In the 2003 Guidance Letter, the Attorney General emphasized that " *'all persons'* in the restricted area, including clinic employees and agents, are subject to the restrictions in

Section 120E 1/2(b) of the Act, including the restriction on oral protest, education, or counseling[,]' and that clinic employees and agents may not use the exemption to 'express their views about abortion[.]' "  *McGuire v. Reilly,* 271 F.Supp.2d 335, 339–40 (D.Mass. 2003) (Harrington, J.), *aff'd, McGuire II,* 386 F.3d 45 (1st Cir.2004) (quoting 2003 Guidance Letter) (emphasis added).

**116.**  *McGuire II,* 386 F.3d at 64 ("[W]e find the Attorney General's interpretation to be one very likely interpretation of the exemption's language . . . [,]" and it "is important for our purposes . . . because it is clearly a proper, content-neutral way of interpreting the exemption.").  *See also supra* Factual Findings § E.

**Discussion: Legal Standard for Facial Challenge**

Three different standards may apply to Plaintiffs' facial challenge.[117]

In *United States v. Salerno*, the Supreme Court held that "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." [118]

Second, although "some Members of the Court have criticized the *Salerno* formulation, all agree that a facial challenge must fail where the statute has a 'plainly legitimate sweep.' " [119]

Lastly, in the First Amendment context, there is another "type of facial challenge . . . under which a law may be overturned as impermissibly overbroad because a 'substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.' " [120]

For the reasons below, the Act survives under all three standards.

**Discussion: First Amendment Challenge**

**A. First Amendment Doctrine**

The Free Speech Clause of the First Amendment states that "Congress shall make no law . . . abridging the freedom of speech. . . ." [121] This prohibition applies to the states by virtue of the Fourteenth Amendment.[122] As clarified by the First Circuit, "Notwithstanding its exalted position in the pantheon of fundamental freedoms, free speech always must be balanced against the state's responsibility to preserve and protect other important rights. This balance may be weighted differently, however, depending upon the nature of the restriction that the government seeks to foster." [123]

"The Supreme Court has articulated a framework for determining whether a particular regulation impermissibly infringes upon free speech rights. That framework dictates the level of judicial scrutiny that is due—and that choice, in turn, informs the nature of the restrictions on free speech that may be permissible in a public forum." [124]

---

**117.** *See, e.g., United States v. Carta*, 503 F.Supp.2d 405 (D.Mass.2007) (Tauro, J.) ("The precise test to apply to a facial challenge is not clear.").

**118.** 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). *See also Crawford v. Marion County Election Bd.*, — U.S. —, —, 128 S.Ct. 1610, 1621, 170 L.Ed.2d 574 (2008) ("Given the fact that petitioners have advanced a broad attack on the constitutionality of [the statute], seeking relief that would invalidate the statute in all its applications, they bear a heavy burden of persuasion."); *McGuire I*, 260 F.3d at 46–47 ("a party who mounts a facial challenge to a statute must carry a significantly heavier burden than one who seeks merely to sidetrack a particular application of the law.").

**119.** *Wash. State Grange v. Wash. State Republican Party*, — U.S. —, —, 128 S.Ct. 1184, 1190, 170 L.Ed.2d 151 (2008) (*quoting Washington v. Glucksberg*, 521 U.S. 702, 739– 40, and n. 7, 117 S.Ct. 2258, 138 L.Ed.2d

772(1997) (Stevens, J., concurring in judgments)).

**120.** *Id.* at 1191 n. 6 (*citing New York v. Ferber*, 458 U.S. 747, 769–771, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) and *quoting Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)).

**121.** U.S. Const. Amend. I.

**122.** *See Knights of Columbus v. Town of Lexington*, 272 F.3d 25, 30–31 (1st Cir.2001) (*citing Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)).

**123.** *McGuire I*, 260 F.3d at 42. *See also Knights of Columbus*, 272 F.3d at 31 ("Despite the uncompromising language in which this proscription is couched, it is not absolute.").

**124.** *Knights of Columbus*, 272 F.3d at 31 (*citing McGuire I*, 260 F.3d at 42).

**[1]** The appropriate level of scrutiny depends on whether a statute is content-based or content-neutral.[125] As a general rule, the government cannot impose content-based restrictions on speech.[126] Any such restriction is presumptively invalid, and must be evaluated under strict scrutiny.[127] A content-based law, therefore, will be upheld only if it is "absolutely necessary to serve a compelling state interest and is narrowly tailored to the achievement of that end." [128]

**[2]** Instead of regulating the content of speech, content-neutral restrictions regulate the time, place and manner in which expression may occur. Content-neutral restrictions "are less threatening to freedom of speech because they tend to burden speech only incidentally, that is, for reasons unrelated to the speech's content or the speaker's viewpoint." [129] As a result, these restrictions are evaluated under the "intermediate" level of scrutiny, and will be upheld if (1) "they are justified without reference to the content of the regulated speech;" (2) "are narrowly tailored to serve a significant governmental interest;" and (3) "leave open ample alternative channels for communication of the information." [130]

## B. Content–Based versus Content–Neutral

Plaintiffs argue that the Act constitutes an impermissible content-based restriction on speech. This argument takes two forms. First, Plaintiffs, albeit briefly, urge this court to find that the statute itself is a content-based restriction.[131] Second, in their Complaint, Plaintiffs bring a viewpoint discrimination count,[132] and "courts correctly regard viewpoint discrimination as a particularly pernicious form of content discrimination . . . ." [133]

Alternatively, Plaintiffs argue that the Act is an impermissible time, place and manner regulation.[134]

**[3]** Defendant argues that the act is content-neutral and validly regulates the time, place and manner of expressive activity. This court agrees.

### 1. No Subject Matter Restriction

**[4]** "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." [135] Accordingly, "a law designed to serve purposes unrelated to the content of protected speech is deemed content-neu-

---

**125.** *Naser Jewelers, Inc. v. City of Concord*, 513 F.3d 27, 32 (1st Cir.2008) ("A threshold question in cases involving challenges to government restrictions on speech is whether the restriction at issue is content-neutral or, to the contrary, is content-based.").

**126.** *McGuire I*, 260 F.3d at 42 (*citing Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641–42, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)).

**127.** *Id.* at 43 (*citing R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 736 (1st Cir.1995)).

**128.** *Id.* (*citing*, as examples, *Boos v. Barry*, 485 U.S. 312, 321–29, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988); *Ark. Writers' Project, Inc.*

**129.** *Id.*

**130.** *Id.* (*quoting Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)).

**131.** *See, e.g.*, Pls.' Proposed Findings of Fact and Conclusions of Law at 27 ("PFF") [# 69].

**132.** Compl. at 18–19.

**133.** *McGuire I*, 260 F.3d at 48.

**134.** *See* Compl. at 15; PFF at 27–32.

**135.** *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989). *See also Hill v. Colorado*, 530

---

*v. Ragland*, 481 U.S. 221, 231–32, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987)).

tral even if, incidentally, it has an adverse effect on certain messages while leaving others untouched." [136]

Here, as with the 2000 Act, "[b]y addressing political speech on public streets and sidewalks, the Act plainly operates at the core of the First Amendment." [137] But "First Amendment interests nonetheless must be harmonized with the state's need to exercise its traditional police powers." [138] As the First Circuit did in *McGuire I*, for the following reasons, this court "resolve[s] this balance" in favor of the Commonwealth.[139]

As noted above, in *Hill v. Colorado*, the Supreme Court considered a Colorado statute that also regulated conduct around reproductive health care facilities.[140] The Court held that the statute was content-neutral for "three independent reasons." [141]

First, it is not a "regulation of speech." Rather, it is a regulation of the places where some speech may occur.

Second, it was not adopted "because of disagreement with the message it conveys." This conclusion is supported not just by the Colorado courts' interpretation of legislative history, but more importantly by the State Supreme Court's unequivocal holding that the statute's "restrictions apply equally to all demon-

strators, regardless of viewpoint, and the statutory language makes no reference to the content of the speech."

Third, the State's interests in protecting access and privacy, and providing the police with clear guidelines, are unrelated to the content of the demonstrators' speech. As we have repeatedly explained, government regulation of expressive activity is "content neutral" if it is justified without reference to the content of regulated speech . . . . [142]

Here, the 2007 Act is content-neutral for the same three reasons. First, the statute does not directly regulate speech. Indeed, it does not mention speech or expression at all, much less prohibit certain types of messages, statements, literature or signage.[143] Instead, and permissibly, "it merely regulates the places *where* communications may occur." [144] Moreover, the statute continues to apply during an RHCF's business hours only, and only if the buffer zone is clearly delineated.[145]

Second, the record clearly demonstrates that the Legislature did not adopt the 2007 Act "because of disagreement with the message it conveys." [146] The Legislature amended the 2000 Act to address continued and serious public safety problems in the areas adjacent to RHCF entrances and

U.S. 703, 719, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (*citing Ward*); *Naser Jewelers, Inc.*, 513 F.3d at 32; *McGuire I*, 260 F.3d at 43.

**136.** *McGuire I*, 260 F.3d at 43 (*citing Hill*, 530 U.S. at 736, 120 S.Ct. 2480; *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)).

**137.** *Id.* at 43 (*citing Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)).

**138.** *Id.* at 44 (*citing Hill*, 530 U.S. at 714–15, 120 S.Ct. 2480).

**139.** *Id.*

**140.** 530 U.S. at 707, 120 S.Ct. 2480.

**141.** *Id.* at 719, 120 S.Ct. 2480.

**142.** *Id.* at 719–720, 120 S.Ct. 2480 (footnote omitted and spacing modified).

**143.** *See id.* at 731, 120 S.Ct. 2480 ("As we have already noted, [the statute] simply does not 'ban' any messages, and likewise it does not 'ban' any signs, literature, or oral statements.").

**144.** *Id.* (emphasis added).

**145.** *See* Mass. Gen. Laws ch. 266 § 120E 1/2(c) (2000), *amended by* Mass. Gen. Laws ch. 266 § 120E 1/2(c) (2007) (Trial Ex. 3); 2008 Guidance Letter at 1–2 (Trial Ex. 26).

**146.** *Ward*, 491 U.S. at 791, 109 S.Ct. 2746.

driveways, including significant concerns regarding safe patient access to medical services. Relatedly, serious enforcement difficulties with the 2000 Act limited its intended protections and were part of the reason that major public safety concerns continued to exist at RHCFs.

These reasons are entirely "unrelated to disagreement with the underlying message of particular speech." [147] Moreover, as with the 2000 Act, the 2007 Act's "restrictions apply equally to *all demonstrators, regardless of viewpoint*, and the statutory language makes no reference to the content of the speech." [148] Indeed, this "comprehensiveness . . . is a virtue . . . because it is evidence against there being a discriminatory governmental motive." [149]

Third, as in *Hill*, the statute "advances interests unconnected to expressive content." [150] "As [the Court has] repeatedly explained, government regulation of expressive activity is 'content neutral' if it is justified without reference to the content of regulated speech." [151]

Here, as was the case with the 2000 Act, "[t]he Massachusetts legislature, confronted with an apparently serious public safety problem, investigated the matter thoroughly." [152] As described above, the investigation demonstrated that there was still a significant public safety and patient access problem in the areas immediately adjacent to RHCF entrances and driveways. Moreover, major enforcement difficulties with the 2000 Act allowed the problems to persist. Accordingly, as in *McGuire I*, the Act is justified by "conventional objectives of the state's police power—promoting public health, preserving personal security, and affording safe access to medical services," without *any* reference to content. [153]

Focusing on this third reason, the First Circuit explained:

The critical question in determining content neutrality is not whether certain speakers are disproportionately burdened, but, rather, whether the reason for the differential treatment is—or is not—content-based. . . . As long as a regulation serves a legitimate purpose unrelated to expressive content, it is deemed content-neutral even if it has an incidental effect on some speakers and not others. . . . In that event, all that remains is for the government to show that accomplishment of the legitimate purpose that prompted the law also rationally explains its differential impact. [154]

Here, as in *McGuire I*, the Act's goals "justify its specific application to RHCFs." [155] Additionally, "[a]lthough the Act clearly affects anti-abortion protesters more than other groups, there is no principled basis for assuming that this differential treatment results from a fundamental disagreement with the content of their expression." [156] As in *McGuire I*,

[T]he finding required on these facts is that the legislature was making every effort to restrict as little speech as possible while combating the deleterious secondary effects of anti-abortion protests.

147.  *McGuire I*, 260 F.3d at 44.

148.  *Hill*, 530 U.S. at 719, 120 S.Ct. 2480 (emphasis added).

149.  *Id.* at 731, 120 S.Ct. 2480.

150.  *McGuire I*, 260 F.3d at 44 (*citing Hill*, 530 U.S. at 719, 120 S.Ct. 2480).

151.  *Hill*, 530 U.S. at 720, 120 S.Ct. 2480.

152.  *McGuire I*, 260 F.3d at 44.

153.  *Id.*

154.  *Id.* (citations omitted).

155.  *Id.*

156.  *Id.*

McCULLEN v. COAKLEY                    **405**
Cite as 573 F.Supp.2d 382 (D.Mass. 2008)

Just as targeting medical centers did not render Colorado's counterpart statute content based, . . . so too the Act's targeting of RHCFs fails to undermine its status as a content neutral regulation.[157]

Plaintiffs, however, as the plaintiffs did in *McGuire I*, imply that the Legislature's reasons for amending the Act were pretextual.[158]  Additionally, Plaintiffs argue:

[I]t is only abortion providers and supporters that talk about all these problems that are around the clinics.  And they don't do it with respect to facts.  They make conclusory allegations.

. . .

These people would be expected to embellish their testimony because they side with the pro choice viewpoint as opposed to those who oppose abortion.

But when we look at the objective unbiased evidence in the record, there is nothing that supports the zone.  The police didn't testify that there was any problem outside the abortion clinics.  They didn't say that there was any impeding, any blocking, any harassment, any trespass.[159]

Plaintiffs' arguments fail for two reasons.  First, with respect to the Legislature's reasons for amending the statute, Plaintiffs' "insinuations are unsupported by any record evidence." [160]  Moreover, "where differential treatment is justified, on an objective basis, by the government's content-neutral effort to combat secondary effects, it is insufficient that a regulation may have been adopted in direct response

to the negative impact of a particular form of speech." [161]

Second, despite Plaintiffs' claims regarding the evidence before the Legislature, the record is replete with factual references to specific incidents and patterns of problematic behavior around RHCFs. Additionally, nothing in the record suggests that the individuals who testified—under oath—before the Legislature, embellished or were in any way untruthful.

Lastly, although Plaintiffs claim abortion providers and supporters were the only individuals who identified problems, Captain Evans of the Boston Police Department testified with respect to public safety problems outside of the RHCFs and the difficulties with enforcing the 2000 Act. Attorney General Coakley testified regarding the same.

### 2.  Count V. Viewpoint Discrimination[162]

**[5]**  Plaintiffs also argue that the statute constitutes unlawful viewpoint discrimination, because "[t]he fixed buffer statute unjustifiably treats the conduct of the facility employees/agents differently from all other speakers, and the different treatment of conduct results in favor toward pro-choice speakers and disfavor toward all other speakers." [163]  Plaintiffs base this claim on the employee/agent exemption in the Act, which exempts from the Act's coverage "employees or agents of such facility acting within the scope of their employment." [164]

---

**157.**  *Id.*

**158.**  *See, e.g.,* Prelim.  Bench Trial Transcript at 70–71 ("Mr. DePrimo:  Well, that's what they claim their purpose is.").

**159.**  *Id.* at 72–73 (spacing modified).

**160.**  *McGuire I,* 260 F.3d at 45.

**161.**  *Id.*

**162.**  This Memorandum addresses Plaintiffs' counts by topic, not by their order in the Complaint.

**163.**  PFF at 40.

**164.**  Mass. Gen. Laws ch. 266, § 120E 1/2(b) (2000), *amended by* Mass. Gen. Laws ch. 266 § 120E 1/2(b) (2007) (Trial Ex. 3).

This count also fails. First, it is important to note that the Act did not modify any of the exemptions previously established by the 2000 Act, including the employee/agent exemption. Furthermore, the First Circuit specifically addressed and upheld this exemption in *McGuire I* and *McGuire II*, holding that it was content-neutral and did not constitute viewpoint discrimination.[165] Nothing in this case warrants a departure from that analysis and holding.

In *McGuire I*, the plaintiffs' argument suggested that "the sole practical purpose of the employee exemption is to promote a particular side of the abortion debate."[166] In response, the court held, among other things,

The Massachusetts legislature may or may not have intended the employee exemption to serve the purpose envisioned by the plaintiffs. There are other likely explanations. For example, the legislature may have exempted clinic workers—just as it exempted police officers—in order to make crystal clear what already was implicit in the Act: that those who work to secure peaceful access to RHCFs need not fear prosecution.[167]

. . .

Because we can envision at least one legitimate reason for including the employee exemption in the Act, it would be premature to declare the Act unconstitutional for all purposes and in all applications.[168]

The First Circuit concluded, "The employee exemption . . . is neutral on its face, drawing no distinction between different ideologies. And to the extent (if at all) that the exemption contributes to the Act's disproportionate impact on anti-abortion protesters, it can be justified by reference to the state's neutral legislative goals."[169]

Similarly, in *McGuire II*, the court held: As we explained in *McGuire I*, so long as a reviewing court can "envision at least one legitimate reason for including the employee exemption in the Act," the law is not facially unconstitutional. *McGuire I*, 260 F.3d at 47. In *McGuire I* this court found there were likely explanations for the exemption other than the desire to favor pro-abortion speech over anti-abortion speech: "For example, the legislature may have exempted clinic workers—just as it exempted police officers—in order to make crystal clear . . . that those who work to secure peaceful access to RHCFs need not fear prosecution." *Id.* at 47. For this reason given in *McGuire I*, the viewpoint facial attack fails, now as then.[170]

Plaintiffs try to distinguish *McGuire I* and *McGuire II* on the ground that "[t]he rationale employed to uphold the employee/agent exemption of the floating buffer statute does not apply to the fixed buffer zone statute. . . ."[171] Plaintiffs argue:

Unlike the fixed buffer statute, the floating buffer statute permitted all persons to access any part of the zone so long as they did not make unconsented to ap-

---

**165.** *See McGuire I*, 260 F.3d at 46–48; *McGuire II*, 386 F.3d at 58.

**166.** *McGuire I*, 260 F.3d at 46.

**167.** *Id.* at 47.

**168.** *Id.*

**169.** *Id.* at 48.

**170.** *McGuire II*, 386 F.3d at 58.

**171.** PFF at 41. Plaintiffs make this argument as part of their equal protection count, but because it directly implicates the employee/agent exemption, this court addresses it here. The equal protection count fails for independent reasons discussed below.

proaches from a distance of 6 feet or less, creating a possibility that the zone could become crowded and therefore make navigation by clinic patients difficult. . . . The same is not true of the fixed buffer statute. Because pro-life advocates and virtually all other persons are excluded from the zone, patients have unhindered and safe passage through the zone to the clinics."[172]

This argument fails for several reasons. First, contrary to Plaintiffs' contention, the rationale advanced in *McGuire I* continues to apply. In *McGuire I*, the court held that the employee exemption served the goals of the 2000 Act "because clinic employees often assist in protecting patients and ensuring their safe passage as they approach RHCFs."[173] As the record reflects, the same is true today. Accordingly, "[s]ince it is within the scope of their employment for clinic personnel to escort patients in this fashion, and since a primary purpose of the law is to facilitate safe access, the employee exemption serves the basic objectives of the Act."[174]

Additionally, "[t]o cinch matters, the legislature could have concluded that clinic employees are less likely to engage in directing of unwanted speech toward captive listeners—a datum that the *Hill* court recognized as justifying the statute there."[175] As with the 2000 Act, the legis-

lature likely concluded the same thing here when deciding to maintain the exemption.

Second, even assuming that the rationale applies with less weight here than with the 2000 Act—contrary to the position of this court—as long as there is "one legitimate reason for including the employee exemption in the Act," the law is not facially unconstitutional.[176] In addressing the identical employee/agent exemption, the *McGuire I* court found "other likely explanations for the exemption," and gave the example cited twice above. The same example applies here: "the legislature may have exempted clinic workers—just as it exempted police officers—in order to make crystal clear . . . that those who work to secure peaceful access to RHCFs need not fear prosecution."[177] Accordingly, there is "at least one legitimate reason for including the employee exemption in the Act, [and] it would be premature to declare the Act unconstitutional for all purposes and in all applications."[178]

Plaintiffs also argue, "Whether or not by design, the fixed buffer statute allows escorts with pro-choice viewpoints to express their views in the zone while prohibiting most other persons from expressing their views in the zone."[179]

This argument also fails, at least on this facial challenge.[180] On its face, the statute

172.  *Id.*

173.  *McGuire I,* 260 F.3d at 46.

174.  *Id.*

175.  *Id.*

176.  *Id.* at 47; *McGuire II,* 386 F.3d at 58 (*citing McGuire I,* 260 F.3d at 47). As noted above, the First Circuit emphasized this point in both *McGuire* cases.

177.  *McGuire I,* 260 F.3d at 47; *McGuire II,* 386 F.3d at 58 (*citing McGuire I,* 260 F.3d at 47). *See also McGuire I,* 260 F.3d at 46

(Holding that "testimony taken before the state senate indicates beyond cavil that the employee exemption will promote the Act's goals because clinic employees often assist in protecting patients and ensuring their safe passage as they approach RHCFs.").

178.  *McGuire I,* 260 F.3d at 47.

179.  PFF at 41.

180.  If "experience shows that clinic staffers in fact are utilizing the exemption as a means either of proselytizing or of engaging in preferential pro-choice advocacy . . . [,]" Plaintiffs may present this argument during the as-applied challenge. *McGuire I,* 260 F.3d at 47.

does not permit advocacy of any kind in the zone. Moreover, the Attorney General's enforcement position expressly and unequivocally prohibits any advocacy by employees and agents of the RHCF's in the buffer zone: [181]

> The second exemption—for employees or agents of the clinic acting within the scope of their employment—allows clinic personnel to assist in protecting patients and ensuring their safe access to clinics, but does not allow them to express their views about abortion or to engage in any other partisan speech within the buffer zone.[182]

This approach is consistent with the Attorney General's past interpretation of the exemption,[183] an approach the District Court and the First Circuit cited with approval in *McGuire II*.[184] As with the 2000 Act, the Attorney General's current position "require[s] evenhanded enforcement of its prohibitions, even against clinic employees and agents . . . ." [185] It is "one very likely interpretation of the exemption's language," and "is clearly a proper, content-neutral way of interpreting the exemption." [186]

For these reasons, the employee exemption does not discriminate based on view-

point, and Count V of Plaintiffs' Complaint fails.

### 3. Conclusion Regarding Content Neutrality

On its face, the 2007 Act is a content-neutral time, place and manner restriction, and the employee exemption does not constitute viewpoint discrimination. Accordingly, this court evaluates the Act using intermediate scrutiny.

### C. Count I. Time, Place and Manner Restriction

[6] Time, place and manner regulations will be upheld if (1) "they are justified without reference to the content of the regulated speech;" (2) "are narrowly tailored to serve a significant governmental interest;" and (3) "leave open ample alternative channels for communication of the information." [187] Here, the Act meets all three prongs of the test.

### 1. Justified Without Reference to Content of Regulated Speech

As explained above, the statute is justified without any reference to the content of regulated speech. The Act's purpose is "to increase forthwith public safety at reproductive healthcare facilities," [188] by pro-

---

**181.** Although this is a facial challenge, this court may properly consider the Attorney General's enforcement position. *See Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 494 n. 5, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (''In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered.'') (*citing Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). *See also Ward v. Rock Against Racism,* 491 U.S. 781, 795–96, 109 S.Ct. 2746, 2756, 105 L.Ed.2d 661 (1989) (*quoting Hoffman Estates,* 455 U.S. at 494 n. 5, 102 S.Ct. 1186).

**182.** 2008 Guidance Letter at 2 (Trial Ex. 26).

**183.** *See supra* Factual Findings § D.

**184.** *See McGuire II,* 386 F.3d at 65–66; *McGuire v. Reilly,* 271 F.Supp.2d 335, 341 (D.Mass.2003). See also *supra* Factual Findings § E.

**185.** *McGuire v. Reilly,* 271 F.Supp.2d at 341.

**186.** *McGuire II,* 386 F.3d at 64.

**187.** *McGuire I,* 260 F.3d at 43 (*quoting Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)).

**188.** An Act Relative to Public Safety at Reproductive Health Care Facilities, Chapter 155 of the Acts of 2007 (codified as amended at Mass. Gen. Laws ch. 266, § 120E 1/2 (2007)). (Trial Ex. 1)[# 36].

McCULLEN v. COAKLEY 409
Cite as 573 F.Supp.2d 382 (D.Mass. 2008)

tecting public safety in the areas adjacent to RHCF entrances and driveways, and ensuring safe patient access to medical services.[189] "The interests that underlie these purposes are firmly rooted in the state's traditional police powers, and these are precisely the sort of interests that justify some incidental burdening of First Amendment rights." [190]

### 2. Narrowly Tailored

The Supreme Court has repeatedly held that "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so." [191] Instead, a law is narrowly tailored if it " 'promotes a substantial government interest that would be achieved less effectively absent the regulation,' " [192] and "does so without burdening substantially more speech than is necessary to further this goal." [193]

As long as this test is satisfied, a "regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." [194] "Put another way, the validity of time, place, or manner regulations is not subject to 'a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted.' " [195]

Lastly, this court "must, of course, take account of the place to which the regulations apply in determining whether these restrictions burden more speech than necessary." [196] "States and municipalities plainly have a substantial interest in controlling the activity around certain public and private places," and the Supreme Court has recognized "the unique concerns that surround health care facilities. . . ." [197]

---

**189.** The Commonwealth's public safety goal is furthered by the statute's attempt to eliminate the enforcement difficulties with the 2000 Act's floating zone. As noted, these difficulties limited the 2000 Act's intended protections and were part of the reason that major public safety concerns persisted at RHCFs.

**190.** *McGuire I*, 260 F.3d at 48 (*citing Hill*, 530 U.S. at 715, 120 S.Ct. 2480 (noting the "enduring importance of the right to be free from persistent importunity, following and dogging after an offer to communicate has been declined") (citation and internal quotation marks omitted)); *Schenck v. Pro–Choice Network*, 519 U.S. 357, 376, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997) (extolling the significance of "ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services"); *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 772–73, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) ("The First Amendment does not demand that patients at a medical facility undertake Herculean efforts to escape the cacophony of political protests.").

**191.** *Ward*, 491 U.S. at 798, 109 S.Ct. 2746.

**192.** *Id.* at 799, 109 S.Ct. 2746 (*quoting U.S. v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)).

**193.** *McGuire I*, 260 F.3d at 48 (*citing Ward*, 491 U.S. at 799, 109 S.Ct. 2746). See also *Naser Jewelers, Inc. v. City of Concord*, 513 F.3d 27, 30 (1st Cir.2008) (*citing Ward*, 491 U.S. at 799, 109 S.Ct. 2746).

**194.** *Ward*, 491 U.S. at 800, 109 S.Ct. 2746; *Naser*, 513 F.3d at 35 (*citing Ward*, 491 U.S. at 800, 109 S.Ct. 2746).

