# United States Court of Appeals
## for the First Circuit

No. 12-1334

––––––––––––––––

ELEANOR McCULLEN, et al.,
PLAINTIFFS-APPELLANTS,

v.

MARTHA COAKLEY, AS ATTORNEY GENERAL
FOR THE COMMONWEALTH OF MASSACHUSETTS, ET AL.,
DEFENDANTS-APPELLEES,

––––––––––––––––

ON APPEAL FROM A FINAL JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

––––––––––––––––

## Brief for the Defendants-Appellees

––––––––––––––––

MARTHA COAKLEY
*ATTORNEY GENERAL OF MASSACHUSETTS*

William W. Porter, *Assistant Attorney General*
   First Circuit Bar No. 15033
Kenneth W. Salinger, *Assistant Attorney General*
   First Circuit Bar No. 24380
   Government Bureau
Gabriel Viator, *Assistant Attorney General*
   Civil Rights Division
One Ashburton Place
Boston, MA  02108
617.727.2200

June 29, 2012

# Table of Contents.

**Page**

Issues Presented.................................................................1

Statement of the Case. .......................................................2

    (1)   The Prior Rulings in *McCullen I*..............................2

    (2)   On Remand, the District Court Refused to Retry Issues Resolved in *McCullen I*. ............................................4

    (3)   The District Court Found that the Act, As Applied, Leaves Open Adequate Channels of Communication. ..........6

Statement of the Relevant Facts..........................................8

    (1)   The Legislature Revised the Buffer Zone Act to Protect Public Safety and Access to Medical Services. ......................8

    (2)   Plaintiffs Can Still Communicate With Clinic Patients. .....10

        (a)   The Boston Clinic........................................10

        (b)   The Worcester Clinic....................................15

        (c)   The Springfield Clinic. ................................19

Summary of Argument.......................................................20

Argument........................................................................22

    I.   Plaintiffs' Renewed Attack on the Clinic Employee Exemption Is Without Merit.........................................22

        A.   Plaintiffs' Facial Attack Is Foreclosed by *McCullen I*...................................................22

            1.   The Court Is Bound by the Law of the Case. .....22

            2.   No Law of the Case Exception Applies Here......24

                a.   There Has Been No Dramatic Change in Controlling Legal Authority. ................25

                b.   Plaintiffs Point to No New Evidence of Legislative Intent.......................................30

                c.   Plaintiffs Waived Any "Serious Injustice" Claim. .......................................30

**Page**

B.    Plaintiffs Abandoned Their As Applied Challenge
to the Clinic Employee Exemption. .............................. 31

C.    The Clinic Employee Exemption Would Be
Severable. .................................................................... 32

II.   The Act As Applied Leaves Adequate Channels for
Communicating With Clinic Patients. ................................. 33

A.    The Court Must Evaluate the Adequacy of
Available Means of Communication, Not Whether
the Act Restricts Speech. ............................................. 33

B.    The Record as a Whole Shows that Plaintiffs Can
Communicate With Their Intended Audience. ........... 36

III.  The District Court Correctly Held That All Issues
Other than the Adequacy of Alternative Channels of
Communication Were Decided in *McCullen I*. ..................... 41

A.    Content Neutrality, Equal Protection, and the
Attorney General's Guidance Letter. ......................... 41

B.    Narrow Tailoring and Overbreadth. ........................... 43

C.    Plaintiffs' Other Claims. ............................................. 45

1.    Prior Restraint. .................................................... 45

2.    Free Exercise of Religion. .................................... 46

3.    Vagueness. ........................................................... 46

4.    "Freedom to Loiter." ........................................... 47

Conclusion. ...................................................................................... 47

Certificate of Compliance with FRAP 32(a) ................................. 48

Certificate of Filing and Service .................................................... 49

Statutory Addendum

G.L. c. 266, § 120E1/2, as amended
November 13, 2007.............................. Statutory Addendum 1

G.L. c. 266, § 120E 1/2, ¶ (b), as in effect
prior to November 13, 2007 ................ Statutory Addendum 3

# Table of Authorities.

**Page**

**Cases**

*Adderley v. Florida,*
  385 U.S. 39 (1966).................................................35

*Ahmed v. Holder,*
  611 F.3d 90 (1st Cir. 2010) ....................................31, 44, 45

*Bay Area Peace Navy v. United States,*
  914 U.S. 1224 (9th Cir. 1990) ...............................37

*Berner v. Delahanty,*
  129 F.3d 20 (1st Cir. 1997) ...................................27

*Bl(a)ck Tea Society v. Boston,*
  378 F.3d 8 (1st Cir. 2004) .....................................40, 45

*Board of Trustees of State University of New York v. Fox,*
  492 U.S. 469 (1989)................................................44

*Bose Corp. v. Consumers Union,*
  466 U.S. 485 (1984)................................................36

*Broadrick v. Oklahoma,*
  413 U.S. 601 (1973)................................................45

*Burson v. Freeman,*
  504 U.S. 191 (1992)................................................4, 40

*Christian Legal Society Chapter of the University of California,*
  *Hastings College of the Law, aka Hastings Christian Fellowship*
  *v. Martinez,* 130 S.Ct. 2971 (2010) ....................28

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993)................................................46

*Citizens United v. Federal Election Comm'n,*
  130 S.Ct. 876 (2010)..............................................25, 26

*Clark v. Community for Creative Non–Violence,*
  468 U.S. 288 (1984)...............................................23, 28

*Cohen v. California,*
  403 U.S. 15 (1971)..................................................40

**Page**

*Cox v. New Hampshire,*
   312 U.S. 569 (1941) ............................................................ 35

*D.H.L. Assocs., Inc. v. O'Gorman,*
   199 F.3d 50 (1st Cir. 1999) ........................................... 6, 34

*de Jesus-Mangual v. Rodriguez,*
   383 F.3d 1 (1st Cir. 2004) ................................................ 42

*Doe v. City of Lafayette, Indiana,*
   377 F.3d 757 (7th Cir. 2004) ........................................... 47

*Duffy v. Sarault,*
   892 F.2d 139 (1st Cir. 1989) ........................................... 36

*Farrell v. Burke,*
   449 F.3d 470 (2d Cir. 2006) ............................................ 45

*Federal Communications Comm'n v. Pacifica Foundation,*
   438 U.S. 726 (1978) ......................................................... 40

*Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.,*
   240 F.3d 1 (1st Cir. 2001) ................................................ 30

*First Nat. Bank of Boston v. Bellotti,*
   435 U.S. 765 (1978) ................................................... 26, 27

*Frisby v. Schultz,*
   487 U.S. 474 (1988) ......................................................... 34

*Globe Newspaper Co. v. Beacon Hill Architectural Comm'n,*
   100 F.3d 175 (1st Cir. 1996) ............................................ 34

*Gresham v. Peterson,*
   225 F.3d 899 (7th Cir. 2000) ........................................... 34

*Heffron v. International Soc. for Krishna Consciousness, Inc.,*
   452 U.S. 640 (1981) ................................................... 35, 39

*Hill v. Colorado,*
   530 U.S. 703 (2000) ............................................. 25, 44, 45

*Holder v. Humanitarian Law Project,*
   130 S.Ct. 2705 (2010) ...................................................... 46

*Hoye v. City of Oakland,*
   653 F.3d 835 (9th Cir. 2011) ...................................... 29, 30

**Page**

*Hudgens v. N.L.R.B.*,
    424 U.S. 507 (1976) ............................................................... 47

*In re Cao*,
    619 F.3d 410 (5th Cir. 2010) ............................................... 41

*In re FBI Distribution Corp.*,
    330 F.3d 36 (1st Cir. 2003) ................................................. 32

*International Action Center v. City of New York*,
    587 F.3d 521 (2d Cir. 2009) ................................................ 35

*Knights of Columbus, Council No. 94 v. Town of Lexington*,
    272 F.3d 25 (1st Cir. 2001) ................................................. 46

*Madsen v. Women's Health Center, Inc.*,
    512 U.S. 753 (1994) ............................................... 25, 40, 45

*Massachusetts Wholesalers of Malt Beverages, Inc., v. Commonwealth*,
    414 Mass. 411, 609 N.E.2d 67 (1993) ................................. 33

*Mastrovincenzo v. City of New York*,
    435 F.3d 78 (2d Cir. 2006) ................................................. 35

*McCullen v. Coakley*,
    573 F.Supp.2d 382 (D.Mass. 2008),
    *aff'd*, 571 F.3d 167 (1st Cir. 2009),
    *cert. denied*, 130 S.Ct. 1881 (2010) ('*McCullen I*) ...................... passim

*McGuire v. Reilly*,
    260 F.3d 36 (1st Cir. 2001) ('McGuire I') .................................... passim

*McGuire v. Reilly*,
    386 F.3d 45 (1st Cir. 2004),
    *cert. denied*, 544 U.S. 974 (2005) ('McGuire II') ......................... passim

*Members of City Council of City of Los Angeles
    v. Taxpayers for Vincent*,
    466 U.S. 789 (1984) ........................................................... 35

*Mullin v. Town of Fairhaven*,
    284 F.3d 31 (1st Cir. 2002) ................................................. 36

*Municipality of San Juan v. Rullan*,
    318 F.3d 26 (1st Cir. 2003) ................................................. 42

**Page**

*Naser Jewelers, Inc. v. City of Concord, New Hampshire*,
  538 F.3d 17 (1st Cir. 2008) ........................................................ 24, 34

*National Amusements, Inc. v. Town of Dedham*,
  43 F.3d 731 (1st Cir. 1995) .......................................................... 6, 34

*National Federation of Independent Business v. Sebelius*,
  No. 11-393, 2012 WL 2427810 (US 2012)................................... 33

*Nevada Commission on Ethics v. Carrigan*,
  131 S.Ct. 2343 (2011) ...................................................................... 28

*Parker v. Levy*,
  417 U.S. 733 (1974) .......................................................................... 46

*Peralta v. United States*,
  597 F.3d 74 (1st Cir. 2010) ............................................................ 25

*Planned Parenthood League of Massachusetts v. Bellotti*,
  641 F.2d 1006 (1st Cir. 1981) ........................................................ 33

*Police Dept. of Chicago v. Mosley*,
  408 U.S. 92 (1972)............................................................................ 27

*Ramos v. Patnaude*,
  640 F.3d 485 (1st Cir. 2011) ......................................................... 30

*Renton v. Playtime Theatres, Inc.*,
  475 U.S. 41 (1986)............................................................................ 28

*Román–Cancel v. United States*,
  613 F.3d 37 (1st Cir. 2010) ........................................................... 41

*Schenck v. Pro-Choice Network of Western New York*,
  519 U.S. 357 (1997).............................................................. 25, 40, 45

*Schenck v. United States*,
  249 U.S. 47 (1919)............................................................................ 36

*Schneider v. New Jersey*,
  308 U.S. 147 (1939).......................................................................... 36

*Snyder v. Phelps*,
  131 S.Ct. 1207 (2011)......................................................... 25, 26, 40

*Sorrell v. IMS Health, Inc.*,
  131 S.Ct. 2653 (2011)......................................................... 25, 26, 28

**Page**

*Startzell v. City of Philadelphia,*
   533 F.3d 183 (3rd Cir. 2008) ............................................................ 37

*Sullivan v. City of Augusta,*
   |511 F.3d 16 (1st Cir. 2007) ........................................................ 6, 34

