No. 12-1334

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

ELEANOR MCCULLEN, *et al.*,

*Plaintiffs-Appellants*,

*v.*

MARTHA COAKLEY, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Massachusetts, No. 08-cv-10066
Before the Honorable Joseph L. Tauro

**REPLY BRIEF FOR PLAINTIFFS-APPELLANTS**

EDWARD C. DUMONT
TODD C. ZUBLER
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000

PHILIP D. MORAN
265 Essex Street, Suite 202
Salem, MA  01970
(978) 745-6085

MARK L. RIENZI
THE CATHOLIC UNIVERSITY OF AMERICA
COLUMBUS SCHOOL OF LAW
3600 John McCormack Road, NE
Washington, DC  20064
(202) 319-5140

MICHAEL J. DEPRIMO
778 Choate Avenue
Hamden, CT  06518
(203) 281-1496

August 3, 2012

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................... iii

SUMMARY OF ARGUMENT ...........................................................................1

ARGUMENT ....................................................................................................4

I. *MCCULLEN I* CANNOT BE RECONCILED WITH SUBSEQUENT
SUPREME COURT DECISIONS ...........................................................4

    A.    Rational-Basis Review and a Blanket Prohibition Are
Not "The Same Standards" ...................................................7

    B.    The *Clark/Ward* Test Does Not Provide The Framework
For Analyzing Laws That Discriminate Among Speakers ................8

    C.    *Citizens United* And *Sorrell* Prohibit Reliance On
Defendants' Claimed Distinction Between "Bans" On
Speech And "Regulations" Of Speech ...............................................13

    D.    The Speaker Discrimination Cannot Be Severed...............................15

II. THE ACT IS UNCONSTITUTIONAL AS-APPLIED BECAUSE
REMAINING AVENUES OF COMMUNICATION ARE NOT
ADEQUATE FOR EFFECTIVE COMMUNICATION WITH PLAINTIFFS'
INTENDED AUDIENCE...................................................................18

    A.    The Trial Court Impermissibly Used *McCullen I* To
Narrow Plaintiffs' As-Applied Challenge..........................................18

    B.    The Trial Court Impermissibly Ignored Relevant Facts
Concerning The Adequacy Of Alternatives At The
Challenged Locations .......................................................................20

    C.    The Undisputed Evidence Confirms That Remaining
Avenues Of Communication Are Inadequate As A Matter
Of Law..............................................................................................22

CONCLUSION ..................................................................................................27

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page

*Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990)............................7

*Bailey v. Callaghan*, 2012 WL 2115300 (E.D. Mich. June 12, 2012) ....................12

*Bay Area Peace Navy v. United States*, 914 F.2d 1224 (9th Cir. 1990)............22, 27

*Christian Legal Society v. Martinez*, 130 S. Ct. 2971 (2010)................................2, 9

*Citizens United v. FEC*, 130 S. Ct. 876 (2010) ....................................................*passim*

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994)........................................................24, 25

*Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984)....................8

*Gresham v. Peterson*, 225 F.3d 899 (7th Cir. 2000)................................................27

*Heffron v. International Society for Krishna Consciousness*, 452 U.S.
    640 (1981)........................................................................................................26

*Hill v. Colorado*, 530 U.S. 703 (2000) ...........................................................9, 21, 25

*Hoye v. City of Oakland*, 653 F.3d 835 (9th Cir. 2011) .........................6, 10, 11, 21

*Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994) ................................9

*Mahoning Education Ass'n of Developmental Disabilities v. State
    Employee Relations Board*, ___ N.E.2d ___, 2012 WL 2520952
    (Ohio Ct. App. June 28, 2012)........................................................................12

*McCullen v. Coakley*, 571 F.3d 167, 178 (1st Cir. 2009)...........................1, 4, 18, 19

*McCullen v. Coakley*, 573 F. Supp. 2d 382 (D. Mass. 2008) .....................11, 18, 19

*McGuire v. Reilly*, 260 F.3d 36 (1st Cir. 2001) .............................................5, 11, 19

*McGuire v. Reilly*, 386 F.3d 45 (1st Cir. 2004) ......................................................20

*Nevada Commission on Ethics v. Carrigan*, 131 S. Ct. 2343 (2011) .......................9

*Police Department of City of Chicago v. Mosley*, 408 U.S. 92 (1972) ..................16

*Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011) .........................................27

*Schenck v. Pro-Choice Network of Western N.Y.*, 519 U.S. 357 (1997) ..................9

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Board*, 502 U.S. 105 (1991) ............................................................................14

*Snyder v. Phelps*, 131 S. Ct. 1207 (2011) ..................................................................5

*Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653 (2011) ........................................3, 5, 14

*Startzell v. City of Philadelphia*, 533 F.3d 183 (3d Cir. 2008)...............................27

*United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000)............................................................................................................14

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)..................................................8

*Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002).........................................................................14

*Weinberg v. City of Chicago*, 310 F.3d 1029 (7th Cir. 2002)............................22, 27

## DOCKETED CASES

*McGuire v. Reilly*, Reply Brief of Defendants-Appellants, 2001 WL 36026241 (1st Cir. Mar. 19, 2001) ..................................................................7

## STATUTES

Mass. Gen. Laws ch. 266, § 120E1/2 ........................................................................1

## SUMMARY OF ARGUMENT

Massachusetts' buffer-zone Act makes it a criminal offense for any person to "enter or remain on a public way or sidewalk" within a 35-foot radius of any marked-and-posted entrance to a freestanding (non-hospital) abortion clinic. Mass. Gen. Laws ch. 266, § 120E1/2. It then provides complete exemptions for, among others, clinic employees or agents; those entering or leaving a clinic; and anyone who is simply passing by. The net effect is to prohibit entry only by one, carefully targeted group: persons who wish to enter or remain in the prohibited zone in order to speak about abortion from a point of view other than that of a clinic itself. In particular, the Act almost eliminates the opportunity to engage or offer to engage in calm, conversational, non-confrontational speech with individual women approaching a clinic to offer support and alternatives to abortion.