**195.** *Bl(a)ck Tea Society v. City of Boston*, 378 F.3d 8, 12 (1st Cir.2004) (*citing Ward*, 491 U.S. at 800, 109 S.Ct. 2746) (internal citations and quotation marks omitted).

**196.** *Hill*, 530 U.S. at 728, 120 S.Ct. 2480 (*quoting Madsen*, 512 U.S. at 772, 114 S.Ct. 2516).

**197.** *Id.*

---

[7] Here, the Commonwealth has a substantial and legitimate content-neutral interest in protecting public safety at RHCF entrances and driveways, because "[i]t is a traditional exercise of the States' police powers to protect the health and safety of their citizens." [198] The Commonwealth also has a legitimate, content-neutral interest in providing "unimpeded access to health care facilities and the avoidance of potential trauma to patients associated with confrontational protests." [199] Indeed, Plaintiffs appear to acknowledge the importance of this interest: "[I]t appears the fixed buffer statute was designed to protect the health and safety of women seeking reproductive health care services. This is a legitimate interest." [200] Additionally, at the Bench Trial, Plaintiffs noted: "In this particular case the legitimate sweep is what? It is clearing out the bottleneck ... immediately adjacent to the doors and to the driveways. Certainly blocking, impeding, trespass is actually a significant interest. That's a legitimate interest of the government." [201]

Having found qualifying governmental interests, this court now determines that the law is narrowly tailored to serve those interests. Despite the passage of the 2000 Act, the Commonwealth faced significant public safety problems in the areas adjacent to RHCF entrances and driveways, including serious concerns regarding safe patient access to medical services. As a result, following an investigation, the Legislature reasonably concluded that the 2000 Act's floating buffer zone was insufficient,[202] and determined that a 35-foot fixed buffer zone was immediately necessary to protect public safety and ensure patient access to clinics. Accordingly, based on the record before the Legislature and the record before this court, promoting these public safety interests would be achieved less effectively without the fixed-buffer zone law.

Additionally, the law does not burden substantially more speech than necessary to further these public safety goals. Again, "the government is not required to choose the least restrictive approach in content-neutral regulation." [203] Here, the Legislature appears to have carefully considered and balanced the Act's effects on speech with the Commonwealth's legitimate governmental interests. The result was a 35-foot fixed buffer zone that targeted the problematic areas (areas immediately adjacent to RHCF entrances and driveways), during the problematic times (an RHCF's business hours).

Furthermore, the Supreme Court and other federal courts have upheld several

---

198. *Hill*, 530 U.S. at 715, 120 S.Ct. 2480 (internal citations and quotation marks omitted).

199. *Id.* (*citing Madsen*, 512 U.S. 753, 114 S.Ct. 2516; *NLRB v. Baptist Hospital, Inc.*, 442 U.S. 773, 99 S.Ct. 2598, 61 L.Ed.2d 251 (1979)). *See also id.* at 728, 120 S.Ct. 2480 ("Persons who are attempting to enter health care facilities—for any purpose—are often in particularly vulnerable physical and emotional conditions. The State of Colorado has responded to its substantial and legitimate interest in protecting these persons from unwanted encounters, confrontations, and even assaults by enacting an exceedingly

modest restriction on the speakers' ability to approach.").

200. PFF at 34 (*citing McGuire I*, 260 F.3d at 44).

201. Prelim. Bench Trial Transcript at 76.

202. *See, e.g., McGuire I*, 260 F.3d at 49 (holding that "[t]he Massachusetts legislature reasonably concluded that *existing law inadequately addressed* the public safety, personal security, traffic, and health care concerns created by persistent demonstrations outside RHCFs.") (emphasis added).

203. *Naser*, 513 F.3d at 36.

fixed zones as "narrowly tailored" under the First Amendment. For example, in *Madsen,* the Court upheld part of an injunction that created a 36–foot fixed buffer zone around an RHCF's entrances and driveway.[204] Also, in *Schenck,* the Court upheld an injunction that created a 15–foot fixed buffer zone around RHCF entrances, doorways and driveways.[205]

On the record before this court, like in *Schenck,* this court finds that the fixed buffer zone is "necessary to ensure that people and vehicles trying to enter or exit the clinic property or clinic parking lots can do so,"[206] which directly furthers the public safety and access goals of the Commonwealth. As in *Madsen* and *Schenck,* "the record shows that protesters purposefully or effectively blocked or hindered people from entering and exiting the clinic doorways, from driving up to and away from clinic entrances, and from driving in and out of clinic parking lots."[207] As such, the Legislature "was entitled to conclude that the only way to ensure access was to move back the demonstrations away from the driveways and parking lot entrances," and "the only way to ensure access was to move *all* protesters away from the doorways."[208]

Lastly, the exact size of the buffer zone is not a choice for this court to make.[209] Maybe the Legislature's concerns warranted a slightly larger buffer zone, or maybe the Legislature could have accomplished its objectives with a slightly smaller zone. It is the view of this court, however, considering all of the evidence before the Legislature and this court, the Legislature's choice of 35 feet was a reasonable one under the circumstances, and one that was narrowly tailored to promoted the Commonwealth's substantial and legitimate interests.

### i. Note: Plaintiffs' Challenges to Legislature's Evidence

Plaintiffs argue that the Legislature based the 2007 Act on outdated evidence that preceded the passage of the 2000 Act.[210] This argument carries no weight.

First, virtually all of the evidence presented to the Legislature in 2007 addressed the public safety situation in the years *following* the enactment of the 2000 Act, including information from the then-recent past. This cannot be considered stale by any means.

---

**204.** *See Madsen,* 512 U.S. 753, 114 S.Ct. 2516. The Court invalidated other aspects of the injunction, including the 36–foot buffer zone as applied to certain private property surrounding the clinic. *See id.* at 776, 114 S.Ct. 2516.

**205.** *See Schenck v. Pro-Choice Network of Western N.Y.,* 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997).

**206.** *Id.* at 380, 117 S.Ct. 855.

**207.** *Id.*

**208.** *Id.* at 380–381, 117 S.Ct. 855 (emphasis in original). Similarly, as this court noted at the Bench Trial, "the government has the right to neutralize a certain amount of property." Prelim. Bench Trial Transcript at 79.

**209.** Again, "The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted." *Ward,* 491 U.S. at 800, 109 S.Ct. 2746 (internal citations and quotation marks omitted). Additionally, "Courts owe legislative judgments substantial respect and, as a general matter, should be reluctant " 'to reduce statutory language to a merely illustrative function.' " " *McGuire I,* 260 F.3d at 47 (*quoting Mass. Ass'n of HMO v. Ruthardt,* 194 F.3d 176, 181 (1st Cir.1999)).

**210.** *See, e.g.,* Pl. Mem. in Supp. of Mot. for Prelim. Inj. at 48 (characterizing the evidentiary record as "stale").

Second, based on the record before this court, the post–2000 Act evidence formed the primary basis for the Legislature's adoption of the 2007 Act.

Third, the Legislature may certainly "make use of past experience," as long as "the degree to which inferences drawn from past experience are plausible." [211] Here, to the extent the Legislature considered the Commonwealth's history of public safety problems at RHCFs, it was reasonable to do so, particularly because the "past experience" derived from a relatively recent time frame. Indeed, this would be expected prior to the passage of most public safety laws. Additionally, it was plausible and reasonable for the Legislature to infer from past experiences at RHCFs that these problems would continue unless the 2000 Act was passed.

Plaintiffs also argue that nothing in the record supports creation of the fixed zone. According to Plaintiffs: "There is no evidence that anything happened between 2000 and 2007 that warranted the increase in the size of the buffer zone or even the fixed buffer zone but for the fact that the police were having difficulty in enforcing it. That's it." [212] Similarly, Plaintiffs claim:

The police didn't testify that there was any problem outside the abortion clinics. They didn't say there was impeding, any blocking, any harassment, any trespass. The police are there all the time. That's the testimony in the record. They're there all the time and they didn't see any of the problems that these abortion providers and supporters saw.

Nothing in the record with respect [to] arrests and convictions.

. . .

Well, if these things are happening, Judge, why aren't the people who were actually violating the law being prosecuted? And if they're being prosecuted, why are there no convictions? There are no arrests and no convictions in the record with respect to unlawful conduct.

. . .

My point is is the lack of arrests and the law of convictions are showing that the illegal unlawful behavior isn't occurring in the first place.[213]

These arguments echo Plaintiffs' claims in the "content-based" versus "content-neutral" debate, and the response is the same. Contrary to Plaintiffs' contentions, the record contains numerous and specific factual references to continued public safety problems around RHCFs in the years following the passage of the 2000 Act, including impeded access, blocking and harassment. All of this evidence went well beyond difficulties in enforcing the 2000 Act.

Furthermore, although Plaintiffs claim that only RHCF employees and supporters identified problems, Captain Evans of the Boston Police Department testified about public safety problems outside of the RHCFs. Attorney General Coakley also testified. Moreover, nothing in the record supports Plaintiffs' implication that RHCF employees and supporters embellished or fabricated their testimony.

Additionally, as explained above, police and district attorneys *tried* to prosecute

**211.** *Bl(a)ck Tea Society v. City of Boston,* 378 F.3d 8, 14 (1st Cir.2004). Indeed, Plaintiffs acknowledged this at the Bench Trial. *See* Prelim. Bench Trial Transcript at 38 ("In *Bl(a)ck Tea Society* the First Circuit said that the government can consider past experiences but, I mean, there has to be a fairly reasonable nexus, a plausible nexus between what happened in the past and what's happened in the future.").

**212.** Prelim. Bench Trial Transcript at 39.

**213.** *Id.* at 73–74 (spacing modified).

violations of the 2000 Act, but encountered significant difficulty; and the low number of arrests for violations was due to the difficulty of enforcing the law, not a lack of problematic conduct.

Lastly, although the 2007 Act mainly—if not entirely—responds to an existing public safety and law enforcement problem, the Legislature may certainly take a preventative approach to lawmaking. Indeed, in this case, "[a] bright-line prophylactic rule may be the best way to provide protection, and, at the same time, by offering clear guidance and avoiding subjectivity, to protect speech itself." [214]

### ii.  Note: Plaintiffs' Conduct

Plaintiffs note that their conduct at RHCFs is peaceful, and that they do not block, impede or harass patients or pedestrians.[215] If this case involved an injunction directed at Plaintiffs, the lawfulness and character of their behavior would be important. At this time, however, this court is evaluating a facial challenge to a statute of general application. Accordingly, Plaintiffs' specific conduct is largely, if not entirely, irrelevant to the present analysis.[216]

**214.**  *Hill,* 530 U.S. at 729, 120 S.Ct. 2480.

**215.**  *See, e.g.,* Decl. of Eleanor McCullen at 2, 4 (Trial Ex. 4); Decl. of Jean Blackburn Zarrella at 2–3 (Trial Ex. 5); Decl. of Carmel Ferrell at 2–3 (Trial Ex. 6); Decl. of Eric Cadin at 2–3 (Trial Ex. 7); PFF at 3–4.

**216.**  Moreover, this court does not have a complete record on such conduct.

**217.**  Plaintiffs may try to establish otherwise during their as-applied challenge, but this court cannot make such a finding on this facial challenge.

**218.**  Mass. Gen. Laws ch. 266, § 120E 1/2(2)(c) (2000), *amended by* Mass. Gen. Laws ch. 266 § 120E 1/2(c) (2007) (Trial Ex. 3).

### 3.  Ample Alternative Channels

#### i.  Alternative Channels

The law also satisfies the final requirement, because it leaves open ample alternative avenues of communication.[217] First, there are important prerequisites for the Act to apply at a particular RHCF: the buffer zone must be clearly marked and posted, and is only enforceable during the normal business hours of the clinic.[218] Additionally, when in effect, the Act only applies within 35–foot radii of RHCF entrances and driveways, not around the entire property line.[219]

Furthermore, as long as Plaintiffs—or anyone for that matter—remain outside the zone, they may freely talk to individuals entering and exiting the RHCFs, as well as people inside the zone. The Act also does nothing to prevent patients from leaving the zone to speak with protesters or counselors. Moreover, individuals may continue to display signs and photographs, hand out literature, talk, pray, chant, sing or engage in any other form of lawful communication or protest outside of the buffer zone. Importantly, most, if not all of this expressive activity, can be seen and heard by people entering and exiting the buffer zone, and also by people inside the buffer zone.[220]

**219.**  An Act Relative to Public Safety at Reproductive Health Care Facilities, Chapter 155 of the Acts of 2007 (codified as amended at Mass. Gen. Laws ch. 266, § 120E1/2 (2007)) (emphasis in original) (Trial Ex. 1)[# 36].

**220.**  *See, e.g., Madsen,* 512 U.S. at 770, 114 S.Ct. 2516 ("Protesters standing across the narrow street from the clinic can still be seen and heard from the clinic parking lots."). Plaintiffs may try to establish otherwise during their as-applied challenge, but there is no basis for such a finding at the facial challenge stage.

### ii.  Plaintiffs' Approach Argument

Plaintiffs argue that "[t]he First Amendment protects the right of speakers to communicate with their intended audience from a normal conversational distance, and distances of 15 feet or more do not, as a matter of law, allow for normal conversation." [221]

The Supreme Court, however, has repeatedly upheld fixed buffer zones that have the effect of limiting normal conversation within the zone.  For example, in *Madsen* and *Schenck*, respectively, the Court upheld 36–foot and 15–foot fixed buffer zones around RHCF entrances and driveways.[222]

Plaintiffs, however, urge that *Schenck* supports their position.  There, the Court addressed both a floating and a fixed buffer zone.  The floating zone required all protesters to stay at least 15 feet away from any individual or vehicle seeking access to or leaving an RHCF, regardless of the person or vehicle's location.[223]  The fixed buffer zone prohibited "demonstrating within fifteen feet from either side or edge of, or in front of, doorways or doorway entrances, parking lot entrances, driveways and driveway entrances of such facilities." [224]

The Court observed that the floating buffer zone "prevented defendants . . . from communicating a message from a normal conversational distance or handing leaflets to people entering or leaving the clinics who are walking on the public sidewalks," and that this was a "broad prohibition, both because of the type of speech that is restricted and the nature of the location." [225]  But, "[o]n the other hand, we have before us a record that shows physically abusive conduct, harassment of the police that hampered law enforcement, and the tendency of even peaceful conversations to devolve into aggressive and sometimes violent conduct.  In some situations, a record of abusive conduct makes a prohibition on classic speech in limited parts of a public sidewalk permissible." [226]

The Court, however, declined to decide "whether the governmental interests involved would ever justify some sort of zone of separation between individuals entering the clinics and protesters, measured by the distance between the two." [227]  Instead, the Court held that "because this broad prohibition on speech 'floats,' it cannot be sustained on this record." [228]  The Court explained:

[I]t would be quite difficult for a protester who wishes to engage in peaceful expressive activities to know how to remain in compliance with the injunction.  This lack of certainty leads to a substantial risk that much more speech will be burdened than the injunction by its terms prohibits.  That is, attempts to stand 15 feet from someone entering or leaving a clinic and to communicate a message—certainly protected on the face of the injunction—will be hazardous

---

**221.**  PFF at 29.

**222.**  *Madsen*, 512 U.S. at 768–71, 114 S.Ct. 2516; *Schenck*, 519 U.S. at 374–76, 117 S.Ct. 855.  Likewise, albeit in a different context, the Court upheld a 100–foot fixed "campaign free" zone around polling places.  *See Burson v. Freeman*, 504 U.S. 191, 210–11, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992).

**223.**  *See Schenck*, 519 U.S. at 366, 117 S.Ct. 855.

**224.**  *Id.* (internal quotation marks omitted).

**225.**  *Id.* at 377, 117 S.Ct. 855.

**226.**  *Id.*

**227.**  *Id.*

**228.**  *Id.*

if one wishes to remain in compliance with the injunction.[229]

Significantly, however, the Court *upheld* the 15-foot fixed buffer zone around RHCF entrances and driveways,[230] even though the effect on conversation was similar.

Here, the buffer zone is fixed, not floating. Accordingly, the Court's concern regarding the uncertainty that attaches to a floating zone disappears. A fixed zone provides a bright-line rule for violations: if you are a non-exempt person in the zone, you are violating the Act.[231] Moreover, as discussed in the narrowly tailored analysis, this court finds that the substantial governmental interests involved here justify the creation of the 35-foot fixed buffer zone.

Additionally, although the Supreme Court cases control the holding here, this court briefly notes the First Circuit's decision in *Bl(a)ck Tea Society v. City of Boston.*[232] There, the First Circuit considered and upheld the establishment of a "designated demonstration zone" for the 2004 Democratic National Convention.[233]

The designated zone "allowed no opportunity for physical interaction (such as the distribution of leaflets) and severely curtailed any chance for one-on-one conversation."[234] The court held, however, among other things, that "although the opportunity to interact directly with the body of delegates by, say, moving among them and distributing literature, would doubtless have facilitated the demonstrators' ability to reach their intended audience, there is no constitutional requirement that demonstrators be granted that sort of particularized access."[235]

The same applies here. Although slightly closer physical interaction may partially enhance one's ability to sidewalk counsel RHCF patients, there is no constitutional right to that level of particularized access.

### 4. Conclusion Regarding Time, Place and Manner Restriction

For the foregoing reasons, this court finds that the 2007 Act (1) is justified without reference to the content of the regulated speech; (2) is narrowly tailored to serve significant governmental interests; and (3) leaves open ample alternative channels for communication. Accordingly, the Act is a lawful time, place and manner restriction, and Defendant prevails on Count I of Plaintiffs' Complaint.

### D. Note on Public Forum Doctrine

Although Plaintiffs do not press a separate public forum challenge, Plaintiffs correctly note that sidewalks and streets are " 'quintessential' public forums."[236] Plaintiffs also dedicate a section of their brief to the subject of free speech on public streets and sidewalks.[237] Accordingly, this court

**229.** *Id.* at 378, 117 S.Ct. 855 (internal citations omitted).

**230.** *Id.* at 380–81, 117 S.Ct. 855 ("We uphold the fixed buffer zones around the doorways, driveways, and driveway entrances. These buffer zones are necessary to ensure that people and vehicles trying to enter or exit the clinic property or clinic parking lots can do so . . . .").

**231.** This also provides the police with clear guidelines for enforcing the law.

**232.** 378 F.3d 8 (1st Cir.2004).

**233.** *Id.* at 10.

**234.** *Id.* at 13.

**235.** *Id.* at 14.

**236.** *See* PFF at 18 (*citing Frisby v. Schultz,* 487 U.S. 474, 481, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988); *United States v. Grace,* 461 U.S. 171, 179, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983)).

**237.** *See* "The Nature of Public Streets and Sidewalks," *id.* at 18–19; "Free Speech on Public Streets and Sidewalks," *id.* at 20–22.

will conduct a separate public forum analysis.

Governments can regulate public forums if the restrictions meet the appropriate level of scrutiny.  As noted, while content-based regulations must survive strict scrutiny,[238] content-neutral time, place and manner restrictions must pass intermediate scrutiny.[239]

Here, the Act clearly can affect sidewalks and streets in the vicinity of RHCFs, and is thereby subject to the public forum doctrine.  For the reasons above, however, the Act is content-neutral, time, place and manner regulation.  Accordingly, intermediate scrutiny applies, and this court has already held that the Act passes this level of scrutiny.  The Act, therefore, also survives a separate public forum challenge.

### E.  Count II. Overbreadth Challenge

[8]   Plaintiffs also assert that the Act is overbroad because it burdens more speech than is necessary to achieve a substantial and legitimate government interest.  There are two main parts to this argument.  First, Plaintiffs argue that the "statute bans from the zone all types of speech . . . and all manner of speech . . . . not only the abortion-related speech . . . . [,]"[240] and the government's interest is not served by such a broad ban.[241]  Second, Plaintiffs argue that the statute unconstitutionally burdens personal liberty interests, because it "prohibits virtually all persons from standing in or utilizing the zone for any and all purposes other than 'reaching a destination other than such facility.' "[242]

The Supreme Court rejected similar arguments in *Hill v. Colorado*, and the Court's analysis applies with equal weight here.  There, the Court held, "The fact that the coverage of a statute is broader than the specific concern that led to its enactment is of no constitutional significance.  What is important is that all persons entering or leaving health care facilities share the interests served by the statute."[243]  Here, all persons entering and exiting the health care facilities share the legitimate health and safety interests served by the Act.

Furthermore, as noted in the content-neutral discussion, the Act's "comprehensiveness . . . is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive."[244]  Indeed, "there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally."[245]

Additionally, as already noted, the Act "simply does not 'ban' any messages, and likewise it does not 'ban' any signs, literature, or oral statements.  It merely regulates the places where communications may occur."[246]

---

238.  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

239.  *Id.* ("The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.").

240.  PFF at 33.

241.  *See id.* at 35–36.

242.  *See id.* at 34 (*quoting* Mass. Gen. Laws ch. 266, § 120E1/2(b) (2007)).

243.  *Hill*, 530 U.S. 703, 730–31, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).

244.  *Id.* at 731, 120 S.Ct. 2480.

245.  *Id.*

246.  *Id.*

Addressing Plaintiffs' overbreadth argument more generally, "a law may be overturned as impermissibly overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." [247] The Court, however, "vigorously enforce[s] the substantiality requirement, "not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." [248] Additionally, "[t]he overbreadth doctrine is 'strong medicine' that is used 'sparingly and only as a last resort.'" [249]

On the record before this court on Plaintiffs' facial challenge, Plaintiffs have not established that "the impact of the statute on the conduct of other speakers will differ from its impact on their own sidewalk counseling." [250] "Like [Plaintiffs'] own activities, the conduct of other protesters and counselors at all health care facilities are encompassed within the statute's 'legitimate sweep.'" [251] Accordingly, Count II must fail.

## F. Count III. Prior Restraint

[9] Plaintiffs also assert that the Act constitutes an impermissible prior restraint on speech in violation of the First and Fourteenth Amendments. The Act, however, is not a prior restraint, because the Commonwealth "has not sought to prevent speech, but, rather, to regulate the place and manner of its expression." [252] Indeed, "The Supreme Court has explicitly rejected attempts to analyze security-based time-place-manner restrictions as prior restraints," including in *Hill*, *Schenck* and *Madsen*, "and those cases are controlling here." [253] As cautioned by the First Circuit, "If content-neutral prohibitions on speech at certain places were deemed prior restraints, the intermediate standard of review prescribed in the time-place-manner jurisprudence would be eviscerated." [254]

Accordingly, Count III of Plaintiffs' Complaint fails.

247. *Wash. State Grange v. Wash. State Republican Party*, —— U.S. ——, —— n. 6, 128 S.Ct. 1184, 1191 n. 6, 170 L.Ed.2d 151 (2008) (*citing New York v. Ferber*, 458 U.S. 747, 769–71, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (internal citations and quotation marks omitted)). See also *Hill*, 530 U.S. at 732, 120 S.Ct. 2480 ("'particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.'") (*quoting Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)).

248. *United States v. Williams*, —— U.S. ——, ——, 128 S.Ct. 1830, 1838, 170 L.Ed.2d 650 (2008) (*citing Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 485, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989); *Broadrick*, 413 U.S. at 615, 93 S.Ct. 2908).

249. *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 14, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988) (*quoting Broadrick*, 413 U.S. at 613, 93 S.Ct. 2908). *See also Williams*, 128 S.Ct. at 1838; *Wash. State Grange*, 128 S.Ct. at 1191 n. 6.

250. *Hill*, 530 U.S. at 732, 120 S.Ct. 2480.

251. *Id.*

252. *Bl(a)ck Tea Society*, 378 F.3d 8, 12 (1st Cir.2004).

253. *Id.* (*citing Hill*, 530 U.S. at 733–34, 120 S.Ct. 2480; *Schenck*, 519 U.S. at 374 n. 6, 117 S.Ct. 855; *Madsen*, 512 U.S. at 763 n. 2, 114 S.Ct. 2516).

254. *Id.*

### G. Count IV. "Free Speech—Free Association—Free Exercise Hybrid"

Plaintiffs also argue that "the Act implicates rights to free speech, free assembly, free association and free exercise of religion," [255] and that "[i]nfringement of the right to free exercise of religion exercised in combination of other fundamental constitutional rights subjects the Act to strict scrutiny review." [256] This court will first address each of these rights individually.

#### 1. Free Exercise Claim

[10] "The Free Exercise Clause also is made applicable to the states (and, therefore, to municipalities) through the Fourteenth Amendment." [257] The clause states that "Congress shall make no law . . . prohibiting the free exercise [of religion]. . . ." [258] If, however, "'a law . . . is neutral and of general applicability,'" it "'need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.'" [259]

Here, this court has already determined that the Act is a generally-applicable, content-neutral statute that passes intermediate scrutiny. The Act does not regulate speech, expression, prayer, singing, worship or display of religious articles. It merely regulates where such expression may take place, i.e., outside of a clearly marked buffer zone during the normal business hours of an RHCF. The Act also

applies to all non-exempt persons equally. As a result, this court is "bound to conclude that the regulation does not discriminate against a particular religion or religious practice." [260] Accordingly, as a matter of law, Plaintiffs "cannot rewardingly invoke the Free Exercise Clause in their attack on the regulation." [261]

#### 2. Freedom of Speech

This court has already determined that the Act is a lawful, content-neutral time, place and manner restriction; is not overbroad; and does not constitute a prior restraint. Accordingly, Plaintiffs' free speech claim fails.

#### 3. Freedom of Assembly and Association

[11] The Supreme Court has held, "Regulations imposing severe burdens on plaintiffs' [associational] rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." [262]

[12] Here, the Act does not impose a "severe" burden on a protester's right to assemble or associate. As noted above, the Act permits ample alternative channels of communication, because, among other things, individuals are free to demonstrate and associate outside the buffer zone.

---

**255.** Pl. Mem. of Law in Supp. of Mot. for Prelim. Inj. at 39.

**256.** Compl. at 18.

**257.** *Knights of Columbus v. Town of Lexington*, 272 F.3d 25, 35 (1st Cir.2001) (*citing Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)).

**258.** U.S. Const. Amend. I.

**259.** *Knights of Columbus*, 272 F.3d at 35 (*quoting Church of Lukumi Babalu Aye v. City

*of Hialeah,* 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993)).

**260.** *Id.*

**261.** *Id.*

**262.** *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (internal citations and quotation marks omitted).

Moreover, for the reasons above, the Commonwealth's interests are of sufficient importance to justify the 35–foot fixed buffer zone. Accordingly, the Act does not violate the First Amendment's right to associate or assemble peaceably.

### 4. No Hybrid Cause of Action

All of Plaintiffs' First Amendment individual claims fail, leaving Plaintiffs' "hybrid" cause of action. Again, Plaintiffs argue that "heightened review applies when free exercise rights are infringed in combination with other fundamental constitutional rights." [263]

Although the First Circuit has yet to decide the "hybrid rights" issue definitively,[264] this court declines to apply strict scrutiny to the instant case.[265] After reviewing all of Plaintiffs constitutional claims on an individual basis and finding no violation, this court will not engage in multiplication theory. Notwithstanding the Supreme Court's dicta in *Smith*,[266] there is no basis in the Constitution for heightening the level of review simply based on the number of rights asserted or implicated in a case.[267] Either a plaintiff

---

**263.** Pl. Mem. in Supp. of Mot. for Prelim. Inj. at 39. Plaintiffs base this count on *Employment Div., Dept. of Human Resources of Oregon v. Smith,* where the Court observed, "The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press. . . ." 494 U.S. 872, 882, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), *rehearing denied,* 496 U.S. 913, 110 S.Ct. 2605, 110 L.Ed.2d 285 (1990) (subsequent history omitted).