*Taylor v. United States Dept. of Labor,*
   440 F.3d 1 (1st Cir. 2005) ................................................................ 22

*United States v. Bell,*
   988 F.2d 247 (1st Cir. 1993) ............................................................ 25

*United States v. Matthews,*
   643 F.3d 9 (1st Cir. 2011) .......................................................... 24, 25

*United States v. Moran,*
   393 F.3d 1 (1st Cir. 2004) ................................................................ 24

*United States v. Stevens,*
   130 S.Ct. 1577 (2010) ......................................................... 25, 26, 29

*United States v. Vigneau,*
   337 F.3d 62 (1st Cir. 2003) .............................................................. 25

*Veilleux v. National Broadcasting Co.,*
   206 F.3d 92 (1st Cir. 2000) .............................................................. 36

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) ............................................................ 23, 28, 34

*Watchtower Bible and Tract Society of New York, Inc.*
   *v. Village of Stratton,* 536 U.S. 150 (2002) .......................................... 40

*Weinberg v. City of Chicago,*
   310 F.3d 1029 (7th 2002) ................................................................ 34

**Statutes**

Mass. G.L. c. 266, § 120E1/2 ............................................................ 1, 22

Mass. Gen. L. c. 4, § 6 ....................................................................... 33

Mass. St. 2000, c. 217, § 2 .................................................................. 8

# Issues Presented.

To protect public safety and patient access to medical care, the Massachusetts Legislature limited access to public ways and sidewalks within "buffer zones" around entrances to a reproductive health care facility ("RHCF" or "clinic"). *See* Mass. Gen. L. c. 266, § 120E1/2 (the "Act"). The Court held in the first phase of this case that the Act, as revised in 2007 to change the size and nature of the buffer zone, is constitutional on its face.

On remand, the district court rejected plaintiffs' attempts to reargue issues that were decided in phase one, including that the Act is content- and viewpoint-neutral. After a trial on agreed facts, the court found that the Act as applied near clinics in Boston, Worcester, and Springfield leaves open ample alternative means of communication, because plaintiffs can and do speak with, offer literature to, and otherwise convey their messages to patients approaching the RHCF. It therefore upheld the Act as applied. This appeal raises three issues.

1. Does the law of the case doctrine bar plaintiffs from relitigating the prior holdings in this case that, on its face, the Act's exemption for clinic employees and agents does not discriminate on the basis of speech content or a speaker's viewpoint?

2. Does the record as a whole support the district court's finding that the Act, as applied, leaves open adequate channels to communicate with patients outside the Boston, Worcester, and Springfield clinics?

3. Did the district court correctly hold that the only issue fairly raised in the amended complaint that was left to be decided on remand was whether the Act, as applied, leaves open adequate channels of communication near these three clinics?

## Statement of the Case.

**(1)    The Prior Rulings in *McCullen I*.**

Trial of plaintiffs' claims that the Act is unconstitutional on its face and as applied was bifurcated: the facial claims were tried first, with plaintiffs' consent. *McCullen v. Coakley*, 573 F.Supp.2d 382, 386 (D.Mass. 2008), *aff'd*, 571 F.3d 167, 174 (1st Cir. 2009), *cert. denied*, 130 S.Ct. 1881 (2010) ("*McCullen I*").[1] After a bench trial on agreed facts, the district court rejected plaintiffs' facial claims and denied their request for injunctive relief.

This Court affirmed on de novo review, concluding that "the 2007 Act represents a permissible response by the Massachusetts legislature to what it reasonably perceived as a significant threat to public safety." *Id.*, 571 F.3d at 184. The Court noted its "wholehearted agreement with the district court that the record is 'replete with factual references to specific incidents and patterns of problematic behavior around RHCFs.'" *Id.* at 176-177 (quoting 573 F.Supp.2d at 405). The legislative record was more than adequate to support the Legislature's "concerns about public safety, personal security, and access to medical facilities." *Id.* (quoting *McGuire v. Reilly*, 260 F.3d 36, 45 (1st Cir. 2001) ("*McGuire I*"), which upheld the original version of the Act).

**(a)** The Court held that "the 2007 Act, on its face, is a valid time-place-manner regulation that advances a significant governmental interest without burdening substantially more speech than necessary and leaves open adequate alternative channels of communication." *McCullen I,* 571 F.3d at 180-181. This holding had three prongs.

---

[1]    The *McCullen I* decisions by the district court and this Court can be found in plaintiffs' addendum ("Ps' Add.") at 4a & 50a.

First, the Court found that the Act is content neutral because it "was enacted in response to legitimate safety and law enforcement concerns, … was justified by those objectives without reference to the content of any speech," and thus serves "a legitimate governmental interest unrelated to expressive content." *Id*. at 176-177. The Court rejected plaintiffs' claim that the Act's provision exempting RHCF employees or agents acting within the scope of their employment makes the Act content-based, holding that this provision is "reasonably related to the legislature's legitimate public safety objectives." *Id*. at 177-178. It rejected the claims that this provision is viewpoint discriminatory and violates equal protection for the same reason. *Id*. at 178 n.2. And it also rejected the argument that a guidance letter issued by the Attorney General's office "demonstrates that the 2007 Act is not content-neutral," holding that such interpretive guidance "cannot render an otherwise constitutional statute vulnerable to a facial challenge." *Id*. at 178.

Second, the Court held that the Act is narrowly tailored to serve important governmental interests in enhancing public safety around RHCF entrances, and in remedying "the ineffectiveness of the preexisting law," without burdening substantially more speech than necessary. *Id*. at 178-180.

Third, the Court found that the Act leaves open ample alternative channels of communication, because it "places no burden at all on the plaintiffs' activities outside the 35-foot buffer zone." *Id*. at 180.

**(b)** In addition, the Court rejected plaintiffs' claims that the Act is overbroad either because a 35-foot buffer zone is too big, or because the Act applies to all speakers within the buffer zone instead of being "limited to abortion-related speech." *Id*. at 181-182. On the first point,

the Court held that the Legislature's decision to expand the buffer zone to 35 feet instead of some smaller radius "is not a matter of constitutional significance." *Id.* at 181 (citing *Burson v. Freeman*, 504 U.S. 191, 210 (1992), which held that question of whether 100-foot buffer zone could be reduced to 25-feet is "not of constitutional dimension" because that "is a difference only in degree, not a less restrictive alternative in kind"). "Legislatures are not held to standards of mathematical precision where policy judgments are concerned." *Id.* On the second point, the Court held that "the absence of any reference to any particular kind of speech (and, thus, to any particular content or viewpoint) is what makes the statute content-neutral," and that "a failure to distinguish among speakers" cannot make a statute overbroad. *Id.* at 181-182.

**(c)** Finally, the court held that the Act is not unconstitutionally vague and does not constitute an unlawful prior restraint on speech. *Id.* at 182-184. Plaintiffs did not challenge the district court's further holdings that the Act does not violate plaintiffs' free exercise of religion or any right to loiter or travel. *Cf.* 573 F.Supp.2d at 418-420, 424-425.

**(2)     On Remand, the District Court Refused to Retry Issues Resolved in *McCullen I*.**

When the case returned to the district court, plaintiffs tried to retry their claims that the Act is unconstitutional on its face. Ps' Add. 70a. The district court denied that motion, holding that the law of the case doctrine barred plaintiffs from relitigating issues resolved in phase one. It ruled that none of the exceptions to that doctrine applied, because plaintiffs (1) had not met their burden of proving that the Supreme Court had dramatically changed the standards for evaluating

- 4 -

content-neutral regulations that restrict the time, place, or manner of communicative activities, (2) had not proffered any new evidence that plaintiffs could not have obtained earlier, and (3) waived any claim that the decision in *McCullen I* is based on a blatant error and will result in a serious injustice. *Id*. 71a-80a.

With respect to plaintiffs' as-applied claims, the district court held that "all that remains to be tried is whether the statute as applied at the clinics specified in the complaint leaves open adequate alternative channels of communication." Ps' Add. 86a. It ruled that the other issues had all been resolved in *McCullen I*, because plaintiffs alleged no facts plausibly suggesting that the Act has been applied differently than anticipated during the first phase of the case. Ps' Add. 80a-87a, 94a. The court explained that "[t]he fact situation that plaintiffs are involved in here is the core fact situation intended to be covered by this buffer zone statute, and it is the same type of fact situation that was envisioned … when the facial challenge was denied." *Id*. 96a (quoting *McGuire v. Reilly*, 386 F.3d 45, 61 (1st Cir. 2004), *cert. denied*, 544 U.S. 974 (2005) ("*McGuire II*")). The court held that, with respect to the claim that the Act is an unlawful time-place-manner restriction, the issues of content neutrality and narrow tailoring had been resolved in *McCullen I*. Ps' Add. 86a, 94a. For the same reason, the court granted Appellees' motion for judgment on the pleadings as to the as-applied portions of Plaintiffs' overbreadth, prior restraint, free exercise of religion, vagueness, and freedom to loiter claims. Ps' Add. 80a-86a. Finally, the court held that, although in theory Plaintiffs could have pressed claims that the Act has been applied by local police officials in a manner that discriminates among speakers based on their viewpoint

and that doing so violates both the First Amendment and the Equal Protection Clause, in practice Plaintiffs "have not alleged sufficient facts" to make out such a claim. Ps' Add. 84a.

### (3) The District Court Found that the Act, As Applied, Leaves Open Adequate Channels of Communication.

Plaintiffs amended their complaint to challenge application of the Act at RHCFs in Boston, Worcester, and Springfield. Ps' Add. 93a-94a, A.84-87. They dismissed with prejudice all claims concerning the Brookline clinic and the claims by two of the three plaintiffs who had challenged application of the Act at the Springfield clinic. A.203, A.205.

The district court noted that, in evaluating whether the Act as applied leaves open sufficient alternative channels of communication, the question "is not 'whether a degree of curtailment' of speech exists, but rather 'whether the remaining communicative avenues are adequate.'" Ps' Add. 95a (quoting *Sullivan v. City of Augusta*, 511 F.3d 16, 44 (1st Cir. 2007), *D.H.L. Assocs., Inc. v. O'Gorman*, 199 F.3d 50, 59 (1st Cir. 1999), and *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 745 (1st Cir. 1995)).

The court held that, "[f]rom the evidence contained in the Joint Trial Record, it is clear that the Act, as applied at each of the three challenged RHCFs, leaves open ample adequate alternative means of communication." Ps' Add. 98a. The parties stipulated to the contents of the evidentiary record at trial. *Id.* n.27.

At the Boston clinic, patients enter from a public sidewalk on Commonwealth Avenue. *Id.* 99a. The district court found that plaintiffs can and do converse with, offer help and literature to, and hold signs and chant prayers that are seen and heard by people walking toward

the clinic. *Id.* 100a-107a. It found that "Plaintiffs are still effective in communicating their message to their intended audience" and "are still successful in convincing a number of women not to have abortions." *Id.* 106a. "That more people don't accept Plaintiffs' offers is not an indication that adequate alternative means of communication do not exist, but rather shows that many members of Plaintiffs' audience are simply unreceptive to Plaintiffs' message." *Id.* 107a.