In the first appeal in this case, the Court concluded that the Act was "content neutral" – despite the distinction it draws between clinic employees or agents, on the one hand, and speakers who wish to offer alternatives to abortion, on the other – because the distinction was "reasonably related to the legislature's legitimate public safety objectives," and "[n]o more [was] exigible to reject this aspect of the plaintiffs' facial challenge." *McCullen I*, 571 F.3d 167, 178 (1st Cir. 2009). As Appellants' opening brief demonstrates (at 32-46), however, later Supreme Court cases have clarified that such facial legislative distinctions among speakers in an

- 1 -

otherwise public forum are not merely subject to a much more rigorous standard of First Amendment scrutiny; they are "prohibited." *Citizens United v. FEC*, 130 S. Ct. 876, 898 (2010).

In response, the State now concedes that "restricting speech based on the … identity of the speaker is unconstitutional" (Def. Br. 26), and argues that the Supreme Court's recent cases "merely reiterate[] the same standards" used by this Court in *McCullen I* (*id.* at 20-21, 25-30). Thus clinging to the premise that the Act is content-neutral, the State defends it as a time, place, and manner restriction, invoking cases such as *Ward* and *Clark*. *Id.* at 27. But time, place, and manner analysis presumes content-neutrality—including neutrality among different types of speakers. Every case the State cites addressed a law that treated all speakers alike. Indeed, in the State's primary case (*see id.* at 28), the Supreme Court described the regulation at issue as "textbook viewpoint neutral." *Christian Legal Soc'y v. Martinez*, 130 S. Ct. 2971, 2993 (2010).

Thus, in sharp contrast to *McCullen I*, the Supreme Court in *Citizens United* did not ask whether a statutory distinction between corporate and non-corporate speakers was reasonably related to a legitimate government interest—or even, for that matter, narrowly tailored to serve a compelling interest. Rather, it held that "restrictions distinguishing among different speakers, allowing speech by some but not others," are "[p]rohibited." *Citizens United*, 130 S. Ct. at 898; *compare id.* at

- 2 -

946 (Stevens, J., dissenting) (arguing that government's interests "may be more or less compelling" as to different groups of speakers). A law that discriminates among speakers cannot be content neutral, and therefore cannot be analyzed as a mere time, place, or manner restriction. And that is true whether the law completely "bans" or merely "burdens" speech. *See, e.g.*, *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2664 (2011) ("[T]he 'Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans.'").

The State's plea for "severance" fares no better. First, the remedy it suggests—"an order that [the exemption for clinic employees] be applied in a nondiscriminatory manner" (Def. Br. 32)—effectively concedes that the Act is discriminatory on its face. Second, any such order would involve rewriting—not severing—part of the Act; and the Court would be *expanding* the scope of a criminal statute beyond what was authorized by the state legislature. Under these circumstances, any recrafting of the Act seeking to avoid its constitutional infirmities must be left to the legislature.

Finally, the State's argument that, as applied, the Act leave Plaintiffs with adequate alternative means of communication fails because it ignores the difference between speech designed to reach a general audience and speech designed to reach a specific audience in a particular way. The undisputed facts show that the Act has dramatically decreased *these* Plaintiffs' ability to engage in

effective communication with *their* intended audience.  That audience is women

entering abortion clinics, who are in a stressful situation and may feel they have no

other option.  The message is not a general one about politics or public policy or

abstract principles of morality or religion, but a personal and particularized one

about the availability of other kinds of help.  Under the controlling Supreme Court

case on the issue of speaking to a particular audience in particular ways, *City of

Ladue v. Gilleo*, this makes the alternative of speaking outside the zone—shouting

through a bullhorn, waving signs, or chasing women around the painted lines on

the sidewalk—constitutionally inadequate as a matter of law.  The State's complete

inability to distinguish *Gilleo*—which it does not even mention, despite the

extended discussion of it in Plaintiffs' opening brief (at 52, 55-57)—is dispositive

on the issue of adequate alternatives.

In short, the State's brief offers nothing to change the conclusion required by

the law and the facts:  The Act is unconstitutional both on its face and as applied.

## ARGUMENT

I. *MCCULLEN I* CANNOT BE RECONCILED WITH SUBSEQUENT SUPREME COURT DECISIONS

In *McCullen I*, this Court concluded that the Act was "content-neutral" and

therefore subject to only intermediate scrutiny.  571 F.3d at 178.  The Court was

able to conclude the Act was content neutral only by dismissing the Act's

exemption for abortion-clinic employees or agents.  This exemption was

- 4 -

permissible, the Court reasoned, because it was "reasonably related" to "legitimate" government interests. *Id.* The Court relied heavily on *McGuire v. Reilly*, 260 F.3d 36 (1st Cir. 2001) ("*McGuire I*"), which had held that similar discrimination among potential speakers in a precursor statute would survive a facial challenge if the court could "envision at least one legitimate reason" for it. *Id*. at 47. The State continues to rely centrally on these previous conclusions of content-neutrality. *See, e.g.*, Def. Br. 23-24, 41-42.