**264.** *See Parker v. Hurley,* 514 F.3d 87, 98 (1st Cir.2008) (declining to "enter[ ] the fray over the meaning and application of *Smith's* 'hybrid situations' language"). The court did, however, note that "[n]o published circuit court opinion, including *Brown* [v. *Hot, Sexy & Safer Productions,* 68 F.3d 525 (1st Cir. 1995) ], has ever applied strict scrutiny to a case in which plaintiffs argued they had presented a hybrid claim." *Id.* at 98. Additionally, "[o]ther circuits have held explicitly that *Smith* does not create a new category of hybrid claims." *Id.*

**265.** The court has already held that the Act passes intermediate scrutiny.

**266.** The Court's observation was incidental and unnecessary to the outcome of the case. Indeed, the Court specifically acknowledged, "The present case does not present such a hybrid situation." *Smith,* 494 U.S. at 882, 110 S.Ct. 1595. Accordingly, the comment is dicta and non-binding. *See, e.g., Leebaert v.*

*Harrington,* 332 F.3d 134, 143 (2d Cir.2003) ("We have held, by contrast, in the context of claims involving free exercise and free speech, that Smith's 'language relating to hybrid claims is dicta and not binding on this court.' ") (*quoting Knight v. Conn. Dep't of Pub. Health,* 275 F.3d 156, 167 (2d Cir.2001)). This court also does not believe that the statement rises to the level of a "carefully considered statement" recognized by the First Circuit as controlling precedent. *See United States v. Santana,* 6 F.3d 1, 9 (1st Cir.1993).

**267.** *See, e.g., Leebaert,* 332 F.3d at 144 ("We too can think of no good reason for the standard of review to vary simply with the number of constitutional rights that the plaintiff asserts have been violated. Therefore, at least until the Supreme Court holds that legal standards under the Free Exercise Clause vary depending on whether other constitutional rights are implicated, we will not use a stricter legal standard to evaluate hybrid claims.") (internal citations and quotation marks omitted); *Kissinger v. Bd. of Trustees of Ohio State Univ.,* 5 F.3d 177, 180 (6th Cir.1993) ("We do not see how a state regulation would violate the Free Exercise Clause if it implicates other constitutional rights but would not violate the free Exercise Clause if it did not implicate other constitutional rights."). *See also Hialeah,* 508 U.S. at 567, 113 S.Ct. 2217 (Souter, J., concurring) ("[T]he distinction *Smith* draws strikes me as ultimately untenable. If a hybrid claim is simply one in which another constitutional right is implicated, then the hybrid exception would probably be so vast as to swallow the *Smith* rule, and, indeed, the hybrid exception would cover the situation exemplified by *Smith,* since free speech and

has a constitutional claim or she does not.[268]  Accordingly, Count IV of the Complaint also fails.

### Discussion: Count VIII. Equal Protection Challenge

Plaintiffs also assert that the employees/agents exemption of the Act violates the Equal Protection Clause.  As such, Plaintiffs argue that the Act "impinges fundamental rights and liberty interests and therefore is subject to strict scrutiny review."[269]  This court's other holdings regarding the Act, however, and the case law, foreclose such an argument.

[13]  "From time to time, the Supreme Court has invoked equal protection rather than free speech, as the basis for invalidating a content-based speech restriction."[270]

"But where the state shows a satisfactory rationale for a content-neutral time, place, and manner regulation, that regulation necessarily passes the rational basis test employed under the Equal Protection Clause."[271]

Here, as discussed above, the exemption is content-neutral and there are satisfactory rationales for the exemption.  Accordingly, "the Act passes muster under the Equal Protection Clause for the same reasons that it passes muster under the First Amendment."[272]

Furthermore, as explained above, intermediate scrutiny applies, not strict scrutiny.[273]  Because this court has already held that the Act survives intermediate scrutiny, Count VIII of Plaintiffs' Complaint also fails.

---

associational rights are certainly implicated in the peyote ritual.  But if a hybrid claim is one in which a litigant would actually obtain an exemption from a formally neutral, generally applicable law under another constitutional provision, then there would have been no reason for the Court in what *Smith* calls the hybrid cases to have mentioned the Free Exercise Clause at all.").

**268.**  This court notes, however, that even assuming the existence of a "hybrid rights" doctrine, Plaintiffs' "hybrid" claim would still fail.  Under the doctrine, a plaintiff must still establish an independently viable constitutional violation, or at least a "colorable" associated claim.  *See, e.g., Civil Liberties for Urban Believers v. City of Chicago,* 342 F.3d 752, 765 (7th Cir.2003) ("Based on the analyses of Appellants' speech, assembly, and equal protection claims that follow, however, we find them individually lacking the merit necessary to withstand summary judgment.... Appellants have identified no constitutionally protected interest upon which the [statute] infringes, as they must in order to establish a hybrid rights claim requiring heightened scrutiny."); *EEOC v. Catholic University of America,* 83 F.3d 455, 467 (D.C.Cir.1996) (acknowledging a "hybrid situation," but finding no independently viable constitutional claim).  See also *Thomas v. Anchorage Equal Rights*

*Comm'n,* 220 F.3d 1134, 1148 (9th Cir.2000) (characterizing *EEOC* as "requiring that a free exercise claim based on the hybrid rights exception must include an independently viable claim of infringement of a companion right").  For the "colorable" claim requirement, see, for example, *Grace United Methodist Church v. City of Cheyenne,* 451 F.3d 643, 656 (10th Cir.2006) (explaining that "hybrid rights exception" requires a "colorable independent constitutional claim").  Here, for the reasons above, Plaintiffs have not established either.  Accordingly, any "hybrid" claim would fail.

**269.**  Compl. at 22.

**270.**  *McGuire I,* 260 F.3d at 49.

**271.**  *Id.* at 49–50.

**272.**  *Id.* at 50.

**273.**  *See, e.g., Sullivan v. City of Augusta,* 511 F.3d 16, 32–33 (1st Cir.2007) ("Unlike regulations that are not content-neutral, which are reviewed under a harsher strict-scrutiny standard, ... content-neutral regulations are reviewed under so-called intermediate scrutiny.").

McCULLEN v. COAKLEY                    421
Cite as 573 F.Supp.2d 382 (D.Mass. 2008)

**Discussion: Due Process Challenges**

**A.  Count VI. Vagueness**

**1.  Plaintiffs' Position**

[14]  Plaintiffs argue that the Act is unconstitutionally vague because of one of the Act's exemptions.[274]  Exemption four excludes from the Act's coverage "persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility."[275]

Plaintiffs find two words of the exemption problematic.  First, Plaintiffs argue that "solely" is unclear, "because there are often multiple reasons for persons to travel from one place to another."[276]  Second, Plaintiffs argue that "destination" is unclear, "because a person need not have a destination as a reason to use a public sidewalk."[277]

Plaintiffs also argue that "it is unclear whether the statute permits plaintiffs to walk through the zone carrying a sign, or wearing a t-shirt or hat with an abortion-related or partisan message."[278]  According to Plaintiffs, "Based on the Attorney General's guidance letter, it appears they cannot," because, "[a]s construed by the Attorney General, the term 'partisan speech' is undefined, forcing a person to guess about the conduct proscribed."[279]

**2.  Attorney General's Guidance**

As noted above, the Attorney General's 2008 Guidance Letter addresses all of the exemptions, including the fourth:

Finally, the fourth exemption—for persons using the sidewalk or street adjacent to the clinic to reach a destination other than the clinic—applies to individuals who are crossing through the buffer zone, without stopping, to go somewhere other than a location within the zone and other than the clinic, and who are not using the buffer zone for some other purpose while passing through.  For example, an individual may cross through the buffer zone to reach and speak with someone outside the zone, to reach and stand in a location outside the zone (perhaps to engage in lawful protest, other speech, or prayer), or to travel on to another place altogether, provided that the individual does not do anything else within the buffer zone (such as expressing their views about abortion or engaging in other partisan speech).[280]

**3.  Legal Standard for Vagueness**

[15]  The Due Process Clause of the Fifth Amendment " 'mandates that, before any person is held responsible for violation of the criminal laws of this country, the conduct for which he is held accountable be prohibited with sufficient specificity to forewarn of the proscription of said conduct.' "[281]  Accordingly, " '[a]s generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.' "[282]

---

**274.**  See Compl. at 19–20; PFF at 42–43.

**275.**  Mass. Gen. Laws ch. 266, § 120E 1/2(b) (2000), *amended by* Mass. Gen. Laws ch. 266 § 120E 1/2(b) (2007) (spacing modified) (Trial Ex. 3).

**276.**  PFF at 42.

**277.**  *Id.* at 43.

**278.**  *Id.*

**279.**  *Id.*

**280.**  2008 Guidance Letter at 3 (Trial Ex. 26).

**281.**  *United States v. Lachman,* 387 F.3d 42, 56 (1st Cir.2004) (*quoting United States v. Anzalone,* 766 F.2d 676, 678 (1st Cir.1985)).

**282.**  *Id.* at 56 (*quoting Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) and *citing Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d

"The mere fact that a statute or regulation requires interpretation does not render it unconstitutionally vague."[283] Indeed, " 'Many statutes will have some inherent vagueness.... Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.' "[284]

Lastly, as acknowledged by Plaintiffs,[285] "[i]n evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered."[286]

#### 4. Vagueness Standard Applied

Reading the statute "as a whole,"[287] this court finds the exemption to be clear on its face. "Solely," meaning "to the exclusion of all else,"[288] should not confuse a person of ordinary intelligence.[289] The exemption applies if an individual walks through the zone with the sole purpose of walking home or to work or to the store. Additionally, if a counselor or protester decides to walk through the zone with the *sole* purpose of getting to the other side, the ex-

emption applies. What the statute prohibits is walking through the zone with the purpose of engaging in an activity *other than* reaching the other side. This would clearly not be passing through the zone "to the exclusion of all else."

Moreover, the word "destination," meaning "the place to which one is journeying,"[290] is also clear. Plaintiffs disagree, and argue, as an example, that a person jogging or strolling does not necessarily have a destination. This argument is unpersuasive. A jogger's destination is to the end of his run, which may be at the end of the block or in the next neighborhood. Indeed, for purposes of the exemption, any destination is fine, so long as it is not in the middle of a clearly marked buffer zone during an RHCF's business hours. Even the aimless stroller has a likely destination in mind before she turns around. In any event, the word is sufficiently clear for ordinary people to understand.

Furthermore, even assuming that the exemption requires some degree of explanation, the Attorney General's interpretation eliminates any possible confusion.[291]

---

222 (1972); *Bouie v. City of Columbia,* 378 U.S. 347, 350–51, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). *See also United States v. Williams,* —— U.S. ——, ——, 128 S.Ct. 1830, 1845, 170 L.Ed.2d 650 (2008) ("A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.").

**283.** *Id.*

**284.** *Id.* (quoting *Rose v. Locke,* 423 U.S. 48, 49–50, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975)).

**285.** *See* PFF at 18.

**286.** *Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 495 n. 5, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (*citing Grayned,* 408

U.S. at 110, 92 S.Ct. 2294). *See also McGuire II,* 386 F.3d at 58 (internal citations and quotation marks omitted).

**287.** *See Schenck v. Pro–Choice Network,* 519 U.S. 357, 383, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997) (*citing Grayned,* 408 U.S. at 110, 92 S.Ct. 2294).

**288.** *Merriam–Webster's Collegiate Dictionary* 1114 (Definition 2) (10th ed.2000).

**289.** *Williams,* 128 S.Ct. at 1845.

**290.** *Id.* at 314 (Definition 3).

**291.** Again, although this court considers the statute clear on its face, "[t]he mere fact that a statute ... requires interpretation does not render it unconstitutionally vague." *Lachman,* 387 F.3d at 56.

Not only is the Attorney General's construction reasonable, it comports with a common sense and plain read of the language.

Also, despite Plaintiffs' contention, the Attorney General's guidance is clear. The 2008 Guidance Letter states, "an individual may cross through the buffer zone to reach and speak with someone outside the zone, to reach and stand in a location outside the zone (perhaps to engage in lawful protest, other speech, or prayer), or to travel on to another place altogether, provided that the individual does not do anything else within the buffer zone (such as expressing their views about abortion or engaging in other partisan speech)." [292]

Although Plaintiffs claim to be confused by this, displaying signs or shirts with abortion-related or partisan messages clearly qualifies as "expressing their views about abortion," which counts as "do[ing] anything else within the buffer zone." [293] As such, the Attorney General's interpretation specifically prohibits this type of conduct.[294] After all, if individuals could simply walk back and forth all day in the buffer zone engaging in various activities, the main goals of the statute—ensuring public safety and guaranteeing unimpeded and safe access for patients—would be severely frustrated.

Contrary to Plaintiffs' assertion, the phrase "partisan speech" is also not vague such that an ordinary person is "forc[ed] ... to guess about the conduct proscribed." [295] An ordinary person understands "partisan" as support for political party or cause. The formal definition is also consistent with the contemporary use of the word: when used as an adjective, "partisan" means embodying "a firm adheren[ce] to a party, faction, cause or person." [296] Especially when used in the context of "abortion ... or other partisan speech," [297] an ordinary person would understand that the provision refers to political or cause-related speech. Accordingly, this provides people of ordinary intelligence a reasonable opportunity to understand which type of conduct is prohibited.

Moreover, the Attorney General's interpretation is authoritative. The Attorney General is the Commonwealth's chief law enforcement officer, and she sent the guidance letter to all law enforcement agencies with an RHCF in their jurisdiction.[298] This court has no reason to believe that the guidance will be anything but strictly heeded. Additionally, if past experience in the *McGuire* line of cases serves as a guide, law enforcement will interpret the statute in a manner consistent with the Attorney General's position.

Finally, despite Plaintiffs' argument to the contrary,[299] nothing in the exemption itself or the Attorney General's interpretation appears to encourage arbitrary and discriminatory enforcement.[300] The ex-

**292.** 2008 Guidance Letter at 2 (Trial Ex. 26).

**293.** *Id.*

**294.** Indeed, and despite their alleged confusion, Plaintiffs appear to acknowledge as such: "On its face, it is unclear whether the statute permits plaintiffs to walk though the zone carrying a sign, or wearing a t-shirt or hat with an abortion-related or partisan message. *Based on the Attorney General's guidance letter, it appears they cannot.*" PFF at 43 (emphasis added).

**295.** *Id.*

**296.** *Merriam–Webster's Collegiate Dictionary* 845 (Definition 1).

**297.** 2008 Guidance Letter at 2 (Trial Ex. 26).

**298.** *See* Narayanan Aff. at 1 (Trial Ex. 26).

**299.** *See* Compl. at 20; PFF at 42.

**300.** Indeed, the fixed buffer zone itself provides clearer guidance to law enforcement than its predecessor. Instead of a floating buffer zone with a subjective "approach" requirement, the fixed buffer zone—which is clearly marked on the pavement—provides

emption and the Attorney General's interpretation of the exemption are clear for the reasons above. Additionally, to the extent the "solely" determination requires a judgment call, " '[a]s always, enforcement requires the exercise of some degree of police judgment.' " [301] As in *Hill*, at least facially, "the degree of judgment involved here is acceptable." [302]

For these reasons, the Act is not unconstitutionally vague, and Count VI of Plaintiffs' Complaint fails.

## B. Count VII. Liberty Interest

[16] Count VII of the Complaint alleges violation of Plaintiffs' liberty interests protected by the Due Process Clause. Plaintiffs base this claim on the "freedom to loiter for innocent purposes," and "their rights to intrastate travel in violation of the Fourteenth Amendment." [303] Although Plaintiffs did not press this cause of action at the Bench Trial, this court will address it briefly.

Plaintiffs support this cause of action [304] by reference to *City of Chicago v. Morales*. [305] There, the Supreme Court addressed Chicago's "Gang Congregation Ordinance," which prohibited "criminal street gang members" from "loitering" in public places. [306] In addressing the overbreadth doctrine, Justice Stevens noted, writing for the plurality, "[T]he freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment." [307]

The Court, however, explicitly declined "to decide whether the impact of the Chicago ordinance on constitutionally protected liberty alone would suffice to support a facial challenge under the overbreadth doctrine." [308] Instead, the Court found the law unconstitutionally vague. [309] The "freedom to loiter" reference, therefore, was dicta and not precedential. [310]

Even acknowledging, however, a "right to loiter," this court agrees with the Seventh Circuit that "it is not at all clear, and indeed, quite improbable, that Justice Stevens undertook in this statement any type of fundamental rights analysis." [311] Accordingly, even assuming Plaintiffs are "seeking a right to enter" the areas immediately adjacent to RHCF entrances and driveways "simply to wander and loiter innocently," this court "cannot characterize that right as 'fundamental.' " [312]

As a result, this court applies rational basis review to this count. [313] This court

---

police with a bright-line basis to assess violations. A non-exempt person is either inside the zone or outside the zone.

**301.** *Hill*, 530 U.S. 703, 733, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (*quoting Grayned*, 408 U.S. at 114, 92 S.Ct. 2294).

**302.** *Id.*

**303.** Compl. at 21.

**304.** *See* Pl. Mem. in Supp. of Mot. for Prelim. Inj. at 33.

**305.** 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999).

**306.** *Id.* at 45–46, 119 S.Ct. 1849.

**307.** *Id.* at 53, 119 S.Ct. 1849.

**308.** *Id.* at 55, 119 S.Ct. 1849.

**309.** *Id.* at 55–64, 119 S.Ct. 1849.

**310.** This court also does not believe that the statement rises to the level of a "carefully considered statement" recognized by the First Circuit as controlling precedent. *See United States v. Santana*, 6 F.3d 1, 9 (1st Cir.1993).

**311.** *Doe v. City of Lafayette*, 377 F.3d 757, 772 (7th Cir.2004).

**312.** *Id.* at 772–773.

**313.** *See id.* at 773 ("Because we have concluded that the City's ban does not encroach on a fundamental liberty interest, we are bound to apply the rational basis standard of review to the City's ban.").

KING v. OFFICE FOR CIVIL RIGHTS OF U.S.    **425**
Cite as 573 F.Supp.2d 425 (D.Mass. 2008)

has already held, however, that the Act passes intermediate scrutiny. This ends the analysis, and Plaintiffs' liberty interests count also fails.

**Conclusion**

For the foregoing reasons, the Act survives under all three facial challenge standards. Because the Act passes constitutional muster under the First Amendment, the Equal Protection Clause and the Due Process Clause, Plaintiffs have fallen far short of establishing that "no set of circumstances exists under which the Act would be valid." [314] Furthermore, the Act has a "plainly legitimate sweep." [315] Lastly, Plaintiffs have failed to establish that the Act is impermissibly overbroad.[316]

Because Defendant prevails on all counts of Plaintiffs' facial challenge, Plaintiffs' request for preliminary and permanent injunctive relief is DENIED.[317]

This matter now proceeds to Plaintiffs' as-applied challenge. A Status Conference shall be held to establish a discovery schedule and trial date.

IT IS SO ORDERED.



---

**314.** 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

**315.** *Wash. State Grange v. Wash. State Republican Party,* —— U.S. ——, ——, 128 S.Ct. 1184, 1190, 170 L.Ed.2d 151 (2008) *(quoting Washington v. Glucksberg,* 521 U.S. 702, 739–40, and n. 7, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (Stevens, J., concurring in judgments)).

**316.** *See id.* at 1191 n. 6 *(citing New York v. Ferber,* 458 U.S. 747, 769–71, 102 S.Ct. 3348,

---

**Melvin KING, et al., Plaintiffs,**

v.

**OFFICE FOR CIVIL RIGHTS OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, and Peter Chan, in his official capacity as Regional Manager of the Office for Civil Rights, Defendants.**

**Civil Action No. 07–10861–PBS.**

United States District Court,
D. Massachusetts.

Aug. 26, 2008.

**Background:** Residents of neighborhood where biolab was being built sought writ of mandamus compelling Office of Civil Rights of Department of Health and Human Services (OCR) to conduct prompt investigation of discrimination complaint relating to construction of biolab. Parties filed cross motions for summary judgment, and plaintiffs moved for entry of judgment.

**Holdings:** The District Court, Saris, J., held that:

(1) OCR's decision to postpone determination on review of plaintiffs' complaint until supplemental statement to final Environmental Impact Statement (EIS) regarding biolab had been issued was reasonable, and

(2) OCR's decision to issue determination on review of plaintiffs' complaint within 90 days after issuance of final supple-

---

73 L.Ed.2d 1113 (1982) and *quoting Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)).

**317.** *See, e.g., McDonald's Corp. v. Rappaport,* 532 F.Supp.2d 264, 275 n. 67 (D.Mass.2008) (Tauro, J.) ("Because [Plaintiff] has not prevailed on the merits, and all four elements of the injunction standard must be met for an injunction to issue, this court need not address the remaining elements of the standard.").

**Eleanor McCULLEN et al.,
Plaintiffs, Appellants,**

v.

**Martha COAKLEY, Attorney General for the Commonwealth of Massachusetts, Defendant, Appellee.**

No. 08–2310.

United States Court of Appeals,
First Circuit.

Heard May 5, 2009.

Decided July 8, 2009.

**Background:** Pro-life demonstrators brought action against Attorney General for the Commonwealth of Massachusetts, seeking declaratory and injunctive relief and asserting a facial challenge to the constitutionality of a Massachusetts statute which established a 35-foot fixed buffer zone around driveways and entrances of reproductive health care facilities (RHCF). After a bench trial, the United States District Court for the District of Massachusetts, Joseph L. Tauro, J., 573 F.Supp.2d 382, denied demonstrators' requests for relief. Demonstrators appealed.

**Holdings:** The Court of Appeals, Selya, Circuit Judge, held that:

(1) statute was a content-neutral regulation of speech;

(2) statute was narrowly tailored to serve government's significant interest in enhancing public safety around RHCFs;

(3) statute left open adequate alternative channels of communication;

(4) statute was not overbroad; and

(5) statute was not rendered vague in violation of the Due Process Clause by Attorney General's use of the term "partisan speech" in interpretive guidance letter describing activity not allowed in buffer zone.

Affirmed.

**1. Federal Courts ⇐776**

De novo review was applicable to issues raised on appeal that implicated the First Amendment. U.S.C.A. Const. Amend. 1.

**2. Constitutional Law ⇐1030**

A very heavy burden is imposed on a party who mounts a facial challenge to a state statute.

**3. Constitutional Law ⇐1504**

Even so precious a freedom as freedom of speech must, in particular iterations, be balanced against the government's legitimate interests in protecting public health and safety. U.S.C.A. Const. Amend. 1.

**4. Constitutional Law ⇐1504**

In striking the delicate balance between freedom of speech and the government's interests in protecting public health and safety, a court must calibrate the scales differently depending on the nature of the governmental action, and that calibration takes place along a continuum. U.S.C.A. Const.Amend. 1.

**5. Constitutional Law ⇐1507**

The viewpoint-based discrimination in laws in which the government attempts to differentiate between divergent views on a singular subject, that is, laws in which the government attempts to pick and choose among similarly situated speakers to advance or suppress a particular ideology or outlook, is highly offensive to the core values of the First Amendment, and courts are wary of such encroachments. U.S.C.A. Const.Amend. 1.

**6. Constitutional Law ⇐1018**

A reviewing court must start with a presumption that a content-based regulation of speech is constitutionally suspect

under the First Amendment; that presumption can be rebutted by a showing that the regulation is both necessary to the furtherance of a compelling state interest and narrowly tailored to the achievement of that interest. U.S.C.A. Const.Amend. 1.

**7. Constitutional Law ⚖1509**

Time-place-manner regulations of speech will be upheld as long as they are justified without reference to the content of the regulated speech, are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication of the information. U.S.C.A. Const.Amend. 1.

**8. Abortion and Birth Control ⚖130**
**Constitutional Law ⚖1795**

Massachusetts statute which established a 35-foot fixed buffer zone around driveways and entrances of reproductive health care facilities (RHCF) was a content-neutral regulation of speech and was, thus, subject to intermediate scrutiny, even though statute contained an exception for RHCF employees and agents, and Attorney General's interpretive guidance used phrase "abortion and partisan speech" in describing activity not allowed in buffer zone; exception for RHCF employees was reasonably related to legislature's legitimate public safety objectives, and a state official's interpretation of a statute could not render an otherwise constitutional statute vulnerable to a facial challenge. U.S.C.A. Const.Amend. 1; M.G.L.A. c. 266, § 120E 1/2(b) (2007).

**9. Constitutional Law ⚖1513**

The principal inquiry in determining whether a regulation is content neutral, both in speech cases generally and in time-place-manner cases specifically, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. U.S.C.A. Const. Amend. 1.

**10. Constitutional Law ⚖1512**

A law designed to serve purposes unrelated to the content of protected speech is deemed "content-neutral" even if, incidentally, it has an adverse effect on certain messages while leaving others untouched. U.S.C.A. Const.Amend. 1.

> See publication Words and Phrases for other judicial constructions and definitions.

**11. Constitutional Law ⚖1512**

The test for content neutrality of a regulation of protected speech does not require proof that the legislature's response to a perceived problem be the only solution or even the best solution; it simply requires that the evidence support a conclusion that the regulation is in service to a legitimate governmental interest unrelated to expressive content. U.S.C.A. Const.Amend. 1.

**12. Constitutional Law ⚖1512**

A reviewing court must grant a significant degree of respect to the legislature's judgment when grading the efficacy of a regulation of protected speech under the test for content neutrality, which does not require proof that the legislature's response to a perceived problem be the only solution or even the best solution, but simply requires that the evidence support a conclusion that the regulation is in service to a legitimate governmental interest unrelated to expressive content. U.S.C.A. Const.Amend. 1.

**13. Constitutional Law ⚖1512**

The mere fact that a content-neutral law has a disparate impact on particular kinds of speech is insufficient, without more, to ground an inference that the disparity results from a content-based preference. U.S.C.A. Const.Amend. 1.

McCULLEN v. COAKLEY    **169**
Cite as 571 F.3d 167 (1st Cir. 2009)

**14. Constitutional Law** ⟨⟩**656**

The decisive question in a facial challenge is not whether a regulation is necessary to achieve the legislature's stated goal but, rather, whether a court can glean legitimate reasons for its existence.

**15. Abortion and Birth Control** ⟨⟩**130**
    **Constitutional Law** ⟨⟩**3766**

Exception for employees and agents of reproductive health care facilities (RHCF) to Massachusetts statute which established a 35-foot fixed buffer zone around driveways and entrances of RHCFs did not violate Equal Protection Clause, since exception was reasonably related to legislature's legitimate public safety objectives. U.S.C.A. Const.Amend. 14; M.G.L.A. c. 266, § 120E 1/2(b) (2007).

**16. Constitutional Law** ⟨⟩**1514**

A content-neutral regulation of speech is "narrowly tailored" if it (1) facilitates a substantial governmental interest that would be less effectively served without the regulation and (2) accomplishes this end without burdening substantially more speech than necessary. U.S.C.A. Const. Amend. 1.