At the Worcester and Springfield RHCFs, patients typically arrive by car and park in private lots next to the clinics. *Id.* 108a, 119a. The district court held that any barriers to communication that arise from the fact that most patients park in off-street lots "cannot be attributed to state action or the enforcement of the buffer zone law," and "would exist regardless of whether the Act was in place." *Id.* 113a, 119a.

The district court found, however, that people approaching these two clinics can see and hear plaintiffs' offers of literature and help, signs, and prayers. *Id.* 109a-119a. In Worcester, "Plaintiffs' message can be heard by both willing and unwilling listeners as they enter" the clinic, and "Plaintiffs successfully engage in prayer, protest, counseling, and literature distribution" to or that is "heard by their intended audience." *Id.* 113a. In Springfield, patients approaching the clinic can "see protesters' signs and hear their prayers," and "[a]bout five percent of people who drive to" the clinic "and park in the private parking lot come back out to the sidewalk to receive literature or counseling from pro-life protesters." 116a-117a, 119a.

## Statement of the Relevant Facts.

**(1)    The Legislature Revised the Buffer Zone Act to Protect Public Safety and Access to Medical Services.**

The Massachusetts Legislature adopted the original buffer zone statute in August 2000 in response to "repeated incidents involving violence and other unduly aggressive behaviors" and "evidence of widespread harassment and intimidation outside RHCFs." *McCullen I*, 571 F.3d at 172. "The key component of the 2000 Act was a prohibition against knowingly approaching within six feet of another without consent for certain defined protest-related purposes;" this restriction applied "within an 18-foot fixed buffer zone around RHCF entrances, exits, and driveways[.]" *Id*. at 173; accord Mass. St. 2000, c. 217, § 2(b). The Court rejected both facial and as-applied challenges to the constitutionality of the original Act. *See McGuire I*, 260 F.3d at 51 (rejecting facial claims); *McGuire II*, 386 F.3d at 65-66   (rejecting as-applied and renewed facial claims).

"Over time, legislators became concerned that the statute had failed to achieve its desired goals." *McCullen I*, 571 F.3d at 173.  The Legislature revised the Act in November 2007 after learning that clinic patients were still being harassed near RHCF entrances and driveways, clinic access was still being blocked, and law enforcement officials found that the "approach" element made the original Act very hard to enforce. *See* A.120-133 (written testimony by clinic volunteers and staff and Attorney General Martha Coakley); A.150-163, 175-185 (oral testimony by Attorney General Coakley, Undersecretary for Criminal Justice Mary Beth Heffernan, Norfolk District Attorney William Keating, Boston Police Captain William Evans, and clinic volunteers and staff).

The Legislature also learned that most RHCF patients "receive routine gynecological care, e.g. annual exams, pap smears, birth control and screening tests for breast and cervical cancer," and that only a minority of RHCF patients are seeking to terminate a pregnancy. A.124; *see also* A.130, 132, 152.

The Legislature "heard testimony from RHCF staff, volunteers and law enforcement personnel regarding specific incidents of patient harassment and intimidation in the areas immediately outside RHCF entrances and driveways." *McCullen I*, 573 F.Supp.2d at 393. Witnesses explained that protestors physically barred access to various clinics by blocking driveways and doors, and not infrequently screamed at close range at patients trying to enter clinics. A.120-127, 130-133, 165-166, 176-177; *McCullen I*, 573 F.Supp.2d at 393-395. They testified that these confrontations "terrified" patients; that some patients "reported feeling too intimidated by the pacing protesters to enter the property, and turning back;" and that on a regular basis women trying to drive to a clinic would turn away because protestors were blocking the driveway. A.120, 165, 175-176. Protestors "wearing police hats and police uniforms" would impersonate police officers as a way to get patients trying to enter the Boston clinic to consent to the protestor's approach. A.171-173. Attorney General Coakley summarized the history of interference with clinic access and explained its public safety implications. A.122-127; *McCullen I*, 573 F.Supp.2d at 393.

The 2007 revision changed the nature and size of the statutory buffer zone. The revised Act makes it unlawful to "knowingly enter or remain on a public way or sidewalk adjacent to [an RHCF] within a

radius of 35 feet of any portion of an entrance, exit or driveway of [an RHCF]." Mass. Gen. L. c. 266, § 120E1/2(b).

The other provisions of the buffer zone statute were not changed. The Act continues to apply only during a clinic's business hours, and only if each buffer zone is "clearly marked and posted." *Id.* § 120E1/2(c). In addition, the same four categories of persons are still exempt from the buffer zone restrictions: (1) persons entering or leaving the RHCF; (2) clinic employees or agents acting within the scope of their employment; (3) municipal agents acting within the scope of their employment; and (4) persons crossing through the buffer zone solely to reach a destination other than the clinic. *Id.* § 120E1/2(b)(1)-(4); *McCullen I*, 573 F.Supp.2d at 399.

## (2)    Plaintiffs Can Still Communicate With Clinic Patients.

The district court's findings that plaintiffs have adequate opportunities to communicate with clinic patients outside the Boston, Worcester, and Springfield RHCFs under the Act, as applied, are well supported by the record as a whole. The stipulated record for the as-applied claims includes deposition testimony and declarations by each remaining plaintiff plus testimony by two other witnesses. A.207-553.

### (a)    The Boston Clinic.

Planned Parenthood's Greater Boston Health Center (the "Boston clinic") is at 1055 Commonwealth Avenue on the corner of Alcorn Street in Boston. A.544. All patients enter through the Commonwealth Avenue entrance, which is set back 12 feet from the sidewalk inside a recessed open foyer. A.493, 496, 544. The public sidewalk is 25 feet wide. A.545. There is a marked and posted buffer zone outside this entrance. *Id.* The buffer zone does not cover the entire sidewalk in front of the entrance:

space along the curb at the corner of Alcorn Street and next to Commonwealth Avenue remains outside the zone. A.525-526, 540.

People who want to communicate with clinic patrons from outside the buffer zone may do so while standing on the sidewalk to the east of the entrance, on the outside of the sidewalk opposite the entrance on the edge of Alcorn Street or Commonwealth Avenue, or on the sidewalk across Alcorn Street to the west. A.387-388, 391-392, 525-526, 540. RHCF staff put a large orange barrel in the street to keep vehicles away from protesters on the curb outside the buffer zone. A.413, 481-482. On days when large numbers of protestors are expected, the Boston Police place barriers several feet into Commonwealth Avenue to create extra room for people to stand or walk next to the sidewalk and engage in communications aimed at clinic patrons. A.415, 494-495.

**Plaintiff Eleanor McCullen** goes to the Boston clinic most Tuesday and Wednesday mornings to try to persuade women not to have abortions. A.211-212, 377-378. She approaches young women just outside the buffer zone, offers to help them and to give them some literature, and tries to engage them in a longer conversation. A.378. If a woman stops to talk, McCullen will try to convince her to go with McCullen to a facility called "A Woman's Concern," which McCullen describes as offering alternative help to pregnant women. A.378-379. It is not uncommon for women whom McCullen approaches outside the Boston clinic to ignore her and walk on by. A.214-215, 379.  Other women will stop and talk with her, sometimes just for a moment, sometimes for 15-20 minutes or more. A.379.  Many women then agree to join McCullen in her car "for further counseling." A.213.

McCullen also hands out literature.  Most mornings she hands out fifteen to twenty pamphlets regarding alternatives to abortion, together with a card listing her phone number. A.216, 381-382. As a result, McCullen says that she "frequently receive[s] telephone calls at home from women who want additional help or information, who are calling to thank me after the birth of their children, or who have had abortions and seek a kind person with whom to discuss their experience." *Id*.

Since the Act was revised, about once a week McCullen convinces a woman to come with her instead of going into the Planned Parenthood clinic, and at least 25 times each year—or once every couple of weeks—she has been able to persuade women approaching the clinic not to have abortions. A.379, 383-384. Between November 2007 and May 2011 she convinced 80 or more women not to have an abortion; she did so by standing on the sidewalk outside the Boston clinic's buffer zone, speaking with people, and giving them literature. A.384.

McCullen typically works with Mary O'Donnell, who stands on the opposite side of the buffer zone. A.378-380. McCullen usually sees O'Donnell hand out about 15 pamphlets each morning they are both at the clinic. A.381. In addition, McCullen parks her car directly in front of the clinic, with two signs saying "Abortion stops a beating heart" and one offering help at A Women's Concern. A.389, 393.

**Plaintiff Jean Blackburn Zarella** goes to the Boston clinic most Saturday mornings and tries to persuade women not to have abortions. A.245-246, 407. Zarella greets women walking toward the clinic by saying "May I help you? I have a lot of help available." A.407.  The women always respond, either by saying "no" and walking past, or by saying "yes" and stopping to speak with Zarella. *Id*. Other passersby

often react to Zarrella as well; some react positively such as by thanking her for being there, while others react negatively such as by swearing at her. A.414. Zarrella offers literature to everyone who passes her outside the clinic. A.408-411, 420-424. She estimates that half the people take the pamphlets she offers. A.408. Zarrella has observed other anti-abortion counselors speaking with women, handing out literature, and displaying signs on the sidewalk outside the clinic. A.417-418.

Zarella also prays near the buffer zone, sometimes silently and sometimes aloud. A.408. On the second Saturday of each month she see a group of roughly thirty people gather near the clinic entrance to say twenty decades of the rosary. A.415. Every Good Friday Zarella and up to 50 other people gather in the same place to say the fourteen stations of the cross. A.416. One person displays a large, eight-foot tall wooden cross and another displays a white, baby-sized casket, directly opposite the clinic's door on the buffer zone's edge. *Id*.

**<u>Plaintiff Gregory Smith</u>** goes to the Boston clinic nearly every Saturday morning to pray the rosary out loud and sing religious hymns near the buffer zone. A.262. He often prays with other Catholics so that people "can clearly hear [their] combined prayer." A.263. Smith carries a crucifix on an eight-foot tall pole so that other people can easily see it. A.428. On the second Saturday of each month and Good Friday of each year Smith brings a portable microphone and loudspeaker to amplify the voices of those leading the prayer. A.431-432.

Smith regularly observes people offering pro-life counseling outside the Boston clinic. A.429-430. One of them sets up large signs, three or four feet across, to attract the attention of clinic patients.

A.429. Smith sometimes sees companions of women heading toward the clinic become angry and yell at these counselors. A.430.

**Plaintiff Eric Cadin** regularly goes to the Boston clinic to try to persuade women not to have an abortion. A.238, 396. In a typical morning, at least ten different people will stop and converse with Cadin and 20 to 30 women will take a pamphlet from him. A.398-399. Since the Act was revised in November 2007, Cadin has been able to convince more than ten women not to have an abortion through conversations he had with them on the sidewalk outside the Boston clinic. A.400.

**Other Boston Evidence**: Kristin Metzger, an investigator for the Attorney General's office, visited the Boston clinic on April 2, 2010, which was Good Friday. A.511. She saw and heard about 75 adults and children praying together on the edge of the buffer zone near the clinic's front door. A.513, 522, 525-526, 536, 540. A baby's coffin was set up in front of the group, directly in front of the clinic. A.511, 523. One person held a large crucifix and another supported a large cross. A.523.

While walking into the clinic, Metzger saw some women handing out pamphlets on the sidewalk and heard them call out "Your baby has a heartbeat" and "Abortion is forever." A.523-524. Metzger observed several people holding signs near the clinic entrance. One man held two signs saying "They're Killing Babies Here." A.513, 524, 538. She could read other signs that said "Pregnant? Free Help for Mother and Baby," "Love Creates, Nourishes, and Protects Your Baby's Life," "Abortion Exploits Women," and "It's a Baby, Not a Choice." *Id*. & A.537.