Since *McCullen I*, however, the Supreme Court has made clear that statutory distinctions among speakers are not subject to any such lenient standard under the First Amendment. On the contrary, "restrictions distinguishing among different speakers, allowing speech by some but not others" are simply "prohibited." *Citizens United*, 130 S. Ct. at 898. This is true in part because "restrictions based on the identity of the speaker are all too often simply a means to control content." *Id*. at 899. Indeed, even "[q]uite apart from the purpose or effect of regulating content, … the Government may commit a constitutional wrong when by law it identifies certain preferred speakers." *Id*. Thus, in *Citizens United* and other recent cases, the Supreme Court could "find no basis for the proposition that, in the context of political speech, the Government may impose restrictions on certain disfavored speakers." *Id.*; *see also Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2663-2664 (2011) (rejecting law because it burdened "disfavored speech by

disfavored speakers"); *Snyder v. Phelps*, 131 S. Ct. 1207, 1218-1219 (2011) (First Amendment precluded liability where different speakers "standing at the very spot where Westboro stood" but holding signs with a different message "would not have been subject to liability"); *cf. Hoye v. City of Oakland*, 653 F.3d 835, 851-852 (9th Cir. 2011) (enforcement policy exempting clinic speakers from buffer-zone law was "indubitably content-based").

Confronted with this intervening authority, the State offers four arguments. First, it maintains that the later Supreme Court cases actually applied "the same standards" as *McCullen I*. Def. Br. 20, 26-27. Second, it argues that the time, place, and manner analysis of *Ward* and *Clark* continues to apply because the Act is content neutral. *Id.* at 27. Third, it contends that the "principle that the government may not ban speech by some speakers while allowing it by others is irrelevant because the Act does not ban anyone's speech," but merely "'regulates the places where communications may occur.'" *Id.* Finally, it suggests that if the Act's exemptions for only some potential speakers are unconstitutional, the Court should correct the problem with an order that the Act's employee exemption "be applied in a nondiscriminatory manner" or be severed from the Act. *Id.* at 32. Each argument fails.

## A.    Rational-Basis Review And A Blanket Prohibition Are Not "The Same Standards"

The State first argues that nothing has changed.  *E.g.*, Def. Br. 27.  The Supreme Court's recent decisions cannot, however, be so readily dismissed as mere restatements of "well-settled" law.  *Id.* at 26.

To begin with, the State's *own position* has clearly changed.  When it sought from this Court the prior rulings on which it now relies, the State argued that "laws making distinctions based on the speaker are not unconstitutional."  *McGuire v. Reilly*, Reply Brief of Defendants-Appellants, 2001 WL 36026241, at *9 (1st Cir. Mar. 19, 2001).  That argument can hardly be reconciled with the State's current assertion that it was always a "well-settled proposition that restricting speech based on content or the identity of the speaker is unconstitutional."  Def. Br. 26.

In any event, *Citizens United* expressly overruled one of the Supreme Court's own prior decisions, *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990).  *Austin*, like this Court's decisions in *McGuire I* and *McCullen I*, had permitted a legislative distinction among speakers—in that case, restricting speech by corporations in ways that did not apply to other speakers—so long as it was "justified by a compelling state interest."  494 U.S. at 658; *see Citizens United*, 130 S. Ct. at 912-913.  In overruling that holding, however, *Citizens United* held that, even where there was such a compelling interest, a special rule for corporate speakers was speakers was incompatible with the "premise that the First

- 7 -

Amendment generally prohibits the suppression of political speech based on the speaker's identity." 130 S. Ct. at 905. *A fortiori*, there is no basis for continuing to use the vastly more deferential rational-basis test—"reasonably related" to a "legitimate" government interest—that *McConnell I* applied in determining that the Act at issue here could be viewed as "content-neutral." The Supreme Court's new approach is thus a significant change in the law for purposes of this case, and *McConnell I* can no longer be given effect as the law of the case on this critical point.

### B.    The *Clark/Ward* Test Does Not Provide The Framework For Analyzing Laws That Discriminate Among Speakers

The State argues that the Act's distinctions between, for example, clinic agents or employees and those who want to offer access to abortion alternatives should be analyzed using the standards applied to time, place, and manner regulations. Def. Br. 28. But the standard articulated in cases such as *Clark* and *Ward* starts from the presumption that a regulation is neutral and nondiscriminatory. It is not the right framework for analyzing a law that regulates *who* may speak.

None of the time, place, and manner cases cited by the government involved any discrimination among speakers. Rather, each case involved a content- and viewpoint-neutral restriction equally applicable to all speakers. *See Ward v. Rock Against Racism*, 491 U.S. 781, 787 (1989) (city retained sound engineer "for all

performances"); *id.* at 788 (regulation at issue applied to "all events"); *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 298 (1984) (rules applied to "[a]ll those who would resort to the parks"); *Christian Legal Soc'y v. Martinez*, 130 S. Ct. 2971, 2978, 2993 (2010) (school's "all-comers policy" was applied to Christian Legal Society "in common with all other student organizations" and therefore represented a "textbook" example of neutrality); *Nevada Comm'n on Ethics v. Carrigan*, 131 S. Ct. 2343, 2350 (2011) ("The statute is content-neutral and applies equally to all legislators regardless of party or position."). Thus, contrary to the State's assertion, Plaintiffs make no "implicit suggestion that the Supreme Court abrogated the long-standing test for content neutrality articulated in *Ward* and *Clark*." Def. Br. 28.[1] That test continues to apply to neutral time, place, or manner restrictions. It just has nothing to do with a statute that, like the Act, applies different rules to different speakers.