See publication Words and Phrases for other judicial constructions and definitions.

**17. Abortion and Birth Control** ⟨⟩**130**
    **Constitutional Law** ⟨⟩**1795**

Massachusetts statute which established a 35-foot fixed buffer zone around driveways and entrances of reproductive health care facilities (RHCF) was narrowly tailored to serve a significant government interest, as required for a valid time-place-manner regulation of speech; statute promoted significant interest of enhancing public safety around RHCFs and did not burden substantially more speech than necessary to serve that purpose. U.S.C.A. Const.Amend. 1; M.G.L.A. c. 266, § 120E 1/2(b) (2007).

**18. Constitutional Law** ⟨⟩**1158**

A law of general application passes muster under narrow tailoring principles as long as it is not substantially broader than necessary to accomplish the legislature's legitimate goal.

**19. Constitutional Law** ⟨⟩**1514**

A content-neutral law that promotes a substantial public interest and does not burden substantially more speech than necessary to serve that purpose does not offend the First Amendment simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative; this means that a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted are not conditions precedent to upholding a time-place-manner restriction. U.S.C.A. Const.Amend. 1.

**20. Constitutional Law** ⟨⟩**1490**

The right to free speech under the First Amendment neither recognizes nor gives special protection to any particular conversational distance. U.S.C.A. Const. Amend. 1.

**21. Constitutional Law** ⟨⟩**1870**

Handbilling is not specially protected by the First Amendment. U.S.C.A. Const. Amend. 1.

**22. Constitutional Law** ⟨⟩**1509**

There is no guarantee under the First Amendment of any particular form or mode of expression. U.S.C.A. Const. Amend. 1.

**23. Constitutional Law** ⟨⟩**1509**

In evaluating whether a time-place-manner regulation of speech violates the First Amendment, the correct inquiry is

**Add. 52a**

whether, in light of the totality of the circumstances, the regulation burdens substantially more speech than necessary and, concomitantly, whether such a regulation leaves open adequate alternative channels of communication. U.S.C.A. Const. Amend. 1.

**24. Abortion and Birth Control** ⟺**129**

   **Constitutional Law** ⟺**1795**

   Massachusetts statute which established a 35-foot fixed buffer zone around driveways and entrances of reproductive health care facilities (RHCF) left open adequate alternative channels of communication, as required for a valid time-place-manner regulation of speech; statute placed no burden on activities outside of buffer zone, messages communicated outside buffer zone could be seen and heard by individuals entering, departing, or within the buffer zone, and any willing listener was at liberty to leave the zone, approach those outside it, and request more information. U.S.C.A. Const.Amend. 1; M.G.L.A. c. 266, § 120E 1/2(b) (2007).

**25. Abortion and Birth Control** ⟺**130**

   **Constitutional Law** ⟺**1795**

   Massachusetts statute which established a 35-foot fixed buffer zone around driveways and entrances of reproductive health care facilities (RHCF) was not overbroad in violation of First Amendment's protection of right to free speech, even though legislature was moved to enact the statute by the secondary effects of anti-abortion protests, but statute addressed secondary effects of a broader range of activities; increased degree of expansion was reasonable, and lack of reference to any particular kind of speech was what made statute content-neutral. U.S.C.A. Const.Amend. 1; M.G.L.A. c. 266, § 120E 1/2(b) (2007).

**26. Constitutional Law** ⟺**855**

   Courts will consider First Amendment challenges based on a statute's alleged overbreadth even though the challenger's own free speech rights are not implicated; this leniency results from a judicial assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression. U.S.C.A. Const. Amend. 1.

**27. Federal Courts** ⟺**613**

   Pro-life demonstrators waived argument that Massachusetts statute, which established a 35-foot fixed buffer zone around driveways and entrances of reproductive health care facilities (RHCF), was overbroad in violation of First Amendment because attorney general's interpretive guidance could have been read to criminalize the conduct of anyone who engaged in partisan speech while passing through buffer zone, even though Court of Appeals inquired about the theory at oral argument, where demonstrators did not raise argument in the district court or in their briefs on appeal. U.S.C.A. Const.Amend. 1; M.G.L.A. c. 266, § 120E 1/2(b) (2007).

**28. Federal Courts** ⟺**915**

   Avoiding waiver of an argument requires more than a hint that a particular theory may be lurking; it necessitates some developed argumentation addressed to that particular theory.

**29. Constitutional Law** ⟺**1141**

   A court may overturn a law as overbroad only if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep, and courts must vigorously enforce this substantiality requirement.

McCULLEN v. COAKLEY    **171**
Cite as 571 F.3d 167 (1st Cir. 2009)

**30. Abortion and Birth Control ⟸130**

**Constitutional Law ⟸4329**

Massachusetts statute which established a 35-foot fixed buffer zone around driveways and entrances of reproductive health care facilities (RHCF) was not rendered vague in violation of the Due Process Clause by Attorney General's use of the term "partisan speech" in interpretive guidance letter describing activity not allowed in buffer zone. U.S.C.A. Const. Amend. 14; M.G.L.A. c. 266, § 120E 1/2(b) (2007).

**31. Constitutional Law ⟸3905**

The Due Process Clause forbids the sovereign from depriving an individual of liberty pursuant to an excessively vague law; this doctrine prevents the enforcement of laws that fail to give persons of ordinary intelligence a reasonable opportunity to know what conduct is proscribed and what is not. U.S.C.A. Const.Amend. 14.

**32. Constitutional Law ⟸3905**

The Due Process Clause forbids laws that impermissibly delegate basic policy matters to adjudicators for resolution on an ad hoc or largely subjective basis, thus threatening arbitrary and discriminatory application. U.S.C.A. Const.Amend. 14.

**33. Statutes ⟸47**

When confronting a vagueness challenge to the face of a state statute, a federal court is obliged to accept any limiting construction that a state agency has authoritatively proffered.

**34. Constitutional Law ⟸735**

One to whose conduct a statute clearly applies may not successfully challenge it for vagueness.

**35. Constitutional Law ⟸1509**

Time-place-manner restrictions of speech are analyzed under intermediate scrutiny and not under the more rigorous standard that applies to prior restraints. U.S.C.A. Const.Amend. 1.

––––––––––

Michael J. DePrimo, with whom Philip D. Moran, Philip D. Moran P.C., Benjamin W. Bull, and Alliance Defense Fund were on brief, for appellants.

Dwight G. Duncan and Colbe Mazzarella on brief for Marlynda Augelli, Susanna Brennan, Cynthia Brown, Magdalena Castro, Alveda King, Anita Manninen, Esther Ripplinger, and Molly White, amici curiae.

Kenneth W. Salinger, Assistant Attorney General, with whom Martha Coakley, Attorney General, and Anna–Marie Tabor, Assistant Attorney General, were on brief, for appellee.

Robert E. McDonnell, Laura K. Langley, Josephine Deang, and Bingham McCutchen LLP on brief for American Civil Liberties Union of Mass., amicus curiae.

Before HOWARD, SELYA and HANSEN,* Circuit Judges.

SELYA, Circuit Judge.

For more than three decades, those who advocate for a woman's right to choose and those who advocate for the right to life (based on a belief that life begins at the moment of conception) have struggled for advantage in the marketplace of ideas. A series of pitched battles, forming a part of this struggle, has been waged at free-standing abortion clinics, where protestors and anti-abortion counselors seek to dissuade prospective patients, shame clinic

* Of the Eighth Circuit, sitting by designation.

workers, and call attention to what they perceive as the evils of voluntary terminations of pregnancies. In this campaign Massachusetts has been a battleground state.

This appeal arises out of yet another skirmish in this chronicle of discord. In a very real sense, genesis of the appeal dates back to the dawning of the millennium. At that time, the Massachusetts legislature enacted a statute that created a floating buffer zone around the entrances, exits, and driveways of abortion clinics throughout the state.[1]

Given the benefit of hindsight, the legislature revised the law seven years later. The modified version of the statute replaced the floating buffer zone with a 35–foot fixed buffer zone. This appeal involves a multi-pronged facial challenge to the constitutionality of the modified statute.

In a thoughtful and comprehensive opinion, the district court rejected the facial challenge in all its iterations and refused to enjoin enforcement of the new law. *McCullen v. Coakley,* 573 F.Supp.2d 382 (D.Mass.2008). After careful consideration of the record, the parties' briefs, some helpful friend-of-the-court briefs, and the arguments made orally, we affirm.

**I.  BACKGROUND**

In this case, as in so many cases, the past informs the present. We start there.

By the end of the twentieth century, Massachusetts had experienced repeated incidents involving violence and other unduly aggressive behaviors in the vicinity of reproductive health care facilities (RHCFs). Choosing among a host of possible preventive measures, the legislature

took up a bill that proposed creating a fixed 25–foot buffer zone around the entrances, exits, and driveways of RHCFs.

The state senate held a hearing on the bill in April 1999 and received evidence of widespread harassment and intimidation outside RHCFs. Numerous witnesses addressed not only the peculiar vulnerability of women seeking abortion services but also the deleterious effects of overly aggressive demonstrations on both patient and provider safety. The senate concluded that existing laws did not adequately safeguard clinic staff, prospective patients, or members of the public.

As part of its due diligence, the senate asked the Massachusetts Supreme Judicial Court (SJC) for an advisory opinion on the constitutionality of the proposed law. The SJC discerned no constitutional impediment. *Opinion of the Justices to the Senate,* 430 Mass. 1205, 723 N.E.2d 1, 6 (2000).

The senate subsequently engrossed a bill intended to enhance public safety in and around RHCFs while maintaining the relatively free flow of traffic. *See* Mass. S. Jour., Feb. 29, 2000. That bill resembled the original senate bill.

Before the house of representatives could act on the senate bill, the United States Supreme Court decided *Hill v. Colorado,* in which the Justices upheld, as a content-neutral time, place, and manner restriction, a Colorado statute designed to ameliorate the same panoply of evils through the use of a floating buffer zone. 530 U.S. 703, 707–08, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). The Colorado statute synthesized the fixed and floating buffer zone concepts, making it unlawful within a 100–foot fixed zone for any person, in the absence of consent, to "knowingly ap-

---

1. The mechanics of the 2000 Act and the dimensions of the then-current buffer zone are described in earlier opinions of this court.

*See McGuire v. Reilly,* 386 F.3d 45, 49 (1st Cir.2004); *McGuire v. Reilly,* 260 F.3d 36, 40 (1st Cir.2001).

proach" within eight feet of another person "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person." *Id.* at 707, 120 S.Ct. 2480 (quoting Colo.Rev.Stat. § 18–9–122(3)).

The Massachusetts legislature recognized that *Hill* had shed new light on the legal landscape. Thus, the house tabled the senate bill and repaired to the drawing board. The legislature eventually enacted a law that was loosely patterned on the Colorado statute. *See* An Act Relative to Reproductive Health Care Facilities (2000 Act), S.B. 148, 181st Gen. Ct. (Mass. Aug. 10, 2000). The key component of the 2000 Act was a prohibition against knowingly approaching within six feet of another without consent for certain defined protest-related purposes. Because the prohibition only operated within an 18–foot fixed buffer zone around RHCF entrances, exits, and driveways, it mimicked the Colorado law in combining floating and fixed buffer zone concepts.

A group of Massachusetts residents who wished to protest in front of RHCFs mounted both facial and as-applied challenges to the constitutionality of the new enactment. In successive decisions, we rejected those challenges. *See McGuire v. Reilly* (*McGuire I* ), 260 F.3d 36, 51 (1st Cir.2001) (rejecting facial challenges); *McGuire v. Reilly* (*McGuire II* ), 386 F.3d 45, 65–66 (1st Cir.2004) (rejecting renewed facial challenges as well as as-applied challenges).

Over time, legislators became concerned that the statute had failed to achieve its desired goals. In 2007, the legislature held public hearings devoted to the need for rewriting the statute. Testimony (including statements from law enforcement officials and clinic workers) revealed unanticipated difficulties in enforcing the 2000

Act and called into question that Act's efficacy. The upshot was a decision to reshape the law by, among other things, repudiating the floating buffer zone concept and relying instead on a 35–foot fixed buffer zone.

On November 8, 2007, the legislature enacted the revised law. *See* An Act Relative to Public Safety at Reproductive Health Care Facilities (2007 Act), S.B. 1353, 185th Gen. Ct. (Mass. Nov. 13, 2007). It declares that "[n]o person shall knowingly enter or remain on a public way or sidewalk adjacent to [an RHCF]" within a designated buffer zone. Mass. Gen. Laws ch. 266, § 120E 1/2(b) (2007). The Act describes the new buffer zone as comprising

> a radius of 35 feet of any portion of an entrance, exit or driveway of a reproductive health care facility or within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of a reproductive health care facility in straight lines to the point where such lines intersect the sidelines of the street in front of such entrance, exit or driveway.

*Id.* Moreover, the law prohibits all persons from entering or remaining within the buffer zone during ordinary business hours, subject to exceptions for four classes of persons, namely:

> (1) persons entering or leaving such facility;

> (2) employees or agents of such facility acting within the scope of their employment;

> (3) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and

> (4) persons using the public sidewalk or street right-of-way adjacent to such fa-

cility solely for the purpose of reaching a destination other than such facility.

*Id.* Each of these exceptions derives from the 2000 Act. And the 2007 Act, like the 2000 Act, also requires that the buffer zone be clearly marked. *See id.*

On January 25, 2008, the Attorney General sent a letter to an audience that included law enforcement and RHCF personnel. The letter purports to summarize the provisions of the 2007 Act and to furnish "guidance to assist . . . in applying the four exemptions." This guidance comprises four paragraphs, set forth verbatim in an appendix to this opinion.

## II. TRAVEL OF THE CASE

On January 16, 2008, plaintiffs-appellants Eleanor McCullen, Jean Blackburn Zarrella, Gregory A. Smith, Carmel Farrell, and Eric Caden, all Massachusetts residents who regularly engage in pro-life counseling outside RHCFs, sued the Attorney General of Massachusetts, in her representative capacity, in the federal district court. Their complaint invoked 42 U.S.C. § 1983, limned a constellation of constitutional claims, and prayed for declaratory and injunctive relief aimed at derailing the 2007 Act. Without objection, the district court bifurcated the case into facial and as-applied challenges. As to the former, the court consolidated the preliminary injunction hearing with the hearing on the merits, *see* Fed.R.Civ.P. 65(a)(2), and began a bench trial on May 28, 2008.

In due season, the court issued a decision denying relief. *McCullen*, 573 F.Supp.2d at 425. This interlocutory appeal followed. We have jurisdiction under 28 U.S.C. § 1292(a)(1).

## III. ANALYSIS

[1] We begin our odyssey by outlining the legal standards that apply generally to facial challenges and then proceed to the myriad prongs of the plaintiffs' facial challenge. Because the issues raised on appeal implicate the First Amendment, they engender de novo review. *See Bose Corp. v. Consumers Union,* 466 U.S. 485, 508, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

### A. *General Standards.*

Around the edges, the standards that apply in evaluating facial challenges to the constitutionality of statutes are not entirely clear. *See* Richard H. Fallon, Jr., Commentary, *As-applied and Facial Challenges and Third–Party Standing,* 113 Harv. L.Rev. 1321, 1322–23 (2000). For present purposes, though, the path is reasonably well-lighted.

[2] The Supreme Court recently has stated that a facial challenge will fail if a statute "has a plainly legitimate sweep." *Wash. State Grange v. Wash. State Repub. Party,* — U.S. ——, 128 S.Ct. 1184, 1190, 170 L.Ed.2d 151 (2008) (citation and internal quotation marks omitted). This is a refinement of its earlier statement that a party mounting a facial challenge "must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Howsoever worded, this standard imposes a very heavy burden on a party who mounts a facial challenge to a state statute.

[3] The statute at issue here implicates freedom of speech. Justice Cardozo long ago observed that freedom of speech is "the indispensable condition . . . of nearly every other form of freedom." *Palko v. Connecticut,* 302 U.S. 319, 327, 58 S.Ct. 149, 82 L.Ed. 288 (1937). But even so precious a freedom must, in particular iterations, be balanced against the government's legitimate interests in protecting public health and safety. *See, e.g.,*

*Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919) ("The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre.") (Holmes, J.).

**[4, 5]** In striking this delicate balance, a court must calibrate the scales differently depending on the nature of the governmental action. *McGuire I,* 260 F.3d at 42. That calibration takes place along a continuum. *See Berner v. Delahanty,* 129 F.3d 20, 28 (1st Cir.1997). At one end of the continuum are laws in which the government attempts to differentiate between divergent views on a singular subject; that is, laws in which the government attempts to "pick and choose among similarly situated speakers in order to advance or suppress a particular ideology or outlook." *Id.* Such viewpoint-based discrimination is highly offensive to the core values of the First Amendment, and courts are wary of such encroachments. *See, e.g., Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).

**[6]** Even when a law does not favor one particular viewpoint over another, governmental restrictions on the content of speech may be impermissible. *See Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 641–42, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). At this stage of the continuum, a reviewing court must start with a presumption that such a content-based regulation is constitutionally suspect. *R.A.V. v. City of St. Paul,* 505 U.S. 377, 383, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); *Nat'l Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 736 (1st Cir.1995). That presumption can be rebutted by a showing that the regulation is both necessary to the furtherance of a compelling state interest and narrowly tailored to the achievement of that interest. *See, e.g., Boos v. Barry,*

485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988).

**[7]** Further along the continuum are laws that do not regulate speech per se but, rather, regulate the time, place, and manner in which speech may occur. Because such time-place-manner restrictions are by definition content-neutral, they tend to burden speech only incidentally; that is, they burden speech for reasons unrelated to either the speaker's viewpoint or the speech's content. *See Turner Broad.,* 512 U.S. at 642, 114 S.Ct. 2445. Regulations of this type will be upheld as long as "they are justified without reference to the content of the regulated speech, . . . are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quoting *Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)). This more relaxed standard, familiarly known as "intermediate scrutiny," is justified because the fact that a regulation is both content-neutral and viewpoint-neutral helps to ensure that government is not using the regulation as a sub rosa means of interfering in areas to which First Amendment protections pertain. *See Turner Broad.,* 512 U.S. at 642, 114 S.Ct. 2445.

### B. Content Neutrality.

**[8]** What we have said to this point leads naturally to the threshold question in this case. The district court found the 2007 Act to be content-neutral. *McCullen,* 573 F.Supp.2d at 403. The plaintiffs demur. Because the resolution of this dispute will determine the contours of our subsequent analysis (including the appropriate level of scrutiny), we tackle this question first.

**[9, 10]**  Our principal inquiry in this regard, both in speech cases generally and in time-place-manner cases specifically, "is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward*, 491 U.S. at 781, 109 S.Ct. 2746. "Thus, a law designed to serve purposes unrelated to the content of protected speech is deemed content-neutral even if, incidentally, it has an adverse effect on certain messages while leaving others untouched." *McGuire I*, 260 F.3d at 43; *accord McGuire II*, 386 F.3d at 57.

The lower court, relying mainly on *Hill*, 530 U.S. at 719–20, 120 S.Ct. 2480, determined that the 2007 Act was content-neutral because it did not regulate speech—merely the places in which speech might occur. *McCullen*, 573 F.Supp.2d at 403. Moreover, the law was enacted in response to legitimate safety and law enforcement concerns, and was justified by those objectives without reference to the content of any speech. *Id.*

The plaintiffs resist this characterization. They acknowledge that the statute has a content-neutral patina, but they insist that this patina masks a more sinister reality. They point to several "facts" which, in their estimation, collectively indicate that the legislature's abiding motive was to curb anti-abortion speech. Specifically, the plaintiffs assert that the expanded size of the buffer zone is suspicious; that the zone itself, as reconfigured, contradicts its stated "public safety" goal in that it causes more safety hazards than it abates; that the legislature deliberately drew its evidence from biased sources, in effect listening to only one side of the story; that this court's characterizations of the 2000 Act, *McGuire I*, 260 F.3d at 49, belie the legislators' professed concerns about enforcement of that law; and that the nonexistent "emergency" referenced in the preamble to the 2007 Act is a figment of the legislators' collective imagination (and thus, a cover-up for the legislature's real agenda).

Although a few of the factual components of this broadside are new and others have been refurbished or reworked, the broadside itself is on the order of one that was leveled against the 2000 Act and soundly rebuffed in *McGuire I*. There, we wrote:

> To be sure, the plaintiffs insist that the state's professed concerns about public safety, personal security, and access to medical facilities are mere pretexts for its desire to censor anti-abortion speech. This insistence gets them nowhere. For one thing, their insinuations are unsupported by any record evidence. For another thing, where differential treatment is justified, on an objective basis, by the government's content-neutral effort to combat secondary effects, it is insufficient that a regulation may have been adopted in direct response to the negative impact of a particular form of speech.

*Id.* at 45. So it is here.

As in *McGuire I*, the plaintiffs' basic complaint is that alleged deficiencies in the factual record compiled by the legislature—gaps, distortions, mischaracterizations, and the like—compel an inference of pretext. But as in *McGuire I*, our independent review of the record confirms that the legislative factfinding adequately underpins what the legislature wrought. We need not cite book and verse. Although the plaintiffs, ably represented, have done a thorough job of fly-specking the legislative record, their claim of pretext is no more effective than was the counterpart claim advanced in *McGuire I*. Consequently, it is enough to note our wholehearted agreement with the district court that the record is "replete with factual references

to specific incidents and patterns of problematic behavior around RHCFs." *McCullen*, 573 F.Supp.2d at 405. In the final analysis, the claim of factual inadequacy amounts to little more than wishful thinking.

We nonetheless consider it wise to embellish two points. First, the fact that we spoke approvingly of the 2000 Act did not serve to freeze the statute in place. The legislature had a right (some might say an obligation) to monitor the statute's operation and to revisit the matter if experience revealed unexpected problems. *See Ward*, 491 U.S. at 800, 109 S.Ct. 2746; *Nat'l Amusements*, 43 F.3d at 742.

**[11, 12]** Second, the test for content neutrality does not require proof that the legislature's response to a perceived problem be the only solution or even the best solution; it simply requires that the evidence support a conclusion that the regulation is in service to a legitimate governmental interest unrelated to expressive content. *McGuire II*, 386 F.3d at 58; *McGuire I*, 260 F.3d at 44. In grading a regulation's efficacy under this test, a reviewing court must grant a significant degree of respect to the legislature's judgment. *See Turner Broad.*, 520 U.S. at 195, 117 S.Ct. 1174. Viewed through this deferential prism, the factfinding that undergirds the 2007 Act easily attains a passing grade.

In a related vein, the plaintiffs maintain that several features of the 2007 Act themselves constitute either content-based or viewpoint-based discrimination. These features include the exception for clinic employees and agents, the statute's alleged under-inclusiveness (*i.e.*, the fact that the legislature did not extend it to other types of free-standing medical clinics), and the Attorney General's guidance letter.

**[13]** This three-faceted structural argument is not original. Without exception, claims analogous to those that comprise it were addressed in our earlier decisions anent the 2000 Act. *See McGuire II*, 386 F.3d at 56–59; *McGuire I*, 260 F.3d at 44–47. Those decisions render superfluous any exegetic discussion of the current version of the structural argument. For now, it suffices to say that the mere fact that a content-neutral law has a disparate impact on particular kinds of speech is insufficient, without more, to ground an inference that the disparity results from a content-based preference. *See McGuire II*, 386 F.3d at 57; *McGuire I*, 260 F.3d at 44. Here, there is no "more."

To be sure, the plaintiffs strive to distinguish our earlier decisions and add the missing integers to the equation. Only two of these efforts deserve comment.

The argument that the law is content-based due to the exception permitting those persons associated with RHCFs (*e.g.*, clinic workers and patients) but not others to enter the buffer zone was squarely raised and squarely repulsed in *McGuire I*, 260 F.3d at 45–47. The present plaintiffs try to give that argument a new twist. They posit that the very size and nature of a 35-foot fixed buffer zone somehow changes the constitutional calculus and makes this exception less defensible. This is whistling past the graveyard.

**[14]** The decisive question in a facial challenge is not whether a regulation is necessary to achieve the legislature's stated goal but, rather, whether a court can glean legitimate reasons for its existence. *See id.* at 47. This principle applies to the configuration of the buffer zone selected by the legislature. The size of that zone need only be reasonably related to the attainment of the legislature's goal. That some might think a 25-foot or 30-foot buffer zone sufficient is not the issue.

[15]  Here, moreover, differences in the buffer zone's dimensions and other characteristics do not tip the constitutional balance. Regardless of those differences, the exception for persons associated with RHCFs remains reasonably related to the legislature's legitimate public safety objectives. No more is exigible to reject this aspect of the plaintiffs' facial challenge.[2]

Second, the plaintiffs maintain that the Attorney General's interpretive guidance (reprinted in the appendix) demonstrates that the 2007 Act is not content-neutral. In particular, they highlight the passage in the guidance letter in which the Attorney General uses the phrase "abortion and partisan speech." The force of this attack is dissipated by our decision in *McGuire II*, 386 F.3d at 58, in which we explained that a state official's interpretation of a statute, even if generally authoritative, cannot render an otherwise constitutional statute vulnerable to a facial challenge.

In sum, we find nothing in either the text or the legislative history of the 2007 Act that deprives that statute of content-neutral status. We proceed, therefore, with intermediate scrutiny, recognizing that the constitutionality of the 2007 Act turns on whether it is narrowly tailored and allows sufficient alternative means of communication. *See, e.g., Clark*, 468 U.S. at 293, 104 S.Ct. 3065.

### C. *Narrow Tailoring/Channels of Communication.*

[16]  A regulation is narrowly tailored if it (i) facilitates a substantial governmental interest that would be less effectively served without the regulation and (ii) accomplishes this end without burdening substantially more speech than necessary. *Ward*, 491 U.S. at 799, 109 S.Ct. 2746.

[17]  The first element of this two-part definition is not seriously disputed here. The interests ascribed by the legislature to the 2007 Act (enhancing public safety around RHCFs, improving traffic flow, and the like) are the same as those that we deemed both proper and substantial in *McGuire I*, 260 F.3d at 48 (describing those interests as "precisely the sort of interests that justify some incidental burdening of First Amendment rights").

It is the second part of the definition that draws the plaintiffs' fire: they argue that the 2007 Act regulates too much speech. But this argument rests on a misconception; it assumes that, in order to survive intermediate scrutiny, a law (and within a law, a buffer zone) must burden no more speech than is absolutely necessary to accomplish the law's legitimate purpose.

[18]  Perscrutation of the plaintiffs' briefs makes it apparent that this misconception arises out of a misreading of the Court's decisions in *Schenck v. Pro–Choice Network, Inc.*, 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997), and *Madsen v. Women's Health Center*, 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). In each instance, the Court applied a "no greater restriction than necessary" standard to determine the validity of an injunction. *See Schenck*, 519 U.S. at 374, 117 S.Ct. 855; *Madsen*, 512 U.S. at 765, 114 S.Ct. 2516. But injunctions (which bind only the parties in a particular case and those in privity with them) are more targeted than statutes (which apply broadly to all concerned). This is a critically important distinction; the Court has made it pellucid that the absence of general applicability subjects injunctions to a stricter

2.  This same reasoning also serves to defeat the plaintiffs' equal protection and viewpoint discrimination claims, each of which focuses on the legislature's decision to limit the reach of the relevant exception to persons associated with RHCFs.

standard than legislative enactments. *See Madsen*, 512 U.S. at 764–65, 114 S.Ct. 2516; *cf. Ry. Exp. Agency, Inc. v. New York*, 336 U.S. 106, 112, 69 S.Ct. 463, 93 L.Ed. 533 (1949) ("[T]here is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally.") (Jackson, J., concurring). A law of general application passes muster under narrow tailoring principles as long as it is not substantially broader than necessary to accomplish the legislature's legitimate goal. *See Ward*, 491 U.S. at 799, 109 S.Ct. 2746; *see also Madsen*, 512 U.S. at 764, 114 S.Ct. 2516.