Later, Metzger saw three anti-abortion counselors—the same women whom she had seen handing out pamphlets and who told Metzger "Your baby has a heartbeat"—approach a young Hispanic

woman on the sidewalk in front of the Star Market at the corner of Commonwealth Avenue and Alcorn Street, hand her literature, and speak with her for about 30 minutes. A.511, 522, 524, 538.  Metzger happened to be on the roof of the clinic when she saw two of the counselors accompany the woman to a car, and the three of them drive away. A.512-513, 525. When Metzger left the clinic that day a protestor handed her an anti-abortion pamphlet. A.525, 539.

### (b)    The Worcester Clinic.

Planned Parenthood's Central Massachusetts Health Center (the "Worcester clinic") has been at 470 Pleasant St. in Worcester since December 2009. A.434, 545-546. The front door is under part of the building; it is accessible either from the parking lot behind the building or by a walkway that leads in from Pleasant Street. A.546.  The parking lot is accessible from a driveway around the corner on Dewey Street. A.545. Most patients drive to the clinic, park in the clinic's private lot, and walk to the door. A.270.

Two buffer zones are clearly marked and posted. A.546. One protects the Dewey Street driveway. *Id*. People standing near that buffer zone can be seen and heard by clinic patrons driving to the parking lot. A.497-498. Anti-abortion protestors frequently stand across Dewey Street opposite the driveway. *Id*.  Anyone standing there is only a few feet from the passenger side of a vehicle coming from Pleasant Street and turning left into the clinic's driveway. A.527.

The other buffer zone protects the entrance from Pleasant Street where the walkway goes through two fences. A.317, 546.  Protestors or counselors who stand near that buffer zone can be heard by patrons entering the clinic's main door from the parking lot. A.515, 518.

**Plaintiff Mark Bashour** goes to the Worcester clinic twice a week to offer counseling to pregnant women. A.266-267. He stands on Pleasant Street where he can see people walking to the clinic door; he calls to them, offering help and literature. A.269-270, 317, 435, 437. Bashour does not stand on Dewey Street because he believes that clinic patrons park too far from the parking lot entrance. A.272-273, 436.

Since this clinic opened in its current location, Bashour has "been able to provide in-depth one on one counseling" to "six or seven women" who were walking toward the RHCF. A.271, 437-438. However, most women make clear that they do not want to talk to Bashour. A.438. Each week several people take literature from Bashour, but most refuse to do so. A.439. Bashour is involved with a group called Problem Pregnancy that is located directly across Pleasant Street from the Worcester clinic. A.438-442. Problem Pregnancy offers financial and other help to pregnant women; its mission is to convince pregnant women not to have an abortion. A.440, 442. Bashour, together with others involved with Problem Pregnancy, has helped convince five or six women near the Worcester clinic not to have an abortion since December 2009. A.440-443, 450.  He has also observed others bring women across the street to Problem Pregnancy. A.446-447.

Bashour has seen pro-life protestors holding signs on both sides of Pleasant Street and near the clinic's driveway on Dewey Street. A.444, 447-448. Motorists react to these signs. Some react positively, such as by giving a thumbs-up gesture, while others voice negative comments or gesture with their middle finger. A.445.

**Plaintiff Nancy Clark** also goes to the Worcester clinic several times a week to try to convince women not to have an abortion. A.309-

310. Clark stands across Pleasant Street where she can see the clinic's main door. A.311-312, 457-459.

Clark calls out to women approaching the clinic and tells them that free counseling is available at Problem Pregnancy. A.455. One woman out of 100 will cross Pleasant Street to speak with Clark. A.312, 456. Most women to whom Clark calls out just keep walking, making clear that they do not wish to speak with her. A.455-456. Some women appear to be offended by Clark's overtures and even swear at her. A.457. But others stop and speak with her, often about their pregnancies. A.456. Clark has convinced four women to go to Problem Pregnancy instead of into the Worcester clinic. A.461.

Clark sometimes holds a sign that says "Face It, Abortion Kills." A.314, 457. The sign often elicits negative reactions, including obscene gestures and catcalls. A.457-458. On the other hand, one day when Clark was holding her sign a girl came out of the clinic, walked to Clark, asked her about the sign, got into a conversation with her, and decided not to return to the clinic. A.458.

**Other Worcester Evidence**: One person dresses as the Grim Reaper—wearing a hooded black cloak, white mask, and white gloves and carrying a long-handled scythe—and walks near the clinic along Pleasant Street Thursday mornings. A.309, 443, 462-465. People often react by giving him an obscene gesture or honking their car horn. A.463.

When Metzger drove to the Worcester clinic in September 2010, she stopped just after turning onto Dewey Street from Pleasant Street to figure out which driveway led to the clinic's parking lot; two women who had been standing near the buffer zone approached the car, began speaking with Metzger and her passenger, urged them to go to Problem

Pregnancy, and handed them anti-abortion literature. A.513-515, 526. When she parked in the clinic's lot, Metzger heard several women calling from Pleasant Street, saying "we love you," "please come talk to us," and "there are other options." A.515. As Metzger was about to enter the building, she again heard someone calling from Pleasant Street, asking her to "come across the street and talk." *Id.*

Metzger returned to the Worcester clinic in July 2011. A.517. She saw nine anti-abortion protestors on the Pleasant Street sidewalk near the buffer zone. *Id.* One was dressed up as the Grim Reaper. *Id.* Another held a sign saying "Abortion Is a Bad Sin." *Id.* When Metzger drove down Dewey Street and turned into the clinic's driveway, she saw a man and a woman standing opposite the driveway and holding a sign that said "God Loves You Mom and Dad." A.518, 527. As Metzger slowed down to turn left into the driveway, this man and woman were standing at the edge of the buffer zone a couple of feet from Metzger's passenger door. A.527. Metzger could see and read their sign from the clinic parking lot. *Id.* When Metzger exited the clinic later that morning, and stood just outside the door, she could hear a woman calling to her from across Pleasant Street saying "anything you need, we can help you, come across the street." A.518.

Many people consider the period of Lent (from Ash Wednesday to Easter) to be "40 Days for Life" and come to pray and hold anti-abortion signs outside the Worcester clinic. A.445-446. Groups of up to 100 people gather to pray and protest outside the Worcester clinic during this period. *Id.*; A.460. Those leading the prayer, including the Catholic bishop, amplify their voices with a loudspeaker. A.460.

(c)    **The Springfield Clinic.**

Planned Parenthood's Western Massachusetts Health Center (the "Springfield clinic") is at 3550 Main Street in Springfield, in a three-building medical complex located at the corner of Wason Avenue. A.547. Most patients drive to the clinic, park in a lot accessed by a driveway from Wason Avenue, and enter the clinic's building through a door facing Wason Avenue. A498-499. Patients can see signs held by protestors as the patients pull into the driveway, and can hear the protestors and see their signs from the parking lot. *Id.*

Although there are five driveways leading into the medical complex parking areas, only two of them are surrounded by clearly marked and posted buffer zones. A.547. One buffer zone protects the driveway that most clinic patients use at Wason Avenue, and the other is located around the middle of three driveways on Main Street. *Id.* The buffer zone statute "has no effect" at the other three driveways "because the text of the buffer zone law is not posted" there. Ps' Add. 115a, 119a.

**<u>Plaintiff Cyril E. Shea, M.D.</u>** likes to walk along the sidewalk near the Springfield clinic wearing a large sign that says "They're Killing Babies Here." A.321, 468-469, 473, 477. He is sometimes joined by other anti-abortion protestors and counselors. A.471-472. People notice Dr. Shea's sign: some react positively, giving him a smile or a thumbs-up sign, while others react negatively, making "[o]bscene comments, angry comments, obscene gestures, and sometimes just a shaking of the head and a grimace." A.469-470.

Dr. Shea testified that up to five percent of the people who park in the lot near the building with the clinic come back out to the sidewalk to receive literature from or speak with pro-life protestors. A.323, 474.

- 19 -

**Other Springfield Evidence**: When Metzger drove to the Springfield clinic on July 8, 2011, she saw two men standing on the sidewalk near the middle entrance on Main Street, outside the buffer zone; as she drove by she could see one of the men holding a sign that said "Abortion Hurts Women, Choose Life," and could see the other man hold up a pamphlet. A.516. She later saw three men standing on the sidewalk near the Wason Avenue driveway closest to the clinic's building; she saw the men waving at people, saw one of them holding a framed picture of the Virgin Mary, and saw the others holding anti-abortion signs and standing behind anti-abortion signs facing the street that were leaned against the guardrail. A.517, 528-529.

## Summary of Argument.

I.A.1. Plaintiffs cannot reargue their claims that the statutory exemption for clinic employees and agents acting within the scope of their employment makes the entire Act unconstitutional on its face. The Court rejected that claim in *McCullen I* and the Supreme Court denied certiorari review. The law of the case doctrine bars this panel from second-guessing that prior ruling. *See* pages 22-24, below. Plaintiffs did not challenge before the district court the Act's exemptions for persons entering or leaving a clinic or for persons crossing through a buffer zone to reach some other destination, and cannot do so for the first time on appeal. *See* page 22 & footnote 2.

I.A.2. None of the narrow exceptions to the law of the case doctrine applies here. No Supreme Court decision has dramatically changed how courts must evaluate the content-neutrality of laws that have the effect of restricting the time, place, or manner of speech. The recent case law cited by plaintiffs merely reiterates the same standards

that the Court applied in *McCullen I*. *See* pages 25-30. Plaintiffs have abandoned and thus waived any claim that significant new evidence, not obtainable earlier, compels a different result. *See* page 30. Nor do plaintiffs develop any argument that the Court's prior decision is a blatant error that is causing serious injustice. *See* pages 30-31.

I.B. Though plaintiffs argued below that the employee exemption has been applied in a discriminatory manner, they abandon that claim on appeal.  They therefore waived any challenge to the district court's holding that, under *McGuire II*, Plaintiffs cannot press such a claim without evidence that police officers were aware of unfair or unlawful behavior by clinic agents but did nothing about it. *See* pages 31-32.

I.C. Under Massachusetts law, the exemption for clinic employees and agents would be severable if it were unconstitutional. Plaintiffs would not be entitled to an order invalidating the Act as a whole even if they had proved that this exemption violates the First Amendment. At most they could obtain an order invalidating the employee exemption or requiring that it be enforced in a nondiscriminatory manner.  The rest of the Act would survive. *See* page 32-33.

II.A. The issue to be decided on remand after *McCullen I* was whether the Act as applied allows plaintiffs to offer information and opinions to clinic patrons. Plaintiffs' as-applied challenge does ***not*** turn on whether the Act limits the time, place, or manner in which plaintiffs can communicate with clinic patrons.  All time-place-manner restrictions have the effect of constraining speech. *See* pages 33-36.

II.B. The record demonstrates that the Act as applied leaves open ample alternative communications channels for reaching plaintiffs' intended audience at the Boston, Worcester, and Springfield clinics.

Plaintiffs can and do converse with and provide literature to clinic patients interested in hearing their pro-life message. *See* pages 36-41.