---

[1]    The State's assertion (Def. Br. 25) that *Citizens United* can be ignored because it did not address *Hill v. Colorado*, 530 U.S. 703 (2000), *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994), and *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357 (1997), likewise fails. The Court had no need or occasion to address *Madsen* or *Schenck* because they did not involve statutory distinctions, but rather targeted injunctions based on past bad conduct. And the Court had no need to address *Hill*, because *Hill* did not permit speaker distinctions. Indeed, *Citizens United* confirms that the Court meant exactly what it said in *Hill*—that "buffer zone" restrictions of the sort at issue here must apply equally to all speakers, "*whether they oppose or support* the woman who has made the abortion decision. *That is the level of neutrality that the Constitution demands.*" 530 U.S. at 725 (emphasis added).

*Citizens United* itself is instructive.  Although dissenters in that case argued that the law at issue in many ways "function[ed] as … a time, place, and manner restriction," 130 S. Ct. at 944 (Stevens, J., dissenting in part), the Court never analyzed the law at issue there as the State would analyze the Act here.  Instead, the Court categorically rejected the idea that the government could constitutionally distinguish among types of speakers in the public forum—never needing to ask whether the proffered basis for those distinctions was justifiable, rational, or legitimate.  *See, e.g.*, 130 S. Ct. at 898-899 ("no basis for the proposition" that the State may discriminate among speakers); *see also id.* at 905-906 (exception for media corporations was "a further, separate reason for finding this law invalid" because such "differential treatment cannot be squared with the First Amendment.").

Moreover, it is clear that all nine Justices understood what the Court was doing.  Like the State here, dissenters in *Citizens United* argued that speaker distinctions should be permissible in some circumstances because "[w]hen such restrictions are justified by a legitimate governmental interest, they do not necessarily raise constitutional problems."  130 S. Ct. at 945-946 (Stevens, J. dissenting in part); *see also id*. at 946 (arguing that "the Government's interests may be more or less compelling with respect to different classes of speakers").  But

the dissenters fully understood that their argument stood "[i]n contrast" to the "blanket rule" adopted by the Court. *Id.* at 946.

Recent case law from outside the First Circuit confirms that the State's position is incorrect. Most directly, the Ninth Circuit's decision in *Hoye v. City of Oakland*, 653 F.3d 835 (9th Cir. 2011), holds that exempting clinic speakers from a buffer-zone law is "indubitably" content-based and is the "epitome" of a content-based law. *Id.* at 851-852. The State attempts to distinguish *Hoye* because it involved a discriminatory enforcement policy adopted by the City of Oakland, not a law that was discriminatory on its face. But Oakland's discriminatory policy matches precisely the text of the Act that the State seeks to defend in this case: Clinic speakers are exempt from the law and able to move and speak freely, while others can be imprisoned for entering a forbidden zone. Likewise, the reasons offered for the discrimination in *Hoye* track those previously advanced and accepted as content-neutral in analyzing the Massachusetts Act. *Compare id.* at 851 ("The City explained its position as being that speech that 'facilitates access' to the clinic does not trigger the Ordinance's consent requirement, while speech that does not facilitate access does trigger it.") *with McCullen v. Coakley*, 573 F. Supp. 2d 382, 407 (D. Mass. 2008) ("[S]ince it is within the scope of their employment for clinic personnel to escort patients in this fashion, and since a

primary purpose of the law is to facilitate safe access, the employee exemption

serves the basic objectives of the Act." (quoting *McGuire I*, 260 F.3d at 46)).

Thus when the State now rightly characterizes *Hoye* as involving a law

applied "in an unlawfully discriminatory manner" (Def. Br. 30), it is necessarily

admitting that the same is true of the standards written into its own Act.  *Hoye*

confirms that *McCullen I*'s allowance of speaker discrimination is incompatible

with the First Amendment.[2]

*McCullen I* is also inconsistent with another recent appellate decision that

struck down a ten-day waiting period for permission to picket because it applied

only to certain speakers.  *See Mahoning Educ. Ass'n of Dev. Disabilities v. State

Emp. Relations Bd.*, ___ N.E.2d ___, 2012 WL 2520952, at *3-4 (Ohio Ct. App.

June 28, 2012).  As the court observed in striking down that law:

> [The law] singles out a certain type of speaker:  a public employee
> organization and the public employees themselves.  That is, anyone
> can picket outside a board meeting without notice except public

---

[2]     Unlike in *Hoye*, where invalidation of a discriminatory enforcement policy could leave in place a facially neutral law, the State cannot salvage its facially discriminatory Act by purporting to enforce in a neutral manner.  *See* Opening Br. 42-45.  Indeed, the State itself now seems to have abandoned any reliance on the Attorney General's 2008 enforcement "guidance."  *See* Def. Br. 42 (noting absence of evidence "that any police department or official enforced the Act any differently because of the January 2008 guidance letter").  In any case, that "guidance" is plainly both content-based (purporting to prohibit in-zone speech about "abortion" or "partisan" topics) and wholly unenforceable (because the State could never successfully prosecute any speaker, such as a clinic agency or employee, whom the Act unambiguously authorizes to enter the zone for any purpose).  Opening Br. 43-44.

> employees and their union, who are singled out and required to give ten days' written notice of the intent to picket.  Thus *it is not merely a time, place, and manner restriction …. Rather, it creates a disfavored speaker* by discriminating against public employees and their unions and burdening their ability to engage in spontaneous speech in the form of a picket at a board meeting.