[19] *Ward* supplies the measuring stick that we must wield. The 2007 Act is a law of general application. Given that it promotes a substantial public interest, *McGuire I*, 260 F.3d at 48, the decisive question is whether it burdens *substantially* more speech than necessary to serve that purpose. If the answer to that query is in the negative, the law does not offend the First Amendment "simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward*, 491 U.S. at 800, 109 S.Ct. 2746. This means, of course, that "a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted" are not conditions precedent to upholding a time-place-manner restriction. *Id.*

That conclusion effectively ends this aspect of the matter. Testimony from law enforcement officers and clinic workers attested to the ineffectiveness of the preexisting law. Against that backdrop, the legislature determined, after considerable study, that the state's declared interests

would be better served by reconfiguring the buffer zone around RHCFs. The legislature labored to balance First Amendment concerns with public safety concerns, *see McCullen*, 573 F.Supp.2d at 397–98 (recounting evidence), mulled the advantages and disadvantages of variously configured buffer zones, and decided (reasonably, we think) that a 35–foot fixed buffer zone made sense. Given the deference that is owed to such legislative judgments, *see Turner Broad.*, 520 U.S. at 195, 117 S.Ct. 1174, we cannot say that the 2007 Act is substantially broader than necessary.

The fact that the legislature reached a different conclusion seven years earlier (when it preferred a smaller buffer zone that had both floating and fixed components) does not undercut this conclusion. After all, legislative choice is a dynamic process. Simply because a legislature previously has attempted to address a particular problem in one way does not disable it from taking a different approach at a later time. *See, e.g., Ward*, 491 U.S. at 800, 109 S.Ct. 2746 (justifying increased regulation based on evidence of inadequacy of municipality's prior attempts to combat noise); *Nat'l Amusements*, 43 F.3d at 742 n. 9 (similar); *cf. Rust v. Sullivan*, 500 U.S. 173, 187, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (affirming agency's reversal of position while noting that in exercising legislatively delegated authority agency is free to consider "the wisdom of its policy on a continuing basis"). Experience is often the best teacher, and the incremental nature of the legislature's actions seems more a virtue than a vice. On these facts, the legislature's judgment must be respected. *See Turner Broad.*, 520 U.S. at 195, 117 S.Ct. 1174.

Relatedly, the plaintiffs suggest that the 2007 Act is constitutionally infirm because it amounts to a ban on handbilling and

interferes with the provision of an eight-to-fifteen-foot "constitutional conversational distance." That suggestion is jejune.

[20–23] Contrary to the plaintiffs' importunings, the Constitution neither recognizes nor gives special protection to any particular conversational distance. *See, e.g., Schenck*, 519 U.S. at 380, 117 S.Ct. 855 (upholding a fixed 15–foot buffer zone). By the same token, handbilling is not specially protected. *See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 654, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). Time-place-manner regulations routinely make particular forms of expression impracticable without raising constitutional concerns. *See, e.g., Hill*, 530 U.S. at 726–28, 120 S.Ct. 2480. As we explained in *Bl(a)ck Tea Society v. City of Boston*, 378 F.3d 8, 14 (1st Cir.2004), there is no constitutional guarantee of any particular form or mode of expression. The correct inquiry is whether, in light of the totality of the circumstances, a time-place-manner regulation burdens substantially more speech than necessary and, concomitantly, whether such a regulation leaves open adequate alternative channels of communication. *See Clark*, 468 U.S. at 293, 104 S.Ct. 3065.

[24] This brings us to the question of whether the 2007 Act satisfies the last half of this prescription—the half that deals with alternative channels of communication. To begin, the 2007 Act places no burden at all on the plaintiffs' activities outside the 35–foot buffer zone. They can speak, gesticulate, wear screen-printed T-shirts, display signs, use loudspeakers, and engage in the whole gamut of lawful expressive activities. Those messages may be seen and heard by individuals entering, departing, or within the buffer zone.

Additionally, the plaintiffs may stand on the sidewalk and offer either literature or spoken advice to pedestrians, including those headed into or out of the buffer zone. Any willing listener is at liberty to leave the zone, approach those outside it, and request more information.

To cinch matters, the size of the zone is not unreasonable. It bears repeating at this point that we are dealing exclusively with a facial challenge to the 2007 Act. Thus, as long as we can envision circumstances in which a 35–foot buffer zone allows adequate alternative means of expression, the challenge must fail. *See Wash. State Grange*, 128 S.Ct. at 1190.

It is easy to envision such a scenario. Indeed, the zone at issue here is slightly smaller than that upheld in *Madsen*, 512 U.S. at 768–70, 114 S.Ct. 2516 (validating a 36–foot buffer zone under a standard stricter than that which is applicable here). By like token, the zone at issue here is substantially smaller than the fixed portion of the buffer zone approved in *Hill*, 530 U.S. at 703, 120 S.Ct. 2480 (upholding a floating buffer zone within a 100–foot fixed buffer zone). Also instructive is *Burson v. Freeman*, 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992), in which the Court, applying strict scrutiny to a content-based regulation, approved a 100–foot buffer zone for polling places. *Id.* at 211, 112 S.Ct. 1846. While there is no particular buffer zone radius that is per se permissible or impermissible—everything depends on context—the radius here is not, on its face, constitutionally deficient.

To say more on the binary question of narrow tailoring and alternative channels of communication would be supererogatory. In the circumstances revealed by the record, the 2007 Act, on its face, is a valid time-place-manner regulation that advances a significant governmental interest without burdening substantially more speech than necessary and leaves open adequate alternative channels of communi-

cation. Accordingly, the statute survives intermediate scrutiny.

### D. *Overbreadth.*

**[25, 26]** First Amendment challenges based on a statute's alleged overbreadth are more readily accommodated than other types of facial challenges. The main difference is that courts will consider overbreadth challenges even though the challenger's own free speech rights are not implicated. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). This leniency results from a judicial "assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id.* The plaintiffs mount such a challenge. They argue that the 2007 Act cannot constitutionally be applied to the wide universe of people who might want to linger in the buffer zone and express their views. They liken this case to *Board of Airport Commissioners v. Jews For Jesus*, in which the Supreme Court struck down as overbroad an outright ban on all First Amendment activity within a major international airport. 482 U.S. 569, 577, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987).

The matter at hand is readily distinguishable from *Jews for Jesus*. That case involved a direct ban on First Amendment activity, whereas this case involves a time, place, and manner restriction. The Court has left no doubt but that time-place-manner restrictions should not be analyzed in the same way as direct bans on speech. *See Hill*, 530 U.S. at 731, 120 S.Ct. 2480.

In all events, the plaintiffs' overbreadth argument is eerily reminiscent of one considered and rejected in *Hill*. There, the challengers asserted that the Colorado statute was overbroad because it applied to all medical clinics, not just to abortion providers. The Court debunked that as-

sertion, stating that "[t]he fact that the coverage of a statute is broader than the specific concern that led to its enactment is of no constitutional significance." *Id.* at 730–31, 120 S.Ct. 2480; *see id.* at 723, 120 S.Ct. 2480 (approvingly noting that the statute applies "equally to used car salesmen, animal rights activists, fundraisers, environmentalists, and missionaries").

That logic is persuasive here. Although the Massachusetts legislature was plainly moved to enact the statute by the secondary effects of anti-abortion protests, it opted to address the secondary effects of a broader range of activities in the interest of effective enforcement. This decision to widen the statute's coverage is a matter of degree, not a matter of kind. Legislatures are not held to standards of mathematical precision where policy judgments are concerned. *See, e.g., Burson*, 504 U.S. at 210, 112 S.Ct. 1846 (describing the question of whether a 100–foot buffer zone could be reduced by 25 feet as not of "constitutional dimension"). Here, the increased degree of the expansion is reasonable, so the expansion is not a matter of constitutional significance. *See Hill*, 530 U.S. at 730–31, 120 S.Ct. 2480; *Burson*, 504 U.S. at 210, 112 S.Ct. 1846; *see also City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 802, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (explaining that "if the ordinance may be validly applied to [the plaintiffs], it can be validly applied to [a broader range of persons]").

There is, moreover, a paradox that taints the plaintiffs' overbreadth argument. The plaintiffs say, in effect, that the 2007 Act should have been limited to abortion-related speech. Yet the absence of any reference to any particular kind of speech (and, thus, to any particular content or viewpoint) is what makes the statute content-neutral. *See Hill*, 530 U.S. at 723, 120 S.Ct. 2480; *Burson*, 504 U.S. at 207,

112 S.Ct. 1846. If a failure to distinguish among speakers in itself gave rise to overbreadth problems, legislatures would be forced to choose between passing laws that were not content-neutral or laws that were overbroad. *Hill* pretermits the contention that the First Amendment forces state legislatures to face this sort of Morton's Fork.

[27] We have yet another bridge to cross. At oral argument in this court, the plaintiffs essayed a new and different spin on overbreadth—a perspective that emerged during the panel's questioning. Seizing upon this perspective, the plaintiffs suggested that the Attorney General's guidance letter might be read to criminalize the conduct of anyone who engages in any "partisan speech," whether or not abortion-related, while passing though the buffer zone. This interpretation raises the concern that an individual could be prosecuted merely for passing through the buffer zone en route to a destination outside the zone while, say, wearing a lapel pin advocating the election of a political candidate or a T-shirt exhorting a favorite baseball team.

[28] Though interesting, this argument is untimely. It was not raised either in the district court or in the plaintiffs' briefs on appeal.[3] It is, therefore, waived. *See United States v. Slade*, 980 F.2d 27, 30 (1st Cir.1992) ("It is a bedrock rule that when a party has not presented an argument to the district court, she may not unveil it in the court of appeals."); *Anderson v. Beatrice Foods Co.*, 900 F.2d 388, 397 (1st

Cir.1990) (holding that an appellant's briefs fix the scope of the issues appealed and that, therefore, an appellant cannot breathe life into an omitted theory merely by referring to it at oral argument). That the court inquired about the theory at oral argument does not lower this bar.

[29] We add a coda. Were we to reach the merits of this argument—which we do not—the proper resolution of it is not obvious. The Supreme Court has cautioned that "[t]he overbreadth doctrine is strong medicine that is used sparingly and only as a last resort." *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 15, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988). Thus, a court may overturn a law as overbroad only if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Wash. State Grange*, 128 S.Ct. at 1191 n. 6. Courts must "vigorously enforce" this substantiality requirement. *United States v. Williams*, — U.S. —, —, 128 S.Ct. 1830, 1838, 170 L.Ed.2d 650 (2008). In this case, it seems likely that the alleged overbreadth is not sufficiently sprawling to serve as the foundation for a constitutional challenge.

### E. *Vagueness.*

[30] The plaintiffs contend that the Attorney General's guidance letter renders the 2007 Act void for vagueness because it uses the term "partisan speech"—a term that is allegedly so amorphous "that persons of average intelligence would have no choice but to guess at its meaning and modes of application." *United States v.*

---

**3.** To be sure, the plaintiffs' general overbreadth argument implicitly attacks the exceptions to the 2007 Act. But avoiding waiver requires more than a hint that a particular theory may be lurking; it necessitates some developed argumentation addressed to that particular theory. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990).

The plaintiffs also argued below that the legislature's use of the word "solely" in the statutory text rendered the statute unconstitutionally vague. *See McCullen*, 573 F.Supp.2d at 421. Although their newly minted argument likewise involves, in part, the statute's use of the word "solely," it is a conceptually different argument.

*Hussein*, 351 F.3d 9, 14 (1st Cir.2003). We reject this contention.

[**31, 32**] The Due Process Clause forbids the sovereign from depriving an individual of liberty pursuant to an excessively vague law. *See id.*; *United States v. Arcadipane*, 41 F.3d 1, 5 (1st Cir.1994). This doctrine prevents the enforcement of laws that fail to give persons of ordinary intelligence a reasonable opportunity to know what conduct is proscribed and what is not. *Hill*, 530 U.S. at 732, 120 S.Ct. 2480; *Hussein*, 351 F.3d at 14. The Due Process Clause also forbids laws that impermissibly delegate basic policy matters to adjudicators for resolution on an ad hoc or largely subjective basis, thus threatening arbitrary and discriminatory application. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

In the district court, the plaintiffs alleged that the 2007 Act was impermissibly vague because of the uncertainty inherent in the terms "solely" and "destination." *See McCullen*, 573 F.Supp.2d at 421. They also argued that the term "partisan speech," provided as a gloss in the Attorney General's guidance letter (reprinted in the appendix), rendered the statute vague. *Id.* In this venue, the plaintiffs address only the term "partisan speech," a phrase found exclusively in the guidance letter.

[**33**] When confronting a vagueness challenge to the face of a state statute, we are obliged to accept any limiting construction that a state agency has authoritatively proffered. *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n. 5, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). It is difficult to understand, however, how or why a challenger can mount a facial attack on a statute that is itself not vague

simply because an enforcement official has offered an interpretation of the statute that may pose problems down the road. *See McGuire II*, 386 F.3d at 58; *see also Grayned*, 408 U.S. at 108–09, 92 S.Ct. 2294. As a matter of logic, we do not believe that an official's interpretation can render clear statutory language vague so as to make the statute vulnerable to a facial (as opposed to an as-applied) attack.[4] *See McGuire II*, 386 F.3d at 58; *see also United States v. Protex Indus., Inc.*, 874 F.2d 740, 743 (10th Cir.1989) (noting that a statute can be void for vagueness, as applied, as a result of a retroactive expansion of precise statutory language through interpretation).

Even were we to assume arguendo that the plaintiffs' underlying point is that the statute itself is vague and that this lack of precision is exacerbated by the Attorney General's guidance letter, another obstacle would loom. Although the word "partisan" may be vague at the margins, *but see Broadrick*, 413 U.S. at 608, 93 S.Ct. 2908, that uncertainty would have no relevance here. After all, the plaintiffs, by their own admission, want to engage in anti-abortion protests; and that conduct, as they must know, falls squarely within the hard core of the proscriptions spelled out in the guidance letter.

[**34**] We need go no further. "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *see Broadrick*, 413 U.S. at 608, 93 S.Ct. 2908. That is precisely the situation here.

### F.  *Prior Restraint.*

[**35**] We need not linger long over the plaintiffs' claim that the 2007 Act consti-

---

**4.** The situation may well be different if the statute itself is vague or ambiguous—but that is not the premise of the vagueness argument that the plaintiffs are making here.

tutes an impermissible prior restraint on speech. The case law makes manifest that time-place-manner restrictions are analyzed under intermediate scrutiny and not under the more rigorous standard that applies to prior restraints. *See, e.g., Bl(a)ck Tea Soc'y,* 378 F.3d at 12. Consequently, our determination that the 2007 Act is a valid time-place-manner restriction effectively forecloses the plaintiffs' resort to case law involving prior restraints. *See id.* ("If content-neutral prohibitions on speech at certain places were deemed prior restraints, the intermediate standard of review prescribed in the time-place-manner jurisprudence would be eviscerated.").

## IV. CONCLUSION

To recapitulate, the 2007 Act represents a permissible response by the Massachusetts legislature to what it reasonably perceived as a significant threat to public safety. It is content-neutral, narrowly tailored, and leaves open ample alternative channels of communication. It is, therefore, a valid time-place-manner regulation, and constitutional on its face.

We add a caveat. This decision flows naturally from the very heavy burden that plaintiffs must carry in mounting a facial challenge to a state statute. Nothing that we have said forecloses the possibility that, on a better-developed record, this legislative solution may prove problematic in particular applications.

*Affirmed.*

### Appendix I: The Attorney General's Guidance.

The first exemption—for persons entering or leaving the clinic—only allows people to cross through the buffer zone on their way to or from the clinic. It does not permit companions of clinic patients, or other people not within the

### Appendix I: The Attorney General's Guidance.—Continued

scope of the second or third exemptions, to stand or remain in the buffer zone, whether to smoke, talk with others, or for any other purpose.

The second exemption—for employees or agents of the clinic acting within the scope of their employment—allows clinic personnel to assist in protecting patients and ensuring their safe access to clinics, but does not allow them to express their views about abortion or to engage in any other partisan speech within the buffer zone.

Similarly, the third exemption—for municipal employees or agents acting within the scope of their employment—does not allow municipal agents to express their views about abortion or to engage in any other partisan speech within the buffer zone.

Finally, the fourth exemption—for persons using the sidewalk or street adjacent to the clinic to reach a destination other than the clinic—applies to individuals who are crossing through the buffer zone, without stopping, to go somewhere other than a location within the zone and other than the clinic, and who are not using the buffer zone for some other purpose while passing through. For example, an individual may cross through the buffer zone to reach and speak with someone outside the zone, to reach and stand in a location outside the zone (perhaps to engage in lawful protest, other speech, or prayer), or to travel on to another place altogether, provided that the individual does not do anything else within the buffer zone (such as expressing their views about abortion or engaging in other partisan speech).



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ELEANOR McCULLEN, JEAN BLACKBURN ZARRELLA, GREGORY A. SMITH, CARMEL FARRELL, and ERIC CADIN, | * * * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 08-10066-JLT |
| | * | |
| MARTHA COAKLEY, in her capacity as Attorney General for the Commonwealth of Massachusetts, | * * * | |
| | * | |
| Defendant. | * | |

MEMORANDUM

December 29, 2010

TAURO, J.

I.      Introduction

This case concerns a recently revised Massachusetts statute, Massachusetts General Laws Chapter 266, § 120E1/2 ("Act"), which establishes a thirty-five-foot fixed buffer zone around driveways and entrances of reproductive health care facilities ("RHCFs").  Presently at issue are Plaintiffs' Motion to Permit Arguments as to Facial Invalidity [#95], Defendant's Motion for Judgment on the Pleadings on the As-Applied Claims in Counts Two Through Eight [#99], and Plaintiffs' Motion for Leave to File Amended Complaint [#94].

Plaintiffs' Motion to Permit Arguments as to Facial Invalidity is DENIED; Defendant's Motion for Judgment on the Pleadings is ALLOWED; and Plaintiffs' Motion for Leave to File Amended Complaint is ALLOWED IN PART and DENIED IN PART.

1

**Add. 68a**

II.     Background[1]

        A.      The Parties

        Plaintiffs Eleanor McCullen, Jean Blackburn Zarrella, Gregory A. Smith, Carmel Farrell,

and Eric Cadin are Massachusetts residents who regularly engage in pro-life counseling outside

RHCFs.  Defendant Attorney General Martha Coakley is the chief lawyer and law enforcement

officer of the Commonwealth of Massachusetts.  As such, Defendant bears responsibility for

enforcing the Act.  She is sued in her official capacity only.[2]

        B.      Procedural History

        On January 16, 2008, Plaintiffs filed the Complaint, which advanced eight counts under 42

U.S.C. § 1983: (1) Free Speech—Time, Place, and Manner; (2) Free Speech—Substantial

Overbreadth; (3) Free Speech—Prior Restraint; (4) "Free Speech – Free Association – Free

Exercise Hybrid"; (5) Free Speech—Viewpoint Discrimination; (6) Due Process—Vagueness; (7)

Due Process—Liberty Interest; and (8) Equal Protection.[3]

        After a Status Conference held on April 23, 2008, and without objection from the Parties,

this court ordered that the matter proceed on the merits in two stages: (1) a Bench Trial on

Plaintiffs' facial challenge; and (2) a Bench Trial on Plaintiffs' as-applied challenge.[4]

_____

        [1] This court assumes familiarity with its previous decision in this case, McCullen v.
Coakley ("McCullen I"), 573 F. Supp. 2d 382 (D. Mass. 2008), but nonetheless presents a
condensed background.

        [2] See Compl., 3 [#1].

        [3] Compl., 13–22 [#1].

        [4] Order [#34].

**Add. 69a**

On May 28, 2008, this court held the first Bench Trial, on Plaintiffs' facial challenge.[5]  In an August 22, 2008 decision, this court held that the Act survived all three facial challenge standards.[6]  The Court of Appeals for the First Circuit held a de novo review and affirmed this court's decision,[7] and the Supreme Court denied Plaintiffs' petition for certiorari at this stage of the case.[8]

On September 17, 2010, Plaintiffs filed a <u>Motion for Leave to File Amended Complaint</u> [#94] and a <u>Motion to Permit Arguments as to Facial Invalidity</u> [#95].  On October 7, 2010, Defendant filed a <u>Motion for Judgment on the Pleadings on the As-Applied Claims in Counts Two Through Eight</u> [#99].  On December 2, 2010, this court heard oral arguments on all three <u>Motions</u> and took them under advisement.

III.    <u>Discussion</u>

A.      <u>Plaintiffs' Motion to Permit Arguments as to Facial Invalidity</u>

Despite this court's prior decision dismissing Plaintiffs' facial challenges, and the First Circuit's affirmation of this court's decision, Plaintiffs seek to "continue arguing for facial invalidation."[9]

1.      <u>Legal Standard</u>

---

[5] <u>McCullen I</u>, 573 F. Supp. 2d at 386.

[6] <u>Id.</u> at 425.  This court held that the Act was constitutional under the First Amendment, the Equal Protection Clause, and the Due Process Clause.  <u>Id.</u>

[7] <u>McCullen v. Coakley ("McCullen II")</u>, 571 F.3d 167 (1st Cir. 2009).

[8] <u>McCullen v. Coakley ("McCullen III")</u>, 130 S. Ct. 1881 (2010).

[9] Mot. Permit Args. Facial Invalidity, 2 [#95].

**Add. 70a**

The "law of the case" doctrine generally requires that "a decision of an appellate tribunal on a particular issue . . . governs the issue during all subsequent stages of the litigation . . . and thereafter on any further appeal."[10]  The law of the case doctrine has two components: first, the "mandate rule," which "forbids, among other things, a lower court from relitigating issues that were decided by a higher court, whether explicitly or by reasonable implication, at an earlier stage in the case"; and second, the general rule that "unless corrected by an appellate tribunal, a legal decision made at one stage of a civil or criminal case constitutes the law of the case throughout the pendency of the litigation."[11]  The law of the case doctrine applies to an appellate court's ruling both if the case is on appeal of a final judgment or if the appeal is interlocutory.[12]

Only three, very narrow exceptions to the law of the case doctrine exist.  For a court to revisit an issue,

> the proponent of reopening an already decided matter must accomplish one of three things: [1] "show that controlling legal authority has changed dramatically; [2] proffer significant new evidence, not earlier obtainable in the exercise of due diligence; or [3] convince the court that a blatant error in the prior decision will, if uncorrected, result in a serious injustice."[13]

---

[10] United States v. Rivera-Martinez, 931 F.2d 148, 150 (1st Cir. 1991) (citing Arizona v. California, 460 U.S. 605, 618 (1983)).

[11] Municipality of San Juan v. Rullan, 318 F.3d 26, 29 (1st Cir. 2003) (quoting Ellis v. United States, 313 F.3d 636, 646 (1st Cir. 2002)); see also Rivera-Martinez, 931 F.2d at 150 ("[T]he decision of the appellate court establishes the law of the case and it must be followed by the trial court . . . ." (quoting 1B J. Moore, J. Lucas & T. Currier, Moore's Federal Practice para. 0.404[1] (2d ed. 1991))).

[12] Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 72 F.3d 190, 197–98 (1st Cir. 1995) (citing Elias v. Ford Motor Co., 734 F.2d 463 (1st Cir. 1984)).

[13] United States v. Vigneau, 337 F.3d 62, 68 (1st Cir. 2003) (quoting United States v. Bell, 988 F.2d 247, 251 (1st Cir. 1993); citing Rivera-Martinez, 931 F.2d at 151).

4

**Add. 71a**

2.      Analysis

Here, Plaintiffs contend that the law of the case doctrine does not apply for two reasons. First, Plaintiffs contend that the first exception to the law of the case doctrine applies because controlling legal authority has changed dramatically.  Second, Plaintiffs contend that the second exception, the existence of significant new evidence, also applies.

a.      First Exception: Change in Controlling Legal Authority

To support their first argument, that controlling legal authority has changed dramatically, Plaintiffs cite two recent Supreme Court cases: Citizens United v. Federal Election Commission[14] and United States v. Stevens.[15]

i.      Citizens United v. Federal Election Commission

In Citizens United, the Supreme Court struck down a federal campaign statute that banned independent expenditures by corporations.[16]  The Supreme Court explained that, pursuant to the First Amendment, corporations may not be barred from engaging in political speech simply because they are not natural persons.[17]  Plaintiffs cite Citizens United for the proposition that "legislative [speaker] distinctions are not permitted by the First Amendment."[18]  That is, according to Plaintiffs, the Supreme Court's decision in Citizens United is "directly contrary to the standards

---

[14] 130 S. Ct. 876 (2010).

[15] 130 S. Ct. 1577 (2010).

[16] Citizens United, 130 S. Ct. at 886.

[17] Id. at 900 (citing First Nat'l Bank of Bos. v. Bellotti, 435 U.S. 765, 776, 780 n.16 (1978)).

[18] Mot. Permit Args. Facial Invalidity, 2 [#95] (citing Citizens United, 130 S. Ct. at 898); see Mot. Permit Args. Facial Invalidity, 9–12 [#95].

Add. 72a

applied by the First Circuit [in McCullen II] in permitting speaker distinctions so long as [the court] can 'glean legitimate reasons'" for the existence of the speaker distinction.[19]  Plaintiffs argue that Citizens United is relevant here because the Act "specifically exempts 'employees or agents of [abortion clinics] acting within the scope of their employment,'" thereby creating a speaker distinction.[20]

Plaintiffs' argument with regard to Citizens United is unpersuasive.  Indeed, this court holds that Citizens United is simply not relevant here.  Plaintiffs' construal of the holding in Citizens United is misleading.[21]  Plaintiffs are correct that the Supreme Court reiterated the general prohibition on speaker distinctions in Citizens United.  But that case concerned an absolute ban on speech rather than a time, place, or manner restriction.[22]  This court has previously explained, and the First Circuit has affirmed, that the Act creates a time, place, or manner restriction and is thus not an absolute ban on speech.[23]  Further, as the First Circuit explained in this case, the Supreme Court "has left no doubt but that time-place-manner restrictions should not be analyzed in the same way as direct bans on speech."[24]

---

[19] Mot. Permit Args. Facial Invalidity, 2–3 [#95] (quoting McCullen II, 571 F.3d at 177).

[20] Id. (quoting McCullen I, 571 F. Supp. 2d at 399).

[21] See Mot. Permit Args. Facial Invalidity, 2, 9–12 [#95].

[22] See Citizens United, 130 S. Ct. at 898 (explaining that the law at issue is "a ban on speech" and that "restrictions distinguishing among different speakers, allowing speech by some but not others" are prohibited).