III. The district court correctly held that plaintiffs' remaining "as applied" claims were identical to the facial claims resolved in *McCullen I*. The other claims are based on the same legal theories and the same factual circumstances that were envisioned when the Court and the district court rejected plaintiffs' facial claims.  *See* pages 41-47.

## Argument.

## I.   PLAINTIFFS' RENEWED ATTACK ON THE CLINIC EMPLOYEE EXEMPTION IS WITHOUT MERIT.

### A.    Plaintiffs' Facial Attack Is Foreclosed by *McCullen I*.

#### 1.    The Court Is Bound by the Law of the Case.

Plaintiffs argue yet again that the statutory exemption for "employees or agents [of the RHCF] acting within the scope of their employment," Mass. Gen. L. c. 266, § 120E1/2(b)(1), makes the Act content-based, viewpoint-based, subject to strict scrutiny, and facially unconstitutional. *See* Ps' Br. 32-49. Although Plaintiffs mention in passing the separate exemptions for people entering or leaving an RHCF or those travelling through a buffer zone to reach some other destination (*see* Ps' Br. 33), they did not challenge those exemptions below[2] and cannot do so for the first time on appeal.  *Taylor v. United States Dept. of Labor*, 440 F.3d 1, 8 (1st Cir. 2005).

---

[2]  *See* "Motion to Permit Arguments As to Facial Invalidity," doc. 95 (seeking to reargue facial claims based only on exemption of RHCF employees and agents); Transcript of Bench Trial, August 24, 2011, doc. 149, pp. 3-97, 147-174 (plaintiffs' closing argument, making no argument regarding Act's exemptions of persons entering or leaving clinic, or for persons passing through buffer zone to reach another

The Court rejected this attack on the exemption for clinic employees and agents in the first phase of this case. *See McCullen I*, 571 F.3d at 177-178.  It held that the Act—including the clinic employee exemption—is a content- and viewpoint-neutral time-place-manner regulation, is therefore subject to intermediate scrutiny, and is constitutional on its face. *Id*. at 175-181.

It applied the well-established rule that "[g]overnment regulation of expressive activity is content neutral so long as it is '*justified* without reference to the content of the regulated speech.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (emphasis in original) (quoting *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293 (1984)); *cf. McCullen I*, 571 F.3d at 175 (quoting *Ward* and *Clark*). Under this standard, "a law designed to serve purposes unrelated to the content of protected speech is deemed content-neutral even if, incidentally, it has an adverse effect on certain messages while leaving others untouched." *McCullen I*, 571 F.3d at 176 (quoting *McGuire I*, 260 F.3d at 43).

The Court held that the Act is content neutral because it "was enacted in response to legitimate safety and law enforcement concerns, … was justified by those objectives without reference to the content of any speech," and thus serves "a legitimate governmental interest unrelated to expressive content." *Id*. at 176-177. The Court noted that the same attack on the employee exemption "was squarely raised and squarely repulsed in *McGuire I*, 260 F.3d at 45-47." *Id*. at 177. In that prior decision, the Court held that the exemption for clinic employees

---

destination); "Plaintiffs' Proposed Findings of Fact and Conclusions of Law on the Trial of As Applied Challenge," doc. 152 (plaintiffs did not ask for any finding or conclusion regarding these two exemptions).

and agents lets clinics arrange for escorts to "assist in protecting patients and ensuring their safe passage as they approach RHCFs;" "since a primary purpose of the law is to facilitate safe access, the employee exemption serves the basic objectives of the Act." *McGuire I*, 260 F.3d at 46. The 2007 revision did not change any of the Act's exemptions. *McCullen I*, 57 F.Supp.2d at 399.

Plaintiffs' renewed claim that the employee exemption triggers strict scrutiny "is foreclosed" by the law of the case. *See McGuire II*, 386 F.3d at 58 n.3. The law of the case doctrine "bars a party from resurrecting issues that either were, or could have been, decided on an earlier appeal." *United States v. Matthews*, 643 F.3d 9, 12-13 (1st Cir. 2011). Among other things, this doctrine "binds a 'successor appellate panel in a second appeal in the same case' to honor fully the original decision." *Id.* (quoting *United States v. Moran*, 393 F.3d 1, 7 (1st Cir. 2004)). "This branch [of the doctrine] "contemplates that a legal decision made at one stage of a criminal or civil proceeding should remain the law of that case throughout the litigation, unless and until the decision is modified or overruled by a higher court." *Id.* This doctrine applies with full force even though the reason why Plaintiffs could appeal as of right in *McCullen I* is that the district court denied their request for injunctive relief, and even though Plaintiffs claim that a statute that has the effect of limiting the time, place, or manner of communicative activities violates the First Amendment. *See Naser Jewelers, Inc. v. City of Concord, New Hampshire*, 538 F.3d 17, 19-21 (1st Cir. 2008).

## 2. No Law of the Case Exception Applies Here.

Plaintiff have "not met the heavy burden required to invoke an exception" to the law of the case doctrine. *See Peralta v. United States*,

597 F.3d 74, 84 n.12 (1st Cir. 2010). "For the court to resurrect an issue on remand, the proponent of reopening an already decided matter must accomplish one of three things: 'show that controlling legal authority has changed dramatically; proffer significant new evidence, not earlier obtainable in the exercise of due diligence; or convince the court that a blatant error in the prior decision will, if uncorrected, result in a serious injustice.'" *United States v. Vigneau*, 337 F.3d 62, 68 (1st Cir. 2003) (quoting *United States v. Bell*, 988 F.2d 247, 251 (1st Cir. 1993)). "Such exceptional circumstances are rare and narrowly circumscribed." *Matthews*, 643 F.3d at 14.

### a. There Has Been No Dramatic Change in Controlling Legal Authority.

None of the new Supreme Court decisions cited by plaintiffs dramatically changed the law that governs this case. *Cf.* Ps' Br. 34-44 (invoking *Citizens United v. Federal Election Comm'n*, 130 S.Ct. 876 (2010), *Snyder v. Phelps*, 131 S.Ct. 1207 (2011), *Sorrell v. IMS Health, Inc.*, 131 S.Ct. 2653 (2011), and *United States v. Stevens*, 130 S.Ct. 1577 (2010)). These decisions did not change the standards for evaluating content-neutral regulations affecting the time, place, or manner of communicative activities. Nor did they alter the Supreme Court's precedent upholding the use of buffer zones to protect RHCF entrances and driveways. *See Hill v. Colorado*, 530 U.S. 703 (2000); *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357 (1997); and *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994); *cf. McCullen I*, 571 F.3d at 180-182 (relying on *Hill*, *Schenck*, and *Madsen*).

The holdings of these new Supreme Court decisions are not relevant to this case. *Citizens United* held that the United States may

not prohibit corporations from engaging in political speech because of their corporate identity. *See* 130 S.Ct. at 899-913. *Snyder* held that it is unconstitutional to impose tort liability for engaging in public protest on matters of public concern, even if the protest is undertaken in connection with a private funeral. *See* 130 S.Ct. at 1215-1220. *Sorrell* struck down a Vermont statute barring pharmaceutical manufacturers from obtaining or using prescriber-identifying information for marketing purposes, where the state legislature expressly stated that the act was "designed to impose a specific, content-based burden on protected expression." *See* 131 S.Ct. at 2663-2664. Finally, *Stevens* struck down a federal statute that imposed criminal penalties on anyone who "knowingly creates, sells, or possesses a depiction of animal cruelty with the intention of placing that depiction in interstate or foreign commerce for commercial gain." *See* 130 S.Ct. at 1582 n.1. The Court rejected the argument that "depictions of animal cruelty … are categorically unprotected by the First Amendment," and held that the statute is substantially overbroad. *Id.* at 1584-92.

Plaintiffs invoke *Citizens United*, *Snyder*, and *Sorrell* for the well-settled proposition that restricting speech based on content or the identity of the speaker is unconstitutional. Ps' Br. 34-42. They point to a statement in *Citizens United* that the First Amendment prohibits "restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United*, 130 S.Ct. at 898 (citing *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 784 (1978)); *see* Ps' Br. 35-37. And they argue that "[t]he Supreme Court's later decisions in *Snyder* and *Sorrell* likewise confirm that the First Amendment tolerates no discrimination among speakers." Ps' Br. 37.

But these statements about content- or viewpoint-discrimination do not represent any change in controlling legal authority and thus provide no basis for revisiting *McCullen I*. The Court was well aware during the first phase of this case that "government attempts to 'pick and choose among similarly situated speakers in order to advance or suppress a particular ideology or outlook'" constitutes "viewpoint-based discrimination" and "is highly offensive to the core values of the First Amendment." *McCullen I*, 571 F.3d at 175 (quoting *Berner v. Delahanty*, 129 F.3d 20, 28 (1st Cir. 1997)). It has long been settled that, "[i]n the realm of protected speech, the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue." *Bellotti*, 435 U.S. at 784-85 (1978) (citing *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 96 (1972)).

This principle that the government may not ban speech by some speakers while allowing it by others is irrelevant because the Act does not ban anyone's speech. Like the RHCF buffer zone statute upheld in *Hill*, the Act "does not 'ban' any messages, and likewise it does not 'ban' any signs, literature, or oral statements. It merely regulates the places where communications may occur." *Hill*, 530 U.S. at 731. Because the Act does not impose "a direct ban on First Amendment activity," but instead "involves a time, place, and manner restriction," it "should not be analyzed in the same way as direct bans on speech." *McCullen I*, 571 F.3d at 181. As the Court explained:

> [T]he 2007 Act places no burden at all on the plaintiffs' activities
> outside the 35-foot buffer zone. They can speak, gesticulate, wear
> screen-printed T-shirts, display signs, use loudspeakers, and
> engage in the whole gamut of lawful expressive activities. Those

messages may be seen and heard by individuals entering, departing, or within the buffer zone.

Additionally, the plaintiffs may stand on the sidewalk and offer either literature or spoken advice to pedestrians, including those headed into or out of the buffer zone. Any willing listener is at liberty to leave the zone, approach those outside it, and request more information.

*Id*. 571 F.3d at 180.

Plaintiffs' implicit suggestion that the Supreme Court abrogated the long-standing test for content neutrality articulated in *Ward* and *Clark* is incorrect. The Supreme Court continues to hold that "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others," so long as the rule "is justified without reference to the content of the regulated speech." *Christian Legal Society Chapter of the University of California, Hastings College of the Law, aka Hastings Christian Fellowship v. Martinez*, 130 S.Ct. 2971, 2994 (2010) (quoting *Ward*, 491 U.S. at 791); *accord Sorrell*, 131 S.Ct. at 2664 ("'content-neutral' speech regulations" are "those that are *justified* without reference to the content of the regulated speech" (emphasis in original) (quoting *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986)); *see also Nevada Commission on Ethics v. Carrigan*, 131 S.Ct. 2343, 2347 (2011) (ethics rule barring legislators with conflict of interest from advocating for or against bill "was a reasonable time, place, and manner limitation" (citing *Clark*, 468 U.S. at 293)). The Court issued these decisions after *Citizen's United*, and issued *Nevada Commission on Ethics* after *Snyder* and within a week of *Sorrell*.