2012 WL 2520952, at *3-4 (emphasis added); *see also Bailey v. Callaghan*, 2012 WL 2115300, at *5 (E.D. Mich. June 12, 2012) (relying on *Citizens United* for proposition that "[t]he First Amendment abhors regulations that … distinguish[] among different classes of speakers").

For these reasons, it is clear that, in light of later Supreme Court cases, this Court's decision in the first appeal in this case can no longer be given controlling effect as law of the case.  The First Amendment prohibits discrimination among different types of speakers, and Massachusetts' buffer-zone Act is unconstitutional on its face.

C. ***Citizens United* And *Sorrell* Prohibit Reliance On Defendants' Claimed Distinction Between "Bans" On Speech And "Regulations" Of Speech**

The State seeks to support analyzing the Act under time, place, or manner standards by arguing that the Act does not "ban" Plaintiffs' speech, but merely regulates where it may occur.  Def. Br. 27.  That argument fails because (1) the Act is a "ban" on speech as that term is used in *Citizens United* and, in any event, (2) the Supreme Court has been quite clear that "bans" and "burdens" on speech are equally objectionable when a statute, like the Act here, is not neutral.

As an initial matter, the Act obviously does "ban" Plaintiffs from engaging in speech within the zone. It is therefore just as much a ban on speech as the statute that was at issue in *Citizens United*, which prohibited corporations from making "electioneering communications" that met certain specific criteria, including being made broadcast over the air or by cable or satellite within 30 days of a federal primary or 60 days of a general federal election. *See* 130 S. Ct. at 887. The Court described the law as "[a]n outright ban on corporate political speech during the critical preelection period," despite the fact that corporations could make such communications at other times. *Id.* at 911.[3]

In any event, as the Supreme Court emphasized in *Sorrell*, the "distinction between laws burdening and laws banning speech is but a matter of degree," and the "'Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans.'" 131 S. Ct. at 2664 (quoting *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 812 (2000)). In particular, when a statute discriminates among speakers, as the Act does here, any distinction between a "ban" and a "regulation" is irrelevant. The government may be permitted to

---

[3]     Other cases on which *Citizens United* relied likewise did not completely "ban" speech in the way that the State would apparently limit that term. *See Citizens United*, 130 S. Ct. at 896-897 (citing *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 153 (2002) (invalidating permit requirement applicable only to door-to-door solicitation); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 108 (1991) (invalidating statute that only impounded income from certain speech)).

regulate the time, place, and manner of speech in certain respects if it does so in a neutral manner.  But when a law begins drawing distinctions among speakers— most especially, distinguishing between those likely to express one message and those likely to express another—no amount of characterizing the discriminatory law as merely a "restriction" rather than a "ban" can salvage it.

### D.    The Speaker Discrimination Cannot Be Severed

Finally, the State argues that if the Act's discriminatory exemption of clinic employees is unconstitutional then it would be "severable."  Def. Br. 32-33.  But the remedy the State suggests is not severance, and any actual severance remedy would be irrational.

First, the State suggests "an order that the [employee exemption] be applied in a nondiscriminatory manner."  Def. Br. 32.  Notably, that suggestion essentially admits that the Act is discriminatory on its face.  In any event, such an order would hardly constitute "severance," which normally refers to the excision of a constitutionally impermissible provision.  What the State asks for is instead a re-writing of the statute, broadening the Act's criminal prohibitions to cover clinic agents or employees (and beneficiaries of other statutory exemptions) if they engage in speech on specified topics after having entered a buffer zone.

The State does not explain how it could even begin to prosecute people who have been given an express statutory exemption, and therefore a complete defense,

that does not depend in any respect on their staying silent once in a zones defined by the Act.  *See* Opening Br. 44.  It offers no precedent for the notion that this Court could *expand* criminal liability beyond what the legislature prescribed—and no support for the proposition that the legislature would have wanted the Court to try.  Severance is typically used to *narrow* a statute's reach to ensure constitutionality.  As both *Citizens United* and *Mosley* demonstrate, the proper judicial response to an improper speaker restriction is to restore the right to speak to all, not to purport to extend criminal liability to legislatively exempted speakers. *See Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 98 (1972) (invalidating Chicago picketing ordinance because of unconstitutional preference for labor picketers); *Citizens United*, 130 S. Ct. at 913 (invalidating federal campaign finance restriction on corporate speakers because of impermissible speaker discrimination).

Alternatively, the State suggests that the Court could strike down the employees-and-agents exemption but then allow clinic employees to take advantage of the separate exemption for persons entering or leaving the clinic. According to the State, the clinic employees could then "do their job by waiting outside the buffer zone and then escorting patients into the clinic."  Def. Br. 32-33. That is wrong for at least two reasons.  First, the same constitutional infirmity that requires striking the employee exemption also requires striking other exemptions

that allow others to speak where Plaintiffs may not.[4]  Second, even if only the

employee exemption were struck, if clinic employees or agents could still conduct

the same activities under one of the other exemptions (as the State suggests), then

striking the employee exemption would hardly solve the underlying constitutional

problem.  Unless the substance of the remaining exemptions were changed to

somehow apply in a nondiscriminatory manner (which would be an impermissible

rewriting of the Act for the reasons explained above), clinic employees would

again be able to speak to women on a close, personal basis as they enter the clinic,

while pro-life speakers would be forced to stop at the buffer zone line, limited at