[23] McCullen II, 571 F.3d at 181 ("[T]his case involves a time, place, and manner restriction."); McCullen I, 571 F. Supp. 2d at 408 ("On its face, the 2007 Act is a content-neutral time, place and manner restriction . . . .").

[24] McCullen II, 571 F.3d at 181 (citing Hill v. Colorado, 530 U.S. 703, 731 (2000)).

6

Moreover, the principle that the legislature may not bar some speakers from speaking while allowing others to speak is not a new principle.[25]  The principle certainly is not inconsistent with prior First Circuit law.  Indeed, Plaintiffs argue that "prior First Circuit law had permitted speaker distinctions when supported by a legitimate reason"[26] but that Citizens United renders such prior First Circuit case law outdated.[27]  Specifically, Plaintiffs challenge Defendant's reliance on McGuire v. Reilly (McGuire I),[28] a 2001 First Circuit case that Plaintiffs contend has been abrogated by Citizens United.[29]

Plaintiffs' position is unconvincing.  McGuire I is still good law.  In McGuire I, the First Circuit relied on the test for content-neutrality that was first established in Ward v. Rock Against Racism.[30]  In Christian Legal Society Chapter of the University of California, Hastings College of Law v. Martinez,[31] a decision dated five months after Citizens United, the Supreme Court confirmed the survival of the Ward test.[32]  The Supreme Court, quoting Ward, explained that "'a regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it

---

[25] See, e.g., Bellotti, 435 U.S. at 784–85 (citing Police Dep't v. Mosley, 408 U.S. 92, 96 (1972)).

[26] Reply Br. Supp. Mot. Permit Args. Facial Invalidity, 2 [#102] (citing McGuire v. Reilly (McGuire I), 260 F.3d 36, 45–47 (1st Cir. 2001)).

[27] Id. at 2–3.

[28] 260 F.3d 36 (1st Cir. 2001).

[29] Reply Br. Supp. Mot. Permit Args. Facial Invalidity, 2–3 [#102].

[30] 491 U.S. 781, 791 (1989); see McGuire I, 260 F.3d at 43.

[31] 130 S. Ct. 2971 (2010).

[32]

has an incidental effect on some speakers or messages but not others.'"[33]

Citizens United thus is not controlling legal authority in this case and does not operate to exempt Plaintiffs from the law of the case doctrine.[34]

ii.   United States v. Stevens

Plaintiffs next argue that the Supreme Court's decision in United States v. Stevens constitutes a change in controlling legal authority such that the law of the case doctrine does not apply. Stevens struck down a federal statute that prohibited the creation, sale, or possession of portrayals of animal cruelty, holding that the statute was substantially overbroad and thus facially unconstitutional.[35]

Plaintiffs cite Stevens for the proposition that "a strained interpretation of a law offered by the enforcement authorities cannot save an invalid law, and that the offering of such an interpretation in fact suggests the statute is unconstitutional as written."[36] Plaintiffs argue that Defendant has offered just such a strained interpretation of the Act.[37] Specifically, Plaintiffs contrast, on the one hand, the fact that the Act entirely exempts from the statute anyone sent by an abortion clinic into the buffer zone with, on the other hand, the contents of a guidance letter

---

[33] Id. at 2994 (quoting Ward, 491 U.S. at 791; citing Madsen v. Women's Health Center, Inc., 512 U.S. 753, 763 (1994)).

[34] See Vigneau, 337 F.3d at 68 (quoting Bell, 988 F.2d at 251; citing Rivera-Martinez, 931 F.2d at 151).

[35] Stevens, 130 S. Ct. at 1582, 1592.

[36] Mot. Permit Args. Facial Invalidity, 3 [#95] (citing Stevens, 130 S. Ct. at 1591).

[37] Mot. Permit Args. Facial Invalidity, 14 [#95].

8

**Add. 75a**

that Defendant sent to law enforcement personnel.[38]  Defendant's letter read, in pertinent part: "[T]he third exemption [of the Act] . . . does not allow municipal agents to express their views about abortion or to engage in any other partisan speech within the buffer zone."[39]  According to Plaintiffs,

> the Attorney General has adopted—and instructed law enforcement officers to apply—a "construction" of the Act that is wholly unrelated to its actual text. . . .  The Attorney General's attempt to "interpret" this language to say that, in fact, speakers from abortion clinics are criminally prohibited from discussing abortion in the zone has no basis in the statute.[40]

Plaintiffs' attempt to apply Stevens to this case is itself strained.  In Stevens, the government tried unsuccessfully "to salvage an otherwise unconstitutional law with an official's interpretation."[41]  Here, in contrast, the Act has already been held to be facially valid.  This court already rejected Plaintiffs' substantive argument regarding the Act's employee exemption.[42]  The First Circuit, in affirming this court's decision, was clear: "[A] state official's interpretation of a statute, even if generally authoritative, cannot render an otherwise constitutional statute vulnerable to a facial challenge."[43]  Because this court and the First Circuit have already held the

---

[38] Mot. Permit Args. Facial Invalidity, 14 [#95].

[39] McCullen I, 573 F. Supp. 2d at 400 (quoting Ex. 26 Trial R. Pls.' Facial Challenge, 2 [#63]).

[40] Mot. Permit Args. Facial Invalidity, 14 [#95].

[41] Mot. Permit Args. Facial Invalidity, 13 [#95].

[42] McCullen I, 573 F. Supp. 2d at 407–08 ("On its face, the statute does not permit advocacy of any kind in the zone.").

[43] McCullen II, 571 F.3d at 178 (citing McGuire v. Reilly (McGuire II), 386 F.3d 45, 58 (1st Cir. 2004)).

9

**Add. 76a**

Case 1:08-cv-10066-JLT    Document 111    Filed 12/29/10    Page 10 of 21

Act facially constitutional, Defendant's interpretation of the Act is irrelevant.[44]

Because Stevens is not relevant, it is unnecessary to reach the question of whether Stevens "changed dramatically" "controlling legal authority."[45]  Nevertheless, this court observes that the Supreme Court in Stevens applied the same test for overbreadth that this court and the First Circuit did in McCullen I and McCullen II.[46]  This uniformity weakens considerably Plaintiffs' contention that Stevens constitutes dramatically changed controlling legal authority.

For the foregoing reasons, Plaintiffs have not met their burden of showing that "controlling legal authority has changed dramatically," and thus they have failed to show that they meet the first exception to the law of the case doctrine.[47]

      b.    Second Exception: Significant New Evidence

Plaintiffs next argue that they can "proffer significant new evidence, not earlier obtainable in the exercise of due diligence"[48] such that the second exception to the law of the case doctrine

---

[44] See id.

[45] Vigneau, 337 F.3d at 68 (quoting Bell, 988 F.2d at 251; citing Rivera-Martinez, 931 F.2d at 151).

[46] See Stevens, 130 S. Ct. at 1587 ("[A] law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 n.6 (2008))); McCullen II, 571 F.3d at 182 ("[A] court may overturn a law as overbroad only if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" (quoting Wash. State Grange, 552 U.S. at 449 n.6)); McCullen I, 573 F. Supp. 2d at 401, 417 (citing Wash. State Grange, 552 U.S. at 449 n.6).

[47] See Vigneau, 337 F.3d at 68 (quoting Bell, 988 F.2d at 251; citing Rivera-Martinez, 931 F.2d at 151).

[48] Id.

10

**Add. 77a**

applies.[49]  Plaintiffs argue that the prior opinions of this court and the First Circuit were based on

a limited record, a record that "was largely based on un-cross-examined affidavits, and was

compiled without the benefit of live testimony or a discovery period."[50]  Plaintiffs seek leave to

"argue that the evidence developed during discovery requires reconsideration of facial validity."[51]

Plaintiffs' argument with regard to the second exception to the law of the case doctrine

also fails, for at least two reasons.  First, Plaintiffs have not actually proffered any new evidence,

let alone "significant new evidence."[52]  Second, Plaintiffs have not shown, as they must under the

second exception to the law of the case doctrine, that any new evidence was "not earlier

obtainable in the exercise of due diligence."[53]

Moreover, Plaintiffs did not object in April 2008 to this court's decision to bifurcate the

case into two trials.  Plaintiffs may not have two bites at the apple.[54]

As any one of these reasons is sufficient to defeat Plaintiffs' second argument, Plaintiffs

cannot overcome the law of the case doctrine by relying on the doctrine's second exception.

_____

[49] See Mot. Permit Args. Facial Invalidity, 3–4, 16–17 [#95].

[50] Mot. Permit Args. Facial Invalidity, 17 [#95].

[51] Mot. Permit Args. Facial Invalidity, 17 [#95].

[52] Vigneau, 337 F.3d at 68 (quoting Bell, 988 F.2d at 251; citing Rivera-Martinez, 931 F.2d at 151).  Additionally, Plaintiffs have not demonstrated that any new evidence would be "significant" to their facial challenge.  Id.

[53] Id.

[54] See Kramer v. Gates, 481 F.3d 788, 792 (D.C. Cir. 2007) ("Rule 60(b)(6) . . . may not 'be employed simply to rescue a litigant from strategic choices that later turn out to be improvident.'" (quoting Good Luck Nursing Home, Inc. v. Harris, 636 F.2d 572, 577 (D.C. Cir. 1980))).

11

**Add. 78a**

c.　Third Exception: Serious Injustice

Plaintiffs have not properly raised the issue of the third exception to the law of the case doctrine. Indeed, Plaintiffs' <u>Motion</u> notes only that a third exception to the law of the case doctrine exists and then states in a footnote: "As the Supreme Court has recognized, '[u]nder the law of the case doctrine, as most commonly understood, it is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice.'"[55] This footnote falls within the "Legal Standard" section of Plaintiffs' <u>Motion</u>, rather than under their "Argument" section.[56] Plaintiffs' "Argument" section does not refer at all to this exception to the law of the case doctrine.[57]

Because Plaintiffs fail to raise this argument, it is waived.[58] This court is unconvinced "that a blatant error in the prior decision[s]" exists, let alone any error that "if uncorrected, [would] result in a serious injustice."[59]

For all of the foregoing reasons, this court determines that the law of the case doctrine

---

[55] Mot. Permit Args. Facial Invalidity, 5 & n.1 [#95] (quoting <u>Arizona v. California</u>, 460 U.S. at 618). The footnote continues: "Further, the Supreme Court clarified that the law of the case doctrine 'directs a court's discretion, it does not limit the tribunal's power.'" <u>Id.</u> at 5 n.1.

[56] <u>See</u> Mot. Permit Args. Facial Invalidity, 5 & n.1 [#95].

[57] <u>See</u> Mot. Permit Args. Facial Invalidity, 8–17 [#95].

[58] <u>See</u> <u>Nat'l Foreign Trade Council v. Natsios</u>, 181 F.3d 38, 60 n.17 (1st Cir. 1999) ("We have repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived." (citing <u>Grella v. Salem Five Cent Sav. Bank</u>, 42 F.3d 26, 36 (1st Cir. 1994); <u>Rumford Pharmacy, Inc. v. City of East Providence</u>, 970 F.2d 996, 1000 n.9 (1st Cir. 1992); <u>Barrett v. United States</u>, 965 F.2d 1184, 1194 n.19 (1st Cir. 1992))); <u>Gill v. United States</u>, 2009 U.S. Dist. LEXIS 88159, at 11 n.1 (D. Mass. 2009) (quoting <u>Natsios</u>, 181 F.3d at 61 n.17).

[59] <u>Vigneau</u>, 337 F.3d at 68 (quoting <u>Bell</u>, 988 F.2d at 251; citing <u>Rivera-Martinez</u>, 931 F.2d at 151).

applies and that no exception to that doctrine applies.  For these reasons, Plaintiffs' <u>Motion to Permit Arguments as to Facial Invalidity</u> is DENIED.

      B.     <u>Defendant's Motion for Judgment on the Pleadings on the As-Applied Claims in Counts Two Through Eight</u>

Pursuant to Federal Rule of Civil Procedure 12(c), Defendant moves for judgment on the pleadings with regard to the as-applied claims in Counts Two through Eight.[60]

      1.     <u>Count Two: Free Speech—Substantial Overbreadth</u>

Because this court has already decided Plaintiffs' facial claim, Plaintiffs' remaining claim in Count Two is an "as applied" claim for substantial overbreadth.

Although the First Circuit has not spoken directly on this point, then-Judge Sotomayor has explained that "[a]ll overbreadth challenges are facial challenges, because an overbreadth challenge by its nature assumes that the measure is constitutional as applied to the party before the court."[61]  This court is mindful, however, of an apparent circuit split on this issue.  Plaintiffs cite <u>Turchick v. United States,</u>[62] an Eighth Circuit case from 1977, to support their as-applied overbreadth challenge.[63]  <u>Turchick</u> contains the following footnote:

> 'Facial' overbreadth analysis should be distinguished from overbreadth 'as-applied' to a particular claimant.  The latter involves a judgment as to the constitutionality of a challenged statute based on the harm caused to the litigating party.  The 'as-applied'

---

[60] Def.'s Mot. J. Pleadings As-Applied Claims Counts Two Through Eight [#99].

[61] <u>Farrell v. Burke</u>, 449 F.3d 470, 498 (2d Cir. 2006) (Sotomayor, J.).

[62] 561 F.2d 719 (8th Cir. 1977).

[63] Pls.' Opp'n Defs.' Mot. J. Pleadings As-Applied Claims Counts Two Through Eight & Pls.' Reply Supp. Mot. Amend, 11 [#109] [hereinafter Pls.' Opp'n] (citing <u>Turchick</u>, 561 F.2d at 721 n.3).

**Add. 80a**

method vindicates a claimant whose conduct is within the First Amendment but invalidates the challenged statute only to the extent of the impermissible application. 'Facial' review proceeds without regard to the constitutional status of the litigant's conduct. Under this approach, a statute prohibiting substantial activity protected by the First Amendment is voided entirely.[64]

It appears to this court that while an overbreadth challenge may <u>contain</u> an as-applied challenge, it may not consist <u>solely</u> of an as-applied challenge. Although the Supreme Court has not addressed this exact question, the Court has explained that "the overbreadth doctrine enables litigants 'to challenge a statute, not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'"[65] An overbreadth challenge, therefore, always contains a facial component.

Demonstrative of this point, Plaintiffs' explanation of what remains of their overbreadth challenge appears to require a facial component of the challenge. Plaintiffs claim that the Act is overbroad as applied because it "'sweeps within its ambit a substantial amount of protected speech'"[66] and because it "burdens more speech than necessary to achieve any legitimate state interest."[67] Plaintiffs do not explain how these claims are as-applied claims rather than facial claims, other than asserting that "[t]hese claims are not limited to asserting the rights of third

---

[64] <u>Turchick</u>, 561 F.2d at 721 n.3 (citing Note, <u>The First Amendment Overbreadth Doctrine</u>, 83 Harv. L. Rev. 844, 844–45 (1970)).

[65] <u>Hill v. Colorado</u>, 530 U.S. 703, 731–32 (2000) (quoting <u>Broadrick v. Oklahoma</u>, 413 U.S. 601, 615 (1973)).

[66] Pls.' Opp'n, 12 [#109] (quoting Pls.' Mot. Leave File Am. Compl., Ex. A ¶ 119 [#94]).

[67] Pls.' Opp'n, 12 [#109] (citing Pls.' Mot. Leave File Am. Compl., Ex. A ¶ 120 [#94]).

14

parties."[68]  Simply asserting that a law is overbroad as applied to Plaintiffs is not sufficient to persuade this court to depart from the Second Circuit's clear direction on the overbreadth doctrine.

Because this court and the First Circuit have already held the Act facially constitutional, therefore, Plaintiffs may not challenge the Act as overbroad as applied.

      2.    <u>Count Three: Free Speech—Prior Restraint</u>

Count Three challenges the Act as a prior restraint.[69]  This court has already held that as a matter of law, the Act is a time, place, or manner restriction and not a prior restraint.[70]

Plaintiffs are correct that "Plaintiffs will still be free to argue that the time, place, and manner test is not satisfied in that ample alternative channels of communication do not exist,"[71] that is, that the Act is an unconstitutional time, place, or manner restriction as it is applied.  But the Act has already been adjudicated to be, on its face, a valid time, place, or manner restriction, and thus cannot also be a prior restraint.  As this court has already pointed out, "'[t]he Supreme Court has explicitly rejected attempts to analyze security-based time-place-manner restrictions as prior restraints.'"[72]  Likewise, in affirming this court's decision, the First Circuit explained, "our

---

[68] Pls.' Opp'n, 12 [#109] (citing Pls.' Mot. Leave File Am. Compl., Ex. A ¶ 123 [#94]); <u>see also</u> <u>id.</u> at 12–13 ("[T]hese as-applied claims were included in the original complaint." (citing Compl. Civil Rights Violations, Declaratory J., & Injunctive Relief ¶¶ 88, 89, 91 [#1])).

[69] Compl. Civil Rights Violations, Declaratory J., & Injunctive Relief, 16 [#1].

[70] <u>McCullen I</u>, 573 F. Supp. 2d at 417; <u>see</u> <u>McCullen II</u>, 517 F.3d at 183–84.

[71] Pls.' Opp'n, 15 [#109].

[72] <u>McCullen I</u>, 573 F. Supp. 2d at 417 (quoting <u>Bl(a)ck Tea Soc'y v. City of Bos.</u>, 378 F.3d 8, 12 (1st Cir. 2004)).

determination that the 2007 Act is a valid time-place-manner restriction effectively forecloses the plaintiffs' resort to case law involving prior restraints."[73]

For these reasons, Plaintiffs may not challenge the Act as a prior restraint as applied.

3. Count Four: "Free Exercise Hybrid"

In Count Four, Plaintiffs bring a "free exercise hybrid" challenge to the Act.[74]  With regard to Plaintiffs' freedom of speech claim, this court has already determined, both in McCullen I and in this Memorandum, "that the Act is a lawful, content-neutral time, place and manner restriction; is not overbroad; and does not constitute a prior restraint."[75]  For that reason, Plaintiffs cannot challenge the Act as an as-applied violation of their freedom of speech under Count Four.

Additionally, Plaintiffs may not now argue that the Act constitutes an as-applied violation of their rights under the Free Exercise Clause.  As this court explained when it rejected Plaintiffs' facial claim in Count Four, a law of "'neutral and . . . general applicability' . . . 'need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.'"[76]

Plaintiffs thus cannot now argue Count Four as an as-applied claim.

4. Counts Five and Eight: Free Speech—Viewpoint Discrimination and Equal Protection

---

[73] McCullen II, 571 F.3d at 184 (citing Bl(a)ck Tea Soc'y, 378 F.3d at 12).

[74] Compl. Civil Rights Violations, Declaratory J., & Injunctive Relief, 17 [#1].

[75] McCullen I, 573 F. Supp. 2d at 418.

[76] Id. (quoting Knights of Columbus v. Town of Lexington, 272 F.3d 25, 35 (1st Cir. 2001)).

16

**Add. 83a**

Case 1:08-cv-10066-JLT   Document 111   Filed 12/29/10   Page 17 of 21

In Counts Five and Eight, Plaintiffs allege viewpoint discrimination and a violation of Equal Protection.[77]  Unlike some of Plaintiffs' other as-applied claims, it is theoretically possible for Plaintiffs to press Counts Five and Eight on an as-applied basis.  Plaintiffs have not alleged sufficient facts, however, that rise to the level of viewpoint discrimination or a violation of Equal Protection.

To press as-applied claims under Counts Five or Eight, Plaintiffs would have had to allege that "enforcement of the statute amounted to viewpoint discrimination" or a violation of Equal Protection.[78]  For example, they would have had to allege that police knowingly let clinic employees engage in pro-choice advocacy within a buffer zone.[79]  It is not enough, therefore, to allege "opposition from pro-choice advocates who surround, cluster, yell, make noise, mumble, and/or talk loudly to clinic clients for the purpose of disrupting or drowning out pro-life speech and thwart Plaintiffs' efforts to distribute literature"[80] without also alleging that the police "turned a blind eye toward pro-abortion speech while not turning a blind eye to possible transgressions by plaintiffs."[81]

---

[77] Compl. Civil Rights Violations, Declaratory J., & Injunctive Relief, 18, 21 [#1].

[78] McGuire II, 386 F.3d at 64.

[79] See id. at 65 ("[T]here is no evidence that the police have enforced this statute in anything other than an evenhanded way . . . .").

[80] Compl. Civil Rights Violations, Declaratory J., & Injunctive Relief ¶ 26 [#1].

[81] McGuire II, 386 F.3d at 65.  Plaintiffs' argument that McGuire II is inapplicable is unavailing.  See supra notes 28–32 and accompanying text.

Additionally, Plaintiffs argue that their allegations concerning Defendant's interpretation of the Act are sufficient to constitute as-applied claims under Counts Five and Eight.  See Pls.' Opp'n, 18 [#109].  As explained below, however, Plaintiffs are not permitted to amend their Complaint to include such an argument.  See infra Part C.

Plaintiffs also argue that there is a higher burden on the government at the as-applied stage than the facial stage to show that the law is constitutional.[82]  This argument fails because this court holds here that Plaintiffs have not plead sufficient facts to support an as-applied claim.  That is, the discovery that Plaintiffs wishes to conduct cannot cure insufficient pleadings.

### 5.   Count Six: Due Process—Vagueness

Count Six challenges the Act for vagueness.[83]  This court and the First Circuit have held that the Act is not vague on its face.[84]

The Supreme Court has recently explained that a "plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."[85]  Because Plaintiffs have conceded that the Act applies to them,[86] they cannot argue that the Act is vague as applied.[87]

### 6.   Count Seven: Due Process—Liberty Interest

Count Seven challenges the Act as a violation of Plaintiffs' liberty interest, what Plaintiffs call the "freedom to loiter."[88]  This court held that the Act does not violate any of Plaintiffs' Due

---

[82] See Pls.' Opp'n, 17–18 [#109].

[83] Compl. Civil Rights Violations, Declaratory J., & Injunctive Relief, 19 [#1].

[84] McCullen II, 571 F.3d at 183; McCullen I, 573 F. Supp. 2d at 422.

[85] Holder v. Humanitarian Law Project, 130 S. Ct. 2705, 2719 (2010) (quoting Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982)).

[86] See Compl. Civil Rights Violations, Declaratory J., & Injunctive Relief ¶¶ 42–48, 56–58 [#1].

[87] See Holder, 130 S. Ct. at 2719.

[88] Compl. Civil Rights Violations, Declaratory J., & Injunctive Relief, 20–21 [#1].

**Add. 85a**

Process rights.[89]  As the law of the case, this ruling terminates Plaintiffs' entire claim under Count Seven.

> ### 7.  Count One: Free Speech—Time, Place, and Manner

Defendant does not seek judgment on Count One.[90]  Rather, with regard to Count One, Defendant seeks only a clarification that all that remains to be tried is the as-applied portion of the claim.[91]  This court agrees with Defendant that such a clarification is appropriate.  Given this court's ruling on Counts 2 through 8, this court agrees that "all that remains to be tried is whether the statute as applied at the clinics specified in the complaint leaves open adequate alternative channels of communication."[92]

For the foregoing reasons, Defendant's Motion is ALLOWED.

> ### C.    Plaintiffs' Motion for Leave to File Amended Complaint

Plaintiffs seek to amend their Complaint.  The amended complaint would do three things:

> First, the amended complaint [would] challenge the buffer zone not only in Brookline and Boston (as in the original complaint) but also in Worcester and Springfield, adding five additional plaintiffs who speak at the new locations.  Second, the amended complaint [would] add the relevant district attorneys for all four locations as defendants.  Third, the amended complaint [would] specifically plead[] that [Defendant's] "interpretation" of the Act—which has been communicated to and allegedly implemented by law enforcement—is itself unconstitutional and renders the [A]ct unconstitutional.[93]

Defendant partially opposes this Motion.  Defendant

---

[89] McCullen I, 573 F. Supp. 2d at 424–25.

[90] See Def.'s Mot. J. Pleadings As-Applied Claims Counts Two Through Eight, 1 [#99].

[91] See Def.'s Mot. J. Pleadings As-Applied Claims Counts Two Through Eight, 1 [#99].

[92] Def.'s Mot. J. Pleadings As-Applied Claims Counts Two Through Eight, 1 [#99].

[93] Pls.' Mot. Leave File Am. Compl., 2 [#94].

**Add. 86a**

has no objection to the amendment of the complaint to broaden the geographic scope of Count I so that it will include claims that the Act as applied does not leave open adequate channels of communication at the clinics in Boston, Brookline, Springfield, and Worcester. Nor does she object to the addition of five plaintiffs who will make allegations with respect to the Springfield or Worcester clinics. Finally, she does not object to the addition of the four District Attorneys as defendants in their official capacit[ies] . . . .[94]

Because this court is not allowing Plaintiffs to re-argue the facial validity of the Act, Plaintiffs' Motion for Leave to File Amended Complaint is ALLOWED IN PART and DENIED IN PART. It is ALLOWED to the extent that it seeks to add additional abortion clinics, plaintiffs, and defendants for its as-applied claim in Count One. It is DENIED to the extent that it seeks to plead that Defendant's interpretation of the Act is "unconstitutional and renders the [A]ct unconstitutional."[95] It is also DENIED to the extent that Plaintiffs seek to bolster their pleadings in any count other than the as-applied portion of Count One.

Further, Plaintiffs are ordered to re-file an amended complaint that comports with these directions. Plaintiffs shall file such amended complaint within sixty days, by February 27, 2011.

IV.    Conclusion

For the foregoing reasons, Plaintiffs' Motion to Permit Arguments as to Facial Invalidity [#95] is DENIED. Defendant's Motion for Judgment on the Pleadings on the As-Applied Claims in Counts Two Through Eight [#99] is ALLOWED. Plaintiffs' Motion for Leave to File Amended Complaint [#94] is ALLOWED IN PART and DENIED IN PART. To the extent that Plaintiffs seek to plead that Defendant's interpretation of the Act is unconstitutional, the Motion is DENIED. To the extent that Plaintiffs seek to add additional abortion clinics, plaintiffs, and

_____

[94] Partial Opp'n Pls.' Mot. File Am. Compl. & Mem. Supp. Defs.' Mot. J. Pleadings As-Applied Claims Counts Two Through Eight, 2 [#100].

[95] Pls.' Mot. Leave File Am. Compl., 2 [#94].

**Add. 87a**

defendants for its as-applied claim in Count One, the <u>Motion</u> is ALLOWED.

AN ORDER HAS ISSUED.

       /s/ Joseph L. Tauro      

      United States District Judge

Case 1:08-cv-10066-JLT  Document 110  Filed 12/29/10  Page 1 of 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ELEANOR McCULLEN, JEAN BLACKBURN          *
ZARRELLA, GREGORY A. SMITH, CARMEL        *
FARRELL, and ERIC CADIN,                  *
                                          *
              Plaintiffs,                  *
                                          *
      v.                                  *      Civil Action No. 08-10066-JLT
                                          *
MARTHA COAKLEY, in her capacity as        *
Attorney General for the Commonwealth of  *
Massachusetts,                            *
                                          *
              Defendant.                   *

ORDER

December 29, 2010

TAURO, J.