Plaintiffs' reliance on *Stevens* is also misplaced. *See* Ps' Br. 42-44. Plaintiffs ask the Court to focus on the statement that the Supreme

Court "would not uphold an unconstitutional statute merely because the Government promised to use it responsibly," *Stevens*, 130 S.Ct. at 1591, and to hold that the Attorney General's construction of the clinic employee exemption in her office's January 2008 guidance letter "cannot fix the 2007 Act." Ps' Br. 43-44. But the Court considered the same argument in *McCullen I* and rejected its premise, holding that the Act's exemption for clinic employees is facially constitutional without regard to any guidance by the Attorney General. *See McCullen I*, 571 F.3d at 178 ("a state official's interpretation of a statute, even if generally authoritative, cannot render an otherwise constitutional statute vulnerable to a facial challenge"); *accord McGuire II*, 386 F.3d at 58-59 (same). Thus, this case is the polar opposite of *Stevens*.

Finally, the Ninth Circuit's decision in *Hoye v. City of Oakland*, 653 F.3d 835 (9th Cir. 2011), is controlling authority. *Cf. United States v. Mitchell*, 432 F.2d 354, 356 (1st Cir. 1970) ("the decision of another circuit is not controlling here"). In any case, *Hoye* does not conflict with *McCullen I*. *Hoye* held that an ordinance barring anyone from approaching within eight feet of a person seeking to enter an RHCF, "to engage in conversation with, display signs to, or distribute literature to" them without their consent, is content-neutral and constitutional on its face because it applies equally to "pro-abortion and anti-abortion advocacy." 653 F.3d at 841-842, 846-849, 859. The Massachusetts statute similarly applies to all speech regardless of its content. "[O]n its face," the statutory exemption for RHCF employees and agents "does not permit advocacy of any kind in the zone" and does not allow "escorts with pro-choice viewpoints to express their views in the zone." *McCullen I*, 573 F.Supp.2d at 407-408, *aff'd*, 571 F.3d at 177; *accord McGuire I*,

260 F.3d at 45-48. That is the law of the case. *Hoye* further held that the Oakland ordinance was being applied in an unlawfully discriminatory manner, because local police were deliberately letting clinic employees or agents violate the law while barring pro-life protestors and counselors from doing so. 653 F.3d at 851-854. Here, in contrast, Plaintiffs neither alleged nor presented evidence showing that the Massachusetts Act is being enforced by public officials in a discriminatory manner. *See* pages 31-32, below. The district court correctly held that *Hoye* is distinguishable for this reason. Ps' Add. 105a-106a n.92.

### b.    Plaintiffs Point to No New Evidence of Legislative Intent.

Plaintiffs do not challenge the Court's prior findings that the Legislature had content-neutral reasons for revising the Act in 2007. *See McCullen I*, 571 F.3d at 173, 175-178. They tried below to invoke the "new evidence" exception to the law of the case doctrine, albeit without "actually proffer[ing] any new evidence." Ps' Add. 78a. But Plaintiffs waived that claim by not pressing it on appeal. *Ramos v. Patnaude*, 640 F.3d 485, 489 (1st Cir. 2011).

### c.    Plaintiffs Waived Any "Serious Injustice" Claim.

The district court found that Plaintiffs did not argue and thus waived any claim under the narrow law-of-the-case exception for cases where a "blatant error" causes a "serious injustice." Ps' Add. 79a. Plaintiffs cannot invoke that exception for the first time on appeal. *Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.*, 240 F.3d 1, 13 (1st Cir. 2001). Plaintiffs' "fleeting references" to this exception on appeal,

*see* Ps' Br. 33-34, unsupported by "any developed argumentation" other than their unfounded claim that the Supreme Court has dramatically changed controlling legal authority, would waive this claim in any case. *See Ahmed v. Holder*, 611 F.3d 90, 98 (1st Cir. 2010).

The Court's prior holdings would refute Plaintiffs' cursory "serious injustice" claim even if it had not been waived. The Court held that the Act is a lawful "time, place, and manner restriction," serves substantial and legitimate governmental interests in protecting public safety and patient access to medical care, does not ban any speech by Plaintiffs or anyone else, and does not prevent willing listeners from conversing with, accepting literature from, or otherwise communicating with Plaintiffs. *McCullen I*, 571 F.3d at 175-81.

## B.    Plaintiffs Abandoned Their As Applied Challenge to the Clinic Employee Exemption.

Plaintiffs' as-applied challenge to the conduct of clinic escorts failed below for lack of evidence of any state action. Plaintiffs have abandoned that claim on appeal.

Plaintiffs presented evidence that, at the Boston RHCF, volunteers who escort patients into the clinic sometimes discourage them from listening to pro-life protestors or engage in pro-choice rhetoric. *See* A.241, 247-248, 264. But Plaintiffs neither alleged nor presented evidence that police officers were aware of such conduct by clinic escorts but did nothing about it. Ps' Add. 84a, 106a n.92. Plaintiffs made no claim and presented no evidence regarding conduct by clinic escorts at the other two clinics.

In the *McGuire* case, Zarrella and another individual presented almost identical evidence when they challenged application of this same

clinic employee exemption. *McGuire II*, 386 F.3d at 52. There, too, Zarrella had "never complained to the police about anything the escorts were doing." *Id*. The Court held that this evidence regarding clinic escorts did not demonstrate that the Act's clinic employee exemption was unconstitutional as applied. *Id*. at 59-60.  It explained that "only the government can violate First Amendment rights," and rejected Zarrella's argument "that activities of private persons, including those neither known to the police nor to which the police have turned a blind eye, [can] demonstrate that the statute has been applied" unconstitutionally. *Id*. "The First Amendment is concerned with government interference, not private jousting in the speech marketplace." *Id*. at 60.

In this case, the district court correctly held that plaintiffs' complaint about private action by the Boston clinic escorts fails as a matter of law for the same reason.  Ps' Add. 84a, 106a n.92.

On appeal, Plaintiffs have abandoned their claim that the exemption for clinic employees and agents has been applied by public officials in a discriminatory manner.  Plaintiffs cannot revive this claim in their reply brief.  *See In re FBI Distribution Corp.*, 330 F.3d 36, 41 n.6 (1st Cir. 2003).

## C.    The Clinic Employee Exemption Would Be Severable.

Even if Plaintiffs had proved that the statutory exemption for clinic employees and agents is unconstitutional, which they did not, that would not entitle Plaintiffs to an order invalidating the entire Act. *Cf*. Ps' Br. 31-32, 42, 58, 63. Any constitutional violation arising from application of this exemption could be cured by an order that it be applied in a nondiscriminatory manner, or even by striking this

exemption and allowing clinic employees to do their job by waiting outside the buffer zone and then escorting patients into the clinic. As noted above, Plaintiffs never challenged the separate exemption for persons "entering or leaving" an RHCF. *See* page 22 & footnote 2, above.

Massachusetts law contains an explicit severability instruction, stating that, "[t]he provisions of any statute shall be deemed severable, and if any part of any statute shall be adjudged unconstitutional or invalid, such judgment shall not affect other valid parts thereof." Mass. Gen. L. c. 4, § 6, paragraph Eleventh. This provision inserts "a severability clause into every Massachusetts statute." *Massachusetts Wholesalers of Malt Beverages, Inc., v. Commonwealth*, 414 Mass. 411, 420 n.15, 609 N.E.2d 67, 72 n.15 (1993). The Court must follow this "explicit textual instruction to leave unaffected" all parts of the Act that are neither unconstitutional nor otherwise invalid. *See National Federation of Independent Business v. Sebelius*, No. 11-393, slip op. 56, 2012 WL 2427810 (US 2012). Thus, plaintiffs could not obtain relief invalidating the Act as a whole. *See, e.g., Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006, 1023 (1st Cir. 1981) .

## II. THE ACT AS APPLIED LEAVES ADEQUATE CHANNELS FOR COMMUNICATING WITH CLINIC PATIENTS.

### A. The Court Must Evaluate the Adequacy of Available Means of Communication, Not Whether the Act Restricts Speech.

To determine whether the Act as applied leaves open adequate alternative channels of communication at the Boston, Worcester, and Springfield clinics, the court must determine whether the record as a whole demonstrates that Plaintiffs can still offer information or

opinions to clinic patrons. A content-neutral statute that restricts the
time, place, or manner of speech "does not fail for lack of adequate
alternatives so long as there are avenues for 'the general dissemination
of a message.'" *Sullivan*, 511 F.3d at 44 (quoting *Frisby v. Schultz*,
487 U.S. 474, 483-84 (1988), which upheld ban on picketing in public
forum before any particular residence).

    "The essence of this question is not 'whether a degree of
curtailment' of speech exists, but rather 'whether the remaining
communicative avenues are adequate.'" *Id.* (quoting *D.H.L. Assocs.*, 199
F.3d at 59, and *National Amusements*, 43 F.3d at 745). The Court "has
upheld … alternative means of communication despite diminution in
the quantity of speech, a ban on a preferred method of communication,
and a reduction in the potential audience." *Id.* (citing cases).

    "[A]n adequate alternative does not have to be the speaker's first
or best choice, or one that provides the same audience or impact for the
speech." *Weinberg v. City of Chicago*, 310 F.3d 1029, 1042 (7th 2002)
(quoting *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000)); *accord*
*Naser Jewelers*, 513 F.3d at 37 ("The fact that restrictions prohibit a
form of speech attractive to plaintiff"—and that plaintiff "is losing
potential customers" as result—"does not mean that no reasonable
alternative channels of communication are available."); *Globe*
*Newspaper Co. v. Beacon Hill Architectural Comm'n*, 100 F.3d 175, 194
(1st Cir. 1996) (that a time-place-manner restriction "may reduce to
some degree the potential audience for respondent's speech is of no
consequence, for there has been no showing that the remaining avenues
of communication are inadequate." (quoting *Ward*, 491 U.S. at 802)).
Quite simply, "the law does not require that alternative channels be

'perfect substitutes.'" *International Action Center v. City of New York*, 587 F.3d 521, 528 (2d Cir. 2009) (quoting *Mastrovincenzo v. City of New York*, 435 F.3d 78, 101 (2d Cir. 2006)).

The mere fact that the Act keeps Plaintiffs from standing immediately next to RHCF entrances or driveways does not mean that the Act, as applied, deprives them of adequate alternative channels of communication. "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. International Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) (rejecting as-applied challenge to Minnesota state fair rule barring sale or distribution of leaflets within fairgrounds except from fixed location); *accord Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984) (rejecting as-applied challenge to municipal ordinance prohibiting posting signs on public property); *Adderley v. Florida*, 385 U.S. 39, 48 (1966) (upholding trespass conviction of protesters blocking jail driveway).

"Time-place-manner regulations routinely make particular forms of expression impracticable without raising constitutional concerns." *McCullen I*, 571 F.3d at 180. From the beginning of modern Free Speech Clause jurisprudence almost a century ago, the Supreme Court has made clear that legislatures may restrict the time, place, or manner of speech in order to protect the public health, safety, or convenience. *See, e.g.*, *Cox v. New Hampshire*, 312 U.S. 569, 576 (1941) (holding that States may regulate "time, place and manner" of using public fora to protect public safety and convenience, and thus may require permit to use public streets for parade); *Schneider v. New Jersey*, 308 U.S. 147,

160 (1939) (noting that States "may lawfully regulate the conduct of those using the streets" in order to keep streets and sidewalks open to traffic and pedestrians); *Schenck v. United States*, 249 U.S. 47, 52 (1919) ("The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic.").