---

[4]      The State claims that Plaintiffs have sought to invalidate only the employee exemption.  Def. Br. 33.  That is incorrect.  Plaintiffs' Motion to Permit Arguments as to the facial challenge broadly argued that *Citizens United* and *Hill* prohibited *all* speaker distinctions.  *See* Dkt. No. 95, at 11-12 (D. Mass. Sept. 17, 2010) (arguing that *Citizens United* "prohibits speaker distinctions generally" and that *Hill* requires that buffer zones "appl[y] equally to all speakers"); *see also* App. 108 (First Amended Complaint) ¶ 158 ("The Act, by its express terms, exempts from its reach certain defined classes of persons thereby permitting them to freely engage in all manner of expressive activity and liberty interests pertaining to the public ways.").  If Plaintiffs did not raise this issue in closing arguments in the as-applied challenge, that is because the trial court had previously ruled that they could argue only about the adequacy of alternatives.  Similarly, there is no basis for the State's claims that Plaintiffs have waived their as-applied challenges to the employee exemption (Def. Br. 31-32) and the Attorney General's enforcement policy (*id.* at 41-43).  The trial court foreclosed those arguments by using *McCullen I* to limit arguments in the remanded case to the adequacy of Plaintiffs' alternatives under a time, place, and manner analysis.  *See, e.g.*, Opening Br. Addendum 86a ("all that remains to be tried is whether the statute as applied at the clinics specified in the complaint leaves open adequate alternative channels of communication" (internal quotation marks omitted)); *id.* at 87a ("To the extent that Plaintiffs seek to plead that Defendant's interpretation of the Act is unconstitutional, the <u>Motion</u> is DENIED.").

that point to either silence or shouting.  The statute would still not be neutral:  the government would be allowing its public sidewalks to be used to counsel and escort people into abortion clinics but not to be used to peacefully offer alternative help.

## II.   THE ACT IS UNCONSTITUTIONAL AS-APPLIED BECAUSE REMAINING AVENUES OF COMMUNICATION ARE NOT ADEQUATE FOR EFFECTIVE COMMUNICATION WITH PLAINTIFFS' INTENDED AUDIENCE

The State's arguments on the as-applied challenge likewise fail.  Even if *McCullen I* had not been overtaken by intervening Supreme Court precedent, the case cannot bear the weight the State gives it in seeking to trim the as-applied challenge to the narrow issue of adequate alternatives.  In any case, even in the abridged trial permitted below, the undisputed evidence requires a finding that the Act is unconstitutional as applied at the relevant locations.

### A.   The Trial Court Impermissibly Used *McCullen I* To Narrow Plaintiffs' As-Applied Challenge

*McCullen I* used a heightened facial standard that "imposes a very heavy burden on a party who mounts a facial challenge to a state statute."  *McCullen I*, 571 F.3d at 174. The Court explained that the facial challenge would fail "as long as we can envision circumstances in which a 35-foot buffer zone allows adequate alternative means of expression."  *Id.* at 180.  The Court stated that "[t]he decisive question in a facial challenge is not whether a regulation is necessary to achieve

the legislature's stated goal but, rather, whether a court can glean legitimate reasons for its existence." *Id.* at 177.[5]

The *McCullen I* panel was clear, however, in explaining that on a better-developed record, viewed without the heightened burdens of a facial challenge, Plaintiffs could prove the law unconstitutional as applied:

> We add a caveat. This decision flows naturally from the *very heavy burden* that plaintiffs must carry in mounting a *facial challenge* to a state statute. *Nothing we have said* forecloses the possibility that, on a *better-developed record*, this legislative solution may prove problematic in *particular applications*.

*McCullen I*, 571 F.3d at 184 (emphasis added). Despite this clear admonition—indeed, without even acknowledging it—the district court purported to rely on *McCullen I* to eliminate virtually all of Plaintiffs' as-applied claims. And despite this clear admonition—indeed, without even acknowledging it—the State now suggests that *McCullen I* essentially controls the remainder of the case.

*McCullen I* presumably meant what it said: It was a facial decision, using a heightened standard, on a limited record, and did not foreclose any as-applied challenge. Accordingly, it was error to use the case to eliminate all but one of

---

[5]    The trial court had likewise used a heightened standard, and noted the absence of a well-developed factual record, at the facial stage. *See, e.g.*, *McCullen*, 573 F. Supp 2d at 401, n.118 ("a party who mounts a facial challenge to a statute must carry a significantly heavier burden than one who seeks merely to sidetrack a particular application of the law." (quoting *McGuire I*, 260 F.3d at 46-47)); *see also McCullen*, 573 F. Supp. 2d at 386-387, 401, 407, 408, 413.

Plaintiffs' as-applied claims, and to narrow the remaining claim to the adequacy of alternatives.[6]

Despite this improper narrowing of Plaintiffs' case, the evidence in the as-applied trial proves that the remaining avenues of communication are not constitutionally adequate, and the Act must therefore be enjoined.

### B.    The Trial Court Impermissibly Ignored Relevant Facts Concerning The Adequacy Of Alternatives At The Challenged Locations

The State argues that Court must ignore the physical characteristics of the challenged locations to the extent they are the result of private action rather than state action.  *See* Def. Br. 38 ("'Purely private action' cannot demonstrate that the Act has been applied unconstitutionally" (citing *McGuire II*, 386 F.3d 45, 59-60 (1st Cir. 2004))).  But any adequate alternatives analysis—and particularly one

---

[6]    Narrowing the case, for example, excused the State from carrying its burden of demonstrating that the Act was narrowly tailored to support a substantial government interest at the challenged locations in 2007.  Indeed, the State would have had a very difficult time making any such showing.  The legislative evidence recounted at pages 8-10 of the State's brief was largely non-specific as to when the alleged obstructive conduct occurred.  Moreover, there is no evidence in the legislative record of even a single alleged incident of misbehavior of any kind at two of the three locations at issue here (Worcester and Springfield).  Nor is there any evidence in that record or before the Court that any of the Plaintiffs in this case has engaged in any inappropriate behavior of any kind at any location.