For the reasons set forth in the accompanying memorandum, this court hereby orders that:

1.      Plaintiffs' Motion to Permit Arguments as to Facial Invalidity [#95] is DENIED.

2.      Defendant's Motion for Judgment on the Pleadings on the As-Applied Claims in

        Counts Two Through Eight [#99] is ALLOWED.

3.      Plaintiffs' Motion for Leave to File Amended Complaint [#94] is ALLOWED IN

        PART and DENIED IN PART.  It is ALLOWED to the extent that it seeks to add

        additional abortion clinics, plaintiffs, and defendants for its as-applied claim in

        Count One.  It is DENIED to the extent that it seeks to plead that Defendant's

        interpretation of the Act is "unconstitutional and renders the [A]ct

1

**Add. 89a**

unconstitutional."[1]  It is also DENIED to the extent that Plaintiffs seek to bolster their pleadings in any count other than the as-applied portion of Count One. Further, Plaintiffs are ordered to re-file an amended complaint that comports with these directions.  Plaintiffs shall file the amended complaint by February 27, 2011.

IT IS SO ORDERED.

                                        /s/ Joseph L. Tauro
                                        United States District Judge

---

[1] Pls.' Mot. Leave File Am. Compl., 2 [#94].

2

**Add. 90a**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ELEANOR MCCULLEN, et. al., | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | *    Civil Action No. 08-10066-JLT |
| | * |
| MARTHA COAKLEY, et. al., in their official | * |
| capacities only, | * |
| | * |
| Defendants. | * |

MEMORANDUM

February 22, 2012

TAURO, J.

I.    Introduction

      This case concerns a recently revised Massachusetts statute, Massachusetts General Laws Chapter 266, § 120E1/2 ("Act"), which establishes a thirty-five-foot fixed buffer zone around driveways and entrances of reproductive health care facilities ("RHCFs"). Presently at issue is Plaintiffs' challenge to the Act as applied to their speech activities at three RHCFs in Boston, Worcester, and Springfield. For the reasons given below, this court finds that the Act as applied is a valid regulation of the time, place, and manner of Plaintiffs' speech. For that reason, Judgment shall be entered in favor of Defendants on all counts.

II.    Background[1]

      A.    The Parties

---

[1] This court assumes familiarity with its previous decision in this case, McCullen v. Coakley ("McCullen I"), 573 F. Supp. 2d 382 (D. Mass. 2008) but, nonetheless, presents a condensed background.

**Add. 91a**

Plaintiffs Eleanor McCullen, Jean Blackburn Zarrella, Gregory A. Smith, Eric Cadin, Mark Bashour, Nancy Clark, and Cyril Shea are Massachusetts residents who regularly engage in pro-life counseling outside RHCFs.  Defendant Attorney General Martha Coakley is the chief lawyer and law enforcement officer of the Commonwealth of Massachusetts.  Defendants Conley, Early, and Mastroianni are the District Attorneys for Suffolk, Worcester, and Hampden Counties where the clinics at issue in this action are located.  As such, Defendants bear responsibility for enforcing the Act.  They are sued in their official capacities only.[2]

B.    <u>Procedural History</u>

On January 16, 2008, Plaintiffs filed the <u>Complaint</u>, which advanced eight counts under 42 U.S.C. § 1983: (1) Free Speech—Time, Place, and Manner; (2) Free Speech—Substantial Overbreadth; (3) Free Speech—Prior Restraint; (4) "Free Speech – Free Association – Free Exercise Hybrid"; (5) Free Speech—Viewpoint Discrimination; (6) Due Process—Vagueness; (7) Due Process—Liberty Interest; and (8) Equal Protection.[3]

After a Status Conference held on April 23, 2008, and without objection from the Parties, this court ordered that the matter proceed on the merits in two stages: (1) a Bench Trial on Plaintiffs' facial challenge; and (2) a bench trial on Plaintiffs' as-applied challenge.[4]

On May 28, 2008, this court held the first bench trial, on Plaintiffs' facial challenge.[5]  In an August 22, 2008 decision, this court held that the Act survived all three facial challenge

---

[2] <u>See</u> Am. Compl. 3-4 [#112].

[3] Compl. ¶¶ 13-22 [#1].

[4] Order [#34].

[5] <u>McCullen I</u>, 573 F. Supp. 2d at 386.

standards.[6]  The Court of Appeals for the First Circuit held a de novo review and affirmed this

court's decision,[7] and the Supreme Court denied Plaintiffs' petition for certiorari at this stage of

the case.[8]

On September 17, 2010, Plaintiffs filed a Motion for Leave to File Amended Complaint

and a Motion to Permit Arguments as to Facial Invalidity.  On October 7, 2010, Defendants filed

a Motion for Judgment on the Pleadings on the As-Applied Claims in Counts Two Through Eight.

On December 2, 2010, this court heard oral arguments on all three Motions and took them under

advisement.  On December 29, 2010, this court issued a Memorandum denying Plaintiff's Motion

to Permit Arguments as to Facial Invalidity, and allowing Defendant's Motion for Judgment on

the Pleadings.  Plaintiffs were allowed to amend the complaint to include claims regarding RHCFs

in Springfield and Worcester and to include new plaintiffs who would make allegations regarding

speech activities at those clinics.  Plaintiffs were also permitted to amend the complaint to include

four District Attorneys in their official capacities, consistent with the expansion of the geographic

scope of the complaint.

 On February 25, 2011, Plaintiffs filed the Amended Complaint, and on March 11, 2011,

the Commonwealth filed its Answer.  On May 11, 2011, the parties entered a Stipulation of

Dismissal Covering the Claims by Carmel Farrell Regarding the Brookline Clinic.  The effect of

the Amended Complaint and the Stipulation is that Plaintiffs now challenge the constitutionality of

---

[6] Id. at 425.  This court held that the Act was constitutional under the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Due Process Clause of the Fourteenth Amendment.  Id.

[7] McCullen v. Coakley ("McCullen II"), 571 F.3d 167 (1st Cir. 2009).

[8] McCullen v. Coakley ("McCullen III"), 130 S. Ct. 1881 (2010).

3

**Add. 93a**

the Act as applied at the RHCFs in Boston, Worcester, and Springfield.  On August 24, 2011, a

bench trial was held on Plaintiffs' as applied claims, and the court took the matter under

advisement.

III.   Discussion

    A.   Legal Standard

    This court has already found the Act to be a content neutral time, place and manner

restriction, and upheld it as facially valid.  In so doing, the court found that the Act survived

intermediate scrutiny because it is (1) justified without reference to the content of the regulated

speech; (2) narrowly tailored to serve a significant governmental interest; and (3) leaves open

ample alternative means of communication.[9] It has already been established that the

Commonwealth of Massachusetts has a "substantial and legitimate content-neutral interest in

protecting public safety at RHCF entrances and driveways, because '[i]t is a traditional exercise of

the States' police powers to protect the health and safety of their citizens.'"[10]  In light of this

court's December 29, 2010 opinion, the only issue that remains to be decided is "whether the

statute as applied at the clinics specified in the complaint leaves open adequate alternative

channels of communication."[11]

    A valid time, place, and manner restriction, by its nature must burden some First

Amendment activity for the purpose of advancing the State interest at stake.  As Justice Souter,

emphasized, in his concurring opinion in Hill v. Colorado, however, prior cases "'quite clearly

---

[9] McCullen I, 573 F. Supp. 2d at 402 (setting out the standard for intermediate scrutiny).
[10]Id. at 410 (quoting Hill v. Colorado, 530 U.S. 703, 715; 120 S.Ct. 2480, 2489 (2000)).

[11]Memorandum and Order [#111] at 9.

**Add. 94a**

hold that restrictions on the time, place, or manner of protected speech are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.'"[12] Indeed, "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired."[13]  As this court pointed out in the facial challenge phase of this case, "[t]ime-place-manner regulations routinely make particular forms of expression impracticable without raising constitutional concerns."[14]  The question is not, "'whether a degree of curtailment' of speech exists, but rather 'whether the remaining communicative avenues are adequate.'"[15]  Alternative methods, therefore, need not be perfect substitutes for Plaintiffs' desired manner of communication.

It is well established that, "only the government can violate First Amendment rights," and that, "every First Amendment claim thus requires state action in some sense."[16] As the First Circuit has emphasized, "The First Amendment is concerned with government interference, not private jousting in the speech marketplace."[17]  In order for the Act to violate the First Amendment as it is applied to Plaintiffs, the lack of adequate alternative means of communication must be

---

[12] Hill at 736 (quoting Ward v. Rock Against Racism 491 U.S. 781, 791, 109 S. Ct. 2746 (1989); (also quoting United States v. Albertini, 472 U.S. 675, 689, 105 S.Ct. 2897 (1985)).

[13] Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 647 (1981) (Citing Adderley v. Florida, 385 U.S. 39, 47-48 (1996)); Poulos v. New Hampshire, 345 U.S. 395, 405 (1953); see Cox v. Louisiana, 379 U.S. 536, 554 (1965)).

[14] McCullen v. Coakley, 571 F.3d 167, 180 (1st Cir. 2009).

[15] Sullivan, 511 F.3d at 44 (quoting D.H.L. Assocs., Inc. v. O'Gorman, 199 F.3d 50, 59 (1st Cir. 1999), and quoting in turn Nat'l Amusements, Inc. v. Town of Deadham, 43 F.3d 731, 745 (1st Cir. 1995)).

[16] McGuire v. Reilly ("McGuire II"), 386 F.3d 45, 60 (1st Cir. 2004) (citing Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001); Hudgens v. NLRB, 424 U.S. 507, 514-21 (1976) (First Amendment claim required state action; claim against private shopping center for preventing peaceful labor picketing failed because shopping center was not a state actor); Yeo v. Town of Lexington, 131 F.3d 241, 248, 255 (1st Cir. 1997)).

[17] McGuire II, 571 F.3d at 60.

5

**Add. 95a**

traceable to state action.  As the First Circuit pointed out in <u>McGuire II</u>, when it upheld the

Commonwealth's previous buffer zone law, "there is no state action if what the plaintiff is really

aiming at are the acts of private persons that are actually illegal under the statutory scheme,

because then the acts do not reflect the policy of the state."[18]  To succeed here, Plaintiffs' facial

challenge must demonstrate that the act, as applied by the state, does not leave open adequate

alternative means of communication.  That other barriers to communication not attributable to the

state may exist is irrelevant to the First Amendment analysis.

Much like the Plaintiffs in the <u>McGuire II</u> case, the Plaintiffs in this action challenge the

Act as-applied after it has already been upheld as a facially valid time-place-manner restriction.

As in that case, "The fact situation that plaintiffs are involved in here is the core fact situation

intended to be covered by this buffer zone statute, and it is the same type of fact situation that was

envisioned by this court when the facial challenge was denied."[19]  Plaintiffs are, therefore,

precluded from "argu[ing] that they are different types of actors, or that they are involved in a

different type of fact situation, from the ones on the basis of which the law was already upheld

facially."[20]

In upholding the Act as facially valid, this court found that the Act left open ample

alternative means of communication.  The court noted that,

> as long as Plaintiffs - or anyone for that matter- remain outside the
> zone, they may freely talk to individuals entering and exiting the
> RHCFs, as well as people inside the zone.  The Act also does nothing
> to prevent patients from leaving the zone to speak with protesters or
> counselors.  Moreover, individuals may continue to display signs and
> photographs, hand out literature, talk, pray, chant, sing or engage in

---

[18]<u>Id.</u>, 571 U.S. at 60 (citing <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 940-41 (1982)).
[19]<u>McGuire II</u>, 571 U.S. at 61.
[20]<u>Id</u>.

**Add. 96a**

> any other form of lawful communication or protest outside of the
> buffer zone.  Importantly, most, if not all of this expressive activity,
> can be seen and heard by people entering and exiting the buffer zone,
> and also by people inside the buffer zone.[21]

As the Supreme Court has emphasized, "[t]he First Amendment does not demand that patients at

a medical facility undertake Herculean efforts to escape the cacophony of political protests."[22]

This court has also found in McCullen I that, "[a]lthough slightly closer physical interaction may

partially enhance one's ability to sidewalk counsel RHCF patients, there is no constitutional right

to that level of particularized access."[23]

The First Circuit, "has upheld . . . alternative means of communication despite diminution

in the quantity of speech, a ban on a preferred method of communication, and a reduction in the

potential audience."[24]  In analyzing alternative channels of communication, it is clear that, "'[e]ven

protected speech is not equally permissible in all places and at all times,'"[25] and "the law does not

require that alternative channels be 'perfect substitutes.'"[26] With these constraints in mind, the

court now turns to the question of how the Act is applied at the three RHCFs at the heart of

Plaintiffs' complaint.

---

[21]McCullen v. Coakley, 573 F. Supp. 2d 382, 413 (D. Mass. 2008).
[22]Madsen v. Women's Health Center, Inc., 512 U.S. 753, 772-73 (1994).
[23]McCullen I, 573 F. Supp. at 415.
[24]Sullivan v. City of Augusta, 511 F.3d 16, 44 (1st Cir. 2007) (citing Globe Newspaper Co. v. Beacon Hill Architectural Comm'n, 100 F.3d 175, 192-94 (1st Cir. 1996)); see also D.H.L. Assocs., Inc. v. O'Gorman, 199 F.3d 50, 59 (1st Cir. 1999)) ("The essence of this question is not 'whether a degree of curtailment' of speech exists, but rather 'whether the remaining communicative avenues are adequate.'" (quoting Nat'l Amusements, 43 F.3d 731, 745 (1st Cir. 1995)).
[25]Snyder v. Phelps, 131 S.Ct. 1207, 1218 (2011) (quoting Frisby v. Schultz, 487 U.S. 474, 479 (1988)).
[26]Int'l Action Cent. v. City of New York, 587 F.3d 521, 528 (2d Cir. 2009) (quoting Mastrovincenzo v. City of New York, 435 F.3d 78, 101 (2d Cir. 2006)).

**Add. 97a**

B.   Application[27]

Plaintiffs challenge the application of the Act at three RHCFs: one in Boston, one in

Worcester, and one in Springfield.[28]   This court has already found that the Act, on its face, leaves

open ample alternative means of communication because protestors may engage in any form of

communication with their intended audience so long as they do not do so inside a clearly marked

and posted buffer zone during clinic business hours.[29]   The First Circuit, in its de novo review of

this court's ruling, similarly found that:

> To begin, the 2007 Act places no burden at all on the plaintiffs'
> activities outside the 35-foot buffer zone.  They can speak, gesticulate,
> wear screen printed T-shirts, display signs, use loudspeakers, and
> engage in the whole gamut of lawful expressive activities.  Those
> messages may be seen and heard by individuals entering, departing, or
> within the buffer zone.
>
> Additionally, the Plaintiffs may stand on the sidewalk and offer either
> literature or spoken advice to pedestrians, including those headed into
> or out of the buffer zone.  Any willing listener is at liberty to leave the
> zone, approach those outside it, and request more information.

From the evidence contained in the Joint Trial Record, it is clear that the Act, as applied at each

of the three challenged RHCFs, leaves open ample adequate alternative means of communication.

This court will examine each clinic location in turn.[30]

---

[27]The Parties stipulated to the content of the record at trial. [#128].  All citations are,
accordingly, made to that record.

[28]See Am. Compl. [#112].  Plaintiffs dismissed all claims regarding the Brookline clinic.
See Stipulation of Dismissal [#126].

[29]McCullen v. Coakley, 573 F. Supp. 2d 382, 413-15 (D. Mass. 2008).

[30]At oral argument in this case, Plaintiffs asserted that inclement weather should be taken
into account in determining whether the Act is constitutional as applied.  See e.g. Trial Tr. [#150]
at 67-69. It is clear, however, that inclement weather makes communication more difficult
regardless of whether there is a buffer zone in place. The fact that it rains and snows cannot,
therefore, make a facially valid time, place and manner restriction unconstitutional as applied.  See
Carew-Reid v. Metropolitan Transith Auth., 903 F.2d 914, 919 (2d Cir. 1990) (holding that street
musician who was subject to an ordinance banning amplified music on subway platforms had

**Add. 98a**

1.    <u>Boston Clinic</u>

A.    <u>Clinic Layout and Buffer Zones</u>:[31]

Planned Parenthood: Greater Boston Health Center ("Boston PP") is a stand-alone

building located at 1055 Commonwealth Avenue in the Allston-Brighton neighborhood of

Boston.[32]  It sits on the corner of Commonwealth Avenue and Alcorn Street.  All patients must

enter Boston PP through the Commonwealth Avenue entrance.[33]  The Commonwealth Avenue

entrance is set back approximately 12 feet from the sidewalk inside a recessed open foyer.  Clinic

staff and patrons must cross the public sidewalk to enter Boston PP's front door.

There is a clearly marked and posted buffer zone around Boston PP's Commonwealth

Avenue entrance:

> This buffer zone is an arc that begins to the left of the building
> entranceway, as one looks out from the clinic, at a point 22 feet, 7
> inches from the eastern edge of the foyer entrance; the buffer zone
> then arcs to a point one foot away from the edge of Commonwealth
> Avenue directly opposite that foyer edge.  In accord with the act, the
> buffer zone then extends for the width of the open foyer in straight
> lines the extra foot to Commonwealth Avenue.  The buffer zone then
> jogs back to one foot away from Commonwealth Avenue, at a point
> directly opposite the western edge of the foyer (to the right of the
> front door as one looks out from the entranceway), arcs across the
> corner of the sidewalk to a point that is even with the edge of the
> building and about four feet, four inches into Alcorn Street, and finally
> continues back across the Alcorn Street sidewalk until it hits the side
> of the building roughly twelve feet north from the corner of the
> building.[34]

adequate alternative channels of communication, and rejecting Plaintiff's argument that above-ground venues were inadequate because "inclement weather often precludes performing above ground").

[31]All clinic measurements are taken from the Parties' <u>Stipulation Regarding Buffer Zone Measurements</u> ("Stip.") [#129].

[32]Stip. [#129] at 1.

[33]Baniukiewicz Tr. [#137] at 79-80, 89-90.

[34]Defendants' Proposed Findings of Fact [#147] at 9-10 (Stip. [#129] ¶¶ 3-9).

9

Plaintiffs and others who wish to communicate with clinic patrons may do so while standing: (1) on the wide sidewalk to the east of the Commonwealth Avenue entrance; (2) in the fairly narrow strip between the top of the buffer zone and Commonwealth Avenue; and (3) while standing on the sidewalk across Alcorn Street.[35]  Boston PP places a large orange barrel in the street in order to keep traffic away from protesters standing outside the buffer zone at the corner of Alcorn Street and Commonwealth Avenue.[36]  On days when large numbers of protesters are expected at the Boston PP, the Boston Police place barriers several feet into Commonwealth Ave, which creates extra room for people who wish to engage in communicative activities directed at clinic patrons.[37]

There is also a clearly marked and posted buffer zone around Boston PP's rear garage entrance, but Plaintiffs do not engage in protest or other communication in that location.[38]

## B.    Speech Activities

Plaintiffs Eleanor McCullen, Jean Blackburn Zarella, Gregory A. Smith, and Eric Cadin all engage in protest and counseling at Boston PP.  Each plaintiff's activities at Boston PP will be addressed in turn.

### i.    Eleanor McCullen

Plaintiff Eleanor McCullen engages in sidewalk counseling outside Boston PP on Tuesday and Wednesday mornings between seven and eleven a.m.[39]  She frequently works with another

---

[35] McCullen Tr. [#130] at 45-58, 68, 72; Metzger Tr. [#138] at 84-86; Metzger Dep. Ex. 11 [#138-11].
[36] Baniukiewicz Tr. [#137] at 12-13; Zarrella Tr. [#132] at 32-33.
[37] Zarella Tr. [#132] at 38-39; Baniukiewicz Tr. [#137] at 84-85.
[38] [#129] ¶¶ 4&10. McCullen Decl. [#139]. ¶¶ 6 & 8; McCullen Tr. [#130] at 5-7.
[39] McCullen Tr. [#130] at 5.

**Add. 100a**

sidewalk counselor Mary O'Donnell.[40]  Ms. McCullen attempts to identify women or couples

going to the clinic, and offers those individuals help and alternatives to abortion.[41]  Ms.

McCullen's goal is to engage women in conversations, and to convince them to come to a "Safe

Center" instead of going in to Planned Parenthood.[42]  She also hands out pamphlets with

information about alternatives to abortion and available services.[43]  Each morning that she

engages in sidewalk counseling, Ms. McCullen hands out between fifteen and twenty pamphlets.[44]

Ms. McCullen and Ms. O'Donnell coordinate their counseling efforts so that one of them can

reach clinic patrons entering Boston PP from either side of the buffer zone.[45]

Ms. McCullen estimates that about once a week she convinces a woman to come to a safe

center instead of going in to Planned Parenthood.[46]  Since the buffer zone law went into effect in

November of 2007, Ms. McCullen estimates that, through her sidewalk counseling, she has been

able to persuade eighty women not to have abortions.[47]  Ms. McCullen does not carry a sign when

she is at the clinic, but she does place three signs on her car, which she parks directly in front of

the clinic.[48]  Two of the signs read, "Abortion stops a beating heart," and another offers

pregnancy help.[49]  On Tuesday and Wednesday mornings when Ms. McCullen goes to Boston PP,

there are no clinic escorts or police officers present.[50]  She has observed others outside the clinic

---

[40]Id. at 6.
[41]Id. at 6-10.
[42]Id. at 10.
[43]Id. at 15-19.
[44]Id. at 13.
[45]Id. at 13-14.
[46]Id. at 10.
[47]Id. at 29-31.
[48]Id. at 50.
[49]Id. at 50. See also McCullen Tr. [#130] Exhibit 5.
[50]Id. at 32.

11

**Add. 101a**

engage in counseling and prayer, as well as other forms of protest.[51]

ii.    <u>Jean Blackburn Zarella</u>

Plaintiff Blackburn Zarella goes to Boston PP between seven a.m. and about ten a.m. on Saturdays, and she also occasionally goes for a short time on Wednesday mornings.[52]  While she is at the clinic, Ms. Zarella aims to speak with and offer help to women who are planning to have an abortion.[53]  Ms. Zarella reaches out to clinic patrons by saying, "May I help you? I have a lot of help available."[54]  Clinic patrons always respond to this offer of help, by saying either "yes" or "no."[55]  Ms. Zarella also testified that, on days she is at Boston PP, between one and four women entering the clinic will stop and speak with her.[56]  When a woman does stop to speak with her, Ms. Zarella offers the woman literature to show what help is available.[57]  In addition to her counseling, Ms. Zarella also hands out literature, and about half of everyone who passes by accepts literature from Ms. Zarella.[58]  She also prays near the clinic, sometimes silently, and sometimes aloud.[59]  On some days, Ms. Zarella is joined by another counselor who puts up anti-abortion signs around the buffer zone.[60]

On the second Saturday of every month, there is a rosary vigil outside Boston PP.[61]  At the vigil approximately thirty people gather to say twenty decades of the rosary.[62]  People

---

[51]<u>See id.</u> at 31-45.
[52]Zarella Tr. [#132] at 6-7.
[53]<u>Id.</u> at 7-8.
[54]<u>Id.</u> at 8.
[55]<u>Id.</u> at 8.
[56]<u>Id.</u> at 8-9.
[57]<u>Id.</u> at 9.
[58]<u>Id.</u> at 11.
[59]<u>Id.</u> at 12.
[60]<u>Id.</u> at 28-29.
[61]<u>Id.</u> at 38.
[62]<u>Id.</u> at 38.

12

participating in the rosary vigil stand outside the buffer zone in a police barrier, and often carry large signs.[63]  One regular vigil participant also carries a crucifix on a large pole.[64]  Annually, on Good Friday, Ms. Zarella and other protesters also say the fourteen stations of the cross out loud.[65]

       iii.     <u>Gregory A. Smith</u>

Plaintiff Gregory Smith goes to Boston PP once a week on Saturday mornings between eight and nine-thirty a.m.  When he goes to Boston PP, there are usually about ten or more other people engaging in protest activities outside the clinic.[66]  Mr. Smith carries a crucifix on an eight-foot pole outside the buffer zone while he prays the rosary out loud, and in unison with the other people gathered at the clinic.[67]  Other people gathered outside the clinic on Saturday mornings display signs.[68]  On the second Saturday of the month there is a larger group of people outside Boston PP, and Mr. Smith uses a loudspeaker to amplify the prayer.[69]  Mr. Smith has testified that his goal in holding the crucifix and praying outside Boston PP is to "support[] in prayer [the] counselors so that they have success in talking the girls out of killing their babies."[70]  People entering the clinic see Mr. Smith's crucifix and hear the prayers.[71]  It is not uncommon for passerby who object to the pro-life message to shout at Mr. Smith and others engaged in prayer or counseling outside Boston PP.[72]

---

[63]<u>Id.</u> at 39-41.
[64]<u>Id.</u> at 41.
[65]<u>Id.</u> at 43.
[66]Smith Tr. [#133] at 6-7.
[67]<u>Id.</u> at 7-8.
[68]<u>Id.</u> at 13.
[69]<u>Id.</u> at 39-40.
[70]<u>Id.</u> at 18.
[71]<u>Id.</u> at 57.
[72]<u>Id.</u> at 21-23.

**Add. 103a**

Case 1:08-cv-10066-JLT   Document 153   Filed 02/22/12   Page 14 of 30

iv.   Eric Cadin

Eric Cadin is a student at St. John's Seminary in Brighton.[73]  He goes to Boston PP about once a month when class is in session, and once a week when it is not.[74]  When Mr. Cadin is outside Boston PP, he tries to speak with women going in for an abortion and their companions. His goal is to, "let [the women entering the clinic] know that there is all sorts of help available for them and that I and the people at these centers, and anyone else who is present at these things, really does care about them and wants to help them, and help their child."[75]  On an average morning, Mr. Cadin will engage ten or more different women or couples in conversation.[76]  Mr. Cadin also hands out literature that advises clinic patients about information and services that are available.[77]  On a typical morning outside the clinic, he hands out about twenty to thirty pieces of literature to people passing by.[78]  Occasionally, Mr. Cadin holds a sign, but he mostly attempts to engage people in conversation.[79]  Since the Act came into force in November, 2007, he estimates that, through his counseling activity, he has convinced more than ten women not to have abortions.[80]

C.   Other Observations at Boston PP

Michael Baniukiewicz, who heads Planned Parenthood's security operations, has observed protesters outside Boston PP to hold prayer vigils, distribute literature, and display signs.[81]  The

---

[73]Cadin Tr. [#131] at 6.
[74]Id. at 6.
[75]Id. at 21.
[76]Id. at 14.
[77]Id. at 18.
[78]Id. at 19.
[79]See id. at 14.
[80]Id. at 24-25.
[81]Baniukiewicz Tr. [#137] at 81-83.