In reviewing the district court's findings, the Court must "make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Mullin v. Town of Fairhaven*, 284 F.3d 31, 37 (1st Cir. 2002) (quoting *Bose Corp. v. Consumers Union*, 466 U.S. 485, 499 (1984)). However, "[t]he independent review function is not equivalent to a 'de novo' review of the ultimate judgment itself, in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes that judgment should be entered for plaintiff." *Veilleux v. National Broadcasting Co.*, 206 F.3d 92, 107 (1st Cir. 2000) (quoting *Bose Corp.*, 466 U.S. at 514 n.31). "[T]he reviewing court does not extend the independent review standard to all determinations concerning a particular legal claim, but only to those that specifically involve the application of First Amendment law to specific facts." *Id*. Other findings of fact are subject to the "clearly-erroneous standard of [Fed. R. Civ. P.] 52(a)." *Bose Corp.*, 466 U.S. at 514 n.31; *accord Duffy v. Sarault*, 892 F.2d 139, 142-146 (1st Cir. 1989).

## B.   The Record as a Whole Shows that Plaintiffs Can Communicate With Their Intended Audience.

The evidence demonstrates that the Act, as applied, leaves open adequate alternative channels of communication near the Boston, Worcester, and Springfield clinics. Plaintiffs can and do share their

message with RHCF patients while standing outside the buffer zones. Patients who want to converse with Plaintiffs or take literature from them do so; those who are not interested in Plaintiffs' message pass them by. Although plaintiffs can no longer stand immediately next to these three clinics' entrances or driveways, they may still offer their views, offers of help, and prayers in a manner that can be seen and heard by all clinic patients.

As summarized below, and discussed at pages 10-20 above, the record as a whole shows that Plaintiffs can still communicate their message to their intended audience—women seeking abortions—next to each RHCF. "Although '[a]n alternative is not ample if the speaker is not permitted to reach the intended audience,' … that is not what occurred here." *Startzell v. City of Philadelphia*, 533 F.3d 183, 202 (3rd Cir. 2008) (quoting *Bay Area Peace Navy v. United States*, 914 U.S. 1224, 1229 (9th Cir. 1990)) (holding ample alternatives existed where police ordered protestors to move away from center of gay pride event, even though move "may have reduced their potential audience"). To the contrary, and as plaintiffs acknowledge in their complaint, "[o]n many occasions, clinic patients and/or their companions willingly receive" both "oral communications" and literature offered by plaintiffs to "clinic clients and other persons entering or exiting" one of the three RHCFs at issue in this case. A.91, paras. 37-38.

At the Boston clinic, Ms. McCullen and Mr. Cadin continue to be very successful in convincing pregnant women they meet outside the buffer zone not to have abortions. They and Ms. Zarella are able to and do share their pro-life views through close personal contact and conversation with, and by handing literature to, people approaching the

clinic. Mr. Smith wants to be seen and heard praying alone and with others on the sidewalk, and he is. Other anti-abortion protestors and counselors succeed in communicating with clinic patients by using signs, calling out to passersby, engaging willing listeners in conversation, and engaging in group prayer and demonstrations on the sidewalk near the clinic entrance. *See* pages 10-15, above, and Ps' App. 100a-107a for record citations.

At the Worcester clinic, Mr. Bashour and Ms. Clark are able to convince women not to have an abortion or to go across the street to Problem Pregnancy, despite the buffer zones. They can and do share their pro-life views by offering conversation and literature, and clinic patrons can hear those offers. Many other anti-abortion protestors communicate with clinic patients from outside the two buffer zones by using signs, calling out to people entering or leaving the RHCF, engaging in group prayer and demonstration, and even dressing up like the Grim Reaper. *See* pages 15-19, above, and Ps' App. 109a-114a. Although plaintiffs complain that the clinic's front door and the private parking spaces used by patients are far from the public sidewalks, that is not the result of any state action. *Cf.* Ps' Br. 56, citing A.270-274, 311-315. "Purely private action" cannot demonstrate that the Act has been applied unconstitutionally, because "only the government can violate First Amendment rights." *McGuire II*, 386 F.3d at 59-60

At the Springfield clinic, Dr. Shea can and does wear his sign saying "They're Killing Babies Here" on the sidewalk, and people see and react to his sign. Other anti-abortion protesters also hold signs and offer literature from the sidewalk near the clinic's driveway. Dr. Shea testified that up to five percent of those who park in the private lot walk

back out to the sidewalk to speak with or take literature from some other pro-life counselor. *See* pages 19-20, above, Ps' App. 115a-119a. Plaintiffs' claim that Dr. Shea must avoid five buffer zones around the Springfield clinic is incorrect. *Cf.* Ps' Br. 57. Only two zones are clearly marked and posted; the district court correctly found that the Act is not in effect at the other three driveways. Ps' Add. 115a, 119a. And most clinic patients use the driveway from Wason Avenue that is closest to the building in which the clinic is located. A.499.

"That more people don't accept Plaintiffs' offers is not an indication that adequate alternative means of communication do not exist, but rather shows that many members of Plaintiffs' audience are simply unreceptive to Plaintiffs' message." Ps' Add. 107a (Boston clinic); *accord id.* 113a-114a (Worcester clinic), 116a (Springfield clinic). This finding is well supported by the undisputed evidence that overtures by plaintiffs and other anti-abortion protestors or counselors frequently elicit negative reactions. A.214-215, 379, 407-408, 414, 430, 438-439, 445, 455-458, 469-470. On the other hand, the record as a whole demonstrates that plaintiffs can and do communicate with clinic patients who want to listen to plaintiffs' messages.

Although to some extent the Act "prefers listener-initiated exchanges to those originating with the speaker"— because plaintiffs may not follow people into a clearly marked and posted buffer zone during RHCF business hours, and may not approach either willing or unwilling listeners within the buffer zone—that does not make the Act unconstitutional. *See Heffron*, 452 U.S. at 649 n.12.

Plaintiffs have a right, which each of them exercises, to offer their message and offers of help to willing listeners from the public sidewalks

immediately outside the marked and posted buffer zones. But they have no constitutional right to position themselves so that they can force unwilling listeners to interact with them. *McCullen I*, 571 F.3d at 180; *see also Schenck*, 519 U.S. at 374-76, 380-82 (upholding injunction establishing 15 foot, content-neutral buffer zone around RHCF entrances and driveways); *Madsen*, 512 U.S. at 768-70 (upholding injunction establishing 36-foot, content-neutral buffer zone around entire RHCF property); *Burson*, 504 U.S. at 210-11 (upholding content-based statute that bars solicitation of votes and display of campaign materials within 100 feet of polling place).

Clinic patients, like all of us, have an "unquestioned right to refuse to engage in conversation with unwelcome" sidewalk counselors or protestors. *See Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 168 (2002). An unwilling listener has the right to walk past, turn away from, or otherwise escape or ignore speech that she finds to be offensive or not of interest. *See, e.g., Snyder*, 131 S.Ct. at 1220; *Federal Communications Comm'n v. Pacifica Foundation*, 438 U.S. 726, 749 n.27 (1978); *Cohen v. California*, 403 U.S. 15, 21-23 (1971).

In contrast, Plaintiffs do not have "an unqualified constitutional right to follow and harass an unwilling listener, especially one on her way to receive medical services." *Madsen*, 512 U.S. at 781. "Although the opportunity to interact directly" with every person entering an RHCF may facilitate Plaintiffs' "ability to reach their intended audience, there is no constitutional requirement that demonstrators be granted that sort of particularized access." *See Bl(a)ck Tea Society v. Boston*, 378 F.3d 8, 14 (1st Cir. 2004) (upholding rule confining

demonstrators wishing to be heard by 2004 Democratic National Convention delegates to a heavily secured "pen" that "allowed no opportunity for physical interaction (such as the distribution of leaflets) and severely curtailed any chance for one-on-one conversation").

## III. THE DISTRICT COURT CORRECTLY HELD THAT ALL ISSUES OTHER THAN THE ADEQUACY OF ALTERNATIVE CHANNELS OF COMMUNICATION WERE DECIDED IN *MCCULLEN I*.

Having lost their many facial challenges in *McCullen I*, plaintiffs could not press nominally "as applied" claims based on the same legal theories and "the same type of fact situation that was envisioned … when the facial challenge was denied." *McGuire II*, 386 F.3d at 61. "[S]imply characterizing the challenge as an as-applied challenge does make it one." *In re Cao,* 619 F.3d 410, 430 (5th Cir. 2010) (same).

The district court correctly held that, for this reason, the only issue that remained undecided on remand was whether the Act, as applied, leaves open adequate alternative channels of communication at the Boston, Worcester, and Springfield clinics. The orders granting judgment on the pleadings on the other "as applied" claims, and denying as futile plaintiffs' attempt to amend those claims, should therefore be affirmed. *See* Ps' Add. 68a-90a.

The Court "may affirm the order of dismissal on any ground made manifest by the record." *Román–Cancel v. United States*, 613 F.3d 37, 41 (1st Cir. 2010).

### A. Content Neutrality, Equal Protection, and the Attorney General's Guidance Letter.

Plaintiffs are wrong to argue that the district court should have second-guessed the Court's holding that the Act is content neutral

because it was justified by public safety objectives without reference to the content of any speech. *Compare* Ps' Br. 12 & 59 *with McCullen I*, 571 F.3d at 176-177. The district court could not "relitigate[e] issues that were decided by a higher court, whether explicitly or by reasonable implication, at an earlier stage of the same case." *de Jesus-Mangual v. Rodriguez*, 383 F.3d 1, 6 (1st Cir. 2004) (quoting *Municipality of San Juan v. Rullan*, 318 F.3d 26, 29 (1st Cir. 2003)).

Plaintiffs fare no better with their claim that the January 2008 letter from the Attorney General's Office construing the Act's exemptions demonstrates that the Act has been applied in a manner that discriminates on the basis of content or viewpoint. *Cf.* Ps' Br. 6-7, 59-60, 62.

First, plaintiffs neither alleged nor proved that any police department or official enforced the Act any differently because of the January 2008 guidance letter. Thus the record in this case is very different than in *McGuire*. In that case, there was record evidence that local police departments adhered to the Attorney General's interpretive guidance in applying the original version of the Act; that is the only reason the Attorney General's interpretation was relevant in evaluating the as-applied claim there. *See McGuire II*, 386 F.3d at 52-53, 64. The Act is enforced by local police departments, not the Attorney General's Office. *Id*. The letter from the Attorney General's office merely provided "guidance to assist" the police "in applying the four exemptions." Ps' Add. 4a; *McCullen I*, 571 F.3d at 174.

Second, the whole point of the letter was to remind police departments to apply all of the Act's exemptions in a content- and viewpoint-neutral manner. With respect to the exemption for clinic

employees or agents acting within the scope of their employment, the guidance letter noted that the exemption does not allow clinic personnel "to express their views about abortion or to engage in any other partisan speech within the buffer zone." Ps' Add. 4a. This language was based on the Court's approval of the very similar guidance letter issued by the Attorney General's office after the Act was first passed: the Court observed that construing the exemption "to exclude pro-abortion or partisan speech from the term 'scope of their employment'" is "clearly a proper, content-neutral way of interpreting the exemption." *See McGuire II*, 386 F.3d at 52 n.1 & 64. Nothing in the January 2008 guidance letter sanctions content- or viewpoint-based discrimination among speakers.