Notably, the State does not claim to have even tried enforcing the many speech-neutral laws that bar obstruction, intimidation, or violence.  It is difficult to understand how the State's alleged legislative evidence can be sufficiently compelling to criminalize even peaceful consensual speech by people who have never done anything wrong, yet not be compelling enough to move the State to enforce any of its existing laws actually directed at misconduct.

undertaken in the context of an as-applied challenge—must include consideration of the actual facts on the ground, not merely a law's hypothetical impact in the abstract.

Plaintiffs are not arguing that the arrangement of parking lots, the locations of doors and walls, or the noise on busy streets themselves create constitutional injuries. Instead, Plaintiffs are making the common sense argument that the question whether the Act leaves open adequate alternatives needs to take into account these facts about particular locations. That is, the "government must consider the actual conditions speakers encounter when it restricts their speech." *Hoye*, 653 F.3d at 843. Here, this necessarily includes ambient noise, pedestrian and vehicular traffic, driveways, parking lots, and fencing. It also includes conduct of escorts that interferes with the activities of Plaintiffs. *See id.* at 849-854 (holding that the impact of escorts on speakers' ability to effectively convey their messages is part of the ample alternatives as-applied analysis).

*Hill v. Colorado* explained precisely this point when it noted, in its ample alternatives analysis, that "[s]pecial problems that may arise where clinics have particularly wide entrances or are situated within multipurpose office buildings may be worked out as the statute is applied." 530 U.S. at 730. Of course the width of entrances and the location of clinics within multipurpose office buildings are not state action; but the Court was confirming the logical point that the adequate alternatives analysis necessarily includes consideration of such facts on the ground.

C.    **The Undisputed Evidence Confirms That Remaining Avenues Of Communication Are Inadequate As A Matter Of Law**

The State bears the burden of demonstrating that the Act leaves open ample alternatives as applied to these Plaintiffs at each of the three challenged locations. *See Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1227 (9th Cir. 1990). "Whether an alternative is ample should be considered from the speaker's point of view," not the government's. *Weinberg v. City of Chi.*, 310 F.3d 1029, 1041 (7th Cir. 2002). Here, the State has failed to carry its burden, because the undisputed evidence shows both the peaceful and personal nature of Plaintiffs' speech and that their specific intended audience—women entering abortion clinics who may not know about alternative sources of love and support—cannot be reached nearly as well with that speech by using the remaining avenues of communication. Shouting through a bullhorn or waving a poster may be effective ways to communicate a broad political message. But the undisputed evidence shows that these methods are constitutionally inadequate alternatives to close, personal, non-shouted conversation to kindly offer a person love, support, and assistance.

Plaintiffs' opening brief established that the Act dramatically reduces their ability to make their peaceful, loving, supportive offers of assistance to women entering abortion clinics. *See* Opening Br. 12-27, 50-55. For example, since the Act took effect Eleanor McCullen has been prevented from speaking with between 2,160-2,637 people at Boston Planned Parenthood, and Jean Zarrella has not had a

single successful interaction with a woman despite having had over 100 successful interactions prior to the Act's adoption. *Id.* at 19-20. In Worcester, the Act makes it impossible for Plaintiffs Clark and Bashour to offer literature to the 95% of clinic patrons who arrive by car. *Id.* at 22. In Springfield, the Act makes it virtually impossible for Dr. Shea to successfully offer literature to the 90% of clinic patrons who arrive by car. *Id.* at 25. In fact, despite having gone to Planned Parenthood over 100 times since the Act was adopted, Dr. Shea was unable to distribute even a single piece of literature. *Id.*; *see also* App. 321.

The State does not dispute any of this evidence. It does not claim that Plaintiffs (whose activities are regularly videotaped by Planned Parenthood) are lying about their inability to reach thousands of women. And it does not offer any evidence to suggest that shouting a message through a bullhorn, or waving a sign, or yelling from across the street are as effective as a close, personal, loving approach. Indeed its own witnesses acknowledged that close personal communication is best, and that they had never seen anyone react positively to signs or shouts. Opening Br. 26-27.

Instead, the State argues that, because Plaintiffs have occasionally been able to reach women despite the restrictions in place, the Act necessarily allows for adequate alternative channels of speech. Def. Br. 36-37. Likewise, it claims that,

because signs can be seen and shouts can be heard at a distance (and prompt

negative reactions), these methods of communicating are per se adequate. *Id.* at 39.

   None of this answers the relevant constitutional question, which is not

whether alternatives exist, but whether they are adequate. As the Supreme Court

explained in *City of Ladue v. Gilleo*, 512 U.S. 43 (1994), the relevant question is

whether an audience can be reached as well and with the same message. Thus, in

*Gilleo*, the Court rejected the government's argument that residential lawn signs

could be replaced by other methods of communication. *Id.* at 56. The Court

explained that such other ways of communicating necessarily changed the message

and made it harder to reach the intended audience:

> a sign from one's own residence often carries a message quite distinct
> from placing the same sign someplace else, or conveying the same
> text or picture by other means. Precisely because of their location,
> such signs provide information about the identity of the 'speaker.'
> …
> *Furthermore, a person who puts up a sign at her residence often
> intends to reach neighbors, an audience that could not be reached
> nearly as well by other means.*

*Id.* at 56-57 (emphasis added).

   The same is true here. Speaking in a calm, kind, loving voice from a normal

conversational distance conveys information about the speaker that simply cannot

be conveyed by a sign or a shout. Indeed, both of the State's witnesses candidly

admitted this fact. App. 489, 491-492, 500-501, 512, 520, 522. And the

uncontradicted testimony of Plaintiffs confirmed that women entering abortion clinics are "an audience that could not be reached nearly as well by other means." Like the "*hand-held* signs, letters, handbills, flyers, telephone calls, newspaper advertisements, bumper stickers, speeches, and neighborhood or community meetings" rejected by the Court in *Gilleo* as inadequate, chasing women around the streets, shouting at them, and waving signs with huge letters may be enough to reach an occasional person, but as a matter of law these alternatives are inadequate.[7] This is precisely why, in *Hill*, the Court emphasized the importance of retaining the ability to speak from a "normal conversational distance." 530 U.S. at 726-727 ("Unlike the 15-foot zone in *Schenck*, this 8-foot zone allows the speaker to communicate at a "normal conversational distance.").[8]

Notably, despite Plaintiffs' express reliance on *Gilleo* in their opening brief (at 51-57), the State offers no response. Indeed, it does not even mention or cite the case. Instead, the State joins in the district court's unsupported speculation "[t]hat more people don't accept Plaintiffs' offers is not an indication that adequate alternative means of communication do not exist, but rather shows that many

---

[7]    The State relies on *Bl(a)ck Tea Society*, which is inapplicable here for the reasons set forth in Plaintiffs' Opening Br. 53 n.11.

[8]    The Court in *Hill* also repeatedly emphasized that the law at issue there restricted only *unwanted* physical approaches, and preserved the ability to both engage in speech with willing listeners and to preserved the ability to stand still in the zone and speak, offer leaflets, or hold signs. 530 U.S. at 726-728. All of these activities are banned for Plaintiffs in the zones here.

members of Plaintiffs' audience are simply unreceptive to Plaintiffs' message."

Def. Br. 7, 39. But this is pure, unsupported, unverifiable speculation. Neither the

district court nor the State has any idea whether the people who are not responding

to the Plaintiffs' long-distance communications are "unreceptive to [their]

message." To the contrary, the record strongly indicates otherwise. For example,

Jean Zarrella testified without contradiction that she had more than 100 successful

interactions prior to the Act, and zero since. Blaming the message for this dropoff

is absurd. What changed in 2007 was not Ms. Zarrella's message, but the speech

rules that prevented her from communicating that message in a reasonable,

effective manner.[9]

In short, the State offers no actual evidence to carry its burden and prove that

the remaining alternatives are adequate. Rather, the undisputed evidence shows

that the Act forecloses the most effective manner of communication, and that

---

[9]    The State further concedes, as it must, that the Act "prefers listener-initiated exchanges to those originating with the speaker" (Def. Br. 39), and then cites *Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 649 n.12 (1981), for the proposition that such a preference is a permissible time, place, and manner regulation. *Heffron*, however, involved state fairgrounds, which the Court found to be a *limited* public forum, and therefore quite different from public streets and sidewalks. *Id*. at 651. As the Supreme Court noted, "it is clear that there are significant differences between a street and the fairgrounds. A street is continually open" whereas a state fair "is a temporary event attracting great numbers of visitors who come to the event for a short period." *Id*. Plaintiffs are aware of no case in which this Court or the Supreme Court has held that a time, place, and manner regulation of traditional public forums may prefer listener-initiated exchanges to those of the speaker.

- 26 -

Plaintiffs' ability to reach their audience is severely curtailed.  As a matter of law, such alternatives are not constitutionally adequate.  *See Saieg v. City of Dearborn*, 641 F.3d 727, 740 (6th Cir. 2011); *Startzell v. City of Phila.*, 533 F.3d 183, 202 (3d Cir. 2008); *Weinberg*, 310 F.3d at 1041; *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000); *Bay Area Peace Navy*, 914 F.2d at 1229.

## CONCLUSION

The Court should hold that the 2007 Act is unconstitutional, both on its face and as applied to Plaintiffs in Boston, Worcester, and Springfield, and remand to the district court with directions to enter appropriate injunctive relief. Alternatively, the case should be remanded for full development of Plaintiffs' remaining as-applied claims.

Respectfully submitted,

/s/ Mark L. Rienzi

EDWARD C. DUMONT
TODD C. ZUBLER
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000

PHILIP D. MORAN
265 Essex Street, Suite 202
Salem, MA  01970
(978) 745-6085

MARK L. RIENZI
THE CATHOLIC UNIVERSITY OF AMERICA
COLUMBUS SCHOOL OF LAW
3600 John McCormack Road, NE
Washington, DC  20064
(202) 319-5140

MICHAEL J. DEPRIMO
778 Choate Avenue
Hamden, CT  06518
(203) 281-1496

August 3, 2012

- 27 -

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Reply Brief for Plaintiffs-Appellants was filed using the Appellate CM/ECF system on this 3rd day of August, 2012.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


/s/ Mark L. Rienzi
MARK L. RIENZI

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i).

1.      Exclusive of the exempted portions of the brief, as provided in Federal Rule of Appellate Procedure 32(a)(7)(B), the brief contains 6,918 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word 2003 in 14-point Times New Roman font.  As permitted by Federal Rule of Appellate Procedure 32(a)(7)(B), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


/s/ Mark L. Rienzi
MARK L. RIENZI

August 3, 2012