14

**Add. 104a**

protesters' signs can be easily read from "just about anywhere on the street within the buffer zone area."[82] On the second Saturday of each month, a large number of people gather at Boston PP, and the Boston Police put up barriers to protect the protesters.[83] Mr. Baniukiewicz testified that he can hear protesters and counselors calling out to clinic patrons from his post inside the front door of the clinic.[84]  Three or four times a day a clinic patron will walk in to Boston PP with pro-life literature that they have been handed.[85]

Kristen Metzger is an investigator with the Massachusetts Attorney General's Office.[86] On April 2, 2010, Ms. Metzger visited Boston PP.[87]  That day was Good Friday, and Ms. Metzger observed a group of about seventy-five people gathered reciting a Catholic prayer.[88]  She also saw a group of three counselors engage a young Hispanic woman in conversation.[89] After the conversation the young woman got in to a car with the counselors and they drove away together.[90] While she was at the clinic, Ms. Metzger was able to hear protesters' pro-life statements, and she was able to read their signs.[91]

        D.      Availability of Adequate Alternatives[92]

---

[82]Id. at 82.
[83]Id. at 85.
[84]Id. at 85-86.
[85]Id. at 87-88.
[86]Metzger Tr. [#138] at 6.
[87]Id. at 9.
[88]Id. at 9, 19.
[89]Id. at 14.
[90]Id. at 17.
[91]Id. at 9-19.
[92]At oral argument in this case, Plaintiffs addressed at length the activities of clinic escorts at Boston PP. See Trial Tr. [#150] at 39-41.

As the First Circuit held in McGuire v. Reilly, "The First Amendment is concerned with government interference, not private jousting in the speech marketplace." McGuire II, 386 F.3d 45, 60 (1st Cir. 2004) (finding that "'enforcement' of a state statute by purely private individuals, without some involvement by state officials, does not constitute state action.").  Plaintiffs rely on

15

**Add. 105a**

In light of the testimony in this case, it is clear that adequate alternative means of communication exist for Plaintiffs to communicate their pro-life message at Boston PP. While it is beyond doubt that a "degree of curtailment" exists because of the application of the buffer zone law at Boston PP, it is also evident that Plaintiffs are still effective in communicating their message to their intended audience: women going to Planned Parenthood for abortion services.[93] As the Supreme Court emphasized in Hill v. Colorado, ""The unwilling listener's interest in avoiding unwanted communication has been repeatedly identified in our cases. It is an aspect of the broader "right to be let alone" that one of our wisest Justices characterized as 'the most comprehensive of rights and the most valued by civilized men.'""[94]

The evidence in this case demonstrates that, even though the buffer zone exists, the plaintiffs are still successful in convincing a number of women not to have abortions.[95] Individuals

_____

the Ninth Circuit's recent opinion in Hoye v. City of Oakland for the proposition that the activities of clinic escorts must be taken into account in an as-applied challenge.

The Hoye case is, however, distinct from this case in several important ways. First, the plaintiff in Hoye did allege that a facially neutral buffer zone law was being enforced against pro-life advocates, but not against pro-choice clinic escorts, thus meeting the state action requirement. Hoye 653 F.3d 835, 855 (9th Cir. 2011) ("[P]laintiffs are generally required to show the existence of an unconstitutional policy by extrapolating from a series of enforcement actions. They must argue, in effect, that these actions demonstrate that the municipality is enforcing against them a rule that is distinct from the constitutionally valid enactment."). Second, the Ninth Circuit found that, in determining whether the attempts of escorts to drown out Plaintiff's speech foreclosed ample alternative channels of communication, "[Plaintiff] will bear the burden of showing that it is the *Ordinance's requirement* . . . not the activities of escorts alone, that deprives im of ample alternative means of communication." Id. at 859.

Because this court is bound by the First Circuit's holding in the McGuire II case, and because Plaintiffs have not alleged state action in the manner set out above, the activities of clinic escorts are not relevant to Plaintiffs' as-applied challenge and are, therefore, not addressed in this opinion.

[93]See Trial Tr. [#150] at 22.

[94]Hill v. Colorado, 530 U.S. 703, 716-17 (2000)(quoting Olmstead v. United States, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting)).

[95]McCullen Tr. [#130] at 29-30.

**Add. 106a**

entering the clinic can read Plaintiffs' signs, and clinic patients can hear Plaintiffs' prayers. Plaintiffs successfully hand out literature to people walking toward the clinic from either direction, and Plaintiffs' requests for conversation can be heard by clinic patrons both before and after they enter the buffer zone. That more people don't accept Plaintiffs' offers is not an indication that adequate alternative means of communication do not exist, but rather shows that many members of Plaintiffs' audience are simply unreceptive to Plaintiffs' message.

As the depositions submitted to the court and the arguments at trial show, Plaintiffs can be seen and heard by both willing and unwilling listeners approaching the main entrance to Boston PP. The record does not indicate that there are any barriers that would prevent willing listeners from stepping outside of the buffer zone to engage in a more in-depth conversation with the Plaintiffs in this case. It is evident that while Plaintiffs may indeed suffer some curtailment in their avenues of communication because of the buffer zone law, they are still able to effectively reach their intended audience. It is clear from the case law that, " restrictions on the time, place, or manner of protected speech are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.'"[96] The Act as applied at Boston PP, therefore, leaves open adequate alternative means of communication for Plaintiffs' message.

  2. <u>Worcester Clinic</u>

    A. <u>Clinic Layout and Buffer Zones</u>

Planned Parenthood: Central Massachusetts Health Center ("Worcester PP") is located at 470 Pleasant Street in Worcester, Massachusetts.[97] The clinic is on Pleasant Street, near the

---

[96]<u>Hill</u>, 530 U.S. at 736 (Souter, J. concurring) (quoting <u>Ward</u> 491 U.S. at 717 (quoting in turn <u>United States v. Albertini</u>, 472 U.S. 675, 689 (1985))).

[97]Stip. [#129] at ¶ 12.

**Add. 107a**

intersection with Dewey Street, and it has been at this location since December 2009.[98]  The entrance to the clinic's parking area is around the corner on Dewey Street.[99]  The main door to the Worcester PP building is recessed under the overhang of the building, and is accessible from the parking lot or from a walkway that leads out to Pleasant Street.[100]

> The walkway leads from the door through two metal fences to the sidewalk along Pleasant Street next to the clinic building; that sidewalk is eight and a half feet wide.  The fences are staggered, with one closer to Pleasant Street than the other.  For a pedestrian to access the Worcester clinic's main door from Pleasant Street, she must walk through a fairly narrow gap in the two fences, which are six feet, one inch apart at their nearest point.  The door is fifty-three feet, nine inches from the public sidewalk on Pleasant Street, measured in a straight line.[101]

Most clinic patients drive to Worcester PP and park in the lot before walking to the clinic entrance.[102]

There are two marked and painted buffer zones at Worcester PP: one on Pleasant Street, and one on Dewey Street.[103]  The buffer zone on Pleasant Street surrounds the entrance to the concrete walkway leading to Worcester PP's front door.[104]  It begins thirty-five feet to the left of the walkway, and extends thirty-five feet to the right of the walkway.[105]  It extends in to Pleasant Street, but does not reach the sidewalk on the other side.[106]  The arc on Dewey Street surrounds the driveway entrance to the Worcester PP parking lot.[107]  The buffer zone arc is a total of ninety-

---

[98]Id. at ¶¶ 12-13; Bashour Tr. [#136] at 4.
[99]Stip. [#129] at ¶ 12.
[100]Id. at ¶ 14.
[101]Defendants' Proposed Findings of Fact [#147] at 24 (citing Stip. [#129] at ¶¶ 14, 17).
[102]Bashour Decl. [#145] ¶ 29; Clark Decl. [#144] ¶ 23.
[103]Stip. [#129] at ¶ 15.
[104]Id. at ¶ 16.
[105]Id. at ¶ 17.
[106]Id.
[107]Id. at ¶19.

18

**Add. 108a**

three feet, seven inches from edge to edge along the Dewey Street sidewalk.[108]   At its widest

point, the buffer zone extends five feet, eight inches beyond the street curb opposite the

driveway.[109]

    B. <u>Speech Activities</u>

   Plaintiffs Nancy Clark and Mark Bashour submitted deposition testimony and declarations

detailing their speech activities at Worcester PP.

    i. <u>Nancy Clark</u>

   Plaintiff Nancy Clark has been going to the Planned Parenthood clinic in Worcester two to

three days a week since the clinic opened in December of 2009.[110]   She generally goes to the

clinic in the mornings between nine-thirty and eleven,[111] and she usually stands by the clinic and

prays.[112]   She also attempts to start conversations with girls entering the clinic, and to encourage

clinic patrons to visit Problem Pregnancy, a pro-life counseling center located across the street

from Worcester PP.[113]   Ms. Clark successfully begins a conversation with a girl outside the clinic

about once a week.[114]   She also distributes pamphlets.[115]   On days when she isn't engaging in

counseling, Ms. Clark prays the rosary while holding a sign that says "Face It, Abortion Kills."[116]

When Ms. Clark holds the sign, clinic patrons and others seem to notice the sign and respond to it

in both positive and negative ways.[117]   On one occasion, a girl noticed Ms. Clark holding the sign,

---

[108]<u>Id.</u>
[109]<u>Id.</u>
[110]Clark Tr. [#135] at 5-6.
[111]<u>Id.</u> at 7.
[112]<u>Id.</u> at 7.
[113]<u>Id.</u> at 7-9.
[114]<u>Id.</u> at 14-15.
[115]<u>Id.</u> at 15.
[116]<u>Id.</u> at 16.
[117]<u>Id.</u> at 17-18.

**Add. 109a**

came out of the clinic to speak with Ms. Clark, and ultimately decided not to have an abortion.[118]
Ms. Clark estimates that she has convinced approximately four girls not to have an abortion since
she began counseling outside Worcester PP.[119]  She has also spoken with four or five women
outside Worcester PP who then decided to accompany Ms. Clark to Problem Pregnancy.[120]

Ms. Clark testified at her deposition that many times clinic patrons don't want to speak
with her or don't want the pamphlets she offers.[121]  During Catholic Lent, protesters outside
Worcester PP engage in "40 Days of Life," where they pray for an end to abortion.[122] Participants
in the "40 Days of Life" often pray aloud and sometimes use a microphone to amplify their
prayer.[123]  On Thursdays, a man named Ray dresses up as the grim reaper and stands outside
Worcester PP.[124]  Ms. Clark has observed people react to Ray in his costume in both positive and
negative ways.[125]  Different protesters and counselors at the Worcester PP stand in different
locations around the clinic and are varied in their activities.[126]

ii.    Mark Bashour

Plaintiff Mark Bashour has gone to Worcester PP about twice a week since the clinic
moved to its current location in December 2009.[127]  He generally stands on Pleasant Street on the
same side of the street as the clinic.[128]  Although most patients drive to the Worcester PP, on

---

[118]Id. at 18-19.
[119]Id. at 28.
[120]Id. at 42.
[121]Id. at 13-16.
[122]Id. at 24-25.
[123]Id. at 24-26.
[124]Id. at 49.
[125]Id. at 50-51.
[126]See id. at 49-60.
[127]Bashour Tr. [#136] at 4-5.
[128]Id. at 15-16.

20

occasion a woman or her boyfriend will leave the private parking lot to speak with Mr.

Bashour.[129]  He estimates that he has had a "good conversation" with a clinic patron about six or

seven times since December 2009.[130]  Mr. Bashour also distributes literature outside the clinic,

and successfully hands his pamphlets to someone "[a] couple of times a week."[131]  Mr. Bashour

also engages in prayer outside Worcester PP, either silently or aloud, alone and with others.[132]

About five or six times, Mr. Bashour has participated in bringing a woman who was on her way

to Worcester PP to Problem Pregnancy instead.[133]  Mr. Bashour describes his goal as, "to save as

many lives as possible, because every time a child is aborted, we have a death."[134]  In a typical

day, he will call out to between eight and twelve women in an attempt to start a conversation.[135]

In his deposition, Mr. Bashour testified that ten to fifteen percent of the time the women he calls

out to respond to his efforts in either a positive or a negative way.[136]  He sometimes talks to other

counselors outside Worcester PP, and has observed other counselors bring women to Problem

Pregnancy.[137]  He is also familiar with other protestors who go to Worcester PP to either pray or

hold signs that convey an anti-abortion message.[138]

        C.    <u>Other Observations at Worcester PP</u>

    At Worcester PP, Michael Baniukiewicz has observed protesters hold signs and hand out

---

[129]<u>Id.</u> at 16-17.
[130]<u>Id.</u> at 17.
[131]<u>Id.</u> at 23.
[132]<u>Id.</u> at 24-25.
[133]<u>Id.</u> at 27-30.
[134]<u>Id.</u> at 37.
[135]<u>Id.</u> at 76-77.
[136]<u>Id.</u> at 78-80.
[137]<u>Id.</u> at 66-67.
[138]<u>See id.</u> at 68-76.

**Add. 111a**

information.  He has also observed one man dressed up as the grim reaper.[139]  Protesters' signs can be read from twenty to thirty feet away, and the protesters can be heard from Worcester PP's parking lot.[140]  On days when abortions are being performed, three or four patrons, on average, enter the clinic with pro-life literature[141]

Ms. Metzger visited Worcester PP in her capacity as an investigator for the Attorney General's office on September 10, 2010.[142]  When Ms. Metzger parked in a lot near the Worcester PP facility, she and her investigative partner were approached by a counselor who handed them pro-life literature and urged them to go across the street to Problem Pregnancy.[143]  While in the parking lot at the Worcester PP facility, Ms. Metzger could hear people calling to her from behind the facility's fence asking her to come talk to them.[144]

Ms. Metzger made a second visit to Worcester PP on July 7, 2011.[145]  On that date, she observed about nine people standing on the sidewalk surrounding the buffer zone on Pleasant Street in front of the clinic.[146]  One of the individuals was wearing a grim reaper costume, and another held a sign that read "abortion is a bad sin."[147]  On the opposite side of the sidewalk there were two women and a man, and there was a man across from the Dewey Street entrance with a sign that read, "God loves you mom and dad."[148]  When Ms. Metzger exited the clinic and stood outside in front of the facility, she could hear a woman from across the street say, "anything you

---

[139]Baniukiewicz Tr. [#137] at 92.
[140]Id. at 93-95.
[141]Id. at 96.
[142]Metzger Tr. [#138] at 20.
[143]Id. at 23-24.
[144]Id. at 26-27.
[145]Id. at 42-43.
[146]Id. at 43.
[147]Id. at 43-44.
[148]Id. at 45-46.

**Add. 112a**

need, we can help you, come across the street."[149]

D.      Availability of Adequate Alternatives

In assessing the availability of adequate alternative means of communication at Worcester

PP, it is necessary to keep in mind that a First Amendment violation necessarily requires State

action.[150]  As the First Circuit pointed out in the McGuire II case, "only the government can

violate First Amendment rights."[151]  Although Plaintiffs' arguments at trial drew attention to

factors like the fencing on Worcester PP's clinic property, and the fact that most people park in a

private parking lot,[152] these barriers to communication cannot be attributed to state action or the

enforcement of the buffer zone law.  They are, therefore, not state action as required to state a

First Amendment violation.

As in Hill, this is a case where, "'[the fact that [the Act]] may reduce to some degree the

potential audience for [petitioners'] speech is of no consequence, for there has been no showing

that the remaining avenues of communication are inadequate.'"  The evidence in the record

demonstrates that Plaintiffs' message can be heard by both willing and unwilling listeners as they

enter Worcester PP.  Plaintiffs successfully engage in prayer, protest, counseling, and literature

distribution.  That Plaintiffs experience both positive and negative reactions from passerby

indicates that their message is being heard by their intended audience.  While most women may

choose to ignore Plaintiffs' well-meaning overtures, this is not because the Commonwealth has

failed to leave open adequate alternative means of communication.  Much as Plaintiffs have the

---

[149]Id. at 47.

[150]See McGuire v. Reilly, 386 F.3d 45, 60 (1st Cir. 2004).

[151]Id. (citing Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001)); Hudgens v. NLRB, 424 U.S. 507, 514-21 (1976)).

[152]See Trial Tr. [#150] at 71-73.

23

Add. 113a

right to attempt to engage others in conversation outside Worcester PP, clinic patrons who do not want to engage with Plaintiffs have a right to go about their business unmolested.[153]

As the Supreme Court has emphasized, "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired."[154] Here, this court has already found the Act to be a facially valid content neutral time, place, and manner restriction. Based on the record presented, it is clear that the Act as applied at Worcester PP leaves open adequate alternative means of communication even though it might not grant the level of "particularized access" that Plaintiffs would prefer.[155]

### 3. Springfield Clinic

#### A. Clinic Layout and Buffer Zones

Planned Parenthood's Western Massachusetts Health Center in Springfield ("Springfield PP") is located at 3550 Main Street in Springfield Massachusetts.[156] It is part of a larger medical complex, which contains three buildings, and is located at the corner of Main Street and Wason Avenue.[157] There are seven other distinct medical businesses in this medical complex that have no affiliation with Springfield PP.[158]

---

[153]See Olmstead v. United States, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting).

[154]Heffron v. Int'l Soc. for Krishna Consciousness, Inc., 452 U.S. 640, 647 (1981) (citing Adderley v. Florida, 385 U.S. 39, 47-48 (1996); Poulos v. New Hampshire, 345 U.S. 395, 405 (1953); see Cox v. Louisiana, 379 U.S. 536, 554 (1965)).

[155]See McCullen v. Coakley, 573 F. Supp. 2d 382, 415 (D. Mass. 2008) (discussing Bl(a)ck Tea Society v. City of Boston, 378 F.3d 8, 13 (1st Cir. 2004), "The court held . . . that 'although the opportunity to interact directly with the body of delegates by, say, moving among them and distributing literature, would doubtless have facilitated the demonstrators' ability to reach their intended audience, there is no constitutional requirement that demonstrators be granted that sort of particularized access.'")).

[156]Stip. [#129] at ¶ 22.

[157]Id.

[158]Id. at ¶ 23.

24

**Add. 114a**

The building that contains Springfield PP is set back three hundred sixteen feet, two inches from Main Street and two hundred six feet, five inches from Wason Avenue.[159] There are five driveways leading into the parking area for the medical complex, and each one has a sign saying, "private property, no trespassing."[160] Two of the driveways are surrounded by clearly marked and posted buffer zones.[161] The remaining three driveways are surrounded by painted arcs, but because the text of the buffer zone law is not posted at those driveways, the law has no effect in those locations.[162]

The first buffer zone is located around the driveway on Wason Avenue that is nearest to Springfield PP.[163] The zone is "roughly one hundred feet wide, including the width of the driveway itself."[164] The top of the buffer zone arc is twelve feet, five inches from the curb of Wason Avenue.[165] The second buffer zone surrounds the middle driveway on Main street.[166] It is approximately ninety-nine feet wide, including the width of the driveway itself.[167] The top of the buffer zone arc is twenty-one feet, four inches from the curb on the opposite side of Main Street.[168]

B.    Speech Activities

Plaintiff Dr. Cyril Shea contests the application of the Act at Springfield PP. Dr. Shea protests outside Springfield PP at least once a week on Fridays, and sometimes on Wednesdays

---

[159]Id.
[160]Id. at ¶ 24; Shea Decl. [#143] at ¶ 15.
[161]Stip. [#129] at ¶ 25.
[162]See id. at ¶¶ 28-32; see also Mass. G.L. c. 266 § 120E1/2, ¶ 9(c).
[163]Stip. [#129] at ¶ 26.
[164]Defendants' Proposed Findings of Fact [#147] at 30 (citing Stip. [#129] at ¶ 26).
[165]Stip. [#129] at ¶ 26.
[166]Id. at ¶ 27.
[167]Id.
[168]Id.

and Saturdays as well.[169]  Dr. Shea goes to Springfield PP "to pray and to indicate to the public

that abortions are taking place on that campus and to make that knowledge known."[170]  Dr. Shea

prays aloud outside Springfield PP, sometimes alone and sometimes with others.[171]  He also wears

a sign around his neck that is about three-and-a-half feet by two-an- a-half feet that reads,

"they're killing babies here."[172]  Dr. Shea stands with his sign at various locations near the

entrances to the parking lot of Springfield PP.[173]  People often react both positively and negatively

to Dr. Shea's sign.[174]  Dr. Shea has also observed other people holding signs outside Springfield

PP that convey a variety of pro-life or religious messages.[175]  On occasion, Dr. Shea has been

called over by another counselor who is speaking to a woman so that he can offer a medical

perspective.[176]  Prior to the enactment of the Act, Dr. Shea would stand on the sidewalk beside

the Springfield PP's driveway entrance, and he would wave to people in their cars and ask if they

needed any literature or help.[177]  Occasionally drivers would respond to Dr. Shea's overtures, but

more often people would keep driving in to the parking lot.[178]  Since the buffer zones were

painted at Springfield PP, Dr. Shea can recall one occasion on which a driver, angered by Dr.

Shea's sign, stopped his car and spoke to him.[179]  About five percent of people who drive to

Springfield PP and park in the private parking lot come back out to the sidewalk to receive

---

[169]Shea Tr. [#134] at 7-8.
[170]Id. at 9.
[171]Id. at 11-12.
[172]Id. at 12.
[173]Id. at 15.
[174]Id. at 13-14.
[175]Id. at 23-24.
[176]Id. at 40-45.
[177]Id. at 83.
[178]Id. at 83-84.
[179]Id. at 84.

**Add. 116a**

literature or counseling from pro-life protesters.[180]

### C. Other Observations at Springfield PP

Most patients arrive at Springfield PP by car and enter the parking lot via the driveway on Wason Avenue.[181]  Protesters at Springfield PP have been observed to hold signs and to try to slow down vehicles entering the driveway.[182]  Protesters' signs can be read from cars entering the driveway, and the protesters can be heard from the clinic parking lot.[183]  Because Springfield PP is part of a large medical complex, which is private property, protesters' activities are confined to the sidewalks surrounding the complex parking lot regardless of whether the buffer zones are in place.[184]

Ms. Metzger, as an investigator for the Attorney General's Office, visited Springfield PP on July 8, 2011.[185]  On that date, she saw two men standing in the sidewalk outside the buffer zone holding up pro-life signs.[186]  One of the men held up a pamphlet as Ms. Metzger drove by.[187]  She also saw three men on Wason Avenue waving at cars that were exiting, and another man holding a framed picture of the Virgin Mary.[188]

### D. Availability of Adequate Alternatives

As was the case with Worcester PP, Springfield PP also presents barriers to communication that are not attributable to state action.  Plaintiffs are in error when they assert

---

[180]Id. at 95-96.
[181]Baniukiewicz Tr. [#137] at 100-101.
[182]Id. at 102.
[183]Id. at 104.
[184]See id. at 105-106.
[185]Metzger Tr. [#138] at 39.
[186]Id. at 39-40.
[187]Id. at 40.
[188]Id. at 41-42.

**Add. 117a**

that the buffer zone law is "constitutionally suspect" when applied to a multipurpose office building.[189]  In Hill v. Colorado, the Supreme Court found that, "[s]pecial problems that may arise where clinics have particularly wide entrances or are suited within multipurpose office buildings may be worked out as the statute is applied."[190]  The buffer zone at issue in Hill was a floating buffer zone that limited the ability of protesters to approach people within a fixed radius of a clinic's entrances and exits.[191]  The Supreme Court in that case found that the buffer zone created by the Colorado statute was a facially valid time place and manner restriction.[192]The Act at issue in this case creates a fixed buffer zone akin to the one upheld by the Court in Schenck v. Pro-Choice Network of Western New York, which applied to a number of clinics that were "part of larger hospital complexes."[193]  As the Ninth Circuit has observed, "[t]he State does not design clinics with wide entrances or place them in multipurpose office buildings; instead, the only relevant state action would be the application of the statute to such factual settings."[194]  The question, therefore, remains simply whether the act as applied at this location leaves open ample alternative means of communication.

The evidence in the record shows that the Act, as it is applied at Springfield PP, leaves open adequate alternative means of communication.  Many of the barriers to communication at

---

[189]Trial Tr. [#150] at 81 (purporting to characterize Hill, 530 U.S. 703).

[190]Hill v. Colorado, 530 U.S. 703, 730, 120 S.Ct. 2480 (2000).

[191]Hill involved a statute making it, "unlawful within the regulated areas for any person to 'knowingly approach' within eight feet of another person, without that person's consent, 'for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person . . .'" Hill, 530 U.S. at 707 (quoting Colo. Rev. Stat. § 18-9-122(3) (1999)).

[192]Hill, 530 U.S. at 730.

[193]Shenck v. Pro-Choice Network of Western New York, 519 U.S. 357, 361, 117 S.Ct. 855 (1997).

[194]Hoye v. City of Oakland, No. 09-16753, 2011 WL 3198233, *10 (9th Cir. July 28, 2011).

Springfield PP are due to the fact that the clinic is located in the center of a large parking lot, on private property, and most clinic patrons drive to their appointments. These barriers would exist regardless of whether the Act was in place or not because they are a result of Springfield PP's location on private property, not state action.

Nonetheless, it is apparent that Plaintiffs are able to convey their pro-life message to people entering the clinic and people passing by on Main Street and Wason Avenue. The testimony of Dr. Shea and Ms. Metzger demonstrates that people approaching Springfield PP are able to see protesters' signs and hear their prayers. Protesters are able to stand almost anywhere along the public sidewalk surrounding the medical complex, except for the two clearly marked and posted buffer zones. If clinic patients are receptive to Plaintiffs' message, there is nothing to stop them from leaving clinic property and engaging in conversation or accepting literature or counseling. Simply because Plaintiffs are not able to stand directly next to or in the two clinic driveways that are surrounded by buffer zones does not mean that adequate alternative means of communication do not exist. Indeed, Plaintiffs may engage in any form of communicative activity they desire anywhere else on the public sidewalk. It is clear, therefore, that the Act as applied at Springfield PP leaves open adequate alternative means of communication.

IV.    Conclusion

For the foregoing reasons, this court finds that the Act as applied to Plaintiffs' activities at the Boston, Worcester, and Springfield Planned Parenthood locations is a constitutionally valid, content neutral time, place, and manner restriction. Given this court and the First Circuit's prior rulings that found the Act to be narrowly tailored to serve a significant and legitimate governmental interest, and with respect to the evidence presented in this case, it is clear that the

**Add. 119a**

Act as applied is a constitutionally valid regulation of the time, place and manner of speech.

Judgment shall enter in Defendants' favor on all counts.

IT IS SO ORDERED.

_____/s/ Joseph L. Tauro_____
United States District Judge

**Add. 120a**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ELEANOR MCCULLEN, et. al.,                    *
                                              *
                    Plaintiffs,               *
                                              *
        v.                                    *        Civil Action No. 08-10066-JLT
                                              *
MARTHA COAKLEY, et. al., in their official    *
capacities only,                              *
                                              *
                    Defendants.               *

ORDER

February 22, 2012

TAURO, J.

        For the reasons set forth in the accompanying memorandum [#153], judgment is entered

for Defendants on all remaining counts in Plaintiffs' as-applied challenge.  This case is, therefore,

CLOSED.

IT IS SO ORDERED.

                                              _____/s/ Joseph L. Tauro_____
                                              United States District Judge

**Add. 121a**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Brief for Plaintiffs-Appellants was filed using the Appellate CM/ECF system on this 21st day of May, 2012.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Mark L. Rienzi
MARK L. RIENZI

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i).

1.     Exclusive of the exempted portions of the brief, as provided in Federal Rule of Appellate Procedure 32(a)(7)(B), the brief contains 13,995 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Word 2003 in 14 point Times New Roman font.  As permitted by Federal Rule of Appellate Procedure 32(a)(7)(B), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Mark L. Rienzi
MARK L. RIENZI

May 21, 2012