Third, plaintiffs' assertion that clinic escorts standing in the buffer zone might "tell incoming clients 'we'll help you inside the clinic'" is based solely on the statutory language of the exemption as written, not on anything in the guidance letter. *Cf.* Ps' Br. 62. It therefore merely restates plaintiffs' facial claims.

## B.  Narrow Tailoring and Overbreadth.

The district court correctly dismissed plaintiffs' twin claims that, as applied, the Act is not narrowly tailored and is overbroad.

Plaintiffs' main argument as to the Springfield clinic is based on factual error: they assert that this clinic is protected by five buffer zones, and that five is too many. *See* Ps' Br. 59, 61.  But in fact only two of the driveways—the one off Wason Avenue closest to the RHCF's building and the middle driveway off Main Street—have buffer zones that are both marked and posted. A.547. Clinic patients typically use the former driveway, but sometimes use the latter one.  A.469, 499. The

district court correctly found that no buffer zone is in effect at the other three driveways. Ps' Add. 115a, 119a.

In complaining that no one has been arrested for interfering with access to the Springfield clinic, *see* Ps' Br. 61, plaintiffs are recycling an argument that figured prominently in their facial challenge in *McCullen I*. But the Court previously held that the legislative facts showing persistent interference with clinic access were more than sufficient to show that the revised Act is narrowly tailored and not overbroad, even without evidence of arrests. *McCullen I*, 571 F.3d at 179, 181. The Legislature may enact a buffer zone that "takes a prophylactic approach" to protect patients from protestors in the immediate proximity of clinic entrances. *Hill*, 530 U.S. at 729. "Persons who are attempting to enter health care facilities—for any purpose—are often in particularly vulnerable physical and emotional conditions." *Id*. "A bright-line prophylactic rule may be the best way to provide protection, and, at the same time, by offering clear guidance and avoiding subjectivity, to protect speech itself." *Id*.

Although plaintiffs question in passing whether the Act is overbroad with respect to the Boston and Worcester clinics, they present no developed argumentation on the issue. *Cf.* Ps' Br. 61-62. Plaintiffs therefore waived any such claim. *See Ahmed*, 611 F.3d at 98.

In any case, plaintiffs cannot bring an "as applied" claim for substantial overbreadth. "[I]t is … important to be clear about the difference between an as-applied and an overbreadth challenge." *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 482 (1989). "Where an overbreadth attack is successful, the statute is obviously invalid in all its applications, since every person to whom it is

applied can defend on the basis of the same overbreadth." *Id.* "[T]he overbreadth doctrine enables litigants 'to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Hill*, 530 U.S. at 731-32 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)). Thus, "[a]ll overbreadth challenges are facial challenges, because an overbreadth challenge by its nature assumes that the measure is constitutional as applied to the party before the court." *Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir. 2006) (Sotomayor, J., for the court).

### C.   Plaintiffs' Other Claims.

Plaintiffs' three-sentence assertion that the district court erred by dismissing their four other as-applied claims is not supported by any developed argumentation. *Cf.* Ps' Br. 63. Thus plaintiffs have waived those claims. *See Ahmed*, 611 F.3d at 98. In any case, the district court correctly held that the other claims were resolved in *McCullen I*.

#### 1.   Prior Restraint.

The Court already held that, as a matter of law, the Act is a kind of time-place-manner restriction, not a prior restraint. *McCullen I*, 571 F.3d at 183-84. "The Supreme Court has explicitly rejected attempts to analyze security-based time-place-manner restrictions as prior restraints, ... and those cases are controlling here." *Bl(a)ck Tea Society*, 378 F.3d at 12 (citing *Hill*, 530 U.S. at 733-34, *Schenck*, 519 U.S. at 374 n.6, and *Madsen*, 512 U.S. at 763 n.2). The district court correctly granted judgment on the pleadings on the as-applied claim that the Act is an unlawful prior restraint, in count 3 of the complaint.

## 2.     Free Exercise of Religion.

The district court previously held that the Act "does not discriminate against a particular religion or religious practice," but instead is a law of general applicability that has at most an incidental effect of limiting the time or place of religious prayer near RHCFs. *See McCullen I*, 573 F.Supp.2d at 418.   Plaintiffs did not challenge that holding on appeal, and thus it is the law of the case.

That holding bars plaintiffs' claim that the Act as applied unconstitutionally impairs their free exercise of religion, in count 4 of the complaint. *See Knights of Columbus, Council No. 94 v. Town of Lexington*, 272 F.3d 25, 35 (1st Cir. 2001) (upholding ordinance that barred unattended structures from Lexington's Battle Green and had incidental effect of barring display of crèche). "[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Id*. (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993)).

## 3.     Vagueness.

Plaintiffs are well aware, and expressly concede, that the Act applies to them.  Ps' Add. 85a; A.92-96.  Thus they have no viable claim that the Act is vague as applied, in count 6 of the complaint.  *See Holder v. Humanitarian Law Project*, 130 S.Ct. 2705, 2719 (2010). "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *McCullen I*, 571 F.3d at 183 (quoting *Parker v. Levy*, 417 U.S. 733, 756 (1974)).

### 4.    "Freedom to Loiter."

The district court held that, as a matter of law, the Act does not violate Plaintiffs' alleged "freedom to loiter for innocent purposes" or any other liberty interest protected by the Due Process Clause of the Fourteenth Amendment.   *McCullen I*, 573 F.Supp.2d at 424-25.   This holding is the law of the case, and put an end to all of count 7 of the complaint, including the as-applied claim. Ps' Add. 85a-86a.

Plaintiffs have no constitutional right to loiter in all public places. *Doe v. City of Lafayette, Indiana*, 377 F.3d 757, 772 (7th Cir. 2004) (affirming city order banning convicted sex offender from city's parks). A state or municipality "may constitutionally impose reasonable time, place, and manner regulations on the use of its streets and sidewalks for First Amendment purposes . . . and may even forbid altogether such use of some of its facilities."   *Hudgens v. N.L.R.B.*, 424 U.S. 507, 520 (1976) (citations omitted).

### Conclusion.

There are no grounds for revisiting or altering the holding in *McCullen I* that the Act is constitutional on its face.  The district court correctly held both that the Act as applied leaves open ample alternative channels of communication at the Boston, Worcester, and Springfield clinics, and that plaintiffs' remaining claims were all resolved by *McCullen I*.  The Court should therefore hold that the Act is constitutional and affirm the district court's judgment.

MARTHA COAKLEY
*ATTORNEY GENERAL OF MASSACHUSETTS*

/s/ Kenneth W. Salinger
William W. Porter, *Assistant Attorney General*
First Circuit Bar No. 15033
Kenneth W. Salinger, *Assistant Attorney General*
First Circuit Bar No. 24380
Government Bureau
Gabriel Viator, *Assistant Attorney General*
Civil Rights Division
One Ashburton Place
Boston, MA  02108
617.727.2200

June 29, 2012

Certificate of Compliance with FRAP 32(a)

I hereby certify that:

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,277 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2.  This brief complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5) & (6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word in Microsoft Office Professional Plus 2010.

/s/ Kenneth W. Salinger

<u>Certificate of Filing and Service</u>

I hereby certify that this document was filed through the Electronic Case Filing (ECF) system on June 29, 2012 and thus copies will be sent electronically by that system to counsel for all parties in the case, as follows:

Edward C. Dumont
Todd C. Zubler
Wilmer Cutler Pickering
    Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
202.663.6000
edward.dumont@wilmerhale.com
toddzubler@wilmerhale.com


Philip D. Moran
265 Essex Street, Suite 202
Salem, MA  01970
978.745.6085
philipmoranesq@aol.com

Mark L. Rienzi
The Catholic University of America
Columbus School of Law
3600 John McCormack Road, NE
Washington, DC  20064
202.319.5140
rienzi@law.edu

Michael J. DePrimo
778 Choate Avenue
Hamden, CT  06518
203.281.1496
michaeldeprimo@gmail.com


   /s/ Kenneth W. Salinger  

## Statutory Addendum.

**Page**

G.L. c. 266, § 120E1/2, as amended
    November 13, 2007......................................Statutory Addendum 1

G.L. c. 266, § 120E 1/2, ¶ (b), as in effect
    prior to November 13, 2007.........................Statutory Addendum 3

# Statutory Addendum

## G.L. c. 266, § 120E1/2 (as amended November 13, 2007)

(a) For the purposes of this section, "reproductive health care facility" means a place, other than within or upon the grounds of a hospital, where abortions are offered or performed.

(b) No person shall knowingly enter or remain on a public way or sidewalk adjacent to a reproductive health care facility within a radius of 35 feet of any portion of an entrance, exit or driveway of a reproductive health care facility or within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of a reproductive health care facility in straight lines to the point where such lines intersect the sideline of the street in front of such entrance, exit or driveway.  This subsection shall not apply to the following:--

 (1) persons entering or leaving such facility;

 (2) employees or agents of such facility acting within the scope of their employment;

 (3) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and

 (4) persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility.

(c) The provisions of subsection (b) shall only take effect during a facility's business hours and if the area contained within the radius and rectangle described in said subsection (b) is clearly marked and posted.

(d) Whoever knowingly violates this section shall be punished, for the first offense, by a fine of not more than $500 or not more than three months in a jail or house of correction, or by both such fine and

imprisonment, and for each subsequent offense, by a fine of not less than $500 and not more than $5,000 or not more than two and one-half years in a jail or house of correction, or both such fine and imprisonment.  A person who knowingly violates this section may be arrested without a warrant by a sheriff, deputy sheriff or police officer if that sheriff, deputy sheriff, or police officer observes that person violating this section.

(e) Any person who knowingly obstructs, detains, hinders, impedes or blocks another person's entry to or exit from a reproductive health care facility shall be punished, for the first offense, by a fine of not more than $500 or not more than three months in a jail or house of correction, or by both such fine and imprisonment, and for each subsequent offense, by a fine of not less than $500 nor more than $5,000 or not more than two and one-half years in a jail or house of correction, or by both such fine and imprisonment.  A person who knowingly violates this provision may be arrested without a warrant by a sheriff, deputy sheriff or police officer.

(f) A reproductive health care facility or a person whose rights to provide or obtain reproductive health care services have been violated or interfered with by a violation of this section or any person whose rights to express their views, assemble or pray near a reproductive health care facility have been violated or interfered with may commence a civil action for equitable relief.  The civil action shall be commenced either in the superior court for the county in which the conduct complained of occurred, or in the superior court for the county in which any person or entity complained of resides or has a principal place of business.

## **G.L. c. 266, § 120E 1/2, ¶ (b) (as in effect prior to November 13, 2007)**

(b) No person shall knowingly approach another person or occupied motor vehicle within six feet of such person or vehicle, unless such other person or occupant of the vehicle consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education or counseling with such other person in the public way or sidewalk area within a radius of 18 feet from any entrance door or driveway to a reproductive health care facility or within the area within a rectangle not greater than six feet in width created by extending the outside boundaries of any entrance door or driveway to a reproductive health care facility at a right angle and in straight lines to the point where such lines intersect the sideline of the street in front of such entrance door or driveway.  This subsection shall not apply to the following:--

(1) persons entering or leaving such facility;

(2) employees or agents of such facility acting within the scope of their employment;

(3) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and

(4) persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